## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| EQUAL RIGHTS CENTER | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case. No. 1:06CV01991 |
| | ) | Judge Richard J. Leon |
| POST PROPERTIES, INC. | ) | |
| POST GP HOLDINGS, INC. | ) | |
| POST APARTMENT HOMES, L.P. | ) | |
| Defendants. | ) | |

## DEFENDANTS' MOTION TO DISMISS OR
## IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT

Pursuant to Rules 12(b)(1), 12(b)(6), and 56 of the Federal Rules of Civil Procedure, Defendants Post Properties, Inc., Post GP Holdings, Inc., and Post Apartment Homes, L.P. (collectively "Post"), by their undersigned counsel, hereby move to dismiss Plaintiff Equal Rights Center's Complaint filed on November 21, 2006. This Court lacks subject matter jurisdiction because Plaintiff has no standing to pursue this case. Plaintiff's alleged injury is abstract, self-inflicted, and unrelated to the geographic scope of its limited organizational mission. Furthermore, Plaintiff has failed to state a claim upon which relief can be granted as to the majority of its claims. Plaintiff's claims are untimely as most fall outside of the applicable limitations period or effective date of the statute on which Plaintiff relies. Thus, the Court should dismiss Plaintiff's Complaint. The basis for this Motion is set forth more fully in the attached Memorandum of Points and Authorities.

Respectfully submitted,

HOLLAND & KNIGHT, LLP

Christopher B. Hanback (Bar # 232579)
Alan I. Baron (Bar. # 340273)
Rafe Petersen (Bar # 465542)
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006
(202) 955 3000 Phone
(202) 955 5564 Fax
E-mail: christopher.hanback@hklaw.com
E-mail: alan.baron@hklaw.com
E-mail: rafe.petersen.com
*Counsel for Post Properties, Inc., et al.*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER )
)
Plaintiff, )
)
vs. )          Case. No. 1:06CV01991
)          Judge Richard J. Leon
POST PROPERTIES, INC. )
POST GP HOLDINGS, INC. )
POST APARTMENT HOMES, L.P. )
)
Defendants. )

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR
## IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT

Christopher B. Hanback
Alan I. Baron
Rafe Petersen
Holland & Knight, LLP
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C. 20006-1816
Tel: (202) 955-3000
Fax: (202) 955-5564
E-mail: christopher.hanback@hklaw.com
E-mail: alan.baron@hklaw.com
E-mail: rafe.petersen.com
*Counsel for Post Properties, Inc., et al.*

# TABLE OF CONTENTS

**INTRODUCTION AND SUMMARY OF ARGUMENT** ........................................................ 1

**ARGUMENT** .......................................................................................................... 4

**I.    THE ERC LACKS STANDING TO BRING ITS FHA CLAIM.** ................................ 4

     A.    The Injuries Alleged by the ERC are Abstract and Insufficient to Meet the
         Requirement of Alleging "Injury-in-Fact" ............................................................. 6

         1.    *The ERC's alleged injury of frustration of mission is too abstract to
             constitute an injury-in-fact for standing purposes.* ....................................... 7

         2.    *The ERC's diversion of resources to investigate and to litigate
             against Post is "self-inflicted" and therefore does not constitute
             an injury-in-fact.* ......................................................................................... 9

         3.    *The ERC's unsubstantiated claim that individual members
             suffered injury is insufficient for associational standing.* ......................... 14

     B.    The ERC lacks standing to challenge the construction of any properties
         outside of the Washington, DC metropolitan area and properties
         never visited or tested ........................................................................................ 17

         1.    *The ERC cannot establish a causal connection between its alleged
             injuries and Post's alleged conduct outside of the Washington, D.C.
             area given ERC's limited mission.* ............................................................. 17

         2.    *The ERC fails to show a causal connection between its alleged
             injuries and the properties never visited or tested.* .................................... 20

**II.   THE ERC LACKS STANDING UNDER THE AMERICANS WITH
     DISABILITIES ACT BECAUSE THE ERC ITSELF HAS NOT BEEN
     SUBJECTED TO DISCRIMINATION.** ............................................................... 21

**III.  THE ERC HAS FAILED TO STATE A CLAIM UPON WHICH RELIEF
     CAN BE GRANTED UNDER FEDERAL RULE OF CIVIL PROCEDURE
     12(b)(6).** ........................................................................................................ 23

     A.    The ERC fails to state a claim upon which relief can be granted as to the
         properties where construction has not been completed. ....................................... 24

B.    The ERC fails to state a claim upon which relief can be granted as to the properties designed and constructed prior to the effective date of the statute. .......................................................................................... 25

C.    The ERC is time-barred by the statute of limitations for all Post properties designed and constructed before November 21, 2004. .......................................... 25

    1.    *The continuing violation doctrine does not apply to the ERC's untimely claims* ............................................................................................... 28

    2.    *The ERC cannot aggregate alleged violations into a continuing practice* ................................................................................................... 32

**CONCLUSION** ................................................................................................................ 35

## TABLE OF AUTHORITIES

**CASES**

Abbott Laboratories v. Gardner,
   387 U.S. 136 (1967)...........................................................................................................24

Alliance for Disabled in Action, Inc. v. Renaissance Enterprises,
   371 N.J. Super. 409 (N.J. Super. Ct. 2004).........................................................................27, 31

American Legal Foundation v. Federal Committee Commission,
   808 F.2d 84 (D.C. Cir. 1987).......................................................................................6, 7, 8, 9

Baker v. Henderson,
   150 F. Supp. 2d 17 (D.D.C. 2001)......................................................................................24

Baltimore Neighborhoods, Inc. v. Rommel Builders, Inc.,
   40 F. Supp. 2d 700 (D. Md. 1999)..............................................................................27, 31, 32

Bennet v. Spear,
   520 U.S. 154 (1997)............................................................................................................21

Blum v. Yaretsky,
   457 U.S. 991 (1982)..............................................................................................................5

Buchanan v. Consolidated Stores Corp.,
   125 F. Supp. 2d 730 (D. Md. 2001)....................................................................................19

Callanan Road Importation Co. v. United States,
   345 U.S. 507 (1953)............................................................................................................18

Capital Legal Foundation v. Commodity Credit Corp.,
   711 F.2d 253 (D.C. Cir. 1983).............................................................................................7

*Clark v. McDonald's Corp.,
   213 F.R.D. 198 (D.N.J. 2003).................................................................................21, 22, 23

Communities Against Runway Expansion, Inc. v. Federal Aviation Administration,
   355 F.3d 678 (D.C. Cir. 2004)...........................................................................................17

Conley v. Gibson,
   355 U.S. 41 (1957)..............................................................................................................23

Doe v. Thompson,
   332 F. Supp. 2d 124 (D.D.C. 2004)...............................................................................27, 32

Disability Rights Center of Greater Washington v. District of Columbia,
   2005 WL 513495 (D.D.C. Mar. 3, 2005).....................................................................................18

*Eastern Paralyzed Veterans Association, Inc. v. Lazarus-Burman Associates,
   133 F. Supp. 2d 203 (E.D.N.Y. 2001) ...............................................................................15, 16

*Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp.,
   28 F.3d 1268 (D.C. Cir. 1994).................................................................................9, 10, 11, 12

Fair Housing Council, Inc. v. Village of Olde St. Andrews, Inc.,
   250 F. Supp. 2d 706 (2003), aff'd, 2006 WL 3724128 (6th Cir. Dec. 15, 2006)........................27

*Friends of the Earth, Inc. v. Laidlaw Environmental Services,
   528 U.S. 167 (2000)..........................................................................................................5, 14, 20

*Gladstone Realtors v. Bellwood,
   441 U.S. 91 (1979)...................................................................................................................17

Hamad v. Woodcrest Condominium Association,
   328 F.3d 224 (6th Cir. 2003) ....................................................................................................18

Hargraves v. Capital City Mortgage Corp.,
   140 F. Supp. 2d 7 (D.D.C. 2000)..............................................................................................29

*Havens Realty Corp. v. Coleman,
   455 U.S. 363 (1982)...........................................................................5, 6, 7, 12, 17, 28, 29, 33, 34

Hishon v. King & Spalding,
   467 U.S. 69 (1984)...................................................................................................................23

Hunt v. Washington State Apple Advertising Commission,
   432 U.S. 333 (1977)..............................................................................................................6, 17

Kowal v. MCI Communications Corp.,
   16 F.3d 1271 (D.C. Cir. 1994)..................................................................................................23

Lewis v. Casey,
   518 U.S. 343 (1996)...................................................................................................................5

Louisiana Environmental Action Network v. Browner,
   87 F.3d 1379 (D.C. Cir. 1996)..................................................................................................24

*Lujan v. Defenders of Wildlife,
   504 U.S. 555 (1992)....................................................................................................4, 5, 6, 15, 17

McInnis-Misenor v. Maine Medical Center,
   319 F.3d 63 (1st Cir. 2003) ...................................................................................................21

*Moseke v. Miller & Smith, Inc.,
   202 F. Supp. 2d 492 (E.D. Va. 2002) ....................................12, 13, 19, 25, 26, 27, 28, 29, 30, 31

National Advertising Co. v. City of Raleigh,
   947 F.2d 1158 (4th Cir. 1991) ..............................................................................................29

National Association of Homebuilders v. United States Army Corps of Engineers,
   417 F.3d 1272 (D.C. Cir. 2005) ..............................................................................................4

National Fair Housing Alliance, Inc. v. Prudential Insurance Co. of America,
   208 F. Supp. 2d 46 (D.D.C. 2002) ........................................................................................10

National Railroad Passenger Corp. v. Morgan,
   536 U.S. 101 (2002)..............................................................................................32, 33, 34

*National Taxpayers Union, Inc. v. United States,
   68 F.3d 1428 (D.C. Cir. 1995).................................................................................8, 9, 11, 15

National Treasury Employees Union, Inc. v. United States,
   101 F.3d 1423 (D.C. Cir. 1996) ..............................................................................................8

Ohio Forestry Association, Inc. v. Sierra Club,
   523 U.S. 726 (1998)..............................................................................................................24

Papasan v. Allain,
   478 U.S. 265 (1986)..............................................................................................................23

Perez v. Laredo Junior College,
   706 F.2d 731 (5th Cir. 1983) ................................................................................................30

*Sierra Club v. Morton,
   405 U.S. 727 (1972)..............................................................................................6, 7, 14, 15, 16

Silver State Fair Housing Council v. ERGS, Inc.,
   362 F. Supp. 2d 1218 (D. Nev. 2005) ....................................................................................31

Small v. General Nutrition Corp.,
   388 F. Supp. 2d 83 (E.D.N.Y. 2005) .....................................................................................22

*Spann v. Colonial Village, Inc.,
   899 F.2d 24 (D.C. Cir. 1990) ..............................................................................7, 9, 12, 13, 14

Steel Company v. Citizens for a Better Environment,
    523 U.S. 83 (1998)...............................................................................................................15

Thompson v. Mountain Peak Associates, LLC,
    No. 2:05-CV-145-BES-GWF, 2006 WL 1582126 (D. Nev. June 5, 2006).......................26, 28, 30

Tolbert v. State of Ohio Department of Transportation,
    172 F.3d 934 (6th Cir. 1999) ..............................................................................................29

Totten v. Norton,
    421 F. Supp. 2d 115 (D.D.C. 2006) ......................................................................................18

United States v. Hallmark Homes, Inc.,
    2003 WL 3219807 (D. Idaho Sept. 29, 2003)........................................................................27

United States v. PNE,
    2003 WL 24573548 (D. Idaho Nov. 20, 2003).......................................................................30

*United States v. Taigen & Sons, Inc.,
    303 F. Supp. 2d 1129 (D. Idaho 2003) ..............................................................................26, 28

Wallace v. Chicago Housing Authority,
    321 F. Supp. 2d 968 (N.D. Ill. 2004) ...................................................................................34

Warth v. Seldin,
    422 U.S. 490 (1975)..................................................................................................5, 15, 22

Whitmore v. Arkansas,
    495 U.S. 149 (1990)............................................................................................................4

Wilderness Society v. Norton,
    434 F.3d 584 (D.C. Cir. 2006) .......................................................................................15, 20

Williams v. Poretsky Management Inc.,
    955 F. Supp. 490 (D. Md. 1996)...........................................................................................13

**STATUTES**

42 U.S.C. § 12181 ................................................................................................................2

42 U.S.C. § 12188(a)(1)........................................................................................................21

42 U.S.C. § 2000e-5(e) .........................................................................................................33

42 U.S.C. §§ 3601-3619 .........................................................................................................2

42 U.S.C. § 3604(f)(3) .................................................................................................25, 30

42 U.S.C. § 3613(a)(1).................................................................................................25, 33

**OTHER AUTHORITIES**

D.C. Mun. Regs. tit. 12A § 110.1 ......................................................................................27

Fed. R. Civ. P. 12(b)(1).................................................................................................1, 4

Fed. R. Civ. P. 12(b)(6).............................................................................................1, 4, 23

Fed. R. Civ. P. 56...............................................................................................................1

## IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| EQUAL RIGHTS CENTER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case. No. 1:06CV01991 |
| | ) | Judge Richard J. Leon |
| POST PROPERTIES, INC. | ) | |
| POST GP HOLDINGS, INC. | ) | |
| POST APARTMENT HOMES, L.P. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
### IN SUPPORT OF DEFENDANTS' MOTION TO DISMISS OR
### IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT

Defendants Post Properties, *et al.* ("Post") submit this memorandum in support of their

Motion to Dismiss or in the Alternative for Partial Summary Judgment and request that this

Court enter an Order dismissing the Complaint in accordance with Federal Rules of Civil

Procedure 12(b)(1), 12(b)(6) and 56 for lack of standing and failure to state claim.   Post requests

that oral argument be heard on this motion.

### INTRODUCTION AND SUMMARY OF ARGUMENT

This action is the latest in a series of lawsuits filed by a local advocacy group in an effort

to expand its far-reaching interpretation of the design and construction requirements of the Fair

Housing Act ("FHA") and the Americans With Disabilities Act ("ADA").[1]  Plaintiff is the Equal

---

[1] The complaint against Post is apparently, at the very least, the fifth of the ERC's self-described "series of lawsuits against nationally-known residential apartment developers" alleging design and construction violations of the FHA.  See  Equal Rights Center, Equity Residential Press Release (04/27/06), http://www.equalrightscenter.org/index_files/Page316.htm (last visited Jan. 29, 2007) (attached as Exhibit

Rights Center ("ERC"), a Washington, D.C.-based organization. With this broad and unfocused Complaint, the ERC seeks to impose its interpretation of the FHA and ADA on a laundry list of fifty-eight properties, that the ERC believes to be within Post's portfolio, located in eight states and Washington, DC. However, the ERC alleges "injury" that is abstract, self-inflicted, and unrelated to the geographic scope of its limited organizational mission. Tellingly, the ERC has failed to provide the name of an individual member that has actually been harmed by Post's actions. Simply put, the ERC lacks standing to bring a suit of this breadth. In addition, the ERC's list of "Subject Properties" includes numerous properties that are not subject to the underlying statutes. Properties that were constructed before the effective date of the FHA or that are not even yet complete are not properly subject to suit. In addition, the statute of limitations has run for many properties. Consequently, the ERC's Complaint must be dismissed.

The ERC alleges that Post failed to design and construct multi-family residential dwellings in compliance with the accessibility requirements of the Fair Housing Act, Title VIII of the Civil Rights Act of 1968 as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601-3619, and the Americans with Disabilities Act, 42 U.S.C. § 12181. (Compl. ¶¶ 2, 7.) The ERC further contends that Post's alleged failure to design and construct multi-family residential dwellings according to the FHA and the ADA amounts to a continuous pattern and practice of discrimination against persons with disabilities. (Compl. ¶ 6.) The ERC lists fifty-eight "Subject Properties" that it believes are in violation of the statutes. (Compl. Addendum A.) The Subject Properties are located in Arizona, Colorado, the District of Columbia, Florida, Georgia, New York, North Carolina, Texas and Virginia. Id.

---

2). Actions have also been filed by the ERC against Archstone Smith Trust, AvalonBay Communities, Bozzuto & Associates, and Equity Residential. Id.

To demonstrate injury, the ERC contends that, as a result of Post's alleged wrongful acts, the ERC has been "frustrated" in its mission and has been forced to divert resources to this litigation that would have allegedly been used to provide counseling, outreach, education, and referral services. (Compl. ¶¶ 12, 43-44.) Additionally, the ERC alleges that its unidentified individual public members have been injured. (Compl. ¶¶ 12, 45.) These abstract injuries fail to demonstrate the concrete injury, causation, and redressibility necessary to confer either organizational or associational standing.

First, the ERC's vague claim of "frustration of mission" is too abstract to impart standing. Second, the ERC's alleged diversion of resources to litigate this case (including alleged "testing" of Post's properties) is self-inflicted and therefore not the type of "injury-in-fact" recognized as adequate to confer standing. Third, the ERC, as a Washington, D.C.-based advocacy group, cannot show a causal connection between its alleged injuries and properties located outside the area of its mission and services (including those in Arizona, Colorado, Florida, Georgia, New York, North Carolina, and Texas). Finally, the ERC fails to meet the requirements of associational standing because it has not identified any individual members with standing to sue in their own right.

The ERC's Complaint suffers from other jurisdictional defects. All told, the ERC claims to have visited or tested twenty-seven properties in eight states and the District of Columbia, (Compl. ¶ 18.), and alleges violations at fifty-eight properties.[2] As explained below, for most of these properties the statute of limitations has run or construction was completed before the effective date of the FHA. In two other cases, construction is not yet even complete. At a

---

[2] Although, the ERC alleges 60 Subject Properties in the Complaint, the attached addendum that lists the properties only includes 58 Subject Properties (with Rice Lofts being listed twice). (Compl. ¶ 48, Addendum A.)

minimum, the Complaint must be dismissed as to all such properties (as set forth in the Affidavit of Dayna Boone, attached as Exhibit 1).

In short, Plaintiff has elected to craft a Complaint virtually devoid of the specifics necessary to meet the constitutional standing requirements of Article III as well as the prudential standing requirements that apply to causes of action under the ADA.   Further, the ERC simply ignores the statutory prerequisites that limit the scope of its suit.  The Court, however, cannot ignore these constitutional, judicial, and statutory restraints.  Accordingly, the ERC's Complaint must be dismissed.

**ARGUMENT**

Post files this motion to dismiss, or in the alternative motion for partial summary judgment, because the ERC has failed to sufficiently allege subject matter jurisdiction under Rule 12(b)(1) and has failed to state a claim upon which relief can be granted under Rule 12(b)(6).  Specifically, the ERC lacks standing to assert its FHA and ADA claims because it has failed to allege an injury-in-fact that is fairly traceable to Post's alleged conduct.  Additionally, many of the ERC's claims are time barred as occurring prior to the effective date of the statute or outside of the statute of limitations period.

## I.    THE ERC LACKS STANDING TO BRING ITS FHA CLAIM.

The ERC, as the party invoking federal jurisdiction, has the burden of proving to this Court that it has jurisdiction over Plaintiff's claims.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992); Nat'l Ass'n of Homebuilders v. United States Army Corps of Eng'rs, 417 F.3d 1272, 1286 (D.C. Cir. 2005).  The doctrine of standing provides one means of identifying those disputes that are appropriately resolved through the judicial process.  Whitmore v. Arkansas, 495 U.S. 149, 155 (1990).

4

Standing is a "threshold question in every federal case." Warth v. Seldin, 422 U.S. 490, 498 (1975). Every plaintiff asserting a cause of action must meet the constitutional requirements of standing by showing that it is "entitled to have the court decide the merits of the dispute or of particular issues," and that there exists "a 'case or controversy' between [the plaintiff] and the defendant within the meaning of Article III." Id.; see also Havens Realty Corp. v. Coleman, 455 U.S. 363, 372 (1982) (holding that Congress intended standing under the Fair Housing Act to extend to the full limits of Article III).

To meet the Article III "irreducible constitutional minimum" of standing, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 180-81 (2000) (citing Lujan, 504 U.S. at 560-61). These elements must be established "separately for each form of relief sought" and for each claim brought by the party invoking federal jurisdiction. Laidlaw, 528 U.S. at 185; Lewis v. Casey, 518 U.S. 343, 358, n.6 (1996) ("[S]tanding is not dispensed in gross."); see also Blum v. Yaretsky, 457 U.S. 991, 999 (1982) ("Nor does a plaintiff who has been subject to injurious conduct of one kind possess by virtue of that injury the necessary stake in litigating conduct of another kind, although similar, to which he has not been subject."). Hence, in Lewis, despite the fact that the plaintiff prisoner alleged multiple bases for injunctive relief directed at various prison services and facilities, the court found that the plaintiff sufficiently showed only one injury due to the failure of the prison to provide services based on the plaintiff's illiteracy. Lewis, 518 U.S. at 358. Therefore, the court eliminated the plaintiff's other bases for relief from the scope of the requested injunction. Id.

By this reasoning, the ERC must allege an injury, and thus establish standing, for each of the fifty-eight alleged Subject Properties. The ERC cannot simply cast a net from Washington DC and haul in all of Post's properties for review by this Court.

A.    The Injuries Alleged by the ERC are Abstract and Insufficient to Meet the Requirement of Alleging "Injury-in-Fact"

The ERC bears the burden of proving it has suffered an injury-in-fact. Lujan, 504 U.S. at 561. An organization may allege standing based on an injury to the organization itself or it may allege standing on behalf of its members. Havens, 455 U.S. at 378-379; Hunt v. Wash. State Apple Adver. Comm'n, 432 U.S. 333, 343 (1977). In determining standing based on an organization's own injury, a court conducts the "same inquiry as in the case of an individual" to ensure that the organization has a "personal stake in the outcome of the controversy." Havens, 455 U.S. at 378. Hence, the first standing element that the ERC must sufficiently allege is an injury-in-fact that is concrete and particularized as well as actual and imminent. Lujan, 504 U.S. at 560. "[T]he 'injury in fact' test requires more than an injury to a cognizable interest. It requires that the party seeking review be himself among the injured." Lujan, 504 U.S. at 563 (quoting Sierra Club v. Morton, 405 U.S. 727, 734 (1972)). In other words, an organization must allege a "concrete and demonstrable injury to the organization's activities." Am. Legal Found. v. Fed. Commc'n. Comm'n, 808 F.2d 84, 91 (D.C. Cir. 1987) (quoting Havens, 455 U.S. at 379). This injury must affect the organization in "a personal and individual way." Lujan, 504 U.S. at 561, n. 1.

Here, the ERC alleges two organizational injuries—that it has been frustrated in its mission and that it has been forced to divert resources to identify, investigate, and counteract Post's alleged discriminatory practices. (Compl. ¶¶ 43-44.) Additionally, the ERC alleges a third injury based on the damages to the ERC's individual public members, who are unidentified.

6

(Compl. ¶ 45.). Even if the ERC could prove FHA and ADA violations at the Subject Properties (and they cannot), the Complaint fails to show that the alleged injury flowing from such violations has a concrete and demonstrable impact on the ERC.

1.    *The ERC's alleged injury of frustration of mission is too abstract to constitute an injury-in-fact for standing purposes.*

The ERC's first alleged injury, that it has been frustrated in its mission, is insufficient to confer Article III standing. The Supreme Court has repeatedly held that a "setback to [an] organization's abstract social interests" is inadequate to show an injury-in-fact for standing purpose. Havens, 455 U.S. at 379 (citing Sierra Club, 405 U.S. at 739). Even if an organization can show that its interest or concern in a subject could be affected by a defendant's actions, such interest alone cannot constitute the required injury-in-fact "no matter how long standing the interest and no matter how qualified the organization is in evaluating the problem." Sierra Club, 405 U.S. at 739. See also Spann v. Colonial Village, Inc., 899 F.2d 24, 27 (D.C. Cir. 1990) (holding that "an organization's abstract concern with a subject that could be affected by an adjudication does not substitute for the concrete injury required by Art. III"); Am. Legal Found., 808 F.2d at 92 (holding that an organization must allege more than "an interest in seeing the law obeyed or a societal goal furthered"); Capital Legal Found. v. Commodity Credit Corp., 711 F.2d 253, 255 (D.C. Cir. 1983) (holding that "a sincere, vigorous interest in the action challenged, or in the provisions of law allegedly violated, will not do to establish standing if the party's interest is purely ideological, uncoupled from any injury in fact, or tied only to an undifferentiated injury common to all members of the public").

In expanding upon this rule, the D.C. Circuit has held that a "conflict between a defendant's conduct and organization's mission is alone insufficient to establish Article III standing," and that "[f]rustration of an organization's objectives 'is the type of abstract concern

that does not impart standing.'" Nat'l Treasury Employees Union v. United States, 101 F.3d

1423, 1429-30 (D.C. Cir. 1996) (quoting Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d

1428, 1433 (D.C. Cir. 1995). The D.C. Circuit further explained the rationale for this rule:

"Individual persons cannot obtain judicial review of otherwise nonjusticiable claims simply by

incorporating, drafting a mission statement, and then suing on behalf of the newly formed and

extremely interested organization." Nat'l Treasury, 101 F.3d at 1429. Similarly, in Nat'l

Taxpayers Union, the plaintiff taxpayer organization filed suit against the United States

government seeking an injunction against the enforcement of a new tax law. As an injury, the

organization alleged that the enforcement of the law frustrated the organization's founding

objectives and practical efforts to assist taxpayers and promote fair revenue practices. The court

held that this allegation was "the type of abstract concern that does not impart standing" on an

organization. Nat'l Taxpayers Union, 68 F.3d at 1433.

     In Am. Legal Found., the D.C. Circuit came to a similar conclusion when an organization

challenged the FCC's decision not to initiate an investigation. The organization alleged injury to

its specific institutional interest in seeing that the FCC's fairness doctrine and news distortion

policies were enforced. In denying standing to the organization, the court focused on the fact

that the organization alleged only an injury to its interest and failed to show that "discrete

programmatic concerns [were] being directly and adversely affected by the defendant's actions."

Am. Legal Found., 808 F.2d at 92.

     In this case, the ERC specifically alleges that "the ERC has been directly and

substantially injured in that it has been frustrated in its mission to eradicate discrimination in

housing, and in carrying out the programs and services it provides." (Compl. ¶ 43.) This

frustration of mission claim is similar to the National Taxpayers Union's insufficient claim of

8

frustration of founding objectives and is too abstract to impart standing. Additionally, like the organization in Am. Legal Found., the ERC, in alleging frustration of mission and including a general list of services which the mission encompasses, has failed to allege any frustration or injury to discrete programmatic concerns. Although the ERC's sincerity and motives are not here questioned, the ERC's broad objectives are not sufficiently concrete to establish standing absent evidence of a direct injury.

2.    *The ERC's diversion of resources to investigate and to litigate against Post is "self-inflicted" and therefore does not constitute an injury-in-fact.*

The ERC's second alleged injury, the diversion of resources to litigation expenses such as testing (*i.e.* allegedly investigating Post's properties prior to filing the Complaint), is similarly insufficient to state an injury-in-fact. In the D.C. Circuit, the time and money that an organization spends in bringing a suit against a defendant does not constitute an injury-in-fact for standing purposes. Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp., 28 F.3d 1268, 1277 (D.C. Cir. 1994); see also Spann, 899 F.2d at 27 (holding that "an organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit"). Furthermore, diverting or redirecting organization resources "*to litigation and legal counseling in response to actions or inactions of another party is insufficient to impart standing upon the organization.*" Nat'l Taxpayers Union, 68 F.3d at 1434 (quoting Ass'n for Retarded Citizens v. Dallas County Mental Health & Mental Retardation Center Bd. of Trustees, 19 F.3d 241, 244 (5th Cir. 1994) (holding that organization did not have standing solely based on its statutory mandate to protect and advocate the rights of disabled individuals)). The reasoning for this rule is that an organization has "no legally protected interest in not expending their resources on behalf of individuals for whom they are advocates, at least

9

where the only resources 'lost' are the legal costs of the particular advocacy lawsuit." Ass'n for Retarded Citizens, 19 F.3d at 244.

Additionally, in BMC Marketing, the D.C. Circuit clearly held that the "mere expense of testing" does not constitute an injury-in-fact fairly traceable to the defendant's conduct. BMC Marketing, 28 F. 3d at 1276. The cost of testing is "self-inflicted," and consequently does not result from the actions of the defendant but rather from the plaintiff's own budgetary choices. Id.; see also Nat'l Fair Housing Alliance, Inc. v. Prudential Ins. Co. of Am., 208 F. Supp. 2d 46, 52 (D.D.C. 2002) (holding that "the D.C. Circuit has suggested that money spent on 'testing' is, by itself, insufficient to establish standing"). In other words, a defendant has not injured a plaintiff merely because the plaintiff decided that its money would be better spent by testing rather than by counseling or researching. Id. at 1277.

The ERC is well aware of these limits. In BMC Marketing, the Fair Employment Council of Greater Washington ("Council"), an organization that became the ERC following a merger,[3] hired testers to determine if an employment agency was discriminating in its referral services based on race. The court rejected the Council's suggestion that the expense of testing constituted an injury-in-fact. Although the court recognized that "the diversion of resources to testing might well harm the Council's other programs," the court concluded that this harm was "self-inflicted" and that the "Council and its programs would have been unaffected if it had simply refrained from making the re-allocation."[4] BMC Marketing, 28 F.3d at 1276.

---

[3] See the Equal Rights Center, About Us web page, which states, "the Equal Rights Center (ERC) was formed in 1999 when the Fair Housing Council of Greater Washington merged with the Fair Employment Council of Greater Washington." Equal Rights Center, About Us, http://www.equalrightscenter.org/index_files/Page352.htm (last visited Jan. 29, 2007) (attached as Exhibit 3).

[4] The Court further held that if the rule were otherwise and "the time and money that plaintiffs spend in bringing suit against a defendant would itself constitute sufficient 'injury in fact'", then "a circular

Here, the ERC generally asserts that Post's alleged discriminatory practices have forced the ERC to divert its resources to identifying, investigating, and counteracting Post's discriminatory practices. (Compl. ¶ 44.) There are no allegations, however, to support the fact that the "identifying, investigating, and counteracting" are anything more than a "self-inflicted" *decision to allocate resources in order to advance the ERC's theories on the scope of the FHA and ADA.* The Complaint merely states that, at some unknown time, "the ERC became aware that a large number of new multifamily housing complexes were being constructed in the greater Washington, D.C. area that did not include the required elements of accessible design." (Compl. ¶ 15.) The ERC then allegedly visited a number of Post properties and found what the ERC considers to be FHA and ADA violations. (Compl. ¶ 16.) Finally, the ERC diverted resources from other activities to "conduct further investigation and testing of POST properties so as to ascertain the extent of the FHA and ADA violations by POST." (Compl. ¶ 17.) This investigation and testing was not forced upon the ERC, and like its predecessor organization in BMC Marketing, the ERC would have otherwise been unaffected if it had simply refrained from making such choices about its resources.[5] Furthermore, even if part of what the ERC does on a normal basis is testing,[6] as the court in Nat'l Taxpayers Union held, an organization "cannot convert its ordinary program costs into an injury in fact." Nat'l Taxpayers Union, 68 F.3d at 1434.

---

position that would effectively abolish the requirement altogether" would result. BMC Marketing, 28 F.3d at 1276.

[5] Apparently, "[i]n December 2004, the Equal Rights Center began an initiative to eradicate this form of housing discrimination with the filing of a lawsuit against Archstone-Smith Trust, one of the nation's largest apartment developers." Equal Rights Center, The Bozzuto Group Press Release (9/15/05), http://www.equalrightscenter.org/index_files/Page1808.htm. (last visited Jan. 29, 2007) (attached as Exhibit 4). This is the fifth in the ERC's "series of lawsuits."

[6] The "About Us" section of the ERC's website states that "the ERC has over 20 years of experience in . . . systematic testing for fair housing violations." See Equal Rights Center, About Us, http://www.equalrightscenter.org/index_files/Page352.htm (last visited Jan. 29, 2007) (attached as Exhibit 3).

The D.C. Circuit's understanding of organizational injury in Fair Housing and other discrimination-based cases is more refined than some other jurisdictions. The cases in which other courts employ a broader view of organizational injury, however, can be distinguished from this case. The broader view of organizational injury stems from Havens, wherein the Supreme Court held that a sufficiently alleged injury is that the defendant's discriminatory practice "perceptively impaired [the organization's] ability to provide counseling and referral services." Havens, 455 U.S. at 379. However, as the D.C. Circuit in BMC Marketing stated, "the Court [in Havens] did not base standing on the diversion of resources from one program to another, but rather on the alleged injury that the defendants' actions themselves had inflicted upon the organization's programs." BMC Marketing, 28 F.3d at 1277. Again, the impact must be concrete and demonstrable. Havens, 455 U.S. at 379.

Given this precedent, when an organization is a litigious advocacy group, such as the ERC, in order to show standing the organization must allege damages separate and apart from those caused by preparing for the litigation itself; in other words, the organization must allege an additional impairment to the organization's efforts against discrimination. See Moseke v. Miller & Smith, Inc., 202 F. Supp. 2d 492, 499, n. 8 (E.D. Va. 2002) (stating that courts which grant standing in diversion of resources cases have set up a "'litigation plus' formulation of standing"). Usually, that additional damage is specific to the counseling of an individual suffering from an incident of discrimination or discrimination which can be combatted through education and counseling for those discriminated against. Id.; see also Spann, 899 F. 2d at 27. Here, the ERC has shown no additional damage. This case is but another suit filed in series of suits in which the ERC is attempting to broadly change the application of the FHA on a nationwide basis.

However, it cannot stand as presently crafted because the ERC has failed to show a direct link between Post's activities at each of the Subject Properties and a concrete injury to the ERC.

The ERC knows the limits of its standing to bring these cases. In Moseke, the organizational plaintiff was the ERC and the ERC actually counseled the individual plaintiff Moseke and undertook an investigation based on Moseke's complaint. Moseke, 202 F. Supp. 2d at 499. The court held that the resources expended relating directly to Moseke can be regarded as independent activities associated with the identification and counteraction of the defendants' discriminatory practices. Id. at 500. "These efforts can stand alone and could further the ERC's mission without ultimately resulting in litigation." Id.; see also Williams v. Poretsky Mgmt. Inc., 955 F. Supp. 490, 494 (D. Md. 1996) (holding that the Fair Housing Council was granted standing because, in addition to general litigation expenses, it could show that it spent 122 hours and over $12,000 on the individual plaintiff's complaint).[7]

Similarly, in Spann, the plaintiff organizations had standing because the defendants' preferential advertising "impelled the organizations to devote resources to checking or neutralizing the ads' adverse impact." Spann, 899 F.2d at 27. Additionally, the organizations had to devote more time, effort, and money to educating the local real estate industry and the public that racial preference in housing is illegal. Id. Importantly, in Spann, the organizations did more than just testing and identifying violations.

Here, the ERC has filed a suit based on a broad allegation that it devoted time to investigate and counteract Post's alleged discriminatory conduct after it "became aware that a large number of new multifamily housing complexes were being constructed in the greater

---

[7] In Moseke, the ERC understood and recognized the standard which must be met in order to sufficiently allege standing under the FHA. Nevertheless, the ERC failed to allege the same level of injury in this case, i.e., the ERC did not allege any injury based on anything other than litigation expenses. In contrast to Moseke, the ERC here has failed to allege that it has assisted any individuals suffering from alleged discrimination by Post. Id.

13

Washington, D.C. area that did not include the required elements of accessible design." (Compl. at ¶ 15). Yet, what is lacking is an allegation that any allegedly discriminatory conduct by Post has compelled the ERC to perform any acts independent of the litigation, such as outreach within the local areas of each Subject Property (as did the organization in Spann) or assisting any particular individual complainants (such as those in Moseke) who alleged they were directly impacted by Post's actions. [8]  The ERC only alleges a diversion of resources to litigation-related expenses, presumably as part of its "initiative" against developers. Yet, the ERC's decision to continue its nationwide crusade by allegedly investigating Post and filing this suit is not an injury-in-fact that confers standing.

### 3.  *The ERC's unsubstantiated claim that individual members suffered injury is insufficient for associational standing.*

The ERC's third claim of injury is based on associational standing, that is, the ERC is suing Post on behalf of its individual members. The Supreme Court has held that "an organization whose members are injured may represent those members" in a judicial proceeding. Sierra Club, 405 U.S. at 739. The organization, however, must demonstrate the following requirements to obtain associational standing: (1) "its members would otherwise have standing to sue in their own right," (2) "the interests at stake are germane to the organization's purpose," and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." Laidlaw, 528 U.S. at 181. Establishing injury-in-fact requires more than demonstrating an injury to a cognizable interest; it requires showing that such injury is

---

[8] The ERC's awareness of Post's activities is unlikely to have been triggered by an individual complaint, given that this is the fifth in a series of lawsuits filed by the ERC in its attempt to advance its interpretation of the FHA and ADA against what it characterizes as "major developers." Equity Residential Press Release, *supra* n.1 (Equity is the "third largest owner of multifamily housing units in the United States"); Bozzuto Group Press Release, *supra* n. 6 ("Bozzuto, headquartered in Greenbelt, Maryland, is one of the largest apartment developers in the eastern United States").

particularized to the plaintiff. Wilderness Soc'y v. Norton, 434 F.3d 584, 590 (D.C.Cir. 2006

(holding that a Wilderness Society member's general averment of injury was insufficient to show

a particularized injury to a member) (citing Sierra Club, 405 U.S. at 734).

To prove that the organization's members would otherwise have standing in their own

right, the organization "must allege that its member, or any one of them, are suffering immediate

or threatened injury as a result of the challenged action of the sort that would make out a

justiciable case had the members themselves brought suit." Warth, 422 U.S. at 511; see also

Eastern Paralyzed Veterans Ass'n., Inc. v. Lazarus-Burman Assocs., 133 F. Supp. 2d 203, 210

(E.D.N.Y. 2001) (hereinafter "EPVA"). Further, the organization must assert that at least one

member demonstrates 'actual or imminent injury in fact that is fairly traceable to the challenged

decision and likely to be redressed by a favorable decision.'" Nat'l Taxpayers Union, 68 F.3d at

1435. Finally, the organization must show that its members are "directly affected" by the

defendant's action "apart from their special interest in the subject." Lujan, 504 U.S. at 564

(quoting Sierra Club, 405 U.S. at 735). In sum, the injury to the individual member has to be

"concrete and actual or imminent, not conjectural or hypothetical." Steel Co. v. Citizens for a

Better Env't, 523 U.S. 83, 103 (1998).

In Sierra Club, the Supreme Court held that the plaintiff organization did not have

standing because it "failed to allege that it or its members would be affected in any of their

activities or pastimes" by the defendant's development of park land. Sierra Club, 405 U.S. at

735. The organization failed to identify any specific members and did not state anywhere that

"its members use [the park land] for any purpose, much less that they use it in a ways that would

be significantly affected by the proposed actions of the respondents." Sierra Club, 405 U.S. at

735.

The court in EPVA, a FHA case based on accessibility, similarly held that the plaintiff organization lacked associational standing for failing to identify any injured members:

> The Court finds that the EPVA does not have standing to sue in its representative capacity, because the organization has not alleged that the defendants' conduct has injured any of its members' statutory right to be free from discriminatory housing practices. Neither the complaint nor the affidavits submitted in connection with the plaintiff's opposition to the current motions to dismiss contain references to a member's experience in applying for and being denied housing at the [building] because of the members handicap.  Nor do the complaint and affidavits include an allegation that an EPVA member was denied access to any part of the [building] due to the member's handicap. There is no averment that an EPVA member attempted to gain physical access to the building but could not because the public use and common areas of the development were not sufficiently wide for wheelchair access. Similarly, there is no allegation that an EPVA member visited someone living at the [building] but was unable to enter or move about the unit because doors and hallways were not wide enough for the wheelchair.

EPVA, 133 F. Supp. 2d at 210 (emphasis added). The only member allegation was general— that the entrance to the building in question prohibited members from entering and thus violated the members' rights—and the court held it to be insufficient. Id.

In this case, the ERC's complaint and allegations suffer the same flaws as those in Sierra Club and EPVA. In support of its associational standing, the ERC alleges only that "the ERC's individual public members, many of whom are disabled persons living within the proximity of one or more Subject Properties, have been damaged by POST's denial of access to its dwelling units, common-use areas, and public-use areas." (Compl. ¶ 45.) The ERC does not actually identify any members, or any one member, who can show that they have standing to sue in their own right at each of the Subject Properties. Simply put, living in the vicinity of a Post property is insufficient to confer standing. Indeed, like the organization in EPVA, the ERC fails to allege that its members, or even that any one member, have been directly discriminated

16

against by Post, were denied housing at each of Post's properties, have attempted to gain access and failed at each of Post's properties, or have attempted to visit someone at each of Post's properties and found it inaccessible. Thus, the ERC's broad allegation of harm fails to meet the strict standards for associational standing.

    B.      <u>The ERC lacks standing to challenge the construction of any properties outside of the Washington, DC metropolitan area and properties never visited or tested</u>

        The second element in the standing analysis is that "there must be a causal connection between the injury and conduct complained of," and that the injury has to be fairly traceable to the challenged action of the defendant. <u>Lujan</u>, 504 U.S. at 560. Further, "the interests the association seeks to protect must be germane to its purpose." <u>Communities Against Runway Expansion, Inc. v. Fed. Aviation Admin.</u>, 355 F.3d 678, 684 (D. C. Cir. 2004) ("CARE") (citing <u>Hunt v. Wash. State Apple Adver. Comm'n</u>, 432 U.S. 333, 343 (1977)). Here, the ERC has failed to sufficiently show a causal connection between its alleged injuries and Post's design and construction of properties outside of the Washington, D.C. area as well as properties that the ERC never visited.

        1.      *The ERC cannot establish a causal connection between its alleged injuries and Post's alleged conduct outside of the Washington, D.C. area given the ERC's limited mission.*

        In FHA cases, standing is generally upheld only when the injury based on discrimination occurs within a "relatively compact neighborhood." <u>Havens</u>, 455 U.S. at 377 (quoting <u>Gladstone Realtors v. Bellwood</u>, 441 U.S. 91, 114 (1979)). In other words, the plaintiff must establish that there is a causal connection between the injury and discrimination because both occur in the same geographic area. See <u>Gladstone</u>, 441 U.S. at 112, n.25. In <u>Gladstone</u>, the Supreme Court held that the plaintiffs who claimed "to be injured as homeowners in the community" in which *the discriminatory practice took place had standing, whereas the plaintiffs who were not*

members of the affected community did not.  Id.; see also Hamad v. Woodcrest Condominium

Ass'n, 328 F.3d 224, 232 (6th Cir. 2003).  In sum, "the touchstone for standing under the Fair

Housing Act is whether one is a member of the community in which allegedly unlawful

discrimination is taking place."  Hamad, 328 F.3d at 233.

The ERC is a Washington, D.C.-based organization,[9] however, in this case it has alleged

FHA violations in Arizona, Colorado, Florida, Georgia, New York, North Carolina and Texas, as

well as Washington, D.C., and Virginia.  Given its limited mission, even assuming that the ERC

can successfully allege injury (more than mere frustration of mission, self-inflicted diversion of

resources, or unidentified member injuries), no such injury can be traced to Post's conduct

outside of "the greater Washington, D.C. area." (Comp. ¶ 15).  Simply put, filing a suit on behalf

of unknown individuals that live in the "vicinity" of Post's properties in places such as Texas

reaches beyond what is "germane" to the ERC's interests.  CARE, 355 F.3d at 684.  It is clear

that the ERC is a Washington, D.C.-based advocacy group.  Indeed, the services it provides as

part of its mission, including "educating the public about fair housing rights and requirements,

educating and working with industry groups on fair housing compliance, [and] providing

counseling services to persons either looking for housing or affected by discriminatory housing

practices," (Compl. ¶ 43), have been alleged by the ERC in prior cases as being limited to the

Washington, D.C. metropolitan area.[10]  The Complaint fails to allege how the ERC's mission

---

[9]  The ERC is headquartered in Washington, D.C. (Comp. ¶ 7.)  See also Equal Rights Center, Contact Us, http://www.equalrightscenter.org/index_files/Page1205.htm (last visited Jan. 29, 2007) (attached as Exhibit 5).  Where subject matter jurisdiction is at issue, as it is in this case, a court may consider material other than the allegations in the complaint.  See Totten v. Norton, 421 F. Supp. 2d 115, 122 (D.D.C. 2006) (citing Coalition for Underground Expansion v. Mineta, 333 F.3d 193, 198 (D.C. Cir. 2003)).

[10]  A party cannot "cannot blow hot and cold and take now a position contrary to that taken in [prior] proceedings."  Callanan Road Imp. Co. v. United States, 345 U.S. 507, 513 (1953).  The ERC and its predecessor organizations have brought a number of suits in the past and until now the ERC has alleged that its mission is confined to the Greater Washington area.  See, e.g., Disability Rights Ctr. of Greater Washington v. District of Columbia, 2005 WL 513495 at *2 (D.D.C. Mar. 3, 2005) (regional civil rights

and services, which are based in the Washington, D.C. area, would be impaired by the design

and construction of properties in states outside the reach of the ERC's mission and services.

Similarly lacking from the Complaint is the causal connection between the ERC's

diversion of resources and Post's design and construction of properties outside the Washington,

D.C. area. The Complaint only alleges that "as a result of its activities, the ERC became aware

that a large number of new multifamily housing complexes were being constructed in the greater

Washington, D.C. area that did not include the required elements of accessible design." (Compl.

¶ 15.)[11] On the basis of this alleged awareness, the ERC states that it chose to divert resources to

conduct testing of Post properties to ascertain the extent of FHA and ADA violations. (Compl. ¶

17.). Significantly, the Complaint does not even allege that Post properties were among the

properties of which the ERC became aware. Indeed, Post seemingly was just the next developer

on the list in the ERC's ever expanding initiative against housing developers. Even if the ERC

could show an impairment of resources and activities in the Washington, D.C. area, where the

ERC's activities actually take place, the ERC cannot show any impairment of resources due to

allegedly noncompliant properties in areas where the ERC's activities are nonexistent (such as

---

organization, now the ERC, had standing to seek injunctive relief against District of Columbia); Moseke,
202 F. Supp. 2d at 499 (for standing purposes, the ERC alleged that it "engages in a variety of
educational, counseling, and referral services, as well as community monitoring activities throughout the
Greater Washington area"); Buchanan v. Consol. Stores Corp., 125 F. Supp. 2d 730, 738 (D. Md. 2001)
(ERC alleged that the defendant's conduct frustrates its mission "to eliminate discrimination on the basis
of race or color in the Washington-Baltimore Area" as stated in the complaint). See also Compl. ¶¶ 10,
11 in Moseke, attached at Exhibit 7.

Furthermore, the ERC's website "About Us" page states, "[t]he Equal Rights Center has been
aggressively combating persistent discriminatory practices that place many Washington area residents at a
disadvantage or illegally deny them access to opportunity." See Equal Rights Center, About Us,
http://www.equalrightscenter.org/index_files/Page352.htm (last visited Jan. 29, 2007) (attached as Exhibit
3). Additionally, the website "Resources and Links" page includes links to primarily local resources from
Washington, D.C., Maryland, and Virginia. See Equal Rights Center, Resources and Links,
http://www.equalrightscenter.org/index_files/Page644.htm (last visited Jan. 29, 2007) (attached as Exhibit
6).

[11] The Complaint does not allege that these multifamily housing complexes, of which the ERC "become
aware" were even designed and constructed by Post. (Compl. ¶ 15.)

19

Arizona, Colorado, Texas, Georgia, Florida, North Carolina, and New York). Even if the ERC could allege that it sent testers to other states, it cannot establish standing by simply deciding to expand the scope of its mission for the purposes of this litigation. The injury has to be particularized to the Plaintiff before the suit is filed. Laidlaw, 528 U.S. at 180-81.

Finally, the ERC's Complaint also fails to show that any injury to its members is fairly traceable to Post's design and construction of properties outside of the Washington, D.C. area. First, as noted above, the ERC does not even identify any members who have been specifically affected by Post's alleged discrimination.[12] Second, because the ERC is a Washington, D.C. based organization, its services are provided to individuals in the Washington, D.C. area. The ERC cannot, for the purposes of this suit, manufacture standing beyond the greater Washington D.C. area even if can track down an individual in another state that was allegedly injured by Post's activities. The ERC has failed to allege how the design and construction of properties in seven far away states directly affect its members in the Washington, D.C. area. Properties located in those other states are too far removed from the scope of the ERC's mission to ever have a direct impact on the ERC.

      2.     *The ERC fails to show a causal connection between its alleged injuries and the properties never visited or tested.*

Not only does the ERC seek damages and injunctive relief for properties outside of its service area, the ERC also seeks relief based on properties it has never even visited or tested. The ERC bases this claim on "the pervasiveness and similarity of the FHA and ADA violations at the Tested Properties" and "the common elements of design at the Tested Properties and untested Subject Properties." (Compl. ¶ 40.) Clearly, the ERC cannot show that it has diverted

---

[12] "Living in the proximity" of Post's properties is insufficient to allege injury. The individual has to prove that the action complained of has or will impact a cognizable interest of his or hers. Wilderness Soc'y, 434 F.3d at 590.

any resources based on these properties as it has not tested them nor even seen them. Furthermore, any frustration of its mission as to these untested properties is too general and speculative considering the fact that the ERC cannot know for sure whether they fall within the scope of the FHA and ADA, much less whether violations exist at these properties. The ERC cannot pull all of Post's portfolio into a suit before this Court in hopes that it turns out that there is a violation there. Claims based on Subject Properties where there is no evidence of discrimination must be dismissed for failure to state an injury that can be traced to Post's alleged conduct.

## II.   THE ERC LACKS STANDING UNDER THE AMERICANS WITH DISABILITIES ACT BECAUSE THE ERC ITSELF HAS NOT BEEN SUBJECTED TO DISCRIMINATION.

In addition to a FHA violation, the ERC alleges that Post's properties violate the ADA. Title III of the ADA proscribes discrimination in places of public accommodation against persons with disabilities and confers a private right of action for preventative relief upon "any person who is being subjected to discrimination on the basis of disability . . . or who has reasonable ground for believing that such person is about to be subjected to discrimination." 42 U.S.C. § 12188(a)(1). "[T]his language erects a prudential barrier precluding organization standing" to groups such as the ERC who have not alleged that the group itself has been subjected to discrimination. Clark v. McDonald's Corp., 213 F.R.D. 198, 209 (D.N.J. 2003); see also McInnis-Misenor v. Maine Med. Ctr., 319 F.3d 63, 69 (1st Cir. 2003) (holding that "the ADA does not permit private plaintiffs to bring claims as private attorneys general to vindicate other people's injuries").

Prudential standing, which is presumed unless eliminated by Congress, relates to a series of rules or requirements that a plaintiff must meet in addition to Article III standing. Bennet v. Spear, 520 U.S. 154, 163 (1997) ("Congress legislates against the background of our prudential

21

standing doctrine, which applies unless it is expressly negated."). The prudential standing rule that is most relevant to this case is that a plaintiff must generally assert its own legal rights and interests; a plaintiff cannot rest its claims to relief on the legal rights or interests of third parties. Warth, 422 U.S. at 499-500. This rule is embodied in the language of the enforcement provision of Title III, which "unambiguously requires that the 'person' (be it an individual or entity) possessing the cause of action is being subjected, or is under threat of being subjected, to discrimination." Clark, 213 F.R.D. at 209. In coming to this conclusion, the Clark court compared Title III of the ADA (the claim in this case) to Titles I and II, which state in broad language that relief is extended to "any person alleging discrimination on the basis of disability." Id. at 209 (quoting 42 U.S.C. §§ 12117(a), 12133). The enforcement provision in Title III, by contrast, grants a remedy to "any person who is being subjected to discrimination on the basis of disability." Id. The Clark court held that the more broadly worded language of Titles I and II evinced congressional intent to remove prudential barriers to standing, while the narrow language of Title III clearly did not show such intent. Id. at 210.

In Clark, the plaintiff organization, Access Today, alleged an ADA violation against McDonald's restaurants for failure to remove architectural barriers. Access Today asserted injury based on diversion of resources to litigation expenses and frustration of mission. Id. at 207-208. The court held that "because there is no set of facts alleged in the amended complaint under which it could be said that Access Today is itself suffering, or under threat of suffering, discrimination at the hands of the defendants, Access Today lacks standing to sue." Id. at 210. The court reasoned that Access Today only alleged that it suffered frustration of purpose as a result of the defendant's discrimination against others, for which the ADA provides it no remedy. Id.; see also Small v. General Nutrition Corp., 388 F. Supp. 2d 83, 92 (E.D.N.Y. 2005)

22

(organization lacked standing when it only incurred alleged injuries as a result of discrimination against others).

Similar to Access Today, the ERC cannot show organizational standing under the ADA. *In the ERC's claim for relief under the ADA, the ERC alleged that it is an "aggrieved person"* within the meaning of the ADA. (Compl. ¶ 68.) However, the ERC has failed to allege that the organization itself has been subjected to discrimination as a result of Post's alleged acts. The only discrimination alleged is against the ERC's unknown individual members. An organization lacks standing under the ADA when its only injury occurs as a result of the discrimination toward others.[13] Clark, 213 F.R.D. at 210.

## III. THE ERC HAS FAILED TO STATE A CLAIM UPON WHICH RELIEF CAN BE GRANTED UNDER FEDERAL RULE OF CIVIL PROCEDURE 12(b)(6).

A court will grant a motion to dismiss when "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." Conley v. Gibson, 355 U.S. 41, 45-46 (1957). Accordingly, at this stage of the proceedings, the court accepts as true all of the Complaint's factual allegations as well as all reasonable inferences derived from the facts alleged. Hishon v. King & Spalding, 467 U.S. 69, 73 (1984); Kowal v. MCI Communications Corp., 16 F.3d 1271, 1276 (D.C. Cir. 1994). That said, the court is "not bound to accept as true a legal conclusion couched as a factual allegation." Papasan v. Allain, 478 U.S. 265, 286 (1986).

Furthermore, "in determining whether a complaint fails to state a claim, the court may consider facts alleged in the complaint, any documents either attached to or incorporated in the

---

[13] Although the ERC alleges that it is the "aggrieved person" and thus, does not allege associational standing under the ADA, it is worth noting that the ERC also fails to allege sufficient injury for associational standing under the ADA. As discussed in Part I.A.3., for associational standing, the organization must allege that its members would otherwise have standing to sue in their own right. Here, again, the ERC has failed to identify any members that were actually discriminated against by Post under the ADA, and therefore, cannot meet the first requirement for associational standing.

complaint and matters of which the court may take judicial notice." Baker v. Henderson 150 F.Supp.2d 17, 19, n. 1 (D.D.C. 2001) (citing E.E.O.C. v. St. Francis Xavier Parochial School, 117 F.3d 621, 625 (D.C.Cir.1997). "[T]he court may take judicial notice of matters of a general public nature, such as court records, without converting the motion to dismiss into one for summary judgment." Id. (citing Marshall County Health Care Auth. v. Shalala, 988 F.2d 1221, 1226 (D.C.Cir.1993); Phillips v. Bureau of Prisons, 591 F.2d 966, 969 (D.C.Cir.1979)).[14]

### A.     The ERC fails to state a claim upon which relief can be granted as to the properties where construction has not been completed.

Like the standing doctrine, the ripeness doctrine tests the fitness of a controversy for judicial resolution. Louisiana Envtl. Action Network v. Browner, 87 F.3d 1379, 1382 (D.C. Cir. 1996) ("LEAN"). Standing focuses on the appropriateness of a party bringing the questioned controversy before the court, while ripeness examines whether the controversy itself is ready to be heard. See Abbott Labs. v. Gardner, 387 U.S. 136, 148 (1967).[15] The ERC alleges that Post violated the FHA and ADA by "designing, constructing and operating covered multifamily dwellings, and the common-use and public use areas associated with those covered dwellings." However, as stated in the Affidavit of Dayna Boone, Director, Real Estate Legal Services for Post (attached as Exhibit 1) the following properties have not yet been fully constructed: Mercer Square Condos and Carlyle (condominium building).   For these properties, the ERC's alleged claim is not ripe for judicial review.

---

[14] If this court instead considers this motion as one for summary judgment, under Rule 56 of the Federal Rules of Civil Procedure, summary judgment will be granted if "there is no genuine issue as to any material fact" and "the moving party is entitled to a judgment as a matter of law."

[15] To determine whether a claim is ripe, the court must balance the fitness for judicial review of the issues presented by plaintiff's claims with the hardship to the parties from withholding review. Abbott Labs, 387 U.S. at 149. More specifically, courts must consider "(1) whether delayed review would cause hardship to the plaintiffs; (2) whether judicial intervention would inappropriately interfere with further administrative action; and (3) whether the courts would benefit from further factual development of the issues presented." Ohio Forestry Ass'n, Inc. v. Sierra Club, 523 U.S. 726, 733 (1998).

B.    The ERC fails to state a claim upon which relief can be granted as to the
properties designed and constructed prior to the effective date of the statute.

The ERC has based its allegations of discrimination on § 3604(f)(3)(C) of the FHA.

Section 3604(f)(3)(C) applies the accessibility requirements only to multifamily dwellings

designed and constructed "for first occupancy after the date that is 30 months after September

13, 1988." 42 U.S.C. § 3604(f)(3)(C). This provision makes the effective date for FHA design

and construction claims March 13, 1991. As stated in the Affidavit of Dayna Boone, the

following properties were designed and constructed for first occupancy prior to March 13, 1991:

Vinings (Phase 1); Brookhaven (Phase I, Phase II Leasing Office and Building 1); Dunwoody

(Phase 1); Forest; Tyson's Corner; Rice Lofts; Wilson Building; Uptown Square (Building C

Lofts); and Parkside (FL) (Tower). (Exhibit. 1.) Unquestionably, for those properties the ERC

has failed to state a claim.

C.    The ERC is time-barred by the statute of limitations for all Post properties
designed and constructed before November 21, 2004.

Under the FHA, like other statutes, a defendant's alleged wrongful act triggers the statute

of limitations – requiring the potential plaintiff to file its action before the statute of limitations

runs. The governing statute of limitations for a FHA claim is as follows: "An aggrieved person

may commence a civil action in an appropriate United States district court or State court not later

than 2 years after the occurrence or the termination of an alleged discriminatory housing

practice." 42 U.S.C. § 3613(a)(1)(A). Thus, the statute of limitations for suits brought by the

ERC is two years from the date of completion of construction of each of the "Subject

Properties." The ERC filed this complaint on November 21, 2006. Hence, any property for

which construction was completed before November 21, 2004 falls outside of the statute of

limitations and cannot properly be subject to suit.

25

The statute of limitations provision was thoroughly analyzed in Moseke, a case in which the ERC sued developers and architectural firms alleging non-compliance with the FHA design and construction provision. Moseke, 202 F. Supp. at 495. Therein, the court first considered the separate definitions of "occurrence," "termination" and "practice." Rejecting the ERC's attempts to narrowly construe the statute of limitations, the court concluded that, "the plain meaning of 'the occurrence . . . of a discriminatory housing practice' is a discrete event or incident that encompasses a discriminatory custom." Id. at 503. Additionally, the court held that "the phrase 'the termination of a discriminatory housing practice' thus plainly means the cessation of a discriminatory repeated action." Id. at 503. In other words, the statute of limitations begins to run when the alleged wrongful act or omission occurs or ceases occurring. Id.

Given that the alleged wrongful act in this case is the design and construction of the Subject Properties, the wrongful act ceases on the date the design and construction is completed. See United States v. Taigen & Sons, Inc., 303 F. Supp. 2d 1129, 1144 (D. Idaho 2003) (holding that for a FHA case, the alleged violation occurred on "the date the design of construction was completed"); Thompson v. Mountain Peak Assocs., LLC, No. 2:05-CV-145-BES-GWF, 2006 WL 1582126, at *2 (D. Nev. Jun. 5, 2006) (holding "the last act of discrimination occurs upon the completion of the design and construction of the non-compliant structure or complex"); see also Alliance for Disabled in Action, Inc. v. Renaissance Enters., 371 N.J. Super 409, 417 (N.J. Super. Ct. 2004) (holding that for a similar New Jersey law on design and construct claims, "the appropriate date to start the period of limitations is the date construction was completed"). Although the date of completion varies among properties, many courts have found that the issuance of a certificate of occupancy is the best indicator of the date of completion, especially in the case of buildings which contain rental units. See Taigen, 202 F. Supp. 2d at 1144 (holding

26

that the date the design and construction was completed can be determined by the date the last certificate of occupancy was issued);[16]   As set forth in the attached Affidavit of Dayna Boone, the date of completion for the following properties was before November 21, 2004, two years prior to the filing date of the Complaint:

> Harbour Place; Harbour Place City Homes; Hyde Park; Parkside (FL) (excluding Tower); Rocky Point; Biltmore; Briarcliff; Brookhaven (Phase III, Phase II excluding the Leasing Office and Building 1,); Collier Hills; Crest; Crossing; Dunwoody (Phase II); Gardens; Glen; Lenox Park; Lindbergh; Oak; Oglethorpe; Parkside (GA); Peachtree; Renaissance; Ridge; Riverside; Spring; Stratford; Vinings (Phase II); Luminaria; Toscana; Ballantyne (with the exception of Pool Cabana and Manor Building); Gateway Place; Park at Phillips Place; Uptown Place; Abbey; Addison Circle; Cole's Corner; Gallery; Heights; Legacy; Midtown Square; Square; Uptown Village; Vineyard; Vintage; Worthington;

---

[16] See also Alliance for Disabled in Action., Inc., 371 N.J. Super. 409, 417 (2004) (holding that "the appropriate date to start the period of limitations is . . . the date upon which a certificate of occupancy was issued"); United States v. Hallmark Homes, Inc., 2003 WL 3219807 (D. Idaho Sept. 29, 2003) (same). A certificate of occupancy is a reliable indicator of the completion of construction because it reflects a decision by the permitting authority that the construction has been completed in conformity with applicable building codes. See, e.g., D.C. Mun. Regs. tit. 12A § 110.1 ("[N]o person shall use any structure, land, or part thereof for any purpose other than a one-family dwelling until a Certificate of Occupancy has been issued to that person stating that the use complies with the Zoning Regulations and related building, electrical, plumbing, mechanical, and fire prevention requirements.").

A few courts have instead held that the date of completion is the day of sale of the last inaccessible unit. See Balt. Neighborhoods, Inc. v. Rommel Builders, Inc., 40 F. Supp. 2d 700, 710 (D. Md. 1999); Fair Housing Council, Inc. v. Village of Olde St. Andrews, Inc., 250 F. Supp. 2d 706, 719 (2003), aff'd on this issue, 2006 WL 3724128 (6th Cir. Dec. 15, 2006). In Village of Olde St. Andrews, the Sixth Circuit held that "where the plaintiff alleges that the owner of a multifamily housing development failed to design and construct the development so as to make it accessible to disabled individuals, the limitations period will depend on the specific circumstances of each case." Id. at *12. Furthermore, where the plaintiff alleges the developer engaged in discrimination throughout an entire complex, the Court held that the statute of limitations began to run on the "sale of the last unit in that development." Id. In this case, the specific circumstances can be distinguished from Village of Olde St. Andrews. Although a few of the alleged Subject Properties include units for sale, the majority of the alleged Subject Property units are rentals. The date of sale is inapplicable to units which are rented. For rentals the date of completion is the date on which the statute of limitations should begin to run to give full meaning to the statute of limitations. This is the case because rentals are ongoing, whereas sales are one time events. In effect, an application of the continuing violation doctrine to rental units would obliterate the two year statute of limitations provision of the FHA. See Doe v. Thompson, 332 F. Supp. 2d 124, 134 (D.D.C. 2004) (holding that the continuing violations doctrine should not be applied to a Privacy Act case where the application of the "doctrine would in practical effect, mean that the two year statute [of limitations] would never run").

Corners; Pentagon Row; Massachusetts Avenue; Roosevelt Square; Uptown Square (excluding Building C Lofts); Hyde Park Walk; West Avenue Lofts; and River (n/k/a River West Condominiums).

Therefore, the ERC's claims as to these properties are precluded by the FHA statute of limitations. Based on this list of properties, as well as the properties built before the effective date of the statute and the properties not yet completed, only one-half of one Subject Property, Carlyle (apartment building) in Virginia, and one four-unit building in another Subject Property, Ballantyne (Manor Building) in North Carolina, fall within the statute of limitations time period.

        1.    *The continuing violation doctrine does not apply to the ERC's untimely claims.*

The ERC is likely to argue that the continuing violation doctrine and continuing existence of noncomplying properties keeps its claims alive for even those properties where construction was completed prior to November 21, 2004. However, this argument has been rejected by several courts. See e.g., Moseke, 202 F. Supp. 2d at 501; Taigen, 303 F. Supp. at 1141; Thompson, 2006 WL 1582126, at *2. Even if the decision allegedly may have continuing *effects*, such effects are distinguishable from a continuing violation. Post's alleged wrongful conduct—*i.e.* violation— is the discrete act of design and construction of the Subject Properties. Moseke, 202 F.Supp.2d at 501 (rejecting the continuing violation doctrine, reasoning that "it is either a discrete discriminatory event . . . or the last discriminatory event in a series of discriminatory events that triggers the statute of limitations").

The continuing violation doctrine is limited to circumstances where a plaintiff "challenges not just one incident of conduct violative of the [Fair Housing] Act, but an unlawful practice that continues into the limitations period." Havens, 455 U.S. at 381. The doctrine, which should be narrowly applied, is appropriate only for "a series of related and continuing

discriminatory acts" at least one of which occurred within the limitations period,[17] Moseke, 202 F. Supp. 2d at 504, and is limited to situations "where the type of violation is one that could not reasonably have been expected to be made the subject of a lawsuit when it first occurred because its character as a violation did not become clear until it was repeated during the limitations period," Hargraves v. Capital City Mortgage Corp., 140 F. Supp. 2d 7, 18 (D.D.C. 2000). That doctrine is not relevant to the FHA design and construction requirements.

For example, in Havens, the Supreme Court found that the alleged discrimination, racial steering, constituted a continuing violation for two reasons. First, the alleged racial steering by the defendant continued to occur within the limitations period. Havens, 455 U.S. at 381. Second, the nature of racial steering is such that it is "manifested in a number of incidents." Id. at 380. In other words, the practice of racial steering can only be fully determined after looking at a series of discriminatory acts.

In contrast, design and construction as a violation is a discrete act with a clear ending point—the date on which construction or design is completed at each individual building.[18] The alleged existence of inaccessible features are, at best, continuing *effects* of the initial discriminatory act of design and construction. Hence, the continuing violation doctrine has been *rejected where an effect is continuing but the defendant's act is not.* See Nat'l Adver. Co. v. City of Raleigh, 947 F.2d 1158, 1166 (4th Cir. 1991) (holding that "[a] continuing violation is occasioned by continual unlawful acts, not continual ill effects from an original violation"); see

---

[17] A second type of continuing violation is a systematic violation, which refers to an "ongoing discriminatory policy or system." Moseke, 202 F. Supp. 2d at 504. However, systematic violations are irrelevant to this case because "inaccessible features [such as those alleged here] do not constitute a [discriminatory]policy." Id.

[18] If this were to the contrary, then Congress's clear mandate that the accessibility requirements apply only to multifamily dwellings designed and constructed after a certain date, 42 U.S.C. § 3604(f)(3)(C), would have no meaning. Similarly, the statute of limitations would be rendered moot. It is the design and construction of a covered building, not the ownership of a noncomplying building, that is relevant.

also <u>Tolbert v. State of Ohio Dep't of Transp.</u>, 172 F.3d 934, 940 (6th Cir. 1999) (holding that in a complaint alleging discriminatory allocation of sound barriers along the highway, the continuing lack of such barriers constituted a "continuing ill effect," and was not the result of continuing unlawful acts); <u>Perez v. Laredo Junior College</u>, 706 F.2d 731, 734 (5th Cir. 1983) (holding that even though the damages resulting from the denial of the claim for pay may have continued, the wrongful act itself did not and therefore did not constitute a continuing violation).

In <u>Moseke</u>, the court held that "a FHA non-compliant building which contains inaccessible features to disabled persons is more akin to a continuing effect rather than a continuing violation under the FHA." <u>Moseke</u>, 202 F. Supp. 2d at 507; <u>see also</u> <u>United States v. PNE</u>, 2003 WL 24573548, *4 (D. Idaho Nov. 20, 2003) ("This 'failure' [to design and construct] occurs and is complete at the time the particular dwellings are designed and/or constructed. There is no basis, under the plain language of § 3604(f)(3) of the FHA for applying the continuing violation doctrine."); <u>Thompson</u>, 2006 WL 1582126, at *2 (holding "that the noncompliant buildings at issue in this case constitute continuing effects of past discriminatory acts, not continuing violations of the FHA"). Rejecting the ERC's attempt to reanimate its time-barred claims, the <u>Moseke</u> court reasoned that "the existence of allegedly non-compliant FHA condominium complexes" did not constitute "an occurrence or act that Defendants have done or performed within the requisite statute of limitations time frame." <u>Moseke</u>, 202 F. Supp. 2d at 507. Instead, the court held that "the existence of inaccessible features in the buildings is rather an ongoing *result* or *effect* of Defendants' actions," especially in view of the fact that the plaintiffs failed to allege "that Defendants have repeated some discriminatory act of design and construction within the statutory period." <u>Id</u>. The court concluded that "the alleged discriminatory act occurred at the design and construction of the building" and to rule otherwise,

would "eviscerate the statute of limitations with respect to design and construction claims." Id. at 507, 508.[19]

In contrast to Moseke, the ERC is likely to point to Balt. Neighborhoods, Inc. v. Rommel Builders, Inc., 40 F. Supp. 2d 700 (D. Md. 1999), in which the court held that the continuing violation doctrine was appropriate for FHA claims. In Balt. Neighborhoods, however, the court held that the FHA claim to which the continuing violations doctrine applied was the "continuing violation in the sale of alleged inaccessible new construction," not the actual design and construction of the building. Id. at 710. Thus, the court held that the sale of each condominium unit constituted an "occurrence" of discrimination under the FHA statute of limitations, and in applying the continuing violation doctrine, the statute of limitations did not begin to run until the last act of discrimination—the sale of the final condominium unit—"terminated." Id.

In this Complaint, the ERC has alleged a FHA claim of discrimination based on Post's alleged design and construction. (Compl. ¶¶ 6, 19, 21, 38, 51-52.) As a result, the statute of limitations began to run at each property at the time the design and construction was completed (i.e. issuance of the certificate of occupancy). Furthermore, beyond Post's initial act in designing and constructing its properties, the ERC has not alleged that Post repeated any acts of design and construction within the limitations period. Therefore, just as the allegation of non-complying condominiums in Moseke was deemed insufficient to overcome the statute of limitations, here the alleged inaccessible features in Post's properties are, at most, a continuing

---

[19] Moseke, and this case, can be distinguished from other cases which have held that the continuing violation doctrine can apply to a design and construction claims. See, e.g., Silver State Fair Housing Council v. ERGS, Inc., 362 F. Supp. 2d 1218, 1222 (D. Nev. 2005) (holding that the continuing violation doctrine applied since the development of the two apartment complexes in question (one within the statute of limitations period and one before) "followed seamlessly in time"); Alliance for Disabled in Action v. Renaissance Enterprises, Inc., 271 N.J. Super 409, 422 (2004) (holding that the discriminatory conduct, i.e., failure to design and construct was a continuing violation because part of the construction occurred during the limitations period and the "project was built on a continuous basis, with no significant interruption in construction activity")

effect of Post's alleged discriminatory design and construction and the statute of limitations has run.

Additionally, unlike Balt. Neighborhoods, in which an individual unit's "sale" was determined to be a discriminatory act, the majority of Post's property units are not for sale; they are rentals.[20] The Balt. Neighborhoods court's rationale for employing the continuing violations doctrine does not apply here because if the rental of each apartment unit was considered an occurrence of discrimination, the statute of limitations would be meaningless. This Court has held in the past that a plaintiff cannot bring a suit under the continuing violations doctrine where the application of the "doctrine would 'in practical effect, mean that the two-year statute [of limitations] would never run.'" See Doe v. Thompson, 332 F. Supp. 2d 124, 134 (D.D.C. 2004) (holding that the continuing violations doctrine did not apply to the plaintiff's Privacy Act cause of action) (quoting Bergman v. United States, 751 F.2d 314, 317 (10th Cir. 1984)).

Thus, the continuing violations doctrine does not apply regardless of the current state of the Subject Properties.

2.    *The ERC cannot aggregate alleged violations into a continuing practice.*

The ERC cannot establish the applicability of the continuing violation doctrine based on the aggregation of Post's alleged FHA violations. Although the ERC alleges that Post has "engaged in a continuous pattern and practice" of discrimination, this allegation cannot be used to aggregate discrete acts into a series of related acts such that the continuing violation doctrine would apply to the ERC's untimely claims. In Nat'l Railroad Passenger Corp. v. Morgan, 536 U.S. 101 (2002), the Supreme Court reexamined the continuing violation doctrine and held that

---

[20] Even the alleged Subject Properties which are now condominium buildings, were originally built as rental units, and thus, the original certificate of occupancy for the rental is the best indicator of those buildings' dates of completion. Additionally, in a few buildings a token number of units were built for sale; however, those units were all sold before November 21, 2004, and therefore, are outside of the statute of limitations period.

32

"discrete acts that fall within the statutory time period do not make timely acts that fall outside the time period." Id. at 113. Instead, "each discrete discriminatory act starts a new clock for filing charges alleging that act." Id. In this case, the design and construction of each of the *Subject Properties is a discrete act.*

In Morgan, the plaintiff filed suit under Title VII of the Civil Rights Act (governing employment discrimination) alleging that he had been subjected to discrete discriminatory acts as well as a hostile work environment. Id. at 104. The Supreme Court held that the discrete acts occurring outside the statute of limitations were barred while the hostile work environment claim was not barred, even though some related acts occurred prior to the limitations period. In so *holding, the Court began by interpreting the Title VII statutory terms "shall," "after . . . occurred," and "practice."[21]* Id. at 109. The Court determined that "'shall' makes the act of filing a charge within a specified time period mandatory," "occurred" refers to the particular day on which a discrete act happened, and "practice" refers to a discrete act as described in the statute. Id. at 109-111. Importantly, the Court concluded, "there is simply no indication that the term 'practice' converts related discrete acts into a single unlawful practice for the purposes of timely filing." Id. at 111.

For use in a FHA case, the holding in Morgan can be reconciled with that of Havens, in which the Supreme Court applied the continuing violation doctrine to racial steering. In Morgan, the Court made a distinction between hostile work environment claims and discrete discriminatory acts because it found that the "very nature of the [hostile work environment claims] involves repeated conduct." Morgan, at 115. The Court held that because a hostile work

---

[21] The relevant Title VII statute of limitation provision is as follows: "A charge under this section shall be filed within one hundred and eighty days after the alleged unlawful employment practice occurred." 42 U.S.C. § 2000e-5(e)(1). This language is substantially similar to the language of the FHA statute of limitations, which limits an action to "not later than 2 years after the occurrence . . . of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A).

environment claim necessarily involves a series of separate acts that collectively constitute one unlawful practice, the court may consider the entire time period for that practice as long as an act contributing to the claim occurred within the limitations period. Id. at 117. As at least one District Court has recognized, the Morgan decision does not contradict the Havens application of a continuing violation because "it recognizes that prior acts may be timely under the continuing violations theory where the asserted claim necessarily arises from a pattern of unlawful conduct." Wallace v. Chicago Housing Auth., 321 F. Supp. 2d 968, 973 (N.D. Ill. 2004). Racial steering, like a hostile work environment, springs from a pattern of events and can often be "discerned only after the defendants have engaged in a pattern of conduct." Id.

In contrast, a design and construction violation under the FHA can be discerned as soon as the design and construction is completed. It is unlike the ongoing creation of a hostile work environment or the ongoing practice of racial steering, which necessarily involve patterned and repeated conduct. Here, each discrete act of design and construction by Post, that is, the completion of construction at each covered building, started a new and unique clock for statute of limitations purposes applying uniquely building-by-building. The separate properties were completed in various states and in different years and even if a similarity in the alleged violations exists, that similarity does not aggregate the discrete violations into a continuing practice. See Morgan, 536 U.S. at 113 ("[D]iscrete discriminatory acts are not actionably if time barred, even when they are related to acts alleged in timely filed charges.").

The law is clear that the continuing violations doctrine does not apply to discrete acts or the continuing effect of alleged discrimination, and the ERC's claims based on properties constructed prior to November 21, 2004, are time-barred and should be dismissed.

34

## CONCLUSION

For the foregoing reasons, Post Properties, et al. respectfully request that the Court

dismiss the ERC's claims for relief as set out in its Motion and this Memorandum in Support.

Respectfully submitted,

HOLLAND & KNIGHT, LLP

Christopher B. Hanback (Bar # 232579)
Alan I. Baron (Bar. # 340273)
Rafe Petersen (Bar # 465542)
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006
(202) 955 3000 Phone
(202) 955 5564 Fax
E-mail: christopher.hanback@hklaw.com
E-mail: alan.baron@hklaw.com
E-mail: rafe.petersen.com
*Counsel for Post Properties, Inc., et al.*

35

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Motion to Dismiss or in the

Alternative for Partial Summary Judgment and accompanying Memorandum of Points and

Authorities were served by electronic filing and via first-class mail, postage prepaid, this 29th

day of January, 2007, on the following:

> Sheila Jane Carpenter, Esq.
> Jorden Burt LLP
> 1025 Thomas Jefferson Street, NW
> Suite 400 East
> Washington, DC 20007
>
> Donald Lee Kahl, Esq.
> Washington Lawyers' Committee for Civil Rights & Urban Affairs
> 11 Dupont Circle, NW
> Suite 400
> Washington, DC 20036

Christopher B. Hanback

# EXHIBIT 1

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER )
)
Plaintiff, )
)
vs. )                                        Case. No. 1:06CV01991
)                                        Judge Richard J. Leon
POST PROPERTIES, INC. )
POST GP HOLDINGS, INC. )
POST APARTMENT HOMES, L.P. )
)
Defendants. )
)

### AFFIDAVIT OF DAYNA BOONE

I, Dayna Boone, hereby swear and affirm the following:

1.      I am over 18 years of age and have personal knowledge of the facts set forth herein, and

if asked, could competently testify to the same.

2.      I am the Director, Real Estate Legal Services for Post Properties, Inc., *et al.* ("Post").

My regular duties include safekeeping of certificates of occupancy. I have reviewed certificates

of occupancy and other business records kept in the ordinary course of business of Post to

determine to the dates that construction was completed at each of the "Subject Properties" as set

forth in Addendum A to the Complaint filed by the Equal Rights Center.

3.      Of the Subject Properties named in the Complaint, the following properties or buildings

were designed and constructed for first occupancy prior to March 13, 1991:

(1) The Vinings (Phase I);

(2) Brookhaven (Phase I,
Phase II Leasing Office
and Building 1);

(3) Dunwoody (Phase I);

(4) Forest;

(5) Tyson's Corner;

(6) Rice Lofts;

(7) Wilson Building;

(8) Uptown Square (Building
C Lofts); and

(9) Parkside (FL) (Tower).

1

4.     Of the properties named in the Complaint, construction of the following properties has not yet been completed: Mercer Square Condos and Carlyle (condominium building).

5.     Apart from the Subject Properties set forth in paragraphs 3 and 4 of this Affidavit, of the Subject Properties named in the Complaint, the following properties were designed and constructed prior to November 21, 2004:

(1) Harbour Place;

(2) Harbour Place City Homes;

(3) Hyde Park;

(4) Parkside (FL) (excluding Tower);

(5) Rocky Point;

(6) Biltmore;

(7) Briarcliff;

(8) Brookhaven (Phase III, Phase II excluding the Leasing Office and Building 1 which were completed prior to March 13, 1991);

(9) Collier Hills;

(10) Crest;

(11) Crossing;

(12) Dunwoody (Phase II);

(13) Gardens;

(14) Glen;

(15) Lenox Park;

(16) Lindbergh;

(17) Oak;

(18) Oglethorpe;

(19) Parkside (GA);

(20) Peachtree;

(21) Renaissance;

(22) Ridge;

(23) Riverside;

(24) Spring;

(25) Stratford;

(26) Vinings (Phase II)

(27) Luminaria

(28) Toscana

(29) Ballantyne (with the exception of Pool Cabana and Manor Building);

(30) Gateway Place;

(31) Park at Phillips Place;

(32) Uptown Place;

(33) Abbey;

(34) Addison Circle;

(35) Cole's Corner;

(36) Gallery;

(37) Heights;

(38) Legacy;

(39) Midtown Square;

(40) Square;

(41) Uptown Village;

(42) Vineyard;

(43) Vintage;

(44) Worthington;

2

(45) Corners;

(46) Pentagon Row;

(47) Massachusetts Avenue;

(48) Roosevelt Square;

(49) Uptown Square (excluding Building C Lofts);

(50) Hyde Park Walk;

(51) West Avenue Lofts;

(52) River (n/k/a River West Condominiums).

I solemnly affirm under the penalties of perjury that the contents of the foregoing Affidavit are true to the best of my knowledge, information and belief.

January 29, 2007
Date

Dayna W. Boone
NAME

3

# EXHIBIT 2



# EQUITY RESIDENTIAL PRESS RELEASE

### Equal Rights Center Files Largest National Lawsuit in Initiative to Stop Discrimination Against People with Disabilities



WASHINGTON, D.C., April 27, 2006—The Equal Rights Center, represented by the Washington Lawyers' Committee for Civil Rights and Urban Affairs and the law firm of Gilbert Heintz & Randolph LLP, announced today the filing of the fourth, and largest, in a series of lawsuits against nationally-known residential apartment developers. This most recent lawsuit, filed in federal district court in Maryland, against developer Equity Residential, alleges continuous and systematic civil rights violations against persons with disabilities in the design and construction of at least 300 apartment complexes in 21 states and the District of Columbia. These complexes include more than 80,000 individual apartment and residential units.

Equity Residential, a publicly-traded real estate investment trust that is incorporated in Maryland, is headquartered in Chicago, Illinois. Equity Residential has been recognized as the third largest owner of multifamily housing units in the United States, claiming to own over 200,000 apartment units.

"It is estimated that there are over 47 million people in the United States with disabilities. Housing is a fundamental need and right for everyone, including this huge segment of our population. No provider of housing, and certainly not one of the largest in the country should be allowed to bar people with disabilities from its apartments by building them so that they are inaccessible," said Rabbi Bruce E. Kahn, the Executive Director of the Equal Rights Center.

This new action is the fourth lawsuit brought against major developers as part of the Equal Rights Center's efforts to eliminate disability-based discrimination in the housing industry. Actions have previously been filed by the Equal Rights Center against Archstone Smith Trust, AvalonBay Communities, and Bozzuto & Associates. "At the Equal Rights Center we are committed to doing everything we can to convince the housing industry that it should, and must, treat all people fairly under the law," concluded Rabbi Kahn.

"Since 1991 the law has required developers to include basic features of accessibility in multi-family housing," said Isabelle M. Thabault, Director of the Fair Housing Project at the Washington Lawyers Committee. "Years later, major developers like Equity Residential are still building apartment complexes that are difficult to access by persons who use wheel chairs. As one of the largest providers of rental housing in the United States, Equity Residential should be a leader in stopping this type of discrimination. Instead, it has added thousands of dwelling units to the housing market that are off-limits to persons who use wheelchairs."

The federal Fair Housing Act requires multi-family dwellings with four or more units, built for first occupancy after March 13, 1991, to be designed and constructed in a manner that incorporates certain features of accessibility and adaptable design including usable doors, kitchens and bathrooms, reinforced walls for grab bars and accessible and usable public and common use areas. The requirements apply to all units in elevator-served buildings, and the first floor of buildings without elevators. Some of the specific requirements include, for example, that doors be sufficiently wide, and kitchens and bathrooms have enough turning space, to allow use by a person using a wheelchair.

"These accessibility requirements add comparatively little to the cost of a building if they are included, as required by law, at the time of construction; however, they can be very expensive to fix if not done right the first time." said Ms. Thabault.

The Equal Rights Center is represented in this lawsuit by the Washington Lawyers' Committee for Civil Rights and Urban Affairs and the Washington law firm of Gilbert Heintz & Randolph LLP.

"As will be shown during the course of the litigation, the discriminatory allegations in the complaint are readily verifiable and beyond dispute," said Stacy Schaefer, an attorney with Gilbert Heintz & Randolph LLP. "The fair housing claims in this lawsuit should not come as a surprise to a major developer like Equity Residential, since the federal requirements have been in place for over a decade and half. Unfortunately, Equity Residential buildings reveal a pattern and practice of accessibility violations at scores of apartment properties across the country. We hope that Equity Residential will be willing to sit down with us and take all appropriate action to remedy the situation. While we are committed to discussions, we are equally committed to ensuring that the law is followed."

Originally established in 1983 as the Fair Housing Council of Greater Washington, the Equal

Rights Center is a private, not-for-profit, civil rights agency that is the product of mergers with the Fair Employment Council in 1999 and the Disability Rights Council of Greater Washington on June 30, 2005. It is dedicated to identifying, challenging, and eliminating discrimination in housing, employment, public accommodations, and government services through education, research, testing, counseling, enforcement, and advocacy. To obtain more information about the Equal Rights Center, please go to www.equalrightscenter.org or call the Equal Rights Center at 202-234-3062.

The Washington Lawyers' Committee for Civil Rights & Urban Affairs was established in 1968 to provide pro bono legal services to address issues of discrimination and entrenched poverty. Since its founding, the Committee has handled more than 5,000 cases on behalf of individuals and advocacy organizations in the areas of equal employment, fair housing, public accommodations, public education, asylum and refugee rights, and disability rights. For more information about the Committee, please see www.washlaw.org. The Committee can be reached at 202.319.1000.

For more information, please contact:

Rabbi Bruce E. Kahn

Executive Director

Equal Rights Center

202-234-3062
bkahn@equalrightscenter.org

Donald L. Kahl

Senior Counsel
Washington Lawyers' Committee for Civil Rights and Urban Affairs

202-319-1000 ext. 145
don_kahl@washlaw.org

# # #

# EXHIBIT 3



# ABOUT US

**Background:** Founded by community leaders and interdenominational clergy, the Equal Rights Center (ERC) was formed in 1999 when the Fair Housing Council of Greater Washington merged with the Fair Employment Council of Greater Washington. The ERC is the first private civil rights organization in the nation dedicated to advancing the principles of fair housing, fair employment, and equal access to public accommodations.

**Our Work:** The Equal Rights Center has been aggressively combating persistent discriminatory practices that place many Washington area residents at a disadvantage or illegally deny them access to opportunity. Partnering with fair housing groups from across the nation and with a variety of local and national community organizations, academics, researchers, the Washington Lawyers' Committee for Civil Rights and Urban Affairs and other civil rights litigators, the ERC implements effective enforcement, education, and outreach programs. Experts on civil rights law, students, and volunteers use both traditional and novel techniques to identify, test, and document discriminatory practices in areas of housing, employment, and public accommodations.

- Fair Housing: The ERC targets home warranty coverage, homeowners insurance, predatory lending, reverse redlining, and inaccessible housing for persons with disabilities. Recognized by the U.S. Department of Housing & Urban Development as a "Full Service Qualified Fair Housing Organization," the ERC has over 20 years of experience in complaint based and systemic testing for fair housing violations and the enforcement of meritorious claims. The ERC has developed a national reputation for its successful fair housing investigations and testing initiatives that have led to widely publicized and precedent-setting civil rights cases in the areas of sales; rentals; predatory lending and reverse redlining; homeowners' and renters insurance; home warranty services; and accessible housing for persons with physical disabilities.

- Fair Employment: The Fair Employment Project surveys employment practices utilizing traditional and novel testing techniques, works to redress workplace discrimination, and provides targeted anti-discrimination training programs and educational products. Utilizing testing, an ERC predecessor agency, the Fair Employment Council of Greater Washington, set national standards for the use of employment discrimination testing and was responsible for the country's first judicial precedents upholding the standing of private organizations and testers to litigate equal employment opportunity claims on the basis of tester-






**To learn more about the ERC, visit these pages**



**Board of Directors**



Staff

ation Support

generated evidence.

- Public Accommodations: The ERC targets discriminatory actions in the taxicab industry and internet-based delivery services, and enforces the laws regarding access to goods and services in the retail and restaurant industries. The Public Accommodations Project is responsible for developing the nation's first formal testing program to uncover differences in treatment to consumers based on unlawful practices. Tests are conducted in response to complaints received and at the requests of private and public organizations and public interest law firms. The Public Accommodations program has received both local and national attention and recognition. Past areas of focus have included gender discrimination by the home repair industry, race discrimination by the taxicab companies, racial redlining by dot.com companies, denial of and inferior service based on race and national origin in restaurants, and national origin and language access testing of services provided by government facilities.



# EXHIBIT 4





# THE BOZZUTO GROUP PRESS RELEASE

## Initiative to Stop Discrimination Against People with Disabilities Gains Momentum with the Filing of New Lawsuit

WASHINGTON, D.C., September 15, 2005-- A lawsuit against nationally known residential apartment developer Bozzuto and Associates was announced today, alleging discrimination against persons with disabilities. The complaint, filed in Maryland federal court by the Equal Rights Center and the Washington Lawyers' Committee for Civil Rights and Urban Affairs, charges Bozzuto with continuous and systematic violations of the civil rights of persons with disabilities in the design and construction of more than 50 apartment complexes in the District of Columbia , Maryland, Virginia, Connecticut, New Jersey, Pennsylvania.

Bozzuto, headquartered in Greenbelt, Maryland, is one of the largest apartment developers in the eastern United States. The apartment complexes involved in the District include: The Ellington, The Lexington at Market Square, the Residences at Historic Row, and the Fedora at Meridian Hill. Also included are 14 complexes in Virginia located in Ashburn, Centreville, Reston, Manassas, Vienna and Woodbridge; and 31 complexes in Maryland including: The Bennington in Silver Spring, The Whitney at Bethesda Theater in Bethesda, and Centerpoint in Baltimore.

"Since 1991 the law has required developers to include basic features of accessibility," said Isabelle M. Thabault, Director of the Fair Housing Project at the Washington Lawyers' Committee. "Fourteen years later, companies like Bozzuto continue to build apartment complexes that are difficult or impossible for persons who use wheel chairs to access. Through the use of narrow doorways, steps, and insufficient floor space, they have effectively barred from their apartments persons who use wheel chairs."

The federal Fair Housing Act requires all covered multi-family dwellings, built for first occupancy after March 13, 1991, to be designed and constructed in a manner that incorporates certain features of both accessibility and adaptable design including usable doors, kitchens and bathrooms, reinforced walls for grab bars and accessible and usable public and common use areas.

"Many players in the rental housing industry seem to believe that they can, with impunity, shut their apartment doors to people with disabilities," said Rabbi Bruce E. Kahn, Executive Director of the Equal Rights Center. "This attitude is wrong legally

and morally. This is an extremely serious civil rights issue. Disability rights are civil rights. It is uncivil to ignore them."

In December 2004, the Equal Rights Center began an initiative to eradicate this form of housing discrimination with the filing of a lawsuit against Archstone-Smith Trust, one of the nation's largest apartment developers. As a result, Archstone-Smith is retro-fitting over 12,000 apartment units in 71 complexes across the country to make them more accessible to persons with disabilities.

"The Equal Rights Center is determined to do all we can to help erase this damaging and demeaning form of discrimination," continued Rabbi Kahn. "Today, we take the next step by asking the courts to require Bozzuto and Associates to comply with the law and make their properties accessible to everyone. In 2005, in these United States of America, how could we settle for anything less?"

The Equal Rights Center, a long-standing advocate of civil rights issues, brings this lawsuit as part of its efforts to eliminate disability-based discrimination in the rental housing industry. In this suit, the Equal Rights Center is represented by the Washington Lawyers' Committee for Civil Rights and Urban Affairs and the Washington law firm of Fried, Frank, Harris, Shriver & Jacobson, LLP.

Originally established in 1983 as the Fair Housing Council of Greater Washington, the Equal Rights Center is a private, not-for-profit, civil rights agency that is now a product of mergers with both the Fair Employment Council in 1999 and the Disability Rights Council of Greater Washington on June 30, 2005. It is dedicated to identifying, challenging, and eliminating discrimination in housing, employment, public accommodations, and government services through education, research, testing, counseling, enforcement, and advocacy. To obtain more information about the Equal Rights Center, please go to www.equalrightscenter.org or call the Equal Rights Center at (202) 234-3062.

The Washington Lawyers' Committee for Civil Rights & Urban Affairs was established in 1968 to provide pro bono legal services to address issues of discrimination and entrenched poverty. Since its founding, the Committee has handled more than 5,000 cases on behalf of individuals and advocacy organizations in the areas of equal employment, fair housing, public accommodations, public education, asylum and refugee rights, and disability rights. For more information about the Committee, see www.washlaw.org. The Committee can be reached at (202) 319-1000.

For more information contact:

Isabelle M. Thabault, 202.319.1000 ext. 106
Director of the Fair Housing Project, Washington Lawyers' Committee
for Civil Rights and Urban Affairs
Isabelle_Thabault@washlaw.org

Rabbi Bruce E. Kahn, 202.234.3062
Executive Director, Equal Rights Center
bkahn@equalrightscenter.org

# EXHIBIT 5



# CONTACT US

**11 Dupont Circle NW, Suite 400**
**Washington, DC 20036**

**(Free) 866.719.4ERC**
**(Voice) 202.234.3062**
**(TTY) 202.234.7590**
**(Fax) 202.234.3106**
**info@equalrightscenter.org**

To contact an individual staff member, please click <u>here</u> for names, e-mail addresses, and extensions.

We are located at 11 Dupont Circle, on the corner of New Hampshire Avenue and Dupont Circle, which is accessible by bus and metro. The building's distinguishing feature is the "Books-A-Million" sign on the first floor. The entrance is on the side of the building, off of New Hampshire: come in, sign the visitor's book, and take the elevator to the fourth floor.

**Home**

**In the News**

**Media Room**

**About Us**

**What We Do**

**Testimonials**

**...ces and Links**

**FAQ**

**Employment**

# EXHIBIT 6



# RESOURCES AND LINKS

## Local Human Rights and Relations Agencies

Alexandria Office of Human Rights
(703) 838-6390

Arlington County Human Rights Commission
(703) 228-3929

DC Office of Human Rights
(202) 727-4559

Equal Employment Opportunity Commission
(202) 257-7377

Fairfax County Human Rights Commission
(703) 324-2953

HUD Office of Fair Housing and Equal Opportunity
(800) 669-9777

Justice Department (Civil Rights Division)
(202) 514-4713

Maryland Commission on Human Relations
(410) 767-8600

Montgomery County Office of Human Rights
(240) 777-8450

Prince George's County Human Relations Commission
(301) 883-6170

Prince William County Human Rights Commission
(703) 792-4680

Virginia Council on Human Rights
(804) 225-2292



## Assorted Links

<u>D.C. Resources</u>

# EXHIBIT 7

UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

NOV 1 9 2001

|  |  |
|---|---|
| TONYA MOSEKE and | ) |
| EQUAL RIGHTS CENTER | ) |
| Plaintiffs, | ) |
| v. | ) |
| MILLER AND SMITH, INC. | ) |
| MILLER AND SMITH HOLDING, INC. | ) |
| MILLER & SMITH LAND, INC. | ) |
| MILLER & SMITH COMMERCIAL PROPERTIES, INC. | ) |
| MILLER & SMITH HOMES, INC. | ) |
| BC CONSULTANTS, INC. | ) |
| CHRISTOPHER CONSULTANTS, LTD. | ) |
| ETON SQUARE CONDOMINIUM ASSOCIATION, INC. | ) |
| KINGSTOWNE RESIDENTIAL OWNERS CORPORATION | ) |
| BALDWIN GROVE, A CONDOMINIUM ASSOCIATION, INC. | ) |
| GATES AT WEST FALLS, A CONDOMINIUM ASSOCIATION, INC. | ) |
| Defendants. | ) |

Case No.: 01-1771-A

257783 v2

## COMPLAINT

Plaintiffs Tonya Moseke ("Ms. Moseke") and Equal Rights Center ("ERC"), for their complaint against the defendants herein, allege on knowledge, information and belief as follows:

1.    This is an action for damages, declaratory judgment, and permanent injunctive relief, for discrimination on the basis of disability.

2.    Plaintiff Ms. Moseke sought housing in the Eton Square condominium complex. Ms. Moseke, who is handicapped and has limited mobility, was unable to access or move within the Eton Square condominium units or access certain Eton Square common areas because various design features of the property prevented her from using her motorized scooter.

3.    After Ms. Moseke filed a complaint with the ERC regarding the design and construction of Eton Square, the ERC surveyed Eton Square and two other Northern Virginia condominium complexes—Baldwin Grove and Gates at West Falls. The ERC investigation uncovered numerous features that made the properties inaccessible to persons with a mobility impairment or any other handicap.

4.    Defendants Miller and Smith, Inc., Miller and Smith Holding, Inc., Miller & Smith Land, Inc., Miller & Smith Commercial Properties, Inc., Miller & Smith Homes, Inc. (collectively, "Miller & Smith"), BC Consultants, Inc. ("BC Consultants"), Christopher Consultants, Ltd. ("Christopher Consultants"), Eton Square Condominium Association, Inc., ("ESCA"), Kingstowne Residential Owners Corporation ("KROC"), Baldwin Grove, A Condominium Association, Inc. ("BGCA"), and Gates at West Falls, A Condominium Association, Inc. ("GWFCA") participated in the design, construction, and maintenance of Eton Square, Baldwin Grove, and/or Gates at West Falls.

5.    Defendants' actions constitute discriminatory housing practices in violation of the Fair Housing Amendments Act of 1988, 42 U.S.C. § 3601 *et seq.* (the "FHAA") and the Virginia Fair Housing Law, Va. Code Ann. § 36-96.1 *et seq.* (the "FHL").

## I.    JURISDICTION AND VENUE

6.    This court has subject matter jurisdiction over this action under 42 U.S.C. § 3613(a) and 28 U.S.C. §§ 1331, 1337, 1343(a)(4), and 2201.

7.    Venue is proper because all of the defendants reside or are located in this district of the Commonwealth of Virginia. Additionally, venue is proper because the events and omissions giving rise to the claims occurred in this district of the Commonwealth of Virginia.

## II.    PARTIES

8.    Plaintiff Ms. Moseke is a United States citizen and resident of the Commonwealth of Virginia. Ms. Moseke has juvenile rheumatoid arthritis and requires a motorized scooter for mobility. Ms. Moseke is a person with a "handicap" within the meaning of 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1.

9.    Ms. Moseke is an "aggrieved person" within the definition of 42 U.S.C. § 3602(i) and Va. Code Ann. § 36-96.1:1, and as used in 42 U.S.C. § 3613(a)(1)(A) and Va. Code Ann. § 36-96.18.

10.    Plaintiff ERC is a nonprofit corporation organized under the laws of the District of Columbia with its principal place of business at 11 Dupont Circle, N.W., 4th Floor, Washington, D.C. 20036. The ERC was founded in 1999 by a group of interdenominational clergy and community leaders to provide a multi-faceted approach to civil rights issues and to create an open society where equal opportunity for all is assured. The ERC provides a multi-disciplinary

program of private enforcement, voluntary compliance, education and outreach, diversity training, research, and planning initiatives for the public and private sector.

11.    Throughout the greater Washington metropolitan area, the ERC engages in activities to identify barriers to fair housing and to help counteract and eliminate discriminatory housing practices. In support of its goals, the ERC engages in a variety of educational, counseling, and referral services, as well as community monitoring activities, throughout the greater Washington metropolitan area. The ERC's various programs provide guidance, information, and assistance to protected individuals who are seeking housing in the greater Washington metropolitan area.

12.    The ERC is an "aggrieved person" within the definition of 42 U.S.C. § 3602(i) and Va. Code Ann. § 36-96.1:1, and as used in 42 U.S.C. § 3613(a)(1)(A) and Va. Code Ann. § 36-96.18.

13.    The companies denoted herein as Defendant Miller & Smith are all chartered under the laws of the Commonwealth of Virginia and are located at 1568 Spring Hill Road, Suit 400, McLean, Virginia 22102.

14.    Defendant BC Consultants is chartered under the laws of the Commonwealth of Virginia and is located at 12600 Fair Lakes Circle, Suite 100, Fairfax, Virginia 22033.

15.    Defendant Christopher Consultants is chartered under the laws of the Commonwealth of Virginia and is located at 9900 Main Street, Suite 503, Fairfax, Virginia 22301.

16.    Defendant ESCA is an entity organized under the laws of the Commonwealth of Virginia and is located in Kingstowne, Virginia. ESCA controls the common areas of Eton Square condominium complex, including the parking areas, sidewalks, building entrances, and mailbox areas.

17.    Defendant KROC is an entity organized under the laws of the Commonwealth of Virginia and is located at 6090 Kingstowne Village Parkway, Kingstowne, Virginia 22315. KROC also controls the common areas of Eton Square, including the parking areas, sidewalks, building entrances, and mailbox areas.

18.    Defendant BGCA is an entity organized under the laws of the Commonwealth of Virginia and is located in Reston, Virginia. BGCA controls the common areas of Baldwin Grove condominium complex, including the parking areas, sidewalks, building entrances, and mailbox areas.

19.    Defendant GWFCA is an entity organized under the laws of the Commonwealth of Virginia and is located in Falls Church, Virginia. GWFCA controls the common areas of Gates at West Falls condominium complex, including the parking areas, sidewalks, building entrances, and mailbox areas.

## III.    FACTS

### Eton Square Condominiums

20.    Eton Square is a condominium complex situated in Kingstowne, Virginia, a planned community of nearly 5000 homes located near Springfield, Virginia. The 298-unit Eton Square complex consists of approximately thirty multi-story, multi-family buildings, all of which have been completely constructed. Each building has eight to twelve units on three or four levels. Eton Square has external parking, sidewalks, common entrances to buildings and mailbox facilities.

21.    Eton Square was designed and constructed by Miller & Smith, a developer, and BC Consultants, an architectural firm, for first occupancy after March 13, 1991.

22.    During the summer of 1999, Ms. Moseke and her brother, David Moseke, sought an

apartment in the Northern Virginia area. Ms. Moseke requires an apartment that is accessible by

her motorized scooter.

23.    Ms. Moseke was encouraged by her realtor to consider renting one of the

condominiums in Eton Square. David Moseke viewed a unit for rent at Eton Square and

completed and signed a rental application. Shortly thereafter, Ms. Moseke viewed the Eton

Square buildings and surrounding neighborhood.

24.    Ms. Moseke observed that the exterior common areas of Eton Square lacked several

features necessary to allow her access to the interior of the individual units or use common areas:

> a)  the parking lots lacked reserved handicapped parking spots;
>
> b)  the parking lots lacked curb cuts necessary to allow a motorized scooter or
> wheelchair to access the sidewalks from the surface of the parking lots;
>
> c)  there were steps from the sidewalks to the common entrances of the buildings,
> preventing a motorized scooter or wheelchair user from entering a building without
> being carried; and
>
> d)  the mailbox facilities had no curb cuts from the parking lot to the median where
> the mailboxes were located, and some of the mailboxes were out of the reach of
> persons seated in a motorized scooter or wheelchair.

25.    In June, 1999, Ms. Moseke contacted the Fair Housing Council of Greater

Washington (now a component of the ERC) seeking advice regarding her options for requesting

a reasonable accommodation.

26.    Ms. Moseke's realtor requested on Ms. Moseke's behalf that the condominium owner

or the ESCA accommodate her disability by providing a reserved, accessible handicapped

parking space and by constructing a ramp that would enable her to reach the front door from the sidewalk. The ESCA refused to make the unit accessible.

27.    Ms. Moseke has continued to desire to reside at one of the Eton Square units and has continued to investigate the availability of units. In April, 2001, Ms. Moseke considered purchasing an available unit at Eton Square. Ms. Moseke did not rent or purchase an Eton Square unit because the complex is inaccessible to her.

28.    In January 2000, Ms. Moseke filed a complaint regarding her experience at Eton Square with the ERC.

29.    After receiving Ms. Moseke's complaint, the ERC began an investigation of the accessibility of the Eton Square complex. On March 23, 2000, an ERC investigative tester ("First Eton Square tester"), visited Eton Square to determine its accessibility for those with any mobility impairment or any other handicap as defined in 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1.

30.    The First Eton Square tester surveyed the exterior features of fifteen units in five buildings of the Eton Square complex. The First Eton Square tester also investigated certain interior features of one Eton Square unit. The First Eton Square tester's observations revealed several features that made the units inaccessible to persons with any mobility impairment or any other handicap as defined in 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1.

31.    The Eton Square complex had no accessible parking spaces reserved for the use of handicapped persons.

32.    Two of the buildings surveyed lacked curb cuts from the parking area to the sidewalks leading to the ground floor units. Only one curb cut led to an accessible parking aisle.

That parking aisle was located adjacent to a parking space that was not designated as handicapped parking.

33.    One of the buildings investigated had steps leading to three of the four ground level units. Nine of the fifteen units surveyed had exterior thresholds of at least 3.5". Each of the remaining six units investigated had exterior thresholds of at least .75"

34.    The mailbox structures, located on a raised median near the parking lot, did not have any curb cuts.

35.    The interior of the one ground floor Eton Square unit observed by the First Eton Square tester was inaccessible to those with any mobility impairment or any other handicap as defined in 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1. Two environmental controls observed were 60 or 54 inches above the floor. The front door of the unit was 33 inches wide.

36.    On June 25, 2001 and July 9, 2001, the ERC dispatched second investigative testers (the "Second Eton Square testers") to observe the accessibility of Eton Square units. The Second Eton Square testers observed that the interior space of another Eton Square unit was inaccessible to those with any mobility impairment or any other handicap as defined in 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1. The entrance door did not have a lever or handle. The passageway into the kitchen was as narrow as 32 inches. The kitchen itself permitted only a turning diameter of 50 inches. The doorway between the second bathroom and the second bedroom was less than 32 inches. At least one environmental control was 60 inches above the floor.

37.    The Second Eton Square testers also observed that eighteen of the thirty-three ground floor units observed had steps leading to the entrance doors and twenty-two of the units had thresholds measuring between 3.5 and 6 inches. The Second Eton Square testers also observed

that the mailboxes island located in the parking lot did not have curb cuts for wheelchair or scooter access.

38.     Defendants Miller & Smith and BC Consultants and their agents have designed and constructed the exterior entrances, access routes, public use and common use areas, parking, sidewalks, foyers, and mailbox facilities in Eton Square in violation of the FHAA requirements, 42 U.S.C. § 3604(f), and the FHL requirements, Va. Code Ann. § 36-96.3, and in such a way as to make purchasing or renting a unit and living there difficult or impossible for those with any mobility impairment or any other handicap as defined in 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1.

39.     Defendants Miller & Smith and BC Consultants and their agents have designed and constructed the interior space, doorways and environmental controls in the individual units of Eton Square in violation of the FHAA requirements, 42 U.S.C. § 3604(f), and the FHL requirements, Va. Code Ann. § 36-96.3, and in such a way as to make purchasing or renting a unit and living there difficult or impossible for those with any mobility impairment or any other handicap as defined in 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1.

40.     The ERC's investigation further included examining other complexes developed by Miller & Smith and BC Consultants.

### Baldwin Grove Condominiums

41.     Baldwin Grove is a condominium complex located in Reston, Virginia. The complex consists of seven multi-story, multi-family buildings, all of which have been completely constructed. Each building has four levels with nine to twelve units each. Baldwin Grove has external parking, sidewalks, foyers, and mailbox facilities.

42.    Baldwin Grove also was designed and constructed by Miller & Smith and BC Consultants for first occupancy after March 13, 1991.

43.    On August 11, 2000, an ERC investigative tester (the "First Baldwin Grove tester"), visited Baldwin Grove in order to test its accessibility for those with any mobility impairment or any other handicap as defined in 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1.

44.    During the visit, the First Baldwin Grove tester observed that the buildings had features that made them inaccessible to those with any mobility impairment or any other handicap as defined in 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1.

45.    The First Baldwin Grove tester observed at least fourteen ground level units with steps to the front entrances. The First Baldwin Grove tester also observed at least fourteen units with thresholds as high as 6.5 inches.

46.    The First Baldwin Grove tester observed that the public use and common use areas were also inaccessible to those with any mobility impairment or any other handicap as defined in 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1. Baldwin Grove lacked sufficient reserved, accessible handicapped parking spaces. The parking lot lacked curb cuts leading to the sidewalks. Mailbox facilities, which were attached to the buildings, had steps leading up to them.

47.    On June 25, 2001, the ERC dispatched second investigative testers to Baldwin Grove (the "Second Baldwin Grove testers") to survey the accessibility of the complex. The Second Baldwin Grove testers observed that the interior spaces of one Baldwin Grove unit was inaccessible to those with any mobility impairment or any other handicap as defined in 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1.

48.    The entrance door did not have a lever or handle. The hallway entrance to the bathrooms and bedrooms was 34.5 inches wide. Environmental controls were placed 60 inches above the floor. The door to the hallway full bathroom was 31.5 inches wide.

49.    The Second Baldwin Grove testers observed that eleven of thirteen ground floor units surveyed had steps leading to the entrance doors. The Second Baldwin Grove testers did not observe any curb cuts leading from the parking lot to the buildings.

50.    Defendants Miller & Smith and BC Consultants and their agents have designed and constructed the exterior entrances, access routes, public use and common use areas, parking, sidewalks, foyers, and mailbox facilities in Baldwin Grove in violation of the FHAA requirements, 42 U.S.C. § 3604(f), and the FHL requirements, Va. Code Ann. § 36-96.3, and in such a way as to make purchasing or renting a unit and living there difficult or impossible for those with any mobility impairment or any other handicap as defined in 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1.

51.    Defendants Miller & Smith and BC Consultants and their agents have designed and constructed the interior space, doorways and environmental controls in the individual units of Baldwin Grove in violation of the FHAA requirements, 42 U.S.C. § 3604(f), and the FHL requirements, Va. Code Ann. § 36-96.3, and in such a way as to make purchasing or renting a unit and living there difficult or impossible for those with any mobility impairment or any other handicap as defined in 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1.

### Gates at West Falls Condominiums

52.    The Gates at West Falls is a condominium complex located in Falls Church, Virginia. The complex consists of nine multi-story, multi-family buildings, all of which have been

completely constructed. Each building has seven to fourteen units on several levels. The Gates at West Falls has external and covered parking, sidewalks, foyers, and mailbox facilities.

53.    The Gates at West Falls was designed and constructed by Miller & Smith and Christopher Consultants, an architectural firm, for first occupancy after March 13, 1991.

54.    On August 7, 2000, an ERC investigative tester (the "First Gates at West Falls tester"), visited the Gates at West Falls in order to test its accessibility for those with any mobility impairment or any other handicap as defined in 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1. The First Gates at West Falls tester surveyed certain exterior features of the buildings in the complex. The First Gates at West Falls tester observed that the buildings all had features that made them inaccessible to those with any mobility impairment or any other handicap as defined in 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1.

55.    The First Gates at West Falls tester observed at least thirteen units with between one and six steps leading to the front ground floor entrances. The First Gates at West Falls tester observed that five of the Gates at West Falls buildings had steps leading to the covered parking.

56.    The First Gates at West Falls tester observed that the public use and common use areas were also inaccessible to those with any mobility impairment or any other handicap as defined in 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1. At least two of the mailbox facilities, attached to the buildings, had steps leading up to them.

57.    On June 25, 2001, the ERC dispatched second investigative testers to the Gates at West Falls (the "Second Gates at West Falls testers") in order to test the accessibility of the complex. The Second Gates at West Falls testers observed that the interior spaces of one Gates at West Falls unit was inaccessible to those with any mobility impairment or any other handicap as defined in 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1.

58.    The entrance door did not have a lever or handle. The front door threshold was as high as 1.5 inches. The front hallway was as narrow as 33.5 inches and the hallway to the bathrooms and bedrooms was 35 inches. Environmental controls were placed at 49.5 inches and 60 inches above the floor. The hallway bathroom lacked an adequate turning radius for use by a person in a wheelchair or motorized scooter.

59.    The Second Gates at West Falls testers observed that approximately half of the twelve ground floor units surveyed were inaccessible to those with any mobility impairment or any other handicap as defined in 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1 because of stairs or passageways of 34.5 inches.

60.    Defendants Miller & Smith and Christopher Consultants and their agents have designed and constructed the exterior entrances, access routes, public use and common use areas, parking, sidewalks, foyers, and mailbox facilities in the Gates at West Falls in violation of the FHAA requirements, 42 U.S.C. § 3604(f), and the FHL requirements, Va. Code Ann. § 36-96.3, and in such a way as to make purchasing or renting a unit and living there difficult or impossible for those with any mobility impairment or any other handicap as defined in 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1.

61.    Defendants Miller & Smith and Christopher Consultants and their agents have designed and constructed the interior space, doorways and environmental controls in the individual units of Gates at West Falls in violation of the FHAA requirements, 42 U.S.C. § 3604(f), and the FHL requirements, Va. Code Ann. § 36-96.3, and in such a way as to make purchasing or renting a unit and living there difficult or impossible for those with any mobility impairment or any other handicap as defined in 42 U.S.C. § 3602(h) and Va. Code Ann. § 36-96.1:1.

## IV.     INJURY TO PLAINTIFFS

62.     As a result of Defendants' actions described above, Plaintiff Ms. Moseke has

suffered, is continuing to suffer, and will in the future suffer, great and irreparable loss and

injury, including, but not limited to, out-of-pocket expenses, humiliation, embarrassment,

emotional distress, and a deprivation of the right to equal housing opportunities regardless of

handicap.

63.     As a result of Defendants' actions described above, Plaintiff ERC has been directly

and substantially injured and frustrated in its mission to eradicate discrimination in housing and

home ownership, and in its efforts to carry out the programs and services that it provides,

including encouraging integrated living patterns, educating the public about fair housing rights

and requirements, educating and working with industry groups on fair housing compliance,

providing counseling services to persons either looking for housing or affected by discriminatory

housing practices, and eliminating discriminatory housing practices. Plaintiff ERC also has been

damaged by having to divert scarce resources that could have been used to provide these services

to instead identify and counteract Defendants' discriminatory policies and practices.

## V.     CAUSE OF ACTION

64.     Plaintiffs repeat the allegations of all of the above paragraphs as if fully set forth

herein.

65.     As described above, Defendants' actions and practices, including the actions and

practices of its agents, violate the Fair Housing Act of 1968, as amended, 42 U.S.C. § 3601 *et*

*seq.* and the Virginia Fair Housing Law, Va. Code Ann. §36-96.1 *et seq.*

66.     As described above, Defendants' actions and practices, including the actions and

practices of its agents, discriminate in the sale or rental, otherwise make unavailable or deny,

257783 v2                                    - 14 -

dwellings to buyers or renters because of a handicap of the buyer or renter, persons residing in or intending to reside in that dwelling after it is sold, rented, or made available; and other persons associated with the buyer or renter. See 42 U.S.C. § 3604(f)(1) and Va. Code Ann. § 36-96.3(A)(8).

67.    As described above, Defendants' actions and practices, including the actions and practices of its agents, constitute a failure to design and construct Eton Square, Baldwin Grove, and the Gates at West Falls, all covered, multi-family buildings, in such a manner that (i) the public use and common use portions of such dwellings are readily accessible to and usable by those with any mobility impairment or any other handicap as defined in 42 U.S.C. §3602(h) and Va. Code Ann. § 36-96.1:1; (ii) all the doors designed to allow passage into and within all premises within such dwellings are sufficiently wide to allow passage by those with any mobility impairment or any other handicap as defined in 42 U.S.C. §3602(h) and Va. Code Ann. § 36-96.1:1; and (iii) all premises within such dwellings contain the following features of adaptive design: (a) an accessible route into and through the dwelling; (b) light switches, electrical outlets, thermostats, and other environmental controls in accessible locations; (c) reinforcements in bathroom walls to allow later installation of grab bars; and (d) usable kitchens and bathrooms such that those with any mobility impairment or any other handicap as defined in 42 U.S.C. §3602(h) and Va. Code Ann. § 36-96.1:1, can maneuver about the space. See 42 U.S.C. § 3604(f)(3)(C) and Va. Code Ann. 36-96.3(B)(iii).

68.    As described above, Defendant Eton Square Condominium Association's actions and practices, including the actions and practices of its agents, constitute a refusal to make reasonable accommodations in rules, policies, practices, or services, when such accommodations may be

necessary to afford a person equal opportunity to use and enjoy a dwelling.  See 42 U.S.C. §

3604(f)(3)(B) and Va. Code Ann. 36-96.3(B)(ii).

## VI.    RELIEF

69.    WHEREFORE, Plaintiffs Moseke and the ERC pray that this Court enter an order

that:

      a)  Declares that Defendants' policies, practices, and actions as alleged herein,

      violate the FHAA;

      b)  Enjoins Defendants from continuing to discriminate on the basis of handicap in

      the construction and sale of housing;

      c)  Orders Defendants to cease further construction and sales of all units that are not

      in compliance with the FHAA, and its implementing regulations;

      d)  Orders Defendants to take affirmative actions as necessary to bring the interior

      spaces, exterior entrances, access routes, public use and common use areas, parking,

      sidewalks, foyers and mailbox facilities at Eton Square, Baldwin Grove and the Gates

      at West Falls into compliance with 42 U.S.C. § 3604 of the FHAA and its

      implementing regulations and into compliance with Va. Code Ann. 39-96.3 of the

      FHL and its implementing regulations;

      e)  Awards Plaintiffs appropriate compensatory and punitive damages against

      Defendants;

      f)  Awards Plaintiffs reasonable attorneys' fees, expenses and costs; and

      g)  Grants such other relief as may be just and necessary.

## VII.    DEMAND FOR JURY

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiffs Moseke and the

ERC demand trial by jury of all issues triable by jury in this matter.

Dated:  November 19, 2001.

Respectfully submitted,

Richard A. Simpson (Va Bar No. 32454)
Pragna Soni (Va Bar No. 41612)
Benjamin C. Eggert
Ross, Dixon & Bell, L.L.P.
2001 K Street, N.W.
Washington, D.C.  20006-1040

(202) 662-2000

*Counsel  for Plaintiffs*
*Tonya Moseke and the*
*Equal Rights Center*

Reed Colfax
Eliza Platts-Mills (Va Bar. No. 44442)
Washington Lawyers' Committee for Civil
Rights & Urban Affairs
11 Dupont Circle, N.W., #400
Washington, D.C.  20036

(202) 319-1000

*Counsel for Plaintiffs*
*Tonya Moseke and the*
*Equal Rights Center*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| EQUAL RIGHTS CENTER )<br><br>Plaintiff, )<br><br>vs. )<br><br>POST PROPERTIES, INC. )<br>POST GP HOLDINGS, INC. )<br>POST APARTMENT HOMES, L.P. )<br><br>Defendants. ) | Case. No. 1:06CV01991<br>Judge Richard J. Leon |

### ORDER

UPON CONSIDERATION OF Defendants Post Properties, Inc., Post GP Holdings, Inc.,

and Post Apartment Homes, L.P.'s Motion to Dismiss or in the Alternative for Partial Summary

Judgment, and any opposition thereto, it is by the United States District Court for the District of

Columbia, this _____ day of _____ 2007, hereby

ORDERED that Defendant's Motion to Dismiss is GRANTED

_____
**JUDGE RICHARD J. LEON**

Copies provided to:

Sheila Jane Carpenter, Esq.
Jorden Burt LLP
1025 Thomas Jefferson Street, NW
Suite 400 East
Washington, DC 20007

1

Donald Lee Kahl, Esq.
Washington Lawyers' Committee for Civil Rights & Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, DC 20036

Christopher B. Hanback, Esq.
Holland & Knight LLP
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006