IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EQUAL RIGHTS CENTER )<br>)<br>Plaintiff, )<br>)<br>vs. )<br>)<br>POST PROPERTIES, INC. )<br>POST GP HOLDINGS, INC. )<br>POST APARTMENT HOMES, L.P. )<br>)<br>Defendants. )<br>) | Case. No. 1:06CV01991<br>Judge Richard J. Leon |

**DEFENDANTS' REPLY IN SUPPORT OF ITS MOTION TO DISMISS OR
IN THE ALTERNATIVE FOR PARTIAL SUMMARY JUDGMENT**

Defendants Post Properties, Inc., Post GP Holdings, Inc., and Post Apartment Homes, L.P. (collectively "Post"), by undersigned counsel, hereby file this Reply in Support of their Motion to Dismiss or in the Alternative Motion for Partial Summary Judgment.[1]

**INTRODUCTION**

Plaintiff Equal Rights Center ("ERC"), in filing this complaint against Post[2] has overlooked (1) the constitutional limits on standing (the requirements of which *every* plaintiff must satisfy regardless of the plaintiff's intentions), and (2) the two-year statute of limitations

---

[1] Post's Alternative Motion for Summary Judgment only pertains to the additional facts acquired in the ordinary course of business as provided in the Affidavit of Dayna Boone, which is attached as Exhibit 1 to Post's Motion to Dismiss. For the sake of completeness, accompanying this Reply is Post's Statement of Material Facts to Which There is No Genuine Dispute. Post will not oppose if the ERC desires to submit a surreply based on these limited facts. However, Post notes that the ERC had an opportunity to respond to these facts in their opposition brief.

[2] The ERC's Complaint states two causes of action, one under the Fair Housing Act ("FHA"), 42 U.S.C. § 3604(f), and one under the Americans With Disabilities Act ("ADA"), 42 U.S.C. §§ 12182 +and 12183.

provision of the FHA. In responding to Post's Motion to Dismiss, the ERC provides no new evidence of its standing and merely cites to the allegations of its Complaint. Because the ERC has failed to meet its burden in proving or producing evidence of its standing and because the majority of Post's properties were designed and constructed outside of the statute of limitations period, Post's Motion to Dismiss should be granted and the ERC's Complaint should be dismissed.

Once the ERC's standing has been challenged, the ERC must come forward with more than conclusory and bare allegations of injury. Incredibly, the ERC asserts that the way to cure the problems set forth in Post's Motion to Dismiss would be to allow for discovery against Post. Not only would that turn the burden of proof on its head, the ERC can offer no rational explanation for how discovery propounded against Post would fill the enormous holes in the ERC's allegations of injury necessary to support standing. Nothing in Post's documents, for example, will offer proof that the ERC suffered an actual injury that is traceable to a building constructed in Texas.

The ERC's broad and undefined allegations of injury (frustration of mission and diversion of resources) are insufficient to impart standing. The alleged fact that the ERC has a broad mission of fighting discrimination is alone too abstract to impart standing. In turn, the ERC's diversion of resources claim, which is based on nothing more than the testing required to pursue this litigation, is the manufactured type of injury that has been rejected by this court in the past as a basis for standing.

Furthermore, the ERC has made no attempt to tie its alleged injuries to the alleged discriminatory acts of Post. The complaint casts a wide net, alleging design and construction violations in numerous states, including Arizona, Colorado, Florida, Georgia, New York, North

Carolina, and Texas. Yet, the ERC has failed to show how Post's design and construction of properties in those states outside of the greater Washington, DC area could possibly lead to a direct impact on the ERC's routine activities. The point is not that its "headquarters" are in Washington, DC (although tellingly the ERC did not offer that it operates or undertakes any activities in any other location), but rather that the ERC has failed to demonstrate that there is a causal connection between its allegations of injury and the Subject Properties located outside of the Washington, DC metropolitan area.

Regardless of the generous breadth of the ERC's mission statement, aside from its preparation to file suit (e.g. the testing of properties) the ERC cannot prove that design and construction of a building located over 2,000 miles away from Washington, DC actually affected the services the ERC provides or caused the ERC to divert any resources to actually responding to harm in the location of the alleged violation. While the ERC can claim that there are "no limits" on the "geographical scope" of its mission, it still must show actual, as opposed to hypothetical injury.

The ERC ignores the statutory requirements of the FHA's statute of limitations, which limits the scope of this suit to only those properties where construction was completed within the two years preceding the ERC's filing date. In response, the ERC claims that the statute of limitations is irrelevant because Post's alleged failure to design and construct multi-family residential dwellings according to FHA and ADA standards amounts to a continuous pattern and practice of discrimination against person with disabilities. The design and construction of a building, however, is a discrete act with a clear point of termination; by its nature, it is not subject to the continuing violation doctrine. If upheld, the ERC's contentions concerning the continuing violation doctrine would eviscerate the statute of limitations entirely by holding a

developer liable for all properties built after the effective date of the FHA as long as that developer continues to build or design properties. If this never-ending source of liability were Congress's intent, then Congress would not have drafted a statute of limitations provision at all.

In sum, the ERC attempts to rely upon the bare allegations of the complaint and the broad intentions of its mission statement to suggest that, as a civil rights organization, it has standing to challenge whatever activity it believes is contrary to that mission. The ERC, however, has not demonstrated the concrete injury, causation, and redressibility necessary to confer either organizational or associational standing and it cannot get around the statutory limits on the scope of its suit. The Court should not be diverted by the ERC's desire to have the allegations of the merits of its case replace proof of actual standing. The ERC's complaint must be dismissed.

## ARGUMENT

I. **The ERC Failed To Adequately Allege An Injury-in-Fact That Is Fairly Traceable To The Alleged Actions Of Post For The Purposes Of Article III Standing Under The Fair Housing Act.**

To meet the Article III "irreducible constitutional minimum" of standing, a plaintiff must show "(1) it has suffered an 'injury in fact' that is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical; (2) the injury is fairly traceable to the challenged action of the defendant; and (3) it is likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision." Friends of the Earth, Inc. v. Laidlaw Envtl. Servs., 528 U.S. 167, 180-81 (2000) (citing Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992)). Here, the ERC alleges two injuries to itself as an organization—that it has been frustrated in its mission and that it has been forced to divert resources to identify, investigate, and counteract Post's alleged discriminatory practices. It is the ERC's burden to prove that these injuries

constitute an injury-in-fact in accordance the Laidlaw definition above; however, the ERC has not met this burden.[3] See Lujan, 504 U.S. at 561.

    A.    The ERC's alleged injury of frustration of mission is too abstract and the allegation of diversion of resources is not enough to confer standing

In response to Post's Motion, the ERC simply cites to its Complaint and alleges that Post's design and construction of the Subject Properties caused the ERC injury because it has been frustrated in its mission. The law is clear, though, that such an amorphous injury cannot constitute an injury-in-fact for standing purposes. See Havens Realty Corp. v. Coleman, 455 U.S. 363, 379 (1982) (citing Sierra Club v. Morton, 405 U.S. 727, 739 (1972)) (holding that a "setback to [an] organization's abstract social interests" is inadequate as an injury-in-fact). In fact, the D.C. Circuit has specifically held that "[f]rustration of an organization's objectives 'is the type of abstract concern that does not impart standing.'" Nat'l Treasury Employees Union v. United States, 101 F.3d 1423, 1429-30 (D.C. Cir. 1996) (quoting Nat'l Taxpayers Union, Inc. v. United States, 68 F.3d 1428, 1433 (D.C. Cir. 1995). Thus, the ERC's bare allegation of frustration of mission does not constitute an injury-in-fact for standing.[4]

The ERC also alleges that it was injured when it was forced to divert its resources to identify and counteract Post's alleged unlawful practices. To support this allegation as an

---

[3] Once standing has been challenged, it is the plaintiff's burden to come forward with proof of its standing. Sierra Club v. EPA, 292 F.3d 895 (D.C. Cir. 2002). The Sierra Club Court held that when standing is not self-evident, a plaintiff must establish its standing "by the submission of its arguments and any affidavits or other evidence appurtenant thereto at the first appropriate point" in the proceeding. Id. at 900; see also Spann v. Colonial Village, Inc., 899 F.2d 24, 28, n. 1 (D.C. Cir. 1990) ("This court and the district court may properly consider affidavits submitted by the parties in addition to the complaint, to resolve the standing question."). The Court further held that "in some cases that [point in the proceeding] will be in response to a motion to dismiss for want of standing." Sierra Club, 292 F.3d at 900. Surprisingly, the ERC did not avail itself of the opportunity to submit affidavits or other proof of its standing. Rather, the ERC chose to submit a declaration that is more properly characterized as a discovery request against Post.

[4] The ERC does not seem to dispute this case law in its Response.

5

adequate injury-in-fact, the ERC relies on Havens. (Pl. Br. 9-10.) In Havens, the plaintiff organization alleged that the defendant's discriminatory racial steering practices "frustrated the organization's counseling and referral services, with a consequent drain on resources," and the Court held that the alleged perceptive impairment on the organization's ability to provide counseling and referral services constituted an injury-in-fact." Havens, 455 U.S. at 369, 380. Thus, in Havens, the Court focused not on the fact that resources were allegedly diverted but on the allegation that the organization was "impaired" by the defendant. In other words, the defendant's alleged actions must actively inflict injury upon the organization. See Fair Employment Council of Greater Washington, Inc. v. BMC Marketing Corp., 28 F.3d 1268, 1277 (D.C. Cir. 1994) (explaining that in Havens, "the Court did not base standing on the diversion of resources from one program to another, but rather on the alleged injury that the defendants' action themselves had inflicted upon the organization's programs").[5]

Here, the ERC has failed to allege that Post's alleged violations inflicted any injury on the ERC other than the assertion that its decision to investigate and counteract Post's alleged violations caused it to spend resources on that investigation. The ERC alleges only that "it became aware that a large number of new multifamily housing complexes were being constructed in the greater Washington, D.C. area that did not include the required elements of accessible design." (Compl. ¶ 15.) The ERC does not allege that there was any specific action

---

[5] Spann v. Colonial Village, Inc., 899 F.2d 24 (D.C. Cir. 1990), to which the ERC also cites, can be distinguished on similar grounds. In Spann, the plaintiff organization alleged that the defendant's discriminatory advertising practices interfered with the organization's efforts and programs thus impelling the organizations to devote resources to checking or neutralizing the ads' adverse impacts. Id. at 27. In other words, in Spann, the interference with the organization occurred first and it was that interference which prompted the organization to divert resources. Here, the ERC alleges only that it *chose* to divert resources to investigate Post. The ERC does not allege that Post initially interfered with the ERC's services and it was that interference that prompted it to do further investigation.

taken by Post or a third-party that caused such awareness or that it had any particular reason for investigating Post's properties.[6] The Complaint does not allege, for example, that a person with disabilities came to the ERC complaining that he or she found a particular Post property inaccessible. Hence, there was no impairment to the ERC due to Post's alleged violations until the ERC took it upon itself, without specific provocation, to investigate Post in preparation for this lawsuit.

This self-inflicted "injury," suffered in the pursuit of litigation, cannot constitute an injury-in-fact in the D.C. Circuit. See BMC Marketing, 28 F.3d at 1277 (holding that the time and money an organization spends in bringing a suit does not constitute an injury-in-fact for standing purposes); see also Spann v. Colonial Village, Inc., 899 F.2d 24, 27 (D.C. Cir. 1990) (holding that "an organization cannot, of course, manufacture the injury necessary to maintain a suit from its expenditure of resources on that very suit").

    B.    <u>The ERC must produce a link to the geographic locations of the alleged violations in order to show the causation element of standing.</u>

Even if the ERC's alleged injuries could be considered sufficient injuries-in-fact (which they cannot), the ERC has not shown that these injuries are fairly traceable to Post's alleged violations, especially with respect to the alleged violations in states outside of the greater Washington, DC area. Contrary to the ERC's argument, the geographic location of the Subject Properties is hardly "irrelevant" to whether the ERC has standing to challenge a laundry list of Post's properties. (See Plf. Br. at 11-13.) The ERC's argument is based on the faulty presumption that it has standing to challenge any and all properties it believes were constructed in violation of the FHA and ADA regardless of where they are located because the ERC's mission statement

---

[6] As noted in Post's Motion, it appears that Post was simply the fifth company sued in the ERC's "series of lawsuits" against apartment building companies. Post's Mot. at 11.

has "no limits" on "geographic scope." In so arguing, the ERC glosses over two important principles of standing: (1) an organization's broad mission alone does not mean that it has standing to challenge any actions it believes are contrary to that mission — there still must be <u>direct</u> injury,[7] and (2) the causation element of standing must be established for each of alleged violations.[8]

Post's Motion made the point that under the applicable law, the ERC must show that it has more than a broad mission in advancing the FHA and ADA and that the ERC must prove that its injuries are fairly traceable to Post's alleged violations. (Def. Br. 17-20.) In response, the ERC simply alleges that it is an "organizational plaintiff" that has "no limits on its geographic scope" and that it "has sustained direct injuries to its mission, services, and programs irrespective of geographic proximity to the Subject Properties." (Pl. Br. at 13.) This bare allegation of harm fails to rebut the fact that the ERC has not demonstrated how its injuries (e.g. its alleged diversion of resources) are traceable to Post's alleged violations in Arizona, Colorado, Florida, Georgia, New York, North Carolina, or Texas.

The point is not that "nothing in the Complaint suggests that the ERC's mission or activities are confined to the Washington, DC area," (Pl. Br. 12), but whether the ERC can actually show that its mission and activities have a nexus to the Subject Properties in question. For example, the ERC did not allege that prior to its "investigation" of Post it committed any resources or provided any services in these areas. The ERC did not allege that it has members in

---

[7] "A mere interest in a problem no matter how longstanding the interest and no matter how qualified the organization is in evaluating the problem, is not sufficient by itself to render the organization adversely affected" for standing purposes. <u>Sierra Club v. Morton</u>, 405 U.S. 727, 739 (1972).

[8] The elements of standing must be established "separately for each form of relief sought" and for each claim brought by the plaintiff. <u>Laidlaw</u>, 528 U.S. at 185; <u>Lewis v. Casey</u>, 518 U.S. 343, 358, n.6 (1996) ("[S]tanding is not dispensed in gross.").

8

these states, an office in these states, or does any outreach in these areas. The ERC did not allege that persons with disabilities seeking housing in Arizona, Colorado, Florida, Georgia, New York, North Carolina, or Texas have ever even sought help from the ERC, or much less that the ERC provided some level of services directly related to Post. The only connection the ERC has to any of these states is that it allegedly sent "testers" to properties in Colorado, Florida, Georgia, North Carolina, and Texas.[9] Yet, if simply sending a tester to a property were enough to establish injury, then the requirement of a causal connection between the injury and conduct complained of would lose all meaning. The requisite injury for standing is not so easily manufactured.

In this case, given that housing is a location-based need, there must be a geographic connection, i.e., a "fairly traceable" link, between the ERC's alleged injury and each of the Subject Properties. See Gladstone Realtors v. Bellwood, 441 U.S. 91, 114 (1979) (upholding standing where the injury based on discrimination occurred within a "relatively compact neighborhood"). Hence, for the ERC to challenge an action Post took in a particular locality (e.g. construction of a building in Arizona), it must do more than simply allege that such building was likely built in a manner offensive to its mission and that the ERC visited it. The ERC's misperception that a broad mission statement "with no limits on its geographic scope" (Pl. Br. at 13), confers it nationwide standing is the exact argument rejected in Nat'l Treasury Employees

---

[9] The ERC admits that no testers were sent to the subject property in Colorado or subject properties in New York, but argues that this is "irrelevant." (Pl. Br. at 13.) Thus, the ERC takes the extraordinary position that whether or not it suffered any injury with regard to these properties (given that without testing the ERC has alleged no facts whatsoever to support standing to challenge such properties) is something to be sorted out through discovery. Id. at 13. Even the generous rules of pleading under the Federal Rules are not so forgiving.

Union v. United States, 101 F.3d 1423, 1429-30 (D.C.Cir. 1996).[10] Standing is not established by a broad statement of interest in a particular issue and a one day visit.

## II.   The ERC Lacks Standing Under the Americans With Disabilities Act Because The ERC Itself Has Not Been Subjected To Discrimination.

The ERC makes a half-hearted argument that it has standing under the ADA. In so doing, the ERC cites to three cases interpreting Title II of the ADA, which are irrelevant considering this suit arises under Title III, and to Independent Living Resources v. Oregon Arena Corp., 982 F. Supp. 698, 760-61 (D. Or. 1997). (Pl. Br at 14-15.) In Independent Living Resources, while the court upheld an organization's standing under the ADA, its analysis is unpersuasive because it ignored the language of the ADA's enforcement provisions and instead followed case law upholding organizational standing under the FHA. The two statutes are fundamentally different and cannot be so intertwined.

Title III of the ADA proscribes discrimination in places of public accommodation against persons with disabilities and confers a private right of action for preventative relief upon "**any person who is being subjected to discrimination** on the basis of disability . . . or who has reasonable ground for believing that such person is about to be subjected to discrimination." 42 U.S.C. § 12188(a)(1) (emphasis added). "[T]his language erects a prudential barrier precluding

---

[10] Moreover, the ERC cites Havens and Spann as examples where courts have recognized frustration of mission and diversion of resources as injury in fact to organizations with goals similar to its own. (Plf Br. at 9-10.) Yet, both the Havens and Spann decisions conferred standing in cases where there were allegations of regionally based injuries and regionally based discrimination. In Havens, the racial steering claim was limited to Henrico County, Virginia, and the organizational plaintiff's mission was limited in geographic scope to the Richmond metropolitan area. Havens, 455 U.S. at 367, 368. Similarly, in Spann, the injury claimed was limited to the Washington D.C. metropolitan area, and the mission of organizational plaintiff Fair Housing Council of Greater Washington, a predecessor of the ERC, was limited to Washington, DC. Spann, 899 F.2d at 26. Thus, regardless of whether such courts found that the alleged discrimination sufficiently "impaired" the organizational plaintiffs, a deeper reading of those cases reveals that the injury-in-fact was linked to the limited geographic region in which the alleged actions took place. The ERC has not attempted to draw such a link.

organization standing" to groups such as the ERC who have not alleged that the group itself has been subjected to discrimination. Clark v. McDonald's Corp., 213 F.R.D. 198, 209 (D.N.J. 2003); see also McInnis-Misenor v. Maine Med. Ctr., 319 F.3d 63, 69 (1st Cir. 2003) (holding that "the ADA does not permit private plaintiffs to bring claims as private attorneys general to vindicate other people's injuries"). Here, the ERC has specifically alleged that it is the "aggrieved person" but has significantly failed to allege how the organization itself has been subject to discrimination as result of Post's alleged activities. Accordingly, the ERC plainly lacks standing under the ADA.

### III. The Continuing Violation Doctrine Does Not Apply To Rescue The ERC's Claims From the Legal Constraints Of The FHA's Two-Year Statute Of Limitations.

The FHA's statute of limitations provision states that "an aggrieved person may commence a civil action in an appropriate United States district court or State court not later than 2 years after the occurrence or termination of an alleged discriminatory housing practice." 42 U.S.C. § 3613(a)(1)(A). In this case, the alleged discriminatory housing practice is the design and construction of multifamily residential dwellings in violation of the FHA accessibility requirements.

Design and construction is a discrete act that terminates on the date the design and construction is completed. See United States v. Taigen & Sons, Inc., 303 F. Supp. 2d 1129, 1144 (D. Idaho 2003) (holding that for a FHA case, the alleged violation occurred on "the date the design or construction was completed"); Thompson v. Mountain Peak Assocs., LLC, No. 2:05-CV-145-BES-GWF, 2006 Wl 1582126, at *2 (D. Nev. Jun. 5, 2006) (holding that "the last act of discrimination occurs upon the completion of the design and construction of the non-compliant structure of complex"); see also Alliance for Disabled in Action, Inc. v. Renaissance Enters., 371 N.J. Super 409, 417 (N.J. Super Ct. 2004) (holding that for a similar New Jersey law on design

and construction claims, "the appropriate date to start the period of limitation is the date construction was completed"). Thus, the FHA statute of limitations begins to run on the date each property's design and construction was completed (*i.e.* issuance of a certificate of occupancy).

    A.    <u>Design and construction is a discrete act to which the continuing violation doctrine does not apply.</u>

The ERC attempts to avoid the FHA's statute of limitations by claiming that the continuing violation doctrine applies. Specifically, the ERC alleges that "Post has engaged in a continuous pattern and practice of discrimination against persons with disabilities," and then argues that this allegation allows it to challenge the design and construction of buildings that were completed before November 21, 2004. (Pl. Br. at 16-20.)

For support, the ERC cites to <u>Havens</u>, in which the Supreme Court applied the continuing violation doctrine to the plaintiffs' allegations of racial steering in violation of the FHA. <u>Havens</u>, 455 U.S. at 380-81. However, the fact that the continuing violation doctrine was applied in a racial steering case brought under the FHA does not mean that it is applicable to a design and construction case. Racial steering is by its very nature a pattern and practice of discrimination that is actionable when it is proved to have taken place over time. <u>Id.</u> at 367, n. 1 (defining racial steering as "a practice by which real estate brokers and agencies preserve and encourage patterns of racial segregation in available housing"). In contrast, a design and construction violation is discernable upon completion. Hence, allegations of a "continuing violation" related to racial steering are easily distinguishable from allegations that a building was unlawfully designed and constructed. The latter is a one-time occurrence or discrete act.

The ERC also cites to cases in which a limited number of courts have employed the continuing violation doctrine to design and construction claims. (Pl. Br. at 18.) These cases, like

Havens, are distinguishable from the case at hand. For instance, in Memphis Ctr. For Indep. Living v. Makowsky Constr. Co., No. 01-2069 D/Pha, slip op (W.D. Tenn. 2003), the court applied the continuing violation doctrine to three complexes, which had the same floor unit plan, the same architect, the same owner/developers, and the same construction company. Id. at 2. According to the Memphis Ctr. court, the continued use of the *same* design, architect, and construction company was indicative of the continuing wrongful conduct. Id. at 6. Here, although the ERC has attempted to allege "pattern and practice," it has not alleged that Post used the exact same design, architects, and construction companies for all of the subject properties.

This case can similarly be distinguished from Silver State Fair Housing Council, Inc. v. Ergs, Inc., 362 F. Supp. 2d 1218 (D. Nev. 2005), wherein the court found that the continuing violation doctrine applied to two apartment complexes, one completed outside and one inside the statute of limitations period. That court's holding, however, is limited to the facts of that case—mainly, the two apartment complexes were completed "seamlessly in time" within a five-year time period. Id. at 1222. These facts were integral to the court's ultimate opinion. Indeed, the court recognized that "an 'open-ended period of liability' would 'read the statute of limitations right out of existence'" Id. (quoting Moseke v. Miller and Smith, Inc., 202 F. Supp. 2d 492, 508 (E.D. Va. 2002)).

Here, the ERC essentially asks for an open-ended period of liability. Instead of alleging violations in just two apartment complexes completed "seamlessly in time" within a five-year time period, the ERC alleges violations at 58 different properties completed at different times in different places over almost a 20 year time period. If the ERC's arguments were to be upheld, the statute of limitations would be rendered meaningless, and any developer who continued to

design and construct properties could be held liable *ad infinitum*. This clearly was not the intent of Congress in creating a statute of limitations for FHA claims.

B.   The ERC cannot aggregate the alleged violations into a "pattern or practice."

In Nat'l Railroad Passenger Corp. v. Morgan, 536 U.S. 101, 113 (2002), an employment discrimination case, the Supreme Court further examined the continuing violation doctrine and held that "discrete acts that fall within the statutory time period do not make timely acts that fall outside of the time period." Instead, "each discrete discriminatory act starts a new clock for filing charges alleging that act." Id. Thus, the Court held that discrete acts of discrimination occurring outside the statute of limitations period were barred, while the claim of hostile work environment, which is created over time, was not barred.

The design and construction of buildings are discrete acts and it is those acts that trigger the statute. Accordingly, each discrete act of design and construction of a Subject Property must be tested against the two year statute of limitations. The mere fact that Post allegedly had a role in the design or construction of the Subject Properties, which were completed in various states and in different years, does not aggregate such discrete alleged violations into a continuing practice. See Morgan, 536 U.S. at 113 (holding that "discrete discriminatory acts are not actionable if time barred, even when they are related to acts alleged in timely filed charges.").

As Post stated in its supporting memorandum (despite the ERC's inaccurate assertions to the contrary), the Morgan holding is consistent with the Havens holding. Application of the continuing violation doctrine is appropriate where a discriminatory practice, such as racial steering and hostile work environment, only becomes evident over time. As explained by another court, "[t]he Morgan decision does not contradict [Havens]; rather, it recognizes that prior acts may be timely under the continuing violations theory where the asserted claim

14

**necessarily arises from a pattern of unlawful conduct**." Wallace v. Chicago Housing Auth., 321 F. Supp. 2d 968, 973 (N.D. Ill. 2004) (emphasis added). This is not the case here. A design and construction violation is evident upon completion of the design and construction. The FHA statute of limitations is a bar to liability for all Subject Properties completed before November 21, 2004.

## CONCLUSION

Based on the foregoing, Post respectfully requests that its Motion to Dismiss be Granted and that the ERC's Complaint be Dismissed.

Respectfully submitted,

HOLLAND & KNIGHT, LLP

 /s/ Christopher B. Hanback
Christopher B. Hanback (Bar # 232579)
Alan I. Baron (Bar. # 340273)
Rafe Petersen (Bar # 465542)
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006
(202) 955 3000 Phone
(202) 955 5564 Fax
E-mail: christopher.hanback@hklaw.com
E-mail: alan.baron@hklaw.com
E-mail: rafe.petersen.com
*Counsel for Post Properties, Inc., et al.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Reply in Support of the Motion to Dismiss or in the Alternative for Partial Summary Judgment was served by electronic filing this 9th day of March, 2007, on the following:

>Sheila Jane Carpenter, Esq.
>Jorden Burt LLP
>1025 Thomas Jefferson Street, NW
>Suite 400 East
>Washington, DC 20007
>
>Donald Lee Kahl, Esq.
>Washington Lawyers' Committee for Civil Rights & Urban Affairs
>11 Dupont Circle, NW
>Suite 400
>Washington, DC 20036

>/s/ Christopher B. Hanback
>Christopher B. Hanback