**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| | ) | |
| **EQUAL RIGHTS CENTER,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| **POST PROPERTIES, INC.,** *et al.*, | ) | **Case No. 1:06CV01991** |
| | ) | **Judge Richard Leon** |
| Defendants. | ) | |
| | ) | |

**MOTION OF PLAINTIFF THE EQUAL RIGHTS CENTER**
**FOR PRELIMINARY INJUNCTION**

Plaintiff the Equal Rights Center ("ERC"), by its attorneys, respectfully moves this

Court, pursuant to Fed. R. Civ. P. 65(a), for a preliminary injunction prohibiting Defendants Post

Properties, Inc., Post GP Holdings, Inc., Post Apartment Homes, L.P. (the "Post Defendants"),

their affiliates, and their officers, employees and agents from selling any multifamily dwellings

completed for first occupancy on or after March 13, 1991, during the pendency of this litigation

without either (a) the Post Defendants making such modifications as are necessary to bring the

property to be sold into compliance with the Fair Housing Act and the Americans with

Disabilities Act prior to the sale, or (b) including in the terms of any such sale a provision

allowing the Post Defendants to reenter the property and to take such actions, including retro-

fitting, as may be finally ordered by this Court.  Filed with this Motion are the Declarations of

Rebecca Crootof and Sheila Carpenter, a Memorandum of Points and Authorities in support of

this Motion and a proposed injunction.

In support of this Motion, the ERC states the following:

1.      On November 21, 2006, the ERC filed its Complaint alleging that Defendants

have violated and are violating the Fair Housing Act, Title VIII of the Civil Rights Act of 1968,

as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601, *et seq.* (the

"FHA"), and the Americans with Disabilities Act, 42 U.S.C. §§ 12181, *et seq.* (the "ADA").

2.      After Post's violations of these statutes came to the ERC's attention, in order to

determine the scope and severity of Post's discriminatory conduct, the ERC diverted its time and

other resources to conduct investigation and testing at a variety of Post's multifamily

developments across the United States.  This testing disclosed a pervasive pattern of FHA and

ADA violations that included all the Post properties tested.  (Crootof Dec. ¶ 3, 5, 12-18)

4.      As part of its investigation, the ERC also obtained floor plans and other

information for dwelling units in Post complexes that the ERC did not test.  The ERC found,

through a comparison of floor plans, that there were substantial similarities in the designs of

dwelling units at the complexes that were tested (and found to be in violation of the FHA or the

ADA) and those complexes that were not tested.  (Crootof Dec. ¶ 13, 18).

6.      As part of its announced business strategy, Post regularly sells apartment

complexes in its portfolio.  As of December 31, 2006, Post had one rental complex for sale and

was also marketing condominiums in two other complexes.  *See* Excerpts from Post's SEC Form

10-K for the period ending 12/31/06, attached as Ex. C to the Carpenter Declaration submitted

herewith.

7.      Under the FHA, one of the primary remedies ordered by courts to ameliorate this

type of discrimination is the retrofitting of covered multifamily dwellings and associated public

use and common use areas in order to make them accessible to persons with disabilities.  *See,*

*e.g.*, 42 U.S.C. § 3613(c)(1).  The ERC seeks just such relief in this lawsuit.  However, if a third

party purchases a covered dwelling unit in good faith, a court's ability to order retrofitting is

impaired.  *See* 42 U.S.C. § 3613(d).

8.      Shortly after this lawsuit was filed, counsel for the ERC contacted counsel for Post to determine if a procedure could be agreed upon that would preserve Post's ability to sell complexes or units during the course of this litigation, while also preserving the ability of this Court to order and enforce the retrofitting of dwelling units, as well as the public use and common use areas if found to have been built in violation of the FHA or the ADA.  *See* Carpenter Dec. Ex. A.

9.      Post, through its counsel, declined the opportunity to resolve this issue by agreement and indicated its intent to continue selling properties despite the allegations in the Complaint filed in this action.  *See* Carpenter Dec. Ex. B.

10.      Since Post is actively marketing properties not in compliance with the FHA and/or the ADA, irreparable harm is being done to the ERC and its members.

11.      The ERC is likely to succeed on the merits of its claims against Post.  Violations of the FHA and ADA are readily determined with a measuring tape not subject to interpretation or shading.

12.      A balancing of harms favors the issuance of the requested injunctive relief in that Post's "harm" is nothing more than being required to comply with federal law.  The ERC and its members will be harmed if Post is allowed to continue to profit from its violations of law, and the Court loses the ability to order Post to fix the violations in dwelling units and housing complexes built in violation of the law.

13.      It is in the public interest that Post be required, for multi-family housing that it may want to sell, to take the steps necessary to protect and preserve the remedy of future retrofitting of such dwellings, or to make them currently accessible to persons with disabilities, as required by federal law.

Dated:  April 18, 2007

Respectfully submitted,

*Sheila J. Carpenter*
Sheila J. Carpenter
DC Bar #935742

Jorden Burt LLP
1025 Thomas Jefferson St. N.W.
Suite 400 East
Washington, D.C.  20007
Tel:  (202) 965-8165
Fax: (202) 965-8104

*Donald L. Kahl*
Donald L. Kahl
DC Bar # 489472

Washington Lawyers' Committee for
 Civil Rights and Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, D.C.  20036
Tel:  (202) 319-1000
Fax:  (202) 319-1010
Attorneys for Plaintiff
Equal Rights Center

## Certificate of Conference

I HEREBY CERTIFY that on April 17, 2007, I spoke with Rafe Petersen, counsel for the Post Defendants, and requested that the Post Defendants agree to the relief sought by this Motion for Preliminary Injunction.  Mr. Petersen indicated that they would not agree.

*Sheila J. Carpenter*
Sheila J. Carpenter

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 18th day of April, 2007, a copy of the foregoing **Motion of Plaintiff the Equal Rights Center for Preliminary Injunction** and attachments were filed via the electronic case filing system of the United States District Court for the District of Columbia and accordingly, that the Court will send notice of this filing electronically to: Christopher Hanback at, Alan I. Baron at, and Rafe Petersen at, counsel for defendants.

*Sheila J. Carpenter*
Sheila J. Carpenter

# UNITED STATES DISTRICT COURT
## FOR DISTRICT OF COLUMBIA

| | |
|---|---|
| **EQUAL RIGHTS CENTER**, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | **Case No. 1:06CV01991** |
| ) | **Judge Richard A. Leon** |
| **POST PROPERTIES, INC.,** *et al.,* ) | |
| ) | |
| Defendants. ) | |
| ) | |

## MEMORANDUM OF POINTS AND AUTHORITIES
## IN SUPPORT OF PLAINTIFF
## THE EQUAL RIGHTS CENTER'S
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

Date:  April 18, 2007

Sheila J. Carpenter (DC Bar #935742)
sjc@jordenusa.com
Jorden Burt LLP
1025 Thomas Jefferson Street, NW
Suite 400 East
Washington, DC 20007
Tel:  (202) 965-8165
Fax: (202) 965-8104


Donald L. Kahl (DC Bar #489472)
Don_Kahl@washlaw.org
Washington Lawyers' Committee
For Civil Rights and Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, DC 20036
Tel:  (202) 319-1000
Fax: (202) 319-1010

Attorneys for Plaintiff
Equal Rights Center

## TABLE OF CONTENTS

**Page**

I.    INTRODUCTION ................................................................................... 1

II.   FACTS ..................................................................................................... 2

III.  ARGUMENT .......................................................................................... 5

      A.    Applicable Statutory and Regulatory Schemes ....................................... 5

            1.    The Fair Housing Act ..................................................................... 5

            2.    The Americans with Disabilities Act ............................................. 9

      B.    Preliminary Injunctive Relief is Proper Here .......................................... 10

            1.    The Legal Standard ......................................................................... 10

            2.    The ERC Enjoys a Substantial Likelihood of Success on the
                  Merits. ............................................................................................. 12

                  a.    FHA and ADA Violations are Present .................................. 13

                  b.    The Post Defendants Were Involved in the Design and
                        Construction Process so as to Be Liable under the FHA,
                        and are Owners or Operators so as to Be Liable under the
                        ADA ....................................................................................... 16

            3.    Irreparable Harm Will Occur Absent the Entry of the Requested
                  Injunction ....................................................................................... 16

            4.    A Balancing of Harms Favors the Issuance of an Injunction ................. 19

            5.    The Public Interest Is Furthered By the Issuance of an Injunction .......... 19

IV.   CONCLUSION ....................................................................................... 20

# TABLE OF AUTHORITIES*

**Page**

**Cases**

*Baltimore Neighborhoods, Inc. v. LOB, Inc.*, 92 F. Supp. 2d 456 (D. Md. 2000) .................17, 18

*Blackwelder Furniture Co. v. Selig. Mfg. Co.*, 550 F.2d 189 (4th Cir. 1977) .............................12

*Bronk v. Ineichen*, 54 F.3d 425, 427 (7th Cir. 1995) ....................................................................17

*Bronson v. Crestwood Lake Section 1 Holding Corp.*,
724 F. Supp. 148, 153 (S.D.N.Y. 1989)........................................................................................17

*The Canal Authority of Florida v. United States Corp. of Engineers*, 489 F.2d 567
(5th Cir. 1974) ................................................................................................................................18

*Canales v. Paulson*, No. 06-1330, 2006 L 2520611 (D.D.C. Aug. 30, 2006) .............................12

*Chapp v. Bowman*, 750 F. Supp. 274, 277 (W.D. Mich. 1990).....................................................17

*CityFed Fin. Corp. v. Office Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995) ..........................11

*Clarke v. Office of Fed. Housing Enter. Oversight*, 355 F. Supp. 2d 56 (D.D.C. 2004) ........11, 17

*Deck v. City of Toledo*, 29 F. Supp. 2d 431 (N.D. Ohio 1998) ....................................................19

*Express One Int'l, Inc. v. United States Postal Serv.*, 814 F. Supp. 87 (D.D.C. 1992) ...............12

*Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir.), *cert. denied sub nom.*
*Windrush Partners v. Metro Fair Hous. Services*, 469 U.S. 882 (1984)......................................17

*Helen L. v. DiDario*, 46 F.3d 325 (3d Cir. 1995) ..........................................................................6

*Lieber v. Macy's West, Inc.*, 80 F. Supp. 2d 1065 (N.D. Cal. 1999) ............................................18

*Mova Pharm. Cor. v. Shalala*, 140 F.3d 1060 (D.C. Cir. 1998) ...................................................11

*Price v. Pelka*, 690 F.2d 98 (6th Cir. 1982)................................................................................18

*Ralvin Pac. Props. v. United States*, Civ. A. No. 93-0610, 1994 WL 151217
(D.D.C. Apr. 12, 1994) ..................................................................................................................19

*Ramirez v. District of Columbia*, 1999 WL 986914 (D.D.C. Oct. 14, 1999) ..............................19

*Serono Labs., Inc. v. Shalala*, 158 F.3d 1313 (D.C. Cir. 1998) ...................................................11

*Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n*, 790 F. Supp. 1197
(D. Conn. 1992) ..............................................................................................................................17

# TABLE OF AUTHORITIES*

**Page**

*Thomas v. Davidson Academy*, 846 F. Supp. 611 (M.D. Tenn. 1994) ...........................................19

*Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205 (1972) ....................................................17

*Price v. Pelka*, 690 F.2d 98, 102 (6th Cir. 1982)..........................................................................17

*\*United States v. Edward Rose & Sons*, 246 F. Supp. 2d 744 (E.D. Mich. 2003) .................16, 19

*\*United States v. Edward Rose & Sons*, 384 F.3d 258 (6th Cir. 2004) .........................................17

*Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841
(D.C. Cir. 1977) ...........................................................................................................................12

*Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669 (D.C. Cir. 1985) ...........17

**Statutes**

Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601, *et seq.* ................................. *passim*

*\*42 U.S.C. § 3604(f) ...................................................................................................... *passim*

42 U.S.C. § 3613...................................................................................................10, 16, 18

42 U.S.C. § 12101(a) ........................................................................................................9

Americans with Disabilities Act, 42 U.S.C. §§ 12181, *et seq.* ............................................ *passim*

42 U.S.C. §§ 12181-89 ......................................................................................................9

42 U.S.C. § 12181................................................................................................................9

42 U.S.C. § 12182....................................................................................................4, 9, 15

42 U.S.C. § 12183.................................................................................................................4, 9

42 U.S.C. § 12186................................................................................................................10

42 U.S.C. § 12188....................................................................................................11, 15, 17

42 U.S.C. § 12204................................................................................................................10

42 U.S.C. § 12206................................................................................................................10

42 U.S.C. § 2000....................................................................................................11, 17

# TABLE OF AUTHORITIES*

**Page**

**Administrative Rules & Regulations**

24 C.F.R. § 100.202 ...................................................................................................................6

24 C.F.R. § 100.205 .................................................................................................13, 14, 15

Fair Housing Amendments Act Guidelines, 56 Fed. Reg. 9472-9515 (Mar. 6, 1991)(24 C.F.R.
Ch. I, Subch. A, App. II (April 1, 1995)) .................................................................................7

*56 Fed. Reg. 9476 ...................................................................................................................7

56 Fed. Reg. 9478 ....................................................................................................................7

56 Fed. Reg. 9479 ....................................................................................................................7

56 Fed. Reg. 9496-9512 ...........................................................................................................9

56 Fed. Reg. 9499 ....................................................................................................................7

56 Fed. Reg. 9506 ..............................................................................................................13, 14

56 Fed. Reg. 9511 ...................................................................................................................14

Supplement to Notice of Fair Housing Accessibility Guidelines: Questions
and Answers About the Guidelines, 59 Fed. Reg. 33362 (June 28, 1994)
(24 C.F.R. Ch. I, Subch. A, App. IV) .....................................................................................8

ADA Standards for Accessible Design, 56 Fed. Reg. 35544 (July 26, 1991)
(28 C.F.R. pt. 36, App. A) .........................................................................................10, 15, 16

28 C.F.R. § 36.501(a) ........................................................................................................11, 17

**Legislative Materials**

H.R. Rep. No. 100-711 ........................................................................................................7, 19

H.R. Rep. No. 101-485 ....................................................................................................9, 19, 20

**Other**

Wright, Miller & Kane, Federal Practice and Procedure: Civil § 2947..............................17

* Authorities chiefly relied upon are marked with an asterisk.

I.    **INTRODUCTION**

In 1988, recognizing that the fundamental right to housing was a critical problem for persons with disabilities, Congress amended the Fair Housing Act to require that newly constructed multi-family housing include certain basic features of accessibility and adaptable design in order to make them available to persons with disabilities.  As part of this amendment to the civil rights laws, Congress allowed the design and construction industries a 30-month "grace period," until March 13, 1991, to begin complying with this federal law.  Similarly, the effective date for compliance with the Americans with Disabilities Act (the "ADA") as to accessibility in public use areas of multi-family housing was set by Congress as January 26, 1993.

Here, more than a decade and a half after the effective date of the Fair Housing Act Amendments, the Equal Rights Center, a non-profit civil rights organization, after an extensive investigation, alleged in its Complaint that Post Properties, Inc., Post GP Holdings, Inc.; and Post Apartment Homes, L.P. (the "Post Defendants") have, for over 15 years, engaged in a pattern and practice of ignoring this law and systematically designing and constructing approximately 60 apartment complexes, comprised of over 20,000 individual housing units, in the District of Columbia, Virginia, Colorado, Florida, Georgia, New York, North Carolina and Texas, that consistently fail to comply with accessibility requirements.[1]  As a result, persons who use wheelchairs and/or have other disabilities have been and continue to be denied accessible housing by the Post Defendants.

---

[1] On November 21, 2006, the ERC filed this action alleging that the Post Defendants violated the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Amendments Act of 1988, 42 U.S.C. §§ 3601, *et seq.* (the "FHA"), and the Americans with Disabilities Act, 42 U.S.C. §§ 12181, *et seq.* (the "ADA") by failing to design, construct, and operate approximately 60 covered multi-family housing complexes across the country so as to be accessible to persons with disabilities.

Currently, the Post Defendants are actively engaged in the sale of a number of properties that are the subject of this action.  Because the primary remedy in actions such as this, if the plaintiff prevails, is the retrofitting of non-compliant housing, the sale either of individual housing units (condominiums), or of entire housing complexes, will frustrate the ability of this Court to grant full relief with respect to the Post Defendants' violations of the FHA and ADA. The ERC has attempted to negotiate informal relief addressing this issue, but has been unsuccessful in reaching an agreement with the Post Defendants that would preserve the Court's ability to fashion meaningful relief.[2]  Accordingly, the ERC respectfully requests that this Court enjoin the Post Defendants, pursuant to Rule 65(a) of the Federal Rules of Civil Procedure, from selling any of the Subject Properties, or any individual housing units at those properties, unless either:  (a) the Post Defendants make such modifications as are necessary to bring the property to be sold into compliance with the Fair Housing Act and Americans with Disabilities Act prior to the sale, or (b) the Post Defendants include in the terms of any such sale a provision allowing the Post Defendants to reenter the property and retrofit it upon any final order of this Court.

## II.    FACTS

A.    The ERC's Mission is, through education, counseling, advocacy, enforcement, and referral services, to aid protected individuals by apprising them of their civil rights and preserving those rights.  The Equal Rights Center also represents the interests of its approximately 150 individual public members, many of whom are persons with disabilities who have a direct interest in protecting the rights of persons with disabilities.  *See* Declaration of Rebecca Crootof filed herewith at ¶ 2.

---

[2] *See* exchange of letters attached as Exs. A and B to the Carpenter Declaration filed herewith.

B.    Through ownership, control, supervision, building, development, operation and/or management, the Post Defendants have been involved in the design and construction of scores of covered multifamily housing complexes in the District of Columbia, Virginia, Colorado, Florida, Georgia, New York, North Carolina and Texas.  Post publicly represents that it is associated with each of these covered multifamily housing complexes.  *See* Post 10-K excerpts attached to the Declaration of Sheila Carpenter as Exhibit C.  The ERC has identified, through on-site inspection, Post publications, or other public records, Post properties that are subject to the FHA and the ADA.  *See* Crootof Dec. ¶8.

C.    When the ERC learned of FHA violations in the design and construction of Post's properties, the ERC diverted resources, including funding and staff members' time, from other activities in order to conduct further investigation and testing of Post's apartments to ascertain the extent of the FHA and ADA violations.  *See* Crootof Dec. ¶¶ 5, 6, 9, 13.

D.    In 2006, the ERC tested twenty-seven (27) Post properties in the District of Columbia and the States of Virginia, Colorado, Florida, Georgia, North Carolina, New York and Texas (the "Tested Properties").  This testing consisted of ERC personnel trained in the accessibility requirements of the FHA and ADA physically inspecting each of the Tested Properties, making visual observations and taking actual measurements of critical design features.  *See* Crootof Dec. ¶¶ 5, 6, 9, 11.

E.    Each of the Tested Properties is subject to the design and construction requirements set forth in 42 U.S.C. § 3604(f)(3)(C) of the FHA and the applicable regulations because the properties include "covered multifamily dwellings" within the meaning of the FHA, 42 U.S.C. § 3604(f)(7)(A), and were built for first occupancy after March 13, 1991.  Similarly, twenty-six (26) of the twenty-seven (27) Tested Properties were constructed for first occupancy

or remodeled after January 26, 1993, and are subject to the prohibition on discrimination in 42 U.S.C. §12182(a) of the ADA, and to the design and construction requirements of 42 U.S.C. § 12183(a)(1) of the ADA and the applicable regulations.  *See* Crootof Dec. ¶¶ 8-9.

F.    The ERC identified FHA or ADA violations at each of the Tested Properties.  The frequency and similarity of these violations demonstrate that the Post Defendants have engaged in a pervasive pattern and practice of designing and constructing apartment and condominium properties in violation of FHA and ADA accessibility design requirements.  *See* Crootof Dec. ¶¶ 12-18.

G.    The floor plans of the apartment units at each of the Subject Properties are made publicly available by the Post Defendants.  The ERC has conducted a detailed comparison of these floor plans and they demonstrate that many share relevant common elements of design.  These common design elements range from the use of common bathroom or kitchen designs, to virtually identical floor plans in numerous complexes.  Thus, for example, a bathroom design determined by testing to violate the FHA in a Tested Property will exhibit the same violations if it appears in one of the untested Subject Properties.  *See* Crootof Dec. ¶¶ 13, 18.

H.    As demonstrated by: (a) the pervasiveness and similarity of the FHA and ADA violations at the Tested Properties, and (b) the common elements of design at Tested Properties and untested Subject Properties, this continuing pattern and practice of design and construction have resulted in violations at each of the Subject Properties.

I.    As a regular part of its business activities, the Post Defendants are in the process of selling multi-family housing covered by the FHA and ADA that is the subject of this lawsuit.  These sales are publicly reported by the Post Defendants through their periodic filings with the Securities Exchange Commission, and take two forms.  First, the Post Defendants are actively

seeking to sell entire multi-family apartment complexes. *See* Post Properties Form 10K for year ending 12/31/2007 at *e.g.,* pp. 24, 43 attached to Carpenter Declaration as Exhibit C. Second, either as new construction, or converted apartment units, the Post Defendants are actively seeking to sell individual housing units as condominiums. *See id* at p. 25. *See also* Post Properties web site () "View Condominium Offerings" (identifying two Subject Properties offering condominium units for sale).

       J.      In order to protect this Court's ability to order final relief in the form of the retrofitting of non-compliant Subject Properties, the ERC attempted to obtain the Post Defendants' agreement that they would: (a) not sell any of the Subject Properties, or (b) complete retrofits necessary to bring a Subject Property being sold into compliance with the FHA and ADA prior to closing the sale, or (c) require as a term of any sale of a Subject Property the ability for the Post Defendants to re-enter the property after sale in order to comply with any retrofitting order entered by this Court. *See* Carpenter Dec. Exs. A and B. The Post Defendants refused to agree with any of these alternatives. *See id.* Post has now sold a multi-family housing complex covered by both the Fair Housing Act and ADA. *See* Carpenter Dec. Ex. D.

## III.   <u>ARGUMENT</u>

###     A.    Applicable Statutory and Regulatory Schemes

####        1.    The Fair Housing Act

In 1988, Congress amended the Fair Housing Act to require that certain units in multifamily dwellings (*i.e.*, apartments and condominiums) built for use and occupancy after

March 13, 1991, contain basic features of accessibility for persons with disabilities.[3]

Specifically, the FHA makes it unlawful to discriminate:

1.    in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap of that buyer or renter, a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available, or any person associated with that buyer or renter; and

2.    against any person in the terms, conditions, or privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap of that person, a person residing in or intending to reside in that dwelling after it is so sold, rented, or made available, or any person associated with that person.

42 U.S.C. §§ 3604(f)(1)-(2); 24 C.F.R. § 100.202(a)-(b).[4]  Discrimination under these provisions

includes the "failure to design and construct covered multifamily dwellings" built for first

occupancy after March 13, 1991, with the following accessibility features:

(i)    the public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons;

(ii)    all the doors designed to allow passage into and within all premises within such dwellings are sufficiently wide to allow passage by handicapped persons in wheelchairs; and

(iii)    all premises within such dwellings contain the following features of adaptive design:

(I)    an accessible route into and through the dwelling;

(II)    light switches, electrical outlets, thermostats, and other environmental controls in accessible locations;

---

[3] The accessibility features are required in all dwelling units in buildings consisting of four or more units that have one or more elevators; and in ground floor units in other buildings consisting of four or more units.  42 U.S.C. § 3604(f)(7).  All 61 of the "Subject Properties" are subject to the requirements of the FHA, and 26 of the 27 Tested Properties are also subject to the requirements of the ADA.

[4] While the Act uses the term "handicap," this Memorandum uses the term "disability" which is synonymous and generally preferred.  *See, e.g., Helen L. v. DiDario*, 46 F.3d 325, 330 n.8 (3rd Cir. 1995) (noting persons with disabilities find "'handicapped' objectionable").

(III)    reinforcements in bathroom walls to allow later installation of grab bars; and

(IV)    usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space.

42 U.S.C. § 3604(f)(3)(C).[5]

The FHA authorizes the Secretary of HUD to provide technical assistance to implement its accessibility requirements. *See* 42 U.S.C. § 3604(f)(5)(C). Pursuant to this authority, HUD, after notice and comment, issued the Fair Housing Amendments Act Guidelines (the "Guidelines"), published in Vol. 56, No. 44 Fed. Reg. 9472-9515 (March 6, 1991), *codified at* Appendix II to the Fair Housing regulations, 24 C.F.R. Ch. I, Subch. A, App. II (April 1, 1995). The Guidelines "provide technical guidance on designing dwelling units as required by the Fair Housing Amendments Act of 1988." 56 Fed. Reg. 9499. While the Guidelines are not the sole means of compliance with the Act,[6] they state HUD's "recommended specifications for each design feature" required by the Act, *id.*, and are intended to set forth "*minimum standards of compliance* with the specific accessibility requirements of the [FHA]." 56 Fed. Reg. 9476

---

[5] These provisions reflect "a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream." H.R. Rep. No. 100-711, at 18, *as reprinted in* 1988 U.S.C.C.A.N. 2173, 2179 ("House Report"). The amendments aim to increase the stock of accessible housing to further "the goal of independent living" for people with disabilities. *Id.* at 2179. Congress found that the accessibility requirements of the Act "are essential for equal access and to avoid future *de facto* exclusion of persons with handicaps." *Id.* at 2188.

[6] In general, the Guidelines are *the most lenient* of the published accessibility standards. The Act and the Guidelines also reference the American National Standards Institute's more rigorous accessibility standards, ANSI A117.1, and state that compliance with such standards will provide a safe harbor for compliance with the requirements of the Act. *See* 42 U.S.C. § 3604(f)(4); Guidelines Req. 2. Developers are not required to follow the Guidelines, as they may also choose to comply with other recognized accessibility standards, such as ANSI. *See* 56 Fed. Reg. 9479 ("builders and developers may follow alternative standards that achieve compliance with the Act's accessibility requirements"); 56 Fed. Reg. 9478 ("The Guidelines adopted by the Department provide one way in which a builder or developer may achieve compliance with the Act's accessibility requirements. There are other ways to achieve a compliance with the Act's accessibility requirements, as for example, full compliance with ANSI A117.1.").

(*emphasis added*).  In 1994, HUD issued additional technical assistance to answer certain questions it had received about the FHA and the Guidelines.  *See* Supplement to Notice of Fair Housing Accessibility Guidelines: Questions and Answers About the Guidelines, 59 Fed. Reg. 33362 (June 28, 1994), *codified at* 24 C.F.R. Ch. I, Subch. A, App. IV.  Furthermore, in 1998, HUD issued the Fair Housing Act Design Manual ("FHA Design Manual") "to provide clear and helpful guidance about ways to design and construct housing that complies with the Fair Housing Act."  Preface to FHA Design Manual at 1.  A copy of the introduction is attached to the Carpenter Declaration as Exhibit E; its illustrations demonstrate why the clearances required by the FHA and ADA for wheelchairs are so important.

 HUD has consistently taken the position that certain design features of covered dwellings must be adaptable, accessible, and usable for persons who are physically disabled. The Guidelines set forth seven requirements, each with specific accessibility features:

Requirement 1 requires that each building on a site have at least one accessible building entrance on a route accessible to persons who use wheelchairs;

Requirement 2 provides specifications for making public and common use areas accessible;

Requirement 3 specifies door width requirements for all doors that are part of an accessible route in public and common use areas, as well as within individual covered units;

Requirement 4 details requirements for an accessible route into and through each covered unit, including threshold heights for doors into and through covered dwelling units;

Requirement 5 provides wall heights for light switches, electrical outlets, thermostats, and other environmental controls within covered dwelling units;

Requirement 6 sets forth adaptable design features in bathrooms including locations and methods for reinforcing walls for the subsequent installation of grab bars; and

Requirement 7 specifies clearance levels and floor space necessary to make kitchens and bathrooms within covered units usable.  *See* 56 Fed. Reg. 9496-9512.[7]

## 2.    The Americans with Disabilities Act

In 1990, Congress enacted the ADA to remedy the "serious and pervasive" problem of discrimination against individuals with disabilities.  42 U.S.C. § 12101(a).  Specifically, the ADA forbids discrimination against disabled individuals in major areas of public life, including public accommodations.[8]  *See id.* §§ 12181-89 ("Title III").  Title III of the ADA establishes the "general rule" that:  "No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation."  *Id.*, § 12182(a).  The ADA, in the housing context, applies to those areas open to the public including for example, leasing offices, lobbies, and other facilities available to the public.  Discrimination for the purposes of this general rule includes "a failure to design and construct facilities . . . that are readily accessible to and usable by individuals with disabilities."  42 U.S.C. § 12183(a)(1).[9]

---

[7] *See infra* at 13-16 for application of many of these specifications to Post Defendants' FHA violations.

[8] "Public accommodations" under the ADA include a variety of situations where the facilities of a private entity affect commerce.  *See* 42 U.S.C. § 12181(7).  The parking lots, sidewalks, and rental offices at each of the Subject Properties constitute such public accommodations.  *See id.,* subsections (A) and (E); 42 U.S.C. § 12183.

[9] These provisions reflect Congress's conclusion that there was a "compelling need to provide a clear and comprehensive national mandate" to eliminate discrimination against persons with disabilities and integrate them "into the economic and social mainstream of American life." H.R. Rep. No. 101-485(II), at 50 (1990), *as reprinted in* 1990 U.S.C.C.A.N. 303, 332.  The accessibility requirements of the ADA, according to Congress, "fulfill this mandate in a clear, balanced, and reasonable manner."  *Id.*

Congress delegated to the Attorney General the authority to interpret the ADA, set standards for enforcement of and compliance with Title III, and to provide guidance about the statute's requirements. *See* 42 U.S.C. §§ 12186(b), 12206(c)(3). Congress also directed the Architectural and Transportation Barriers Compliance Board ("ATBC Board") to issue "minimum guidelines" for Title III. *Id.* at § 12204(a). Those guidelines—the ADA Accessibility Guidelines—were incorporated into the Attorney General's final implementing regulations which were published on July 26, 1991. *See* ADA Standards for Accessible Design ("DOJ Guidelines"), 56 Fed. Reg. 35544 (July 26, 1991), *codified at* 28 C.F.R. Part 36, App. A.

These regulatory requirements for complying with the ADA include specific guidance for, among other things: (a) providing a continuous, unobstructed path connecting all accessible elements and spaces of a building or facility, including both exterior and interior routes (*See* 28 C.F.R., Part 36, App. A § 4.3); (b) accessible corridors, floors, ramps, and clear floor space at interior fixtures (*id.*); and (c) where a place of public accommodation provides for self-parking by employees and/or visitors, a minimum number of reserved handicapped-accessible spaces. *See id.* § 4.1.2(5).

## B.    Preliminary Injunctive Relief is Proper Here.

### 1.    The Legal Standard

The FHA expressly authorizes a court that finds that a discriminatory housing practice has occurred, or is about to occur, to "grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate.)" 42 U.S.C. § 3613(c)(1). The ADA affords any person who is being subjected to discrimination on the basis of disability in violation of that Act the remedies and

procedures set forth in 42 U.S.C. § 2000a-3(a).  42 U.S.C. § 12188(a)(1).  Section 2000a-3(a)

allows an aggrieved party to institute "a civil action for preventive relief, including an

application for a permanent or temporary injunction, restraining order, or other order."  42

U.S.C. 2000a-3(a).  *See also* 28 C.F.R. 36.501(a).

　　As this Court is aware, "[t]o demonstrate entitlement to a preliminary injunction, a

litigant must show '(1) a substantial likelihood of success on the merits, (2) that it would suffer

irreparable injury if the injunction is not granted, (3) that an injunction would not substantially

injure other interested parties, and (4) that the public interest would be furthered by the

injunction.'"  *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998) (*quoting*

*CityFed Fin. Corp. v. Office of Thrift Supervision,* 58 F.3d 738, 746 (D.C. Cir. 1995)).  *See also*

*Clarke v. Office of Fed. Housing Enter. Oversight*, 355 F. Supp. 2d 56, 62-63 (D.D.C. 2004).

These four factors are not independent of each other, but rather "interrelate on a sliding scale and

must be balanced against each other."  *Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C.

Cir. 1998).  *See also Mova*, 140 F.3d at 1066 ("The district court balances the litigant's showings

in these four areas in deciding whether to grant an injunction."); *CityFed*, 58 F.3d at 747 ("If the

arguments for one factor are particularly strong, an injunction may issue even if the arguments in

other areas are rather weak.").

　　Each of the four factors above supports entry of preliminary relief here.  As explained in

greater detail below, the Post Defendants have engaged in a continuous pattern and practice of

discrimination against persons with disabilities in violation of both the FHA and the ADA by

designing, constructing and operating the properties that are the subject of this action in such a

manner as to deny access to, and use of, such properties to persons with disabilities.  Allowing

the Post Defendants, during the pendency of this action, to sell and/or convert to condominiums

the inaccessible properties that they currently own, thereby cutting off this Court's ability to order that those properties be retrofitted, would cause the ERC and the persons with disabilities on whose behalf the ERC advocates, irreparable injury.

>     **2.    The ERC Enjoys a Substantial Likelihood of Success on the Merits.**

To succeed on the merits in this action, the ERC must establish, by a preponderance of the evidence, that the Post Defendants have violated the FHA and/or ADA's accessibility requirements.  Based on the testing evidence described in detail below, the evidence is irrefutable that the Post Defendants failed to include required accessibility features in scores of housing complexes designed and built for first occupancy after March 13, 1991.

Ultimate success is not, however, the test for entitlement to a preliminary injunction.  *See Express One Int'l, Inc. v. United States Postal Serv.*, 814 F. Supp. 87, 88 (D.D.C. 1992) ("The court is not required to determine that [sic] the ultimate success of the movant to 'a mathematical probability,' particularly when the other factors weigh heavily in favor of the injunction." (*quoting Washington Metro. Area Transit Comm'n v. Holiday Tours, Inc.*, 559 F.2d 841, 843 (D.C. Cir. 1977)).  Rather, the ERC need only establish that there is a *substantial* case on the merits.  *See Blackwelder Furniture Co. v. Selig Mfg. Co.*, 550 F.2d 189, 195 (4th Cir. 1977) (movant for injunction must raise "questions going to the merits so serious, substantial and doubtful as to make them fair game for litigation"); *Canales v. Paulson*, No. 06-1330, 2006 WL 2520611, at *3 (D.D.C. Aug. 30, 2006) ("when the other three factors strongly favor interim relief, a court may grant injunctive relief when the moving party has merely made out a 'substantial' case on the merits").  "[I]t will ordinarily be enough that the plaintiff has raised questions going to the merits so serious, substantial, difficult and doubtful, as to make them a fair ground for litigation and thus for more deliberative investigation."  *Holiday Tours*, 559 F.2d at

844.  Here, there is a substantial likelihood that the ERC will succeed in establishing that the Post Defendants have violated both the FHA and ADA.

**a.       FHA and ADA Violations are Present.**

The ERC has undertaken extensive testing, inspecting 27 properties owned by the Post Defendants in several states, about half of their portfolio.  The FHA and ADA accessibility requirements for specified design elements are clear.  The violations discovered by the ERC in its testing are not subject to reasonable dispute in that they are determinable with a tape measure or digital level—for example, either a door opening is the minimum 32" wide or it is not, there are either steps acting as a barrier to an entrance or there are not, and the required floor space in kitchens and bathrooms either meets the required dimensions and is large enough or it is not.  Comparison of the actual measurements at the Tested Properties to what is required by the law is simply done and subject to verification.

In its testing, the ERC identified at least one FHA or ADA violation, and in most cases multiple violations, at each of the Tested Properties which make access difficult or impossible for persons who use wheelchairs.  These included:

> i.       Doors in units that are not sufficiently wide so as to allow passage into kitchens, bathrooms, bedrooms and other areas in the units by persons using wheelchairs, in violation of 42 U.S.C. § 3604(f)(3)(C)(iii)(I), and 24 C.F.R. § 100.205(c)(2).  *See* 56 Fed. Reg. 9506 (Requirement 3, requiring, *inter alia*, 32" nominal clear door opening).  For example, doors at several of the Subject Properties (including Brookhaven, Gallery, Abbey, Vintage, Corners, Gardens, Oglethorpe, Park Place at Phillips Place, Peachtree and Ballentyne) have been measured at 22" to 28.5", too narrow for a person in a wheelchair.  *See* Crootof Dec. ¶ 14, 17.

ii.    The failure to provide an accessible route into and through the unit, including access to patios, balconies and other outside areas, in violation of 42 U.S.C. § 3604(f)(3)(C)(iii)(I), and 24 C.F.R. § 100.205(c)(3)(i).  *See* 56 Fed. Reg. 9506 (Requirement 4, requiring, *inter alia*, changes in level within dwelling unit to be ramped if greater than 0.5").  For example, Tested Properties Lindbergh, Collier Hills and Lenox utilize 1.5" thresholds and no ramps.  *See* Crootof Dec. ¶ 14.

iii.    Bathrooms that do not have sufficient clear floor space so as to allow a person in a wheelchair to maneuver about the space, in violation of 42 U.S.C. § 3604(f)(3)(C)(iii)(IV), and 24 C.F.R. § 100.205(c)(3)(iv).  *See* 56 Fed. Reg. 9511 (Requirement 7, requiring, *inter alia*, center line of toilet to be at least 1'6" from nearest obstacle).  For example, Tested Properties Uptown Square, Collier Hills, Lindbergh, Stratford, Lenox Park, Gardens, Glen, Ballentyne, Park at Phillips Place, Pentagon Row, Corners, Rocky Point, Hyde Park, Oglethorpe, Gallery and Abbey.  *See* Crootof Dec. ¶ 14, 15.

iv.    Kitchens that do not have sufficient clear floor space so as to allow a person in a wheelchair to maneuver about the space, in violation of 42 U.S.C. § 3604(f)(3)(C)(iii)(IV), and 24 C.F.R. § 100.205(c)(3)(iv).  *See* 56 Fed. Reg. 9511 (Requirement 7, requiring, *inter alia*, 40" clearance between opposing elements). For example, Tested Properties Carlyle Square, Hyde Park, Harbor Park, Peachtree Hills, Gardens, Oglethorpe, Gateway Place, Gallery, Abbey, Vintage, Corners, Mass Ave., Rocky Point, Stratford and Ballentyne.  *See* Crootof Dec. ¶ 14, 15, 16.

v.    Light switches, electrical outlets, thermostats and other environmental controls that are not located in accessible locations, in violation of 42 U.S.C. § 3604(f)(3)(C)(iii)(II), and 24 C.F.R. § 100.205(c)(3)(ii). *See* 56 Fed. Reg. 9506 (Requirement 5, requiring, *inter alia*, such controls to be located no higher than 48" above the floor). For example, Tested Properties Hyde Park, Collier Hills, Peachtree Hills, Stratford, Gardens, Glen, Brookhaven, Oglethorpe, Ballentyne, Park at Phillips Place, Gateway Place, Uptown and Mass Ave. have environmental controls that range from 55" to 61" above the finished floor. *See* Crootof Dec. ¶ 14.

vi.   Rental offices located up stairs, or served by inaccessible ramp routes, in violation of 42 U.S.C. § 12182(a), and 28 C.F.R. §§ 36.201(a), 36.401(a)(1), 36.406(a). *See* 28 C.F.R., Part 36, App. A § 4.3 (requiring, *inter alia*, that a ramp, elevator, or platform lift be provided for changes in level of greater than 0.5" along an accessible route). For example, Tested Properties Carlyle Square, Glen, Gallery and Abbey each has steps without an accompanying ramp, either at units or at the leasing office entrance, making access impossible for a person in a wheelchair. *See* Crootof Dec. ¶ 14.

vii.  A lack of reserved and accessible parking, in violation of 42 U.S.C. § 12182(a), and 28 C.F.R. §§ 36.201(a), 36.401(a)(1), 36.406(a). *See* 28 C.F.R., Part 36, App. A § 4.1.2(5) (requiring, *inter alia*, at least one accessible parking space where parking spaces are provided). For example, Tested Properties Gallery, Heights II, and Worthington provide no accessible parking at various locations for persons with disabilities. *See* Crootof Dec. ¶ 14.

**b.    The Post Defendants Were Involved In the Design and Construction Process so as to Be Liable under the FHA, and are Owners or Operators so as to Be Liable under the ADA.**

The Post Defendants have admitted that they are the owners and operators of each of the Subject Properties.  In their public filings with the SEC, in their press releases, in their sales materials available at individual properties, and on their internet website (used to market their properties), the Post Defendants routinely and repeatedly claim that they own and operate these properties.  *See* Carpenter Dec. Ex. C and www.postproperties.com.

Similarly, in each of its annual and quarterly filings with the SEC, and in its press releases, the Post Defendants routinely admit their development, *i.e.*, the design and construction of apartment and condominium complexes.  *See, e.g.,* Post Properties, Inc., SEC Form 10K for year ending 12/31/06, "Properties" at 16-18, Carpenter Dec. Ex. C.

Thus, the indisputable existence of numerous FHA and ADA violations observed in the 27 Tested Properties, the undeniable existence of common relevant design elements in many of the Subject Properties, and the undeniable involvement of the Post Defendants in the design, construction, ownership and operation of each property clearly demonstrate that the ERC is substantially likely to succeed on the merits here.

**3.    Irreparable Harm Will Occur Absent the Entry of the Requested Injunction.**

Both the FHA and the ADA specifically authorize this Court to grant the preliminary relief sought here by the ERC.  The FHA authorizes a court that finds that a discriminatory housing practice has occurred, or is about to occur, to "grant as relief, as the court deems appropriate, any permanent or temporary injunction, temporary restraining order, or other order (including an order enjoining the defendant from engaging in such practice or ordering such affirmative action as may be appropriate.)"  42 U.S.C. § 3613(c)(1).  The ADA affords any

person who is being subjected to discrimination on the basis of disability in violation of the Act the remedies and procedures set forth in 42 U.S.C. § 2000a-3(a).  42 U.S.C. § 12188(a)(1). Section 2000a-3(a) allows an aggrieved party to institute "a civil action for preventive relief, including an application for a permanent or temporary injunction, restraining order, or other order."  42 U.S.C. 2000a-3(a).  *See also* 28 C.F.R. 36.501(a).  Applying these provisions of the FHA, some courts have specifically held that "a showing of irreparable harm is not required." *United States v. Edward Rose & Sons*, 246 F. Supp. 2d 744, 753 (E.D. Mich. 2003); *United States v. Edward Rose & Sons*, 384 F.3d 258, 264 (6th Cir. 2004)(collecting cases). [10] Accordingly, this prerequisite for injunctive relief is met by the ERC.

Even if the ERC is denied the benefit of this presumption, irreparable harm is nonetheless present.  While the concept of irreparable injury evades simple definition, it has been established that, for injunctive relief to be granted, "the injury must be both certain and great; it must be actual and not theoretical."  *Wisconsin Gas Co. v. Fed. Energy Regulatory Comm'n*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also Clarke*, 355 F. Supp. 2d 56, 65 (D.D.C. 2004).  Here, absent interim injunctive relief, the ERC faces imminent and irreparable harm by being denied the opportunity to seek full and complete relief from this Court in order to ensure the accessibility to persons with disabilities of the properties currently in the Post Defendants' possession.  As

---

[10] The Fair Housing Act constitutes "a broad mandate to eliminate discrimination against and to equalize opportunities for disabled individuals."  *Bronk v. Ineichen*, 54 F.3d 425, 427 (7th Cir. 1995).  The eradication of housing discrimination is a policy that Congress considered to be of the highest priority.  *Trafficante v. Metropolitan Life Ins. Co.*, 409 U.S. 205, 212 (1972); *Price v. Pelka*, 690 F.2d 98, 102 (6th Cir. 1982).  It is, therefore, to be presumed that irreparable injury will flow from a demonstrated violation of the statute.  *Gresham v. Windrush Partners, Ltd.*, 730 F.2d 1417, 1423 (11th Cir.), *cert. denied sub nom. Windrush Partners v. Metro Fair Hous. Services*, 469 U.S. 882 (1984) ("irreparable injury may be presumed from the fact of discrimination and violations of fair housing statutes"); *Bronson v. Crestwood Lake Section 1 Holding Corp.*, 724 F. Supp. 148, 153 (S.D.N.Y. 1989) (citing *Gresham* for the proposition that when housing discrimination is shown, irreparable harm may be presumed); *Stewart B. McKinney Found., Inc. v. Town Plan & Zoning Comm'n*, 790 F. Supp. 1197, 1208 (D. Conn. 1992) (same); *Chapp v. Bowman*, 750 F. Supp. 274, 277 (W.D. Mich. 1990).

explained by Wright & Miller: "the most compelling reason in favor of [granting a preliminary injunction] is the need to prevent the judicial process [**11] from being rendered futile by defendant's action or refusal to act."  Wright, Miller & Kane, Federal Practice and Procedure: Civil § 2947 at 123.  *See The Canal Authority of Florida v. United States Corp. of Engineers*, 489 F.2d 567, 572 (5th Cir. 1974).

Where FHA or ADA design or construction violations are found, retrofitting is a common and appropriate remedy.  *See, e.g., Baltimore Neighborhoods, Inc. v. LOB Inc.*, 92 F. Supp. 2d 456, 466-77, 470 (D. Md. 2000); *Lieber v. Macy's West, Inc*., 80 F. Supp. 2d 1065, 1081-82 (N.D. Cal. 1999).  A party involved in "the design and construction of covered multifamily dwellings," 42 U.S.C. § 3604(f)(3)(c), can be found liable for such violations and ordered to retrofit.  While the Post Defendants are such parties, subsequent bona fide purchasers of properties owned by the Post Defendants will not be.  In fact, 42 U.S.C. § 3613(d) specifically provides: "Relief granted under this section shall not affect any contract, sale, encumbrance, or lease consummated before the granting of such relief and involving a bona fide purchaser, encumbrancer, or tenant, without actual notice of the filing of a complaint with the Secretary or civil action under this subchapter."  By their own admission, the Post Defendants are currently actively engaged in the sale and/or conversion to condominiums of a number of the properties that are the subject of this action.  *See* Carpenter Dec. Exs. C and D.  Thus, absent the requested interim relief, as to properties the Post Defendants sell during the pendency of this litigation, this Court will lose the power to issue an enforceable order to retrofit and bring the properties into compliance with the law.  Without the requested injunction, these housing units will be permanently "unavailable" to persons with disabilities.  *See Baltimore Neighborhoods, Inc.*, 92 F. Supp. 2d at 470-71.

- 18 -

### 4.    A Balancing of Harms Favors the Issuance of an Injunction.

The ERC seeks an injunction merely to maintain the status quo during the pendency of this litigation, allowing it to benefit fully from a positive ruling on the merits. *See Ralvin Pac. Props. v. United States*, Civ. A. No. 93-0610, 1994 WL 151217, at \*2 (D.D.C. Apr. 12, 1994). Given that an even more intrusive preliminary injunction has been granted **requiring immediate retrofitting** in a case similar to this, the Post Defendants cannot argue that they will be substantially harmed by an injunction that merely requires they retrofit before selling and/or converting the properties that are the subject of this action, or obtain an agreement from the buyer(s) to allow retrofitting should this Court so order. *See Ramirez v. District of Columbia*, 1999 WL 986914 (D.D.C. Oct. 14, 1999) ("Making the Defendants comply with their legal responsibilities [under the ADA] is not substantial harm to the Defendants.").

Nor are the financial effects of the requested injunction sufficient to avoid its entry. In this regard, the District Court in *Edward Rose & Sons* explained:

> [T]he Court is unaware of any case in which a Court has held that the potential financial burden of correcting unlawful discrimination outweighs the harm caused by allowing a party to actively engage in acts that Congress has identified as wrongful and injurious to an entire class of people. . . . By enacting the statute and the provisions at issue here, Congress has indicated that obliterating discrimination against disabled individuals at all levels in housing is a priority. Had Congress wanted to limit the Court's authority when the potential financial burden would be great, it could have expressly done so. It did not.

*Id.*, 246 F. Supp. 2d at 755.

### 5.    The Public Interest Is Furthered By the Issuance of an Injunction

There is a strong public interest in eliminating discrimination against persons with disabilities. *See Deck v. City of Toledo*, 29 F. Supp. 2d 431, 434 (N.D. Ohio 1998); *Thomas v. Davidson Academy*, 846 F. Supp. 611, 619 (M.D. Tenn. 1994). In enacting the FHA and ADA, Congress acknowledged this interest. *See* H.R. Rep. No. 100-711, at 18, *as reprinted in* 1988 U.S.C.C.A.N. 2173, 2179. "The Fair Housing Amendments Act . . . is a clear pronouncement of

a national commitment to end the unnecessary exclusion of persons with handicaps from the American mainstream." H.R. Rep. No. 101-485(II), at 35, *as reprinted in* 1990 U.S.C.C.A.N. 303, 317. By granting the ERC a preliminary injunction in this action, this Court will be acting in accord with the strong public interest in ensuring the availability of accessible housing and preventing discrimination against persons with disabilities.

## IV.    <u>CONCLUSION</u>

For the reasons set forth above, the ERC respectfully requests that this Court grant its Motion for a Preliminary Injunction and prohibit the Post Defendants from selling any of the Subject Properties, or any covered housing units in any Subject Property unless (1) the property being sold has been retrofitted to comply with the FHA and ADA (with such compliance verified

by the ERC); or (2) a term of any sale is the agreement from any buyers to allow the Post

Defendants to re-enter and retrofit should the Court so order after adjudication on the merits.

Date: April 18, 2007                              Respectfully submitted,

                                                  *Sheila J. Carpenter*
                                                  Sheila J. Carpenter (DC Bar #935742)

                                                  Jorden Burt LLP
                                                  1025 Thomas Jefferson Street, NW
                                                  Suite 400 East
                                                  Washington, DC 20007
                                                  Tel:  (202) 965-8165
                                                  Fax: (202) 965-8104

                                                  *Donald L. Kahl*
                                                  Donald L. Kahl (DC Bar #489472)

                                                  Washington Lawyers' Committee
                                                  For Civil Rights and Urban Affairs
                                                  11 Dupont Circle, NW
                                                  Suite 400
                                                  Washington, DC 20036
                                                  Tel:  (202) 319-1000
                                                  Fax: (202) 319-1010

                                                  Attorneys for Plaintiff
                                                  Equal Rights Center

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EQUAL RIGHTS CENTER,<br><br>Plaintiff,<br><br>vs.<br><br>POST PROPERTIES, INC. *et al.,*<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

Case No. 1:06CV01991

Judge Richard Leon

## DECLARATION OF REBECCA CROOTOF

1.      I am a Senior Project Coordinator at the Equal Rights Center ("ERC"). I have worked at the ERC for approximately two and a half years. I am over the age of 18 years, have personal knowledge of the facts stated herein and am competent to testify to them. I was primarily responsible for the investigation and testing conducted by the ERC with respect to Post Properties, Inc.'s ("Post") apartment and condominium complexes.

2.      The ERC is a non-profit civil rights organization dedicated to identifying, challenging, and eliminating discrimination in housing, employment, public accommodations, and government services through education, research, testing, counseling, enforcement, and advocacy. The ERC also represents the interests of its approximately 150 individual public members, many of whom are persons with disabilities.

3.      Many of my duties at the ERC revolve around educating the public on their rights under the Fair Housing Act and other civil rights laws. I have been responsible for drafting, editing, and publishing the ERC's quarterly newsletter; I handled the ERC's section of the 2004 annual Fair Housing Symposium (which the ERC now puts on by itself to provide a forum for

experts and the public to discuss current fair housing issues) and assisted with subsequent ones; I

have developed the current version of the ERC's website and been involved in updating it

regularly; I have created, edited, updated, managed translation, and published a number of the

brochures which the ERC uses for education and outreach, including "What We Do" (which has

been translated into Spanish, Chinese, Vietnamese, and Amharic) and "Fair Housing Compliance

Program" (copies attached as Exhibits A and B), and provided graphic design advice for many

other brochures, mailings, posters, and documents; I have conducted numerous public

presentations on fair housing law and individual rights under the FHA; I have managed a

contract the ERC has with a major builder in the eastern U.S. and for over two years I conducted

bi-monthly fair housing training for their sales representatives; I worked as the Intern

Coordinator to educate interns on ERC activities and fair housing law; and I recently spent a

month teaching U.S. fair housing law to employees of the Estate Agents Affairs Board in South

Africa.

    4.     Post is a national developer and manager of apartments and condominiums, with

over 50 multi-family properties built for first occupancy after March 13, 1991 (and, thus,

"covered" by the Fair Housing Act as Amended in 1988 (FHAA).

    5.     In 2006, after the ERC learned that, among other housing providers, Post had a

number of apartment complexes not in compliance with the FHAA), I was asked by the ERC to

divert my time from my other duties to an investigation of Post to discover if, and if so, to what

extent Post participated in housing discrimination against persons with disabilities. I designed,

supervised, and participated in this systemic investigation of multifamily developments built by

Post for first occupancy after March 13, 1991, in order to determine their level of compliance with the technical standards of the FHAA.

6.       I first began a local systemic investigation of Post properties in the greater D.C. metropolitan area.  This testing consisted of two ERC personnel trained in the accessibility requirements of the FHA and some of the requirements of the ADA physically inspecting each of the Tested Properties, making visual observations, and taking actual measurements and photographs of critical design features.  At the conclusion of each testing trip, I debriefed testers and collected all forms, handouts, and signed-out equipment; created files for each test; reviewed the photo log created by one of the two testers; analyzed the test results, and inputted the results into testing reports.

7.       As a result of this local systemic testing, it became apparent that Post had covered housing complexes which were designed and constructed in violation of the FHAA.  The ERC then determined that it was necessary to expand the local investigation of Post to a broader-scoped one in order to determine the extent of Post's non-compliance nationally.

8.       As part of the ERC's investigation, research was conducted to determine how many multi-family properties built for first occupancy after March 13, 1991 Post owned and had developed, the date each property was completed for first occupancy, the number and type of units, and in some cases, information about the office hours and if there were any apartments available to view.

9.       Based on the information available at the time, the ERC decided to test twenty-seven (27), or roughly one-half, of Post's total properties covered by the FHAA.  In addition, twenty-six (26) of the twenty-seven (27) properties to be tested were constructed for first

occupancy or remodeled after January 26, 1993, the effective date for the accessibility requirements of the Americans with Disabilities Act.

10.     When choosing properties to test, the ERC selected sites designed to examine both how widespread geographically Post's discriminatory conduct was, and how pervasive the discriminatory conduct was in areas where Post had developed multiple covered properties.

11.     After selecting the Post properties to be tested, I created a timeline and a budget for the investigation. This budget was approved, and so I began planning the necessary logistics, including travel for testing in Colorado, Florida, Georgia, North Carolina, and Texas. For all of the "expanded-scope" tests, I was the tester who actually took measurements.

12.     As a result of this systemic testing, it became apparent that Post had numerous apartment complexes which were designed and constructed in violation of the FHAA.

13.     After all tests were completed, I worked with others at the ERC to do a floor plan analysis that looked for similarities in design between tested Post properties where FHAA violations were found, and untested properties. As noted in ¶ 18 below, we found many similarities.

14.     After I had completed the analysis for all Post testing, I met with the ERC's Director of Testing to do a complete review of the Post testing and its results. The testing results demonstrated numerous violations. For example, doors at several of the Subject Properties (including Brookhaven, Gallery, Abbey, Vintage, Corners, Gardens, Oglethorpe, Park Place at Phillips Place, Peachtree and Ballentyne have been measured at 22" to 28.5" instead of meeting the required minimum nominal 32", making them too narrow for a person in a wheelchair; Tested Properties Lindbergh, Collier Hills, and Lenox have 1.5" patio thresholds and no ramps,

making access to and from the patios difficult or impossible for a person in a wheelchair; Tested

Property Lenox Park has a main entrance to a unit threshold that appears to make access to the

ground floor unit difficult or impossible for a person in a wheelchair; Tested Properties Carlyle

Square and Gardens had a main entrance to the leasing office that appears to make access to the

leasing office difficult or impossible for a person in a wheelchair; Tested Properties Uptown

Square, Collier Hills, Lindbergh, Stratford, Lenox Park, Gardens, Glen, Ballentyne, Park at

Phillips Place, Uptown, Square, Pentagon Row, Corners, Rocky Point, Hyde Park, Oglethorpe,

Gallery and Abbey have bathrooms that do not have sufficient clear floor space to allow a person

in a wheelchair to maneuver about the space and/or use the facilities; Tested Properties Uptown

Square, Hyde Park, Harbor Park, Peachtree Hills, Stratford, Gardens, Oglethorpe, Gateway

Place, Gallery, Abbey, Square, Vintage, Corners, Carlyle Square, Mass Ave., Rocky Point,

Stratford and Ballentyne have kitchens that do not have sufficient clear floor space so as to allow

a person in a wheelchair to maneuver about the space and/or use the appliances in a safe manner;

Tested Properties Hyde Park, Collier Hills, Peachtree Hills, Stratford, Gardens, Glen,

Brookhaven, Oglethorpe, Ballentyne, Park at Phillips Place, Gateway Place, Uptown, and Mass

Ave. have environmental controls that range from 55" to 61" above the finished floor instead of

meeting the required maximum 48", making them too high for a person in a wheelchair to use;

Tested Properties Carlyle Square, Glen, Gallery and Abbey have steps without an accompanying

ramp, either at units or at the leasing office entrance, making access impossible for a person in a

wheelchair; and Tested Properties Gallery, Heights II and Worthington provide no accessible

parking at the leasing center for persons with disabilities.

15.     One of the properties tested was Post's Rocky Point apartments located in Tampa, FL. I was part of the testing team for this garden-style complex which was built in 1995-1996. While at this property, we were shown Unit #3525 on the ground floor. A number of features in that unit did not meet the requirements of the FHAA. The environmental controls for the unit were 62" above the floor instead of meeting the required maximum of 48", making them too high for a person in a wheelchair. The outlets were at 13.5" above the floor instead of meeting the required minimum height of 15", making them too low for a person in a wheelchair to reach. This unit had a U-shaped kitchen; the standard for such kitchens is to have a 60" diameter clear floor space at the base of the "U," so that a person using a wheelchair can turn around and exit the kitchen safely in case of an emergency. The clear diameter in the kitchen was only 56.5". For a person in a wheelchair to use a sink when no forward approach is possible (as is the case in this kitchen), there needs to be 48" centered clear floor space at the sink; in other words, 24" from the center of the sink to the nearest obstruction. The sink in this kitchen had only 20.5" from the center to the nearest obstruction, making it difficult or impossible for a person in a wheelchair to use. The bathroom in this unit also did not meet the standards for sufficient clear floor space at the toilet or at the sink necessary for a person in a wheelchair to be able to use the facilities. The complex also had open outdoor stairwells with no protective obstacles within cane range underneath the stairwells; such obstacles are required by the standard to prevent a blind or low-vision person from hurting themselves by running into the underside of the steps.

16.     Another of the properties tested was Post's Condominiums at Carlyle Square located in Alexandria, VA. I was part of the testing team for this high-rise facility which was still being built in 2006. We were not shown an apartment unit, as they were not yet available for

public viewing.  We were shown a model kitchen and a model bathroom in the sales office, which the sales agent said would be the same as those in the actual units.  The sales office was up steps  and no ramp was apparent, making it difficult or impossible for a person with a mobility disability to enter the office.  The show kitchen did not have sufficient clear floor space to allow a person in a wheelchair to maneuver about the space or use the appliances in a safe manner. There were other common area problems:  the common area bathroom had a light switch 51" high (instead of the required maximum of 48") and not enough clear floor space for a person in a wheelchair to close the door or use the toilet.

17.      A third property tested was Post's Ballentyne apartments located in Charlotte, NC. I was part of the testing team for this garden-style complex which was completed in 2004.  The rental agent at this property showed us Unit #101 on the ground floor.  The walk-in closet in one of the bedrooms had a door only 28.5" wide instead of the required 32" minimum needed to ensure accessibility.  In the unit's U-shaped kitchen, there was only a 56" turning diameter rather than the required 60" minimum, and the bathroom sink did not have enough clear floor space to allow the facility to be used by a person in a wheelchair.  We were not allowed by the rental agent to photograph the property.

18. The above are just examples of the accessibility problems found in Post's various properties.  We found similar or additional violations at all the other Post properties built for first occupancy after March 13, 1991 which were tested by the ERC.  In addition to testing a large sample of Post properties, the ERC also looked at floor plans, brochures and Post's website to determine if untested Post properties shared common elements of design with the tested properties and would, thus, exhibit similar violations.  We found that they did.  By way of

example:  Five (5) Tested Properties—Uptown Square, Uptown Place, Stratford, Collier Hills, and Lenox Park—share common design elements in the bathrooms of their units, and with the bathroom units of 12 of the untested Subject Properties.  Each of these properties uses a common bathroom design in units that makes the width of the room equal to the length of the bathtub, and arranges the bathtub, the toilet, and the lavatory in sequence along a single wall.  This common design in every tested instance results in inadequate clearance in the bathroom making it difficult or impossible for persons in wheelchairs to use the facilities.  Examples of these floor plans using this common bathroom design are attached as Exhibit C.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 18, 2007

Rebecca Crootof

Uptown
Sq

Studio
( 168,168 )

**LIVING**
**15'-2"X12'-2"**

**BATH**
**5'-1"X9'-5"**

WH

**KITCHEN**
**10'-9"X11'-6"**

FOYER

**CLOSET**
**5'-3"X6'-0"**

PANTRY

Studio 1 by 16th    Straford

#3



1 Bd, 1 Bth
#2

Straford



Parkside

# Loft 2 bed, 2 bath #2



Bridge

# Traditional 1 bed, 1 bath #1



Luminaria

# Traditional 1 bed, 1 bath #5



Post Toscana

# Traditional 1 bed, 1 bath #1



# POST UPTOWN VILLAGE
## TRADITIONAL- 2BR/ 2BATH



Ridge

# Traditional 2 bed, 2 bath #1



# Unit B9a

## 2 bedroom / 2 bath

230, 330

PRINT



THE CONDOMINIUMS AT
# CARLYLE SQUARE



Due to continuing changes in products, building codes and availability of material, builder reserves the right to incorporate new design features of equivalent materials at any time without notice. All dimensions and square footage shown on this page and floorplans are approximate only. Floor plans, specifications and standard features are subject to modifications at any time without notice. Room dimensions may vary between the rendered floor plans and the individually built units. All illustrations and photography are artist's concepts and model representations and may vary in detail from plans and specifications. Renderings and furniture are an artist's interpretation for illustrative purposes only. These renderings are intended for illustrative purposes only and shall not be made part of any Purchase Agreement.





www.pnhoffman.com



# Unit D4

## 2 bedroom / 2 1/2 bath / den

102

[ PRINT ]



THE CONDOMINIUMS AT
# CARLYLE
# SQUARE



1st Level

Mezzanine

Due to continuing changes in products, building codes andavailability of material, builder reserves the right to incorporate new design features of equivalent materials at any time without notice. All dimensions and square footage shown on this page and floorplans are approximate only. Floor plans, specifications and standard features are subject to modifications at any time without notice. Room dimensions may vary between the rendered floor plans and the individually built units. All illustrations and photography are artist's concepts and model representations and may vary in detail from plans and specifications. Renderings and furniture are an artist's interpretation for illustrative purposes only. These renderings are intended for illustrative purposes only and shall not be made part of any Purchase Agreement.

  www.pnhoffman.com 

# Unit D2a1

1 bedroom / 2 bath / den

112

PRINT



THE CONDOMINIUMS AT

# CARLYLE SQUARE





1st Level

Mezzanine

Due to continuing changes in products, building codes and availability of material, builder reserves the right to incorporate new design features of equivalent materials at any time without notice. All dimensions and square footage shown on this page and floorplans are approximate only. Floor plans, specifications and standard features are subject to modifications at any time without notice. Room dimensions may vary between the rendered floor plans and the individually built units. All illustrations and photography are artist's concepts and model representations and may vary in detail from plans and specifications. Renderings and furniture are an artist's interpretation for illustrative purposes only. These renderings are intended for illustrative purposes only and shall not be made part of any Purchase Agreement.





# www.pnhoffman.com



## POST BRIARCLIFF
## TRADITIONAL- 1BR/1BATH



## Traditional 1 bed, 1 bath #1



Dunwoody

Bath #1

LAUNDRY

KITCHEN

DW

MECH

BATH

WALK-IN CLOSET

CLOSET

CLOSET

HALL

FOYER

B'FAST BAR

DINING ROOM

BEDROOM

LIVING ROOM

STORAGE

DECK

# What We Do

## The ERC is committed to fighting discriminatory practices that illegally and immorally deny access and opportunity.

Discrimination based on race, color, national origin, religion, sex, whether one has children, and/or mental or physical disability violates federal law. Also, state and local laws may make it illegal to discriminate on other bases, such as age, sexual orientation, marital status, or if a person relies on government assistance to help pay the rent.

**Victims of discrimination in housing, employment, or the use of public or government services and facilities should immediately contact the Equal Rights Center.** With the ERC on your side, you have the power to stop anyone from illegally discriminating. Without charge, we will listen to your story and do everything within our power to help you pursue all available remedies, possibly including legal awards for damages sustained. All ERC services are fully confidential.

## Education and Outreach

The ERC develops materials, organizes symposia, and conducts a wide range of training programs to educate the public about civil rights law. The ERC also works with businesses and government agencies to help them better understand their responsibilities.

## Compliance Services

Our award winning and comprehensive compliance program has three core components that promote understanding of civil rights law: (1) staff training, (2) corporate policy development, including writing, revising, and updating manuals, (3) internal testing to measure compliance with the law. The ERC has successfully completed projects for local and national corporate, non-profit, and governmental organizations.

## Research

The ERC conducts research and cooperates in locally and nationally sponsored studies to measure trends regarding impediments to equal opportunity.

## Testing (Secret Shopping)

Testing is a legal process used to assess a business's compliance with civil rights law. Testers are trained to visit businesses, request services, and objectively document their experiences. This allows the ERC to measure differences in the quality and quantity of information and services provided. If you or someone you know is interested in becoming a tester, please contact the ERC.

## Counseling and Advocacy

The ERC will provide counseling and advocacy services for individuals, including attending mediations and writing letters. In addition, the ERC advocates for the strengthening of anti-discrimination laws and practices.

## Enforcement

After receiving a complaint, the ERC pursues all available means of determining whether violations of civil rights have occurred. When violations of the law are uncovered, the ERC will assist the complainant in pursuing administrative and civil court remedies to stop the harm, prevent its reoccurrence, and seek compensation for each victim's damages.

*Find more information on all of our activities at* www.equalrightscenter.org.



# Equal Rights Center

**ADVANCING FAIRNESS & EQUALITY** • **IN HOUSING, EMPLOYMENT, & PUBLIC ACCOMMODATIONS**

# *What We Do*

11 Dupont Circle NW, Suite 400
Washington, DC 20036
(p) 202.234.3062
(f) 202.234.3106
(TTY) 202.234.7590
info@equalrightscenter.org
www.equalrightscenter.org

## BOARD OF DIRECTORS

Rev. Dr. James G. Macdonell
*President*

Kim Keenan, Esq.
*First Vice-President*

Peter Edelman, Esq.
*Second Vice-President*

Robert D. Dinerstein
*Treasurer*

Msgr. Ralph Kuehner
*Secretary*

James O. Gibson
*Personnel Committee Chair*

Sue A. Marshall

Beatriz Otero

Daniel Silver, Esq.

Jackie Simon

Tony Yin

George D. Ruttinger, Esq.
*General Counsel*

## EXECUTIVE DIRECTOR

Rabbi Dr. Bruce E. Kahn

## The Equal Rights Center

11 Dupont Circle NW, Suite 400
Washington, DC 20036
(p) 202.234.3062
(f) 202.234.3106
(TTY) 202.234.7590
info@equalrightscenter.org
www.equalrightscenter.org



## Mission:

The Equal Rights Center is a non-profit civil rights organization dedicated to identifying, challenging, and eliminating discrimination in housing, employment, public accommodations, and government services through education, research, testing, counseling, enforcement, and advocacy.

# Training Contract Options*

## Manual Development

The ERC will develop a Fair Housing Manual designed specifically for your employees. It will include a comprehensive review of the Fair Housing Act; Company Policy and Procedures, including sections on Meeting Customer Needs, Equal Professional Service, Neighborhood Information and Common Questions; and Accessible Housing; and recommended Best Practices.

## Behavior Modification

The ERC will develop at least twelve (12) teachable fifteen-minute units designed to help employees practice compliance with fair housing law. These units can be utilized by managers during regular staff meetings.

## Fair Housing Training

These three (3) hour sessions cover the basics of the Fair Housing Act with a focus on protected classes, prohibited activities, advertising, accessibility requirements, and reasonable accommodation and modification requests. The majority of time is spent on suggestions for low-liability responses to common real estate questions. Teaching methods include a short video, on-the-spot audience questioning, and interactive role playing.

## Management Training

The Fair Housing Training can be modified to include time for case studies, a Q&A session about problems faced by employees, and a review of strategies for effectively teaching fair housing to others.

## Testimonials from Real Estate Professionals:

*"I thought it would be all common sense, but [the trainer] really opened my eyes to some issues you would not even think were wrong to do. Great information! Thank you very much!"*

*"Informative. Gave good examples of real life and daily situations that will occur in any sales center."*

*"[The trainer] was knowledgeable and could explain the subtleties of the subject."*

---



# Testing Contract Options*

## Random Testing

The ERC will conduct on-site matched pair tests of federal and local protected classes to assure that all customers are receiving equal professional service. (Please see the back of this brochure for a definition of testing.)

## Targeted Testing

Particular employees will be targeted for matched pair testing. The company will select the employees to be tested and provide all necessary information.

## Accessibility Surveys

The ERC will send testers to survey and evaluate the accessibility of site offices for compliance with the requirements of the Fair Housing Act as Amended in 1988.

*Prices are negotiable. Each party in a contract has the right to cancel the contract with 30 days written notice.



*The ERC Fair Housing Compliance Program*

## Serving Your Customers

and

## Maximizing Your Market

info@equalrightscenter.org
www.equalrightscenter.org

---

## What is Testing?

Testing is a controlled, legal process designed to identify differences in treatment accorded to individuals who are similar in every significant respect except the variable being tested (i.e. race or number of children).

Testers are individuals who pose as prospective candidates without any real intent to receive a loan or rent or purchase a home, apartment, or other dwelling.



**11 Dupont Circle NW, Suite 400
Washington, DC 20036
(v) 202.234.3062
(f) 202.234.3106
(tty) 202.234.7590**

**info@equalrightscenter.org
www.equalrightscenter.org**

---

## Why is FH Important?

### Fair housing is vital because...

- It's the right thing to do.

- It's good business sense: The better you treat everyone, the wider your market base.

- It's great for public relations: If you are known in the community as a fair housing and equal opportunity organization, it's wonderful word-of-mouth advertising.

- It's the law: Full understanding and compliance with fair housing law protects your company.



## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**THE EQUAL RIGHTS CENTER**,

        Plaintiff,

        v.

**POST PROPERTIES, INC.**, *et al.*,

        Defendants.

**Case No.: 1:06-cv-01991**
Judge Richard Leon

## DECLARATION OF SHEILA J. CARPENTER
## IN SUPPORT OF THE EQUAL RIGHTS CENTER'S
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

I, Sheila J. Carpenter, affirm the following to be true:

1.   I am a duly licensed attorney at law, admitted to the Bars of Maryland and the District of Columbia.  I am a partner in the law firm of Jorden Burt LLP in Washington D.C.

2.   Jorden Burt represents the Equal Rights Center (the "ERC") in this action against Defendants Post Properties, Inc., Post GP Holdings, Inc. and Post Apartment Homes L.P. (collectively "Post").  I am one of the attorneys primarily responsible for representing the ERC in this litigation.

3.   I offer this affidavit in support of the ERC's Motion for Preliminary Injunction (the "Motion").

4.   After I learned the identity of Post's outside counsel in this litigation, I wrote to them on December 11, 2006 and suggested that we work out a procedure for handling sales of both apartment complexes and individual condominium units while the litigation was pending, noting

Page 1 of 2

Declaration of Sheila J. Carpenter

ERC v. Post Properties
Case no. 1:06-cv-01991

that it was important to ERC to preserve the ability of this Court to order retrofitting of properties in order to make them accessible to persons with disabilities as part of the relief in this litigation.  A copy of my letter is attached as Exhibit A to this Declaration.

5.    Post, through its counsel, refused to cooperate with ERC's request, or to negotiate any other solution.  A copy of Post's reply dated December 15, 2007 is attached as Exhibit B to this Declaration.

6.    Attached as Exhibit C are true and correct copies of pages from Post's most recent 10-K, for the period ending December 31, 2006, indicating its extensive holdings of condominiums and apartment complexes reviewed by the ERC and also indicating that Post is both seeking to sell entire apartment complexes, as well as individual condominium units.

7.    Attached as Exhibit D is a true and correct copy of a press release, obtained from Post's website, indicating that Post has recently disposed of an apartment complex built in 1993 and thus subject to the Fair Housing Act as amended by the Fair Housing Act Amendments of 1988.

I declare under penalty of perjury that the foregoing is true and correct.

Date:  April 13, 2007

_/s/ Sheila J. Carpenter_
Sheila J. Carpenter

Page 2 of 2

**Carpenter Affidavit**                                        **Civil Action No. 06-01991 (Leon, J.)**

**Exhibit A to Carpenter Affidavit**

## JORDEN BURT

1025 Thomas Jefferson Street, N.W.
Suite 400 East
Washington, D.C. 20007-5208
(202) 965-8100
Fax: (202) 965-8104

777 Brickell Avenue
Suite 500
Miami, FL 33131-2803
(305) 371-2600
Fax: (305) 372-9928

175 Powder Forest Drive
Suite 201
Simsbury, CT 06089-9658
(860) 392-5000
Fax: (860) 392-5058

Sheila J. Carpenter
(202) 965-8165
sjc@jordenusa.com

December 11, 2006

***VIA EMAIL & U.S. MAIL***
Christopher B. Hanback, Esq.
Alan I. Baron, Esq.
Holland & Knight
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006

Re:  ***The Equal Rights Center vs. Post Properties, Case No. 1:06-cv-01991***

Dear Chris and Alan:

This letter will confirm that Plaintiff The Equal Rights Center ("ERC") in the above-referenced litigation (the "Action") has no objection to Post Properties, Inc and its affiliates ("Post") to Post seeking an extension of time to answer or otherwise move with respect to the Complaint to and including January 27, 2006.

As counsel for ERC, we are writing with respect to an issue that was raised in our discussion regarding potential sale and/or conversion to condominiums of a number of properties that are the subject of the Action. As you know, one of the primary remedies typically ordered in cases alleging design and construction issues is the retrofitting of units to bring them into compliance with the Fair Housing Act (FHA), or the Americans with Disabilities Act (ADA). The ERC is concerned that, if Post were to sell properties and/or individual units either by conversion to condominiums, or otherwise, it would frustrate the ability of the Court to grant full relief.

Please be advised that the ERC objects to any action by Post that may potentially interfere with the ability of the ERC to seek, and the Court to order, complete relief in the Action. Because we believe the sale and/or conversion of Post apartments that are part of the Action may make full relief difficult it not impossible to achieve, we oppose any sales and/or conversions of any such properties to occur unless proper safeguards are put into place.

As we discussed, our preference is to enter into a written agreement with Post that addresses the ERC's concerns. This agreement would provide that Post would not sell any

**JORDEN BURT LLP**
http://www.jordenburt.com

**JORDEN**BURT

Christopher B. Hanback, Esq.
December 11, 2006
Page 2 of 2

properties named in the Complaint, or any portion thereof, or convert or otherwise sell any individual units that are the subject of the Action without including as a term of the sale that the buyer must fully cooperate in carrying out any future order of a court in the Action, including, but not limited to, providing Post access to the property, and permitting performance of any required retrofits.

In light of Post's apparent reluctance to enter into such an agreement, alternatively, the ERC requests that before entering into any specific agreement to sell or convert a property that is the subject of the Action, Post *simply inform the ERC* in writing no less than thirty (30) days prior to entering into such an agreement. The ERC further requests that after providing such notice, Post agree to meet and confer with the ERC no less than ten (10) days prior to entering into such an agreement in order to reach agreement on the proper means to implement any remedy or relief afforded by a court in the Action with respect to the property and transaction at issue. Neither party would be bound to any position. This would simply be an agreement to notify and meet.

In the event that Post is not willing to agree to either of these suggested courses of action, and absent the identification of the specific properties that Post is, or may be selling in the near future, the ERC must seek other available courses of action, including without limitation, filing a *lis pendens* for each property that is the subject of the Action and/or seeking to enjoin all sales and/or conversions of properties or units until resolution of the Action. While we do not wish to unnecessarily interfere with Post's operations during the pendency of the Action, we must protect the enforceability of a future court order relating to retrofitting. Obviously, it would appear to be the more sensible approach to address the ERC's concerns on the basis of actual planned sales or conversions, as opposed to a broader filing of *lis pendens* or injunctive relief.

Because time is of the essence with respect to these issues, we request the favor of a response from your client by Friday, December 15, 2006. Please feel free to call me if you wish to discuss this matter further.

Very truly yours,

Sheila J. Carpenter

cc:    Donald L. Kahl, Esq.
       Isabelle M. Thebault, Esq.
       Richard T. Choi, Esq.
       Eric D. Combs, Esq.
       Evan J. Taylor, Esq.

**Carpenter Affidavit**                    **Civil Action No. 06-01991 (Leon, J.)**

**Exhibit B to Carpenter Affidavit**

**Holland+Knight**

Tel  202 955 3000
Fax  202 955 5564

Holland & Knight LLP
2099 Pennsylvania Avenue, N.W., Suite 100
Washington, D.C.  20006
www.hklaw.com

Alan I. Baron
202 457 5915
alan.baron@hklaw.com

December 15, 2006

VIA FACSIMILE AND FIRST CLASS MAIL
Sheila J. Carpenter, Esq.
Jorden Burt LLP
1025 Thomas Jefferson Street, N.W.
Suite 400 East
Washington, D.C.  20007-5208

Re:    Equal Rights Center v. Post Properties, Inc. et al.

Dear Sheila:

This letter is in response to your letter of December 11, 2006.  Among the matters raised by you was a request that Post enter into an agreement with the ERC not to sell any properties named in the Complaint without including as a term of the sale that the buyer must "fully cooperate in carrying out any future order of a court in the action, including, but not limited to, providing Post access to the property, and permitting performance of any required retrofits."

Alternatively, you proposed that Post agree to informing the ERC in writing no less than thirty days prior to entering into an agreement to sell or convert a property that is the subject of the litigation.

We have reviewed your proposal with our client and decline to enter into the agreements the ERC has proposed.  We believe that such agreements and the obligations contained therein would constitute an unwarranted and inappropriate intrusion into our client's ability to conduct its lawful business.

We note your client's apparent intention to file a *lis pendens* or seek injunctive relief.  We wish to put the ERC on notice that there are properties which are not subject to the Fair Housing Act in Post's portfolio.  If ERC were to file a *lis pendens* or obtain an injunction and thereby interfere with the sale of such a property with resulting damages to Post, the ERC would be subjecting itself to liability for slander of title.

Sheila J. Carpenter, Esq.
December 15, 2006
Page 2

If you wish to discuss this matter further, please feel free to give us a call.

Very truly yours,

Christopher B. Hanback
Alan I. Baron

AIB:sac
Enclosure

cc:     Donald L. Kahl, Esq.
        Issabelle M. Thabault, Esq.

# 4245007_v1

**Exhibit C to Carpenter Affidavit**

**Excerpts from Post Properties, Inc.'s Form 10-K for the year ending 12/31/2006**

__From Page 4__

**Summary of Investment and Disposition Activity**

During the five-year period from January 1, 2002 through December 31, 2006, the Company and its affiliates have developed and completed 2,608 apartment units in 10 apartment communities including the expansion of three communities, and sold 30 apartment communities containing an aggregate of 13,174 apartment units. During the same period, the Company acquired 5 apartment communities containing 1,487 units. The Company and its affiliates have sold apartment communities after holding them for investment periods that generally range up to twenty years after acquisition or development. The following table shows a summary of the Company's development and sales activity during these periods.

| | 2006 | | 2005 | | 2004 | | 2003 | | 2002 | |
|---|---|---|---|---|---|---|---|---|---|---|
| Units developed and completed | — | | — | | — | | 468 | | 2,140 | |
| Units acquired | 669 | (1) | 319 | | 499 | | — | | — | |
| Units sold | (1,342 | )(2) | (3,051 | )(4) | (3,880 | ) | (2,236 | ) | (2,665 | ) |
| Units sold as condominiums or currently being converted into for-sale condominiums | — | | (731 | )(5) | — | | — | | — | |
| Total units completed and owned by the Company and its affiliates (including units held for sale) at year-end | 20,564 | (3) | 21,237 | (6) | 24,700 | | 28,081 | | 29,849 | |
| Total revenues from continuing operations (in thousands) | $ 300,096 | | $ 280,496 | | $ 266,792 | | $ 251,851 | | $ 247,705 | |

(1)   Excludes 150 units currently in lease-up, as the community was undergoing renovation upon purchase.

(2)   Includes a net reduction of 2 apartment units to reflect the addition of four apartment units at one community and a reduction of six apartment units at another community to facilitate an expansion.

(3)   Excludes 1,181 apartment units currently under development or in lease-up at December 31, 2006.

(4)   Includes reduction of 4 apartment units that were combined with other units.

(5)   Represents all units within communities that began conversion into condominiums in 2005. Of these units, 219 and 282 units were sold in 2005 and 2006, respectively.

(6)   Excludes 205 apartment units under development at December 31, 2005.

## From Page 5

**Current Development Activity**

At December 31, 2006, the Company had three communities and one community expansion under development and lease-up, containing 1,031 apartment units, and 230 for-sale condominium homes under development in two communities. These communities are summarized in the table below.

| Community | Location | Units | Cost ($ in | 2006 ($ in | Start | First Availabl | Occupa | Leas | Sell-out | Cont | Clos |
|---|---|---|---|---|---|---|---|---|---|---|---|
| **Apartments:** | | | | | | | | | | | |
| Post Alexander™ | Atlanta, GA | 307 | $ 62.8 | $ 17. | 2Q 2006 | 1Q 2008 | 1Q 2009 | — | N/A | N/ | N/ |
| Post Carlyle Square™ | Washington, | 205 | 59.0 | 54. | 4Q 2004 | 4Q 2006 | 4Q 2007 | 43 | N/A | N/ | N/ |
| Post Eastside™ | Dallas, TX | 435 | 53.9 | 8.2 | 4Q 2006 | 4Q 2006 | 1Q | — | N/A | | |
| Post Hyde Park® | Tampa, FL | 84 | 18.6 | 5.5 | 4Q 2006 | 1Q 2008 | 4Q 2008 | — | N/A | N/ | N/ |
| Total Apartments | | 1,03 | $ 194. | $ 85. | | | | — | | | |
| **Condominiums:** | | | | | | | | | | | |
| The Condominiums | Washington, | 145 | $ 45.3 | $ 36. | 4Q 2004 | 2Q 2007 | N/A | N/ | 2Q 2008 | 94 | — |
| Mercer Square™ | Dallas, TX | 85 | 17.3 | 8.5 | 2Q 2006 | 3Q 2007 | N/A | N/ | 3Q 2008 | 5 | — |
| Total Condominiums | | 230 | $ 62.6 | $ 45. | | | | | | 99 | — |

(1)  The Company defines stabilized occupancy as the earlier to occur of (i) the attainment of 95% physical occupancy on the first day of any month or (ii) one year after completion of construction.

(2)  As of January 29, 2007.

(3)  As of January 29, 2007, represents the total number of units under contract for sale upon completion and delivery of the units. There can be no assurance that condominium homes under contract will close.

(4)  Total estimated construction costs for the Post Hyde Park® expansion include the estimated replacement costs of six apartment units at the Company's existing Hyde Park community that are being demolished to accommodate the expansion.

**Carpenter Affidavit**                                    **Civil Action No. 06-01991 (Leon, J.)**

**From Pages 16-18**

### PROPERTIES

 At December 31, 2006, the Company owned 59 Post® multifamily apartment communities, including two communities held in unconsolidated entities and two communities in lease-up that were partially operating during 2006. These communities are summarized below by metropolitan area.

| Metropolitan Area | | # of Units | % of Total |
|---|---|---|---|
| Atlanta, GA | 24 | 9,300 | 44.5 |
| Dallas, TX | 13 | 3,939 | 18.8 |
| Greater Washington, D.C. | 7 | 2,538 | 12.1 |
| Tampa, FL | 4 | 2,027 | 9.7 |
| Charlotte, NC | 4 | 1,388 | 6.6 |
| Houston, TX | 2 | 837 | 4.0 |
| New York, NY | 2 | 337 | 1.6 |
| Austin, TX | 2 | 308 | 1.5 |
| Orlando, FL | 1 | 245 | 1.2 |
| | 59 | | 100.0 |

 Thirty-five of the communities have in excess of 300 apartment units, with the largest community having a total of 1,334 apartment units. The average age of the communities is approximately nine years. The average economic occupancy rate was unchanged at 94.7% for the years ended December 31, 2006 and 2005, and the average monthly rental rate per apartment unit was $1,163 and $1,106, respectively, for the 48 communities stabilized for each of the years ended December 31, 2006 and 2005. See "Selected Financial Information."

 At December 31, 2006, the Company also had 826 apartment units in two communities and the expansion of one community currently under construction.

 At December 31, 2006, the Company is also developing two ground-up condominium projects, consisting of 230 homes. The Company is also converting apartment homes in four communities initially consisting of 597 units (including 121 units in one community held in an unconsolidated entity) into for-sale condominium homes through a taxable REIT subsidiary, at December 31, 2006.

16

**Carpenter Affidavit**                                    **Civil Action No. 06-01991 (Leon, J.)**

## COMMUNITY INFORMATION

| Communities | Location(1) | Year Completed | No. of Units | December Average Rental Rates Per Unit | 2006 Average Economic |
|---|---|---|---|---|---|
| **Georgia** | | | | | |
| Post Ashford® | Atlanta | 1987 | 222 | $    828 | 94.4 |
| Post Biltmore™(3) | Atlanta | 2001 | 276 | 1,123 | 96.6 |
| Post Briarcliff™ | Atlanta | 1999 | 688 | 1,081 | 95.9 |
| Post Brookhaven® | Atlanta | 1990- | 735 | 956 | 93.6 |
| Post Chastain®(7) | Atlanta | 1990 | 558 | 997 | 90.0 |
| Post Collier Hills® | Atlanta | 1997 | 396 | 993 | 94.8 |
| Post Crest® | Atlanta | 1996 | 410 | 1,015 | 95.0 |
| Post Crossing® | Atlanta | 1995 | 354 | 1,076 | 93.7 |
| Post Dunwoody® | Atlanta | 1989- | 530 | 989 | 95.4 |
| Post Gardens® | Atlanta | 1998 | 397 | 1,132 | 93.5 |
| Post Glen® | Atlanta | 1997 | 314 | 1,170 | 92.7 |
| Post Lenox Park® | Atlanta | 1995 | 206 | 1,072 | 93.9 |
| Post Lindbergh® | Atlanta | 1998 | 396 | 1,045 | 94.8 |
| Post Oak™ | Atlanta | 1993 | 182 | 1,010 | 94.8 |
| Post Oglethorpe® | Atlanta | 1994 | 250 | 1,278 | 93.5 |
| Post Parkside™ | Atlanta | 2000 | 188 | 1,303 | 96.3 |
| Post Peachtree Hills® | Atlanta | 1992- | 300 | 1,059 | 95.3 |
| Post Renaissance®(5) | Atlanta | 1992- | 342 | 1,031 | 96.5 |
| Post Ridge® | Atlanta | 1998 | 434 | 1,038 | 94.5 |
| Post Riverside® | Atlanta | 1998 | 523 | 1,437 | 93.5 |
| Post Spring™ | Atlanta | 2000 | 452 | 977 | 94.1 |
| Post Stratford™(5) | Atlanta | 2000 | 250 | 1,166 | 92.0 |
| Post Vinings® | Atlanta | 1989- | 403 | 846 | 96.4 |
| Post Woods® | Atlanta | 1977- | 494 | 906 | 95.2 |
| **Subtotal/Average —** | | | | 1,054 | 94.3 |
| **Texas** | | | | | |
| Post Abbey™ | Dallas | 1996 | 34 | 1,820 | 95.9 |
| Post Addison Circle™ | Dallas | 1998- | | 980 | 92.4 |
| Post Barton Creek™ | Austin | 1998 | 160 | 1,337 | 95.0 |
| Post Cole's Corner™ | Dallas | 1998 | 186 | 1,042 | 93.9 |
| Post Gallery™ | Dallas | 1999 | 34 | 2,890 | 91.1 |
| Post Heights™ | Dallas | 1998- | 368 | 1,100 | 92.8 |
| Post Legacy | Dallas | 2000 | 384 | 933 | 93.5 |
| Post Meridian™ | Dallas | 1991 | 133 | 1,127 | 94.0 |
| Post Midtown Square® | Houston | 1999- | 529 | 1,043 | 92.8 |
| Post Park Mesa™ | Austin | 1992 | 148 | 1,134 | 91.4 |
| Post Rice Lofts™(5) | Houston | 1998 | 308 | 1,311 | 93.6 |
| Post Square™ | Dallas | 1996 | 218 | 1,175 | 94.4 |
| Post Uptown Village™ | Dallas | 1995- | 496 | 922 | 93.9 |
| Post Vineyard™ | Dallas | 1996 | 116 | 996 | 94.6 |
| Post Vintage™ | Dallas | 1993 | 161 | 987 | 95.6 |
| Post Wilson Building™(5) | Dallas | 1999 | 143 | 1,195 | 90.2 |
| Post Worthington™(7) | Dallas | 1993 | 332 | 1,248 | 66.6 |

**Carpenter Affidavit**                                   **Civil Action No. 06-01991 (Leon, J.)**

| Subtotal/Average — Texas | | | | 1,079 | 91.2 |
|---|---|---|---|---|---|

17

| Communities | Location(1) | Year Completed | No. of Units | December Average Rental Per Unit | 2006 Average |
|---|---|---|---|---|---|
| **COMMUNITY INFORMATION** | | | | | |
| **Florida** | | | | | |
| Post Bay at Rocky Point™(6) | Tampa | 1997 | 150 | | N/A |
| Post Harbour Place™ | Tampa | 1999- | 578 | | % |
| Post Hyde Park® | Tampa | 1996 | 383 | | % |
| Post Parkside™ | Orlando | 1999 | 245 | | % |
| Post Rocky Point® | Tampa | 1996- | 916 | | % |
| Subtotal/Average — Florida | | | 2,272 | | % |
| **North Carolina** | | | | | |
| Post Ballantyne | Charlotte | 2004 | 323 | | % |
| Post Gateway Place™ | Charlotte | 2000 | 436 | | % |
| Post Park at Phillips Place® | Charlotte | 1998 | 402 | | % |
| Post Uptown Place™ | Charlotte | 2000 | 227 | | % |
| Subtotal/Average — North Carolina | | | 1,388 | 1,149 | 94.4 % |
| **Greater Washington, D.C.** | | | | | |
| Post Carlyle Square™(6) | D.C. | 2006 | 205 | | N/A |
| Post Corners at Trinity Centre | Fairfax Co., VA | 1996 | 336 | 1,432 | 97.5 % |
| Post Fallsgrove | Rockville, | 2003 | 361 | | % |
| Post Forest® | Fairfax Co., VA | 1990 | 364 | 1,363 | 98.0 % |
| Post Massachusetts Avenue™(3) | D.C. | 2002 | 269 | | % |
| Post Pentagon Row™(5) | Arlington Co.. VA | 2001 | 504 | 2,136 | 96.3 % |
| Post Tysons Corner™ | Fairfax Co., VA | 1990 | 499 | 1,596 | 95.8 % |
| Subtotal/Average — Washington, D.C. | | | 2,538 | 1,786 | 96.1 % |
| **New York** | | | | | |
| Post Luminaria™ | New York | 2002 | 138 | | % |
| Post Toscana™ | New York | 2003 | 199 | | % |
| Subtotal/Average — New York | | | 337 | | % |
| Total | | | | $ | % |

(1) Refers to greater metropolitan areas of cities indicated.

(2) Average economic occupancy is defined as gross potential rent less vacancy losses, model expenses and bad debt divided by gross potential

(3) These communities are owned in unconsolidated entities (Company equity ownership is 35%).

(4) These dates represent the respective completion dates for multiple phases of a community.

(5) The Company has a leasehold interest in the land underlying these communities.

(6)   During 2006, the communities were in lease-up and, therefore, the average economic occupancy information for these communities is not

(7)   These communities are undergoing rehabilitation.

18

## From Pages 24-25

The Company has also been active over the past several years repositioning its real estate portfolio and building its development and value creation capabilities centered upon its Southeast, Southwest and Mid-Atlantic regions. During this time, the Company has been a net seller of apartment assets in an effort to exploit opportunities to harvest value and recycle capital through the sale of non-core assets that no longer met the Company's growth objectives. The Company's asset sales program has been consistent with its strategy of reducing its concentration in Atlanta, Georgia and Dallas, Texas, building critical mass in fewer markets and leveraging the Post® brand in order to improve operating efficiencies. The Company has redeployed capital raised from its asset sales to strengthen its balance sheet, by reducing high-coupon preferred equity and debt, and reinvesting in assets that the Company believes demonstrate better growth potential.

In this regard, the Company disposed of 3,880, 3,047 and 1,340 apartment units in 2004, 2005 and 2006, respectively, for aggregate gross proceeds of approximately $243,000, $232,000 and $175,000 in 2004, 2005 and 2006, respectively. During this same period, the Company acquired 499, 319 and 819 apartment units for aggregate gross purchase prices of approximately $85,814, $37,250 and $152,000 in 2004, 2005 and 2006, respectively.

24

The Company also re-commenced development activities in late 2004 with its start of a new 350 unit mixed-use, for-rent apartment and for-sale condominium project located in Alexandria, Virginia, the start of two for-rent apartment projects and one expansion, totaling 826 units, in Atlanta, Georgia, Dallas, Texas and Tampa, Florida in 2006 and the start of an 85 unit for-sale condominium project in Dallas, Texas in 2006. The Company also expects to begin additional development projects in 2007 and 2008.

In early 2005, the Company entered the for-sale condominium housing market to exploit the strategic opportunity for Post to serve those consumers who are choosing to own, rather than rent, their home. As a result, the Company launched a new for-sale brand, Post Preferred Homes™, which serves as the unified marketing umbrella for the Company's for-sale ventures, including developing new communities and converting existing apartment communities into upscale for-sale housing in several key markets.

In 2005, the Company, through a taxable REIT subsidiary, commenced the conversion of three existing apartment communities consisting of a total of 382 units into for-sale condominium homes, including one in an unconsolidated entity, located in Atlanta, Georgia, Dallas, Texas and Tampa, Florida. One of these communities, containing 134 units, located in Tampa, Florida, was completely sold out in 2005. The other two communities were substantially sold out by the end of 2006. During 2006, the Company, through a taxable REIT subsidiary, also commenced the conversion of a portion of two additional existing apartment communities consisting of a total of 349 units into for-sale condominium homes, located in Houston, Texas and Tampa, Florida. These two communities began closing condominium sales in the second quarter of 2006. Recently, there has been a softening in the condominium and single family housing markets due to increasing mortgage financing rates, increasing supplies of such assets and a perceived slow down in the residential housing market and overall economic activity in the

**Carpenter Affidavit**            **Civil Action No. 06-01991 (Leon, J.)**

U.S. As a result, the pace of condominium closings slowed in the second half of 2006. It is likely that condominium closings will continue to be slow at these communities into 2007. There can be no assurance of the amount or pace of future for-sale condominium sales and closings.

In 2007, the Company expects to begin closing condominium contracts at its two newly developed for-sale condominium projects, containing 230 homes. As of February 15, 2007, the Company had in excess of 100 condominium homes under contract at these communities. These homes are expected to begin closing in the second quarter of 2007. There can be no assurances that condominium homes under contract at these communities will close.

## From Page 41

In 2007, management currently expects to sell one apartment community located in Atlanta, GA. This sale is expected to close in the first half of 2007 and is expected to generate accounting gains in 2007. The expected net proceeds from this sale are intended to be used for various corporate purposes, including funding of the Company's development pipeline and repayments of debt maturing in 2007. Additionally, the Company, through a taxable REIT subsidiary, expects to continue the sale of condominium homes in its condominium conversion projects that commenced sales in 2006 and to begin sales of condominium homes at two newly developed condominium communities that will complete homes in 2007. The Company expects to realize net accounting gains in 2007 from these condominium sales. Net condominium profits are expected to be higher in 2007 due primarily to the expected volume of condominium sales at the Company's newly developed, The Condominiums at Carlyle Square™ project in Alexandria, VA.

## From Page 43

The Company plans to sell at least one apartment community in 2007 classified as held for sale at December 31, 2006. This sale is expected to generate net proceeds in excess of $20,000. The Company also expects to generate additional sales proceeds from the sale of converted condominium homes as well as from the sale of newly developed condominium homes. It is the current intent of management to continue to recycle capital through selling assets and reinvesting the proceeds as a strategy to diversify the cash flows of the Company across its markets and focus on building critical mass in fewer markets.

**Exhibit D to Carpenter Affidavit**

**Post Properties Sells Post Oak(TM) in Atlanta for $24 Million; Moody's Raises Post's Outlook to Positive**

ATLANTA--(BUSINESS WIRE)--March 22, 2007--Post Properties, Inc. (NYSE: PPS) announced today the closing of the sale of its Post Oak(TM) apartment community located in Atlanta, GA. Post sold the community for a gross sales price of approximately $24 million, through a Section 1031 exchange intermediary. The buyer was not disclosed.

Post Oak(TM) is a garden-style apartment community located in the Emory area of Atlanta and consists of 182 units with an average unit size of approximately 997 square feet. The community was completed in 1993.

Post also announced that Moody's Investors Service recently raised the outlook for the Baa3 senior unsecured debt and Ba1 preferred stock ratings of Post Properties, Inc. and Post Apartment Homes, LP to positive, from stable. The rating agency cited improvement in the Company's credit metrics and improved diversification in its apartment portfolio.

Post Properties, founded more than 35 years ago, is one of the largest developers and operators of upscale multifamily communities in the United States. The Company's mission is delivering superior satisfaction and value to its residents, associates, and investors, with a vision of being the first choice in quality multifamily living. Operating as a real estate investment trust ("REIT"), the Company focuses on developing and managing Post(R) branded resort-style garden and high density urban apartments. In addition, the Company develops high-quality condominiums and converts existing apartments to for-sale multifamily communities. Post Properties is headquartered in Atlanta, Georgia, and has operations in nine markets across the country.

Post Properties owns 21,563 apartment homes in 60 communities, including 545 apartment units in two communities held in unconsolidated entities, 1,181 apartment units in four communities (and the expansion of one community) currently under construction and/or in lease-up. The Company is also developing 230 for-sale condominium homes in two communities and is converting apartment units in three communities initially consisting of 470 units (including 121 units in one community held in an unconsolidated entity) into for-sale condominium homes through a taxable REIT subsidiary.

CONTACT: Post Properties, Inc.
Janie Maddox, 404-846-5056

SOURCE: Post Properties, Inc.

**Carpenter Affidavit**                                    **Civil Action No. 06-01991 (Leon, J.)**



# FAIR HOUSING ACT DESIGN MANUAL

A MANUAL TO ASSIST
DESIGNERS AND BUILDERS
IN MEETING THE
ACCESSIBILITY REQUIREMENTS
OF THE FAIR HOUSING ACT

U. S. Department
of Housing and Urban Development
Office of Fair Housing and Equal Opportunity
Office of Housing

**Preface**

The Department is pleased to present the Fair Housing Act Design Manual. The manual was first published in August, 1996, and was updated in 1998. This republication of the 1998 manual is intended to provide clear and helpful guidance about ways to design and construct housing that complies with the Fair Housing Act.

The manual provides comprehensive information about accessibility requirements which must be incorporated into the design and construction of multifamily housing covered by the Act. It carries out two statutory responsibilities:

- first, it provides a clear statement of HUD's interpretation of the accessibility requirements of the Act, so that readers may know what actions on their part will provide them with a "safe harbor," and

- second, it provides guidance in the form of recommendations which meet the Department's obligation to provide technical assistance on alternative accessibility approaches.

Readers following the revised manual can rely on it. They will be in compliance with the Act's accessibility provisions if they carry them out. However, it should be noted that when the manual uses the terms: recommended, preferred, should, could, or uses italics or text labeled as "recommended," the material involved is provided as a suggestion for accessibility and not a requirement under the Act. In addition, HUD currently recognizes six other safe harbors for compliance with the Fair Housing Act's design and construction requirements. The other safe harbors are:

1. HUD's March 6, 1991 Fair Housing Accessibility Guidelines (the Guidelines), and the June 28, 1994 Supplemental Notice to Fair Housing Accessibility Guidelines: Questions and Answers about the Guidelines;
2. ANSI A117.1-1986, used in conjunction with the Act and HUD's regulations, and the Guidelines;
3. CABO/ANSI A117.1-1992, used in conjunction with the Act, HUD's regulations, and the Guidelines;
4. ICC/ANSI A117.1-1998, used in conjunction with the Act, HUD's regulations, and the Guidelines;
5. *Code Requirements for Housing Accessibility 2000* (CRHA), approved and published by the International Code Council (ICC), October 2000;
6. *International Building Code 2000* (IBC) as amended by the IBC *2001 Supplement to the International Codes.*

It is important to note that the ANSI A117.1 standard contains only technical criteria, whereas the Fair Housing Act, the regulations and the Guidelines contain both scoping and technical criteria. Therefore, in using any of the ANSI standards it is necessary to also consult the Act, HUD's regulations, and the Guidelines for the scoping requirements.

Providing an environment where persons with disabilities can have the same access to, and ability to use, housing that persons without disabilities enjoy is both a worthwhile goal and the law. The Department is committed to helping those who develop housing to meet the requirements of the law, so that we can reach the goal of providing meaningful access for people with disabilities.

# FAIR HOUSING ACT DESIGN MANUAL

## A MANUAL TO ASSIST DESIGNERS AND BUILDERS IN MEETING THE ACCESSIBILITY REQUIREMENTS OF THE FAIR HOUSING ACT



designed and developed by
**Barrier Free Environments, Inc.**
**Raleigh, North Carolina**

for
**The U.S. Department of Housing**
**and Urban Development**
**Office of Fair Housing and Equal Opportunity**
**and the Office of Housing**
**Contract # 15903**

**August 1996**
**Revised April 1998**

## CREDITS

| | |
|---|---|
| Project Director | **Ronald L. Mace, FAIA** |
| Project Manager | **Leslie C. Young** |
| Technical Assistance | **Cheryl Kent, FHEO, HUD** |
| Authorship | **Leslie C. Young**<br>**Ronald L. Mace**<br>**Geoff Sifrin** |
| Architectural Design and Conceptual Illustration | **Ronald L. Mace**<br>**Leslie C. Young**<br>**Rex J. Pace**<br>**Geoff Sifrin** |
| Graphic Design | **Christopher A. B. McLachlan** |
| Illustration | **Rex J. Pace**<br>**Mark Pace** |
| Photography | **Kelly Houk**<br>**Leslie C. Young** |

*Acknowledgements*

Creation of this design manual involved the close cooperation of many people. Among them are the reviewers and technical staff at the Department of Housing and Urban Development, including Cheryl Kent, Judy Keeler, Merle Morrow, Alan Rothman, Nelson Carbonell, and Gail Williamson.

Special appreciation to the Barrier Free Environments, Inc. staff who contributed to this publication, including Leslie Young, Rex Pace, and Ron Mace. Special thanks also to Geoff Sifrin in South Africa and Lucy Harber.

Every attempt was made with this project to provide a concise and easy-to-follow guide on the construction requirements of the Fair Housing Act. Our hope is that the construction and disability communities to whom this manual is directed will be able to use and benefit from our efforts.

# CONTENTS

**Part One**

page 1     **INTRODUCTION**

**Part Two**

**DESIGN REQUIREMENTS OF THE GUIDELINES**

page 1.1     **Chapter One: REQUIREMENT 1** – Accessible Building Entrance on an Accessible Route

page 2.1     **Chapter Two: REQUIREMENT 2** – Accessible and Usable Public and Common Use Areas

page 3.1     **Chapter Three: REQUIREMENT 3** – Usable Doors

page 4.1     **Chapter Four: REQUIREMENT 4** – Accessible Route into and Through the Covered Unit

page 5.1     **Chapter Five: REQUIREMENT 5** – Light Switches, Electrical Outlets, Thermostats, and Other Environmental Controls in Accessible Locations

page 6.1     **Chapter Six: REQUIREMENT 6** – Reinforced Walls for Grab Bars

**Chapter Seven: REQUIREMENT 7** – Usable Kitchens and Bathrooms
page 7.1     ■ **PART A:** Usable Kitchens
page 7.31     ■ **PART B:** Usable Bathrooms

**Part Three**

**APPENDICES**

page A.1     ■ Product Resources and Selected References
page B.1     ■ Fair Housing Accessibility Guidelines
page C.1     ■ Supplemental Notice: Fair Housing Accessibility Guidelines: Questions and Answers About the Guidelines

**Part One**



INTRODUCTION

## INTRODUCTION

### THE FAIR HOUSING ACT

Title VIII of the Civil Rights Act of 1968, commonly known as the Fair Housing Act, prohibits discrimination in the sale, rental, and financing of dwellings based on race, color, religion, sex, and national origin. In 1988, Congress passed the Fair Housing Amendments Act. The Amendments expand coverage of Title VIII to prohibit discriminatory housing practices based on disability[1] and familial status. Now it is unlawful to deny the rental or sale of a dwelling unit to a person because that person has a disability.

As a protected class, people with disabilities are unique in at least one respect because they are the only minority that can be discriminated against solely by the design of the built environment. The Fair Housing Act remedies that in part by establishing design and construction requirements for multifamily housing built for first occupancy after March 13, 1991. The law provides that a failure to design and construct certain multifamily dwellings to include certain features of accessible design will be regarded as unlawful discrimination.

The design and construction requirements of the Fair Housing Act apply to all new multifamily housing consisting of four or more dwelling units. Such buildings must meet specific design requirements so public and common use spaces and facilities are accessible to people with disabilities. In addition, the interior of dwelling units covered by the Fair Housing Act must be designed so they too meet certain accessibility requirements.

The Fair Housing Act is intended to place "**modest** accessibility requirements on covered multifamily dwellings .... These **modest** requirements will be incorporated into the design of new buildings, resulting in features which do not look unusual and will not add significant additional costs" (House Report 711[2] at 25 and 18 ). Fair Housing units are not fully accessible, nor are they purported to be; however, new multifamily housing built to comply with the Guidelines will be a dramatic improvement over units built in the past.

The Fair Housing Act gives people with disabilities greater freedom to choose where they will live and greater freedom to visit friends and relatives. But the Fair Housing Act has other broad implications. It proactively addresses the needs of an evolving population, looking ahead at future needs. With the aging of the population and the increase in incidence of disability that accompanies aging, significant numbers of people will be able to remain in and safely use their dwellings longer. For example, housing designed in accordance with the Fair Housing Act will have accessible entrances, wider doors, and provisions to allow for easy installation of grab bars around toilets and bathtubs, i.e., features that make housing safer and more responsive to all users.

---

[1] The Fair Housing Act statute uses the term "handicap"; however, this manual uses the terms "disability" or "persons with disabilities" to the greatest extent possible to be consistent with current preferred terminology as reflected in the Americans with Disabilities Act of 1990.

[2] House Report No. 711, 100th Congress, 2nd Session

## The Role of HUD

The U.S. Department of Housing and Urban Development (HUD) is the Federal agency responsible for enforcement of compliance with the Fair Housing Act. On January 23, 1989, HUD published its final rule implementing the Fair Housing Act. In the preamble to this rule, HUD indicated that it would provide further guidance on meeting the new construction requirements of the Act by developing accessibility guidelines. The preamble stated that until these guidelines are published, designers and builders may be guided by the requirements of the ANSI A117.1-1986 *American National Standard for Buildings and Facilities – Providing Accessibility and Usability for Physically Handicapped People*. More information on the ANSI standard appears on page 13.

The final Fair Housing Accessibility Guidelines (the Guidelines) were published on March 6, 1991 (56 Federal Register 9472-9515, 24 CFR[3] Chapter I, Subchapter A, Appendix II and III). The Guidelines provide technical guidance on designing dwelling units as required by the Fair Housing Act. The Guidelines are not mandatory, but are intended to provide a safe harbor for compliance with the accessibility requirements of the Fair Housing Act. The Guidelines are included in this manual as Appendix B.

The Guidelines published on March 6, 1991, remain unchanged. However, on June 28, 1994, HUD published a supplemental notice to the Guidelines, "Supplement to Notice of Fair Housing Accessibility Guidelines: Questions and Answers About the Guidelines." This supplemental notice reproduces questions that have been most frequently asked by members of the public, and

HUD's answers to those questions. The Supplement also is included in this manual as Appendix C.

Under the Fair Housing Act, HUD is not required to review builders' plans or issue a certification of compliance with the Fair Housing Act. HUD prepared the Guidelines and will answer technical questions. HUD also provides this publication as additional guidance.

The burden of compliance rests with the person or persons who design and construct covered multifamily dwellings. HUD or an individual who thinks he or she may have been discriminated against may file a complaint against the building owner, the architect, the contractor, and any other persons involved in the design and construction of the building. See page 22 for additional information on enforcement.

## The Purpose of the Manual

This design manual has been produced by HUD to assist designers, builders, and developers in understanding and conforming with the design requirements of the Fair Housing Act. It contains explanations and uses detailed illustrations to explain the application of the Guidelines to all aspects of multifamily housing projects.

The manual consists of three parts:

**Part One: The Introduction** contains an overview of the Fair Housing Act, outlines other national laws and standards that regulate accessible design, presents the types of buildings/dwellings that are covered by the Fair Housing Act, and gives a brief discussion of the different types of disabilities.

---

[3]CFR = Code of Federal Regulations

INTRODUCTION

**Part Two: THE DESIGN REQUIREMENTS OF THE GUIDELINES** is a detailed, illustrated explanation of the seven requirements of the Fair Housing Accessibility Guidelines.

**Part Three: THE APPENDIX** contains additional information that may be useful to anyone needing to be familiar with the design requirements of the Fair Housing Act. Included are a list of product resources, a list of selected references, a reprint of the Guidelines, and a reprint of the Supplemental Notice to the Guidelines.

## LAWS AND CODES THAT MANDATE ACCESSIBILITY

Over the past two and a half decades, several statutes have been enacted at various levels of government that ensure nondiscrimination against people with disabilities, both in the design of the built environment and in the manner that programs are conducted. Even though this manual addresses the application of the Fair Housing Act and the Guidelines, certain dwellings, as well as certain public and common use areas, may be covered by several of the laws listed below. A brief synopsis of the landmark legislation follows to show where the Fair Housing Act fits into the overall history of accessibility legislation.

## THE ARCHITECTURAL BARRIERS ACT (1968)

This Act stipulates that all buildings, other than privately owned residential facilities, constructed by or on behalf of, or leased by the United States, or buildings financed in whole or in part by the United States must be physically accessible for people with disabilities. The Uniform Federal Accessibility Standards (UFAS) is the applicable standard.

## SECTION 504 OF THE REHABILITATION ACT (1973)

Under Section 504 of the Rehabilitation Act of 1973 as amended, no otherwise qualified individual with a disability may be discriminated against in any program or activity receiving federal financial assistance. The purpose of Section 504 is to eliminate discriminatory behavior toward people with disabilities and to provide physical accessibility, thus ensuring that people with disabilities will have the same opportunities in federally funded programs as do people without disabilities.

Program accessibility may be achieved by modifying an existing facility, or by moving the program to an accessible location, or by making other accommodations, including construction of new buildings. HUD's final regulation for Section 504 may be found at 24 CFR Part 8. Generally, the UFAS is the design standard for providing physical accessibility, although other standards which provide equivalent or greater accessibility may be used.

## THE FAIR HOUSING ACT OF 1968, AS AMENDED

The Fair Housing Act provides equal opportunities for people in the housing market regardless of disability, race, color, sex, religion, familial status or national origin, regardless of whether the housing is

publicly funded or not. This includes the sale, rental, and financing of housing, as well as the physical design of newly constructed multifamily housing. The Fair Housing Act is discussed in more detail in the next section, "General Provisions of the Fair Housing Act."

## THE AMERICANS WITH DISABILITIES ACT (1990)

The Americans with Disabilities Act (ADA) is a broad civil rights law guaranteeing equal opportunity for individuals with disabilities in employment, public accommodations, transportation, state and local government services, and telecommunications. Title III of the Act covers all private establishments and facilities considered "public accommodations," such as restaurants, hotels, retail establishments, doctors' offices, and theaters. People with disabilities must have equal opportunity in these establishments, both in terms of physical access and in the enjoyment of services. Title II of the ADA applies to all programs, services, and activities provided or made available by public entities. With respect to housing, this includes, for example, public housing and housing provided for state colleges and universities.

Under Title I of the ADA, employers may not discriminate in hiring or firing, and must provide reasonable accommodations to persons with disabilities, such as providing special equipment or training and arranging modified work schedules. A discussion of the relationship between the ADA and the Fair Housing Act appears on page 2 of the "Supplement to Notice of Fair Housing Accessibility Guidelines: Questions and Answers About the Guidelines" at Appendix C.

## STATE AND LOCAL CODES

All states and many cities and counties have developed their own building codes for accessibility, usually based in whole or in part on the specifications contained in the major national standards such as ANSI and UFAS. Many states also have nondiscrimination and fair housing laws similar to the Fair Housing Act and the Americans with Disabilities Act.

When local codes differ from the national standard, either in scope or technical specification, the general rule is that the more stringent requirement should be followed. Many states also have provisions that a certain percentage (often 5%) of new multifamily housing must meet more stringent physical accessibility requirements than required under the Fair Housing Act. In such cases, both the state's mandated percentage of accessible units must be provided and all dwellings covered by the Fair Housing Act must meet the Guidelines.

## GENERAL PROVISIONS OF THE FAIR HOUSING ACT

The 1988 amendments to the Fair Housing Act extend to persons with disabilities and to families with children the same kinds of nondiscrimination protections afforded to persons based on race, color, religion, sex, and national origin. Thus, the Fair Housing Act protects persons with disabilities from discrimination in any activities relating to the sale or rental of dwellings, in the provision of services or facilities in connection with such dwellings, and in the availability of residential real estate related transactions.

The Fair Housing Act covers most types of housing. In some circumstances it exempts owner-occupied buildings with no more than four units, single-family housing sold or rented without the use of a broker, and housing operated by organizations and private clubs that limit occupancy to members.

The design and construction requirements of the Fair Housing Act and the Guidelines apply only to new construction of housing built for first occupancy after March 13, 1991. Those requirements are the focus of this manual; however, a brief discussion follows on the effect of the Fair Housing Act on policies and procedures in both new and existing multifamily housing developments.

The broad objective of the Fair Housing Act is to prohibit discrimination in housing because of a person's race, color, national origin, religion, sex, familial status, or disability. To ensure that persons with disabilities will have full use and enjoyment of their dwellings, the Fair Housing Act also includes two important provisions: one, a provision making it unlawful to refuse to make **reasonable accommodations** in rules, policies, practices, and services when necessary to allow the resident with a disability equal opportunity to use the property and its amenities; and two, a provision making it unlawful to refuse to permit residents with disabilities to make **reasonable modifications** to either their dwelling unit or to the public and common use areas, at the residents' cost.

## REASONABLE ACCOMMODATIONS

Under the Fair Housing Act, it is unlawful for any person to refuse to make reasonable accommodations in rules, policies, practices, or services when

such accommodations may be necessary to afford a person with a disability equal opportunity to use and enjoy the dwelling. For example, in buildings with a "no pets" rule, that rule must be waived for a person with a visual impairment who uses a service dog, or for other persons who use service animals. In buildings that provide parking spaces for residents on a "first come, first served" basis, reserved parking spaces must be provided if requested by a resident with a disability who may need them. Sales material for apartments may need to be provided in a format so an individual with a visual disability may access the information.

## REASONABLE MODIFICATIONS

When a resident wishes to modify a dwelling unit under the reasonable modification provisions of the Fair Housing Act, the resident may do so. The landlord/manager may require that the modification be completed in a professional manner under the applicable building codes, and may also require that the resident agree to restore the interior of the dwelling to the condition that existed before the modification, reasonable wear and tear excepted.

Landlords may not require that modifications be restored that would be unreasonable, i.e., modifications that in no way affect the next resident's "enjoyment of the premises." For example, in existing construction, a resident needs grab bars and pays to have the original wall reinforced with blocking between studs so grab bars can be securely mounted. It would be reasonable to require that the resident remove the grab bars at the end of the tenancy; however, it would be unreasonable to require that the blocking be removed since the reinforced wall would not

interfere with the next resident's use and enjoyment of the dwelling unit and may be needed by some future resident.

However, if a resident who uses a wheelchair were to remove a kitchen base cabinet and mount a lowered countertop to a height suitable for his or her use, the landlord may condition permission on the resident agreeing to restore the cabinet to its original condition when the resident vacates the unit. On the other hand, if a resident who uses a wheelchair finds that the bathroom door in the dwelling unit is too narrow to allow his or her wheelchair to pass, the landlord must give permission for the door to be widened, at the resident's expense. The landlord may not require that the doorway be narrowed at the end of the resident's tenancy because the wider doorway will not interfere with the next resident's use of the dwelling.

Residents also may make modifications to the public and common use spaces. For example, in an existing development it would be considered reasonable for a resident who uses a wheelchair to have a ramp built to gain access to an on-site laundry facility. Modifications of this type are not required to be returned to their original condition. If a resident cannot afford such a modification,  the resident may ask a friend to do his or her laundry in the laundry room, and the landlord must waive any rule that prohibits nonresidents from gaining access to the laundry room.

Regarding the cost of special modifications in new construction, builders or landlords are responsible only for meeting the design requirements specified by the Fair Housing Act. If a particular resident intends to buy a unit and needs additional modifications to meet the needs of his or her disability, then the resident may ask for such

modification and the builder may not refuse. However, the resident is responsible for any extra cost that the modifications might create over and above what the original design would have cost.

**6**

## THE SCOPE OF THE DESIGN AND CONSTRUCTION REQUIREMENTS OF THE FAIR HOUSING ACT

The accessibility requirements of the Fair Housing Act are intended to provide usable housing for persons with disabilities without necessarily being significantly different from conventional housing. The Fair Housing Act specifies certain features of accessible design and certain features of adaptable design. These basic design features are essential for equal access and to avoid future de facto exclusion of persons with disabilities, as well as being easy to incorporate into housing design and construction. These design features assist not only persons with disabilities but also other persons to use and enjoy all aspects of a residential development.[4]

### ADAPTABLE DWELLING UNITS

Covered dwelling units that meet the design requirements of the Guidelines are sometimes referred to as "adaptable dwelling units" or units that meet "certain features of accessible design." The Guidelines incorporate accessibility features that are both accessible and adaptable. Accessible elements and spaces are those whose design allows them to be used by the greatest number of users without being modified. For example, the requirement within the covered dwelling unit for "usable" doors, with a nominal clear opening of 32 inches, ensures that dwelling unit doors are not too narrow or impassable for any resident.

Adaptable/adjustable elements and spaces are those with a design which allows them to be adapted or adjusted to accommodate the needs of different people. The Fair Housing Act incorporates the adaptable/adjustable concept in bathroom walls by requiring that they contain reinforced areas to allow for later installation of grab bars without the need for major structural work on the walls.

### DWELLINGS COVERED BY THE DESIGN REQUIREMENTS

The design requirements apply to buildings built for first occupancy after March 13, 1991, which fall under the definition of "covered multifamily dwellings." See page 12 for a discussion of "first occupancy." Covered multifamily dwellings are:

1. all dwelling units in buildings containing four or more dwelling units if such buildings have one or more elevators, and
2. all ground floor dwelling units in other buildings containing four or more units.

To be a covered unit, all of the finished living space must be on the same floor, that is, be a single-story unit, such as single-story townhouses, villas, or patio apartments. Even though raised and sunken areas are permissible in covered dwelling units, there are limitations to their use and they are discussed in Chapter Four: "Accessible Route Into and Through the Covered Unit." Multistory dwelling units are not covered by the Guidelines except when they are located in buildings which have one or more elevators, in which case, the primary entry level is covered.

---

[4]House Report No. 711, 100th Congress, 2nd Session

PART ONE

FAIR HOUSING ACT DESIGN MANUAL

## Dwelling Units in Buildings with Elevator(s)

As is evident from the preceding discussion, the Fair Housing Act's definition of "covered multifamily dwellings" distinguishes between buildings with elevators and buildings without elevators. Thus, if a building has one or more elevators, all of the dwelling units in the building are covered.

There is one exception to this requirement, and that is when an elevator is provided only as a means of creating an accessible route to dwelling units on a ground floor. In that case, the elevator is not required to serve dwelling units on floors which are not ground floors, and the building is not considered to be a "building with one or more elevators" that would require all of the dwelling units to meet the requirements of the Guidelines. This concept is discussed more fully in Chapter 1: "Accessible Building Entrance on an Accessible Route," starting on page 1.21.



**Buildings with Elevator(s):
All Single-Story Units and the Primary Entry
Level of Multistory Units Are Covered**



= covered floors

← primary entry



**Ground Floor Units in Buildings of 4
or More Units Are Covered**

## Ground Floor Dwelling Units

The **ground floor** is defined as a floor of a building with a building entrance on an accessible route. The ground floor may or may not be at grade.



= covered unit

INTRODUCTION

The definition of **ground floor** further provides that where the first floor containing dwelling units in a building is above grade, all units on that floor must be served by a building entrance on an accessible route. This floor will be considered to be a ground floor.

If more than one story can be designed to have an accessible entrance on an accessible route, then each story becomes a ground floor and all units on those stories are covered. However, the Fair Housing Act and the Guidelines do not require that there be more than one ground floor. See Chapter 1: "Accessible Building Entrance on an Accessible Route" for more detailed discussion of covered ground floors.



an accessible route via a ramp or elevator must be provided to the first floor of dwelling units

placing shops or garages under multi-family housing is a design choice and is not dictated by extremes of terrain

ground floor with single-story dwelling units

shops or garage

**Covered Dwelling Units Over Shops and Garages**

▨ = covered floors



planned grade level entrance

planned grade level entrance

**Building Has Two Ground Floors, Each with an Accessible Entrance on an Accessible Route**



single-story units (covered)

single-story walk-up units (not covered)

**Dwelling Units on the Ground Floor Are Covered**
**(the Guidelines Do Not Require that There Be a Second Ground Floor)**

**9**

## EXAMPLES OF COVERED MULTIFAMILY DWELLINGS

The Fair Housing Act does not distinguish between different forms of ownership when determining whether a unit or building is covered. Condominiums are covered by the Fair Housing Act even if they are pre-sold as a shell and the interior is designed and constructed by the buyer. All covered units must comply with the design and construction requirements of the Guidelines. Single-story townhouses are covered, as are other types of housing including vacation timeshare units, college dormitories, apartment housing in private universities, and sleeping accommodations intended for occupancy as a residence in a shelter.

Continuing care facilities or retirement communities are covered even when they include health care, provided the facility includes at least one building with four or more dwelling units. Whether a facility is considered a "dwelling" depends on whether the facility is to be used as a residence for more than a brief period of time. The operation of each continuing care facility must be examined on a case-by-case basis to determine whether it contains covered multifamily dwellings.

## Buildings Separated by Firewalls or Covered Walkways

Dwellings built within a single structure but separated by a firewall are treated under the Fair Housing Act as a single building. For example, a structure containing two units on each side of a firewall would not be regarded as four two-unit buildings (and thus not covered by the Guidelines) but as a single eight-unit building.

In other situations where the dwelling units are connected, such as by stairs or a walkway that is structurally tied to the main body of the building, for purposes of the Guidelines, they are considered a single building and ground floor units in such buildings without elevators are covered.



**Building with Firewalls
Is Treated as a Single Building**



**For Purposes of the Guidelines, Two Structurally Joined Buildings
Are Treated as a Single Building**

INTRODUCTION

### Building Conversions

If a building was used previously for a nonresidential purpose, such as a warehouse, office building, or school, and is being converted to multifamily housing, the conversion is not covered. The Fair Housing Act only applies to covered buildings for first occupancy after March 13, 1991. The regulations define "first occupancy" as "a building that has never before been used for any purpose." See page 12 for additional discussion of "first occupancy."

### New Construction Behind Old Facade

In cases where the facade of a building is preserved, but the interior of the building, including all structural portions of floors and ceilings is removed, and a new building is constructed behind the old facade, the building is considered a new building for the purposes of the Fair Housing Act. Thus, it is covered and must comply with the Guidelines.

### Additions to Existing Buildings

When an addition is built as an extension to an existing building, the addition of four or more units is regarded as a new building and must meet the design requirements of the Guidelines. If any new public and common use spaces are added, they are required to be accessible. If, for example, an apartment wing is added to an existing hotel, the apartments are covered by the Fair Housing Act.

### Housing for Older Persons Is Covered

Housing built specifically for older persons is exempt from complying with the Fair Housing Act's prohibition against discrimination based on familial status (see 24 CFR 100.303 and 100.304). However, such housing is still subject to the Fair Housing Act's other requirements, including the design requirements for accessibility.



facade is all that remains of original construction

new construction

**New Construction Behind Old Facade Is Covered**

## FIRST OCCUPANCY AFTER MARCH 13, 1991

The Fair Housing Act does not require any renovations to existing buildings. Its design requirements apply to new construction only – to covered multifamily dwellings that are built for first occupancy after March 13, 1991. First occupancy is defined as "a building that has never before been used for any purpose." See also "Definitions Used in the Guidelines," page 16.

A building is not subject to the design requirements of the Fair Housing Act if:

**1.** it was occupied on or before March 13, 1991,

– **or** –

**2.** the last building permit or renewal thereof was issued by a state, county, or local government on or before June 15, 1990.

For a building to be considered occupied, the following criteria must be met:

**1.** a certificate of occupancy must have been issued,

– **and** –

**2.** at least one dwelling unit actually must be occupied.

    **a.** For a building containing **rental units**, this means that a resident has signed a lease and taken possession of a unit. The resident must have the legal right to occupy the premises, but need not have physically moved in yet.

    **b.** For a building containing **for-sale units**, this means that a new owner has completed settlement and taken possession of a unit. The new owner must have the legal right to occupy the premises, but need not have physically moved in yet.

A certificate of occupancy, or the fact that units are being offered for sale but not yet sold, would not be an acceptable means of establishing occupancy. For a project consisting of several buildings which are constructed in phases spanning the March 13, 1991 date, first occupancy will be determined on a building-by-building basis.

INTRODUCTION

## THE ANSI STANDARD, THE FAIR HOUSING ACT, AND THE GUIDELINES

The Fair Housing Act requires certain features of accessible design for covered multifamily dwellings built for first occupancy after March 13, 1991. The Act and HUD's implementing regulations, as well as the final Fair Housing Accessibility Guidelines (the Guidelines) reference the 1986 ANSI A117.1 *American National Standard for Buildings and Facilities – Providing Accessibility and Usability for Physically Handicapped People* as an acceptable standard to meet when designing accessible elements, spaces, and features outside covered dwelling units.

The level of accessibility required by the Fair Housing Act is relatively high on the site and in common use areas where compliance with much of the ANSI Standard is required. Accessibility is less stringent within the dwelling units where only specific features outlined in the Guidelines are required. In some instances, the specification is a modification of the related ANSI section, and in other instances the Guidelines substitute specifications.

The Guidelines state in the "Purpose" Section that the Guidelines are to provide technical guidance on designing dwelling units that are in compliance with the Fair Housing Act, and are not mandatory. Rather, the Guidelines provide a safe harbor for compliance with the accessibility requirements of the Act.

The "Purpose" Section also states, "Builders and developers may choose to depart from these Guidelines and seek alternate ways to demonstrate that they have met the requirements of the Fair Housing Act." However, it is recommended that, if a designer or builder chooses to follow an accessibility standard other than the 1986 ANSI A117.1 Standard, or a more recent version of the ANSI A117.1, such as the 1992 CABO/ANSI, that care be taken to ensure the standard used is at least equivalent to or stricter than the 1986 ANSI A117.1 Standard.

**Note:** Whenever this Manual states the ANSI Standard or the ANSI A117.1 Standard "must be followed," it means the 1986 ANSI A117.1 Standard or an equivalent or stricter standard.





## THE GUIDELINES

The design requirements of the Guidelines to which new buildings and dwelling units must comply are presented in abridged form below. Dwelling units are not subject to these requirements only in the rare instance where there are extremes of terrain or unusual characteristics of the site. Such instances are discussed in detail in Chapter One: "Accessible Building Entrance on an Accessible Route."

### REQUIREMENT 1

**Accessible Building Entrance on an Accessible Route:** Covered multifamily dwellings must have at least one building entrance on an accessible route, unless it is impractical to do so because of terrain or unusual characteristics of the site. For all such dwellings with a building entrance on an accessible route the following six requirements apply.

### REQUIREMENT 2

**Accessible and Usable Public and Common Use Areas:** Public and common use areas must be readily accessible to and usable by people with disabilities. See Chapter Two.

### REQUIREMENT 3

**Usable Doors:** All doors designed to allow passage into and within all premises must be sufficiently wide to allow passage by persons in wheelchairs. See Chapter Three.

### REQUIREMENT 4

**Accessible Route Into and Through the Covered Dwelling Unit:** There must be an accessible route into and through the dwelling units, providing access for people with disabilities throughout the unit. See Chapter Four.

### REQUIREMENT 5

**Light Switches, Electrical Outlets, Thermostats and Other Environmental Controls in Accessible Locations:** All premises within the dwelling units must contain light switches, electrical outlets, thermostats and other environmental controls in accessible locations. See Chapter Five.

### REQUIREMENT 6

**Reinforced Walls for Grab Bars:** All premises within dwelling units must contain reinforcements in bathroom walls to allow later installation of grab bars around toilet, tub, shower stall and shower seat, where such facilities are provided. See Chapter Six.

### REQUIREMENT 7

**Usable Kitchens and Bathrooms:** Dwelling units must contain usable kitchens and bathrooms such that an individual who uses a wheelchair can maneuver about the space. See Chapter Seven.

## DEFINITIONS USED IN THE GUIDELINES

This is the complete list of definitions used in the Guidelines, excluding a definition for "handicap" and "controlled substance." See Appendix B of this manual for a reprint of the Guidelines, which contains the complete list. Two additional definitions, taken from the regulations and a Guideline Requirement, are provided below. They are so noted with the definition.

**Accessible**

when used with respect to the public and common use areas of a building containing covered multifamily dwelling units, means that the public or common use areas of the building can be approached, entered, and used by individuals with physical disabilities. The phrase "readily accessible to and usable by" is synonymous with accessible. A public or common use area that complies with the appropriate requirements of ANSI A117.1-1986, a comparable standard, or these Guidelines is "accessible" within the meaning of this paragraph.

**Accessible route**

means a continuous and unobstructed path connecting accessible elements and spaces in a building or within a site that can be negotiated by a person with a severe disability using a wheelchair, and that is also safe for and usable by people with other disabilities. Interior accessible routes may include corridors, floors, ramps, elevators, and lifts. Exterior accessible routes may include parking access aisles, curb ramps, walks, ramps, and lifts. A route that complies with the appropriate requirements of ANSI A117.1-1986, a comparable standard, or

Requirement 1 of these Guidelines is an "accessible route." In the circumstances described in Requirements 1 and 2, "accessible route" may include access via a vehicular route.

**Adaptable dwelling units**

when used with respect to covered multifamily dwellings, means dwelling units that include the features of adaptable design specified in 24 CFR 100.205(c) (2)-(3).

**ANSI A117.1 - 1986**

means the 1986 edition of the American National Standard for buildings and facilities providing accessibility and usability for physically disabled people.

**Assistive device**

means an aid, tool, or instrument used by a person with disabilities to assist in activities of daily living. Examples of assistive devices include tongs, knob-turners, and oven-rack pusher/pullers.

**Bathroom**

means a bathroom which includes a water closet (toilet), lavatory (sink), and bathtub or shower. It does not include single-fixture facilities or those with only a water closet and lavatory. It does include a compartmented bathroom. A compartmented bathroom is one in which the fixtures are distributed among interconnected rooms. A compartmented bathroom is considered a single unit and is subject to the Act's requirements for bathrooms.

**Building**

means a structure, facility, or portion thereof that contains or serves one or more dwelling units.

**Building entrance on an accessible route**

means an accessible entrance to a building that is connected by an accessible route to public transportation stops, to parking or passenger loading zones, or to public streets or sidewalks, if available. A building entrance that complies with ANSI A117.1 -1986 (see Requirement 1 of these Guidelines) or a comparable standard complies with the requirements of this paragraph.

**Clear**

means unobstructed.

**Common use areas**

means rooms, spaces, or elements inside or outside of a building that are made available for the use of residents of a building or the guests thereof. These areas include hallways, lounges, lobbies, laundry rooms, refuse rooms, mail rooms, recreational areas, and passageways among and between buildings. See Requirement 2 of these Guidelines.

**Covered multifamily dwellings**

or covered multifamily dwellings subject to the Fair Housing Amendments means buildings consisting of four or more dwelling units if such buildings have one or more elevators, and ground floor dwelling units in other buildings consisting of four or more dwelling units. Dwelling units within a single structure separated by firewalls do not constitute separate buildings.

**Dwelling unit**

means a single unit of residence for a household of one or more persons. Examples of dwelling units covered by these Guidelines include: condominiums, an apartment unit within an apartment building, and other types of dwellings in which sleeping accommodations are provided but toileting or cooking facilities are shared by occupants of more than one room or portion of the dwelling. Examples of the latter include dormitory rooms and sleeping accommodations in shelters intended for occupancy as a residence for homeless persons.

**Entrance**

means any exterior access point to a building or portion of a building used by residents for the purpose of entering. For purposes of these Guidelines, an "entrance" does not include a door to a loading dock or a door used primarily as a service entrance, even if nondisabled residents occasionally use that door to enter.

**Finished grade**

means the ground surface of the site after all construction, levelling, grading, and development has been completed.

**First occupancy**

means a building that has never before been used for any purpose. (Definition found in regulations at 24 CFR 100.201)

INTRODUCTION

**Ground Floor**

means a floor of a building with a building entrance on an accessible route. A building may have one or more ground floors. Where the first floor containing dwelling units is above grade, all units on that floor must be served by a building entrance on an accessible route. This floor will be considered a ground floor.

**Loft**

means an intermediate level between the floor and ceiling of any story, located within a room or rooms of a dwelling.

**Multistory dwelling unit**

means a dwelling unit with finished living space located on one floor and the floor or floors immediately above or below it.

**Powder room**

A room containing a toilet and a sink. (Definition found in Requirement 6 of the Guidelines.)

**Public use areas**

means interior or exterior rooms or spaces of a building that are made available to the general public. Public use may be provided at a building that is privately or publicly owned.

**Single-story dwelling unit**

means a dwelling unit with all finished living space located on one floor.

**Site**

means a parcel of land bounded by a property line or a designated portion of a public right of way.

**Slope**

means the relative steepness of the land between two points and is calculated as follows: The distance and elevation between the two points (e.g., an entrance and a passenger loading zone) are determined from a topographical map. The difference in elevation is divided by the distance and that fraction is multiplied by 100 to obtain a percentage slope figure. For example, if a principal entrance is ten feet from a passenger loading zone, and the principal entrance is raised one foot higher than the passenger loading zone, then the slope is $1/10 \times 100 = 10\%$.

**Story**

means that portion of a dwelling unit between the upper surface of any floor and the upper surface of the floor next above, or the roof of the unit. Within the context of dwelling units, the terms "story" and "floor" are synonymous.

**Undisturbed site**

means the site before any construction, levelling, grading, or development associated with the current project.

**Vehicular or pedestrian arrival points**

means public or resident parking areas, public transportation stops, passenger loading zones, and public streets or sidewalks.

**Vehicular route**

means a route intended for vehicular traffic, such as a street, driveway, or parking lot.

## DISABILITY TYPES AND IMPLICATIONS FOR DESIGN

### TYPES OF DISABILITIES

Most people will, at some time during their life, have a disability, either temporary or permanent, which limits their ability to move around in and use the built environment. In fact, more than one in five Americans aged 15 and over have some type of disability; problems with walking and lifting are the most common. Not until fairly recently have the needs of people with disabilities been given adequate attention. The passage of the Fair Housing Act is another step in the process to create a built environment where people with disabilities can move freely in society as do persons who have no disability.

According to the "Statistical Report: the Status of People with Disabilities," compiled by the President's Committee on Employment of People with Disabilities, published in 1994[5] :

- 48.9 million Americans are persons with disabilities;
- 32 million Americans are age 65 or over;
- 3.3 million Americans are 85 and older, and this number is projected to grow by 100%, to over 6 million by 2010;
- 70% of all Americans will, at some time in their lives, have a temporary or permanent disability that makes stair climbing impossible;
- 8,000 people survive traumatic spinal cord injuries each year, returning to homes that are inaccessible;
- 17 million Americans have serious hearing disabilities;
- 8.1 million Americans have vision disabilities;
- 27 million Americans have heart disease and reduced or limited mobility.

There are hundreds of different disabilities and they manifest themselves in varying degrees. One person may have multiple disabilities while another may have a disability whose symptoms fluctuate. Most standards and design criteria are based on the needs of people defined by one of the following four general categories:

### 1. MOBILITY DISABILITIES

This category includes people who use wheelchairs and those who use other mobility aids.

### Wheelchair Users

People with severe mobility disabilities use either a power-driven or manually operated wheelchair or, the more recent development, the three-wheeled cart or scooter to maneuver through the environment. People who use wheelchairs have some of the most obvious access problems. They include maneuvering through narrow spaces, going up or down steep paths, moving over rough or uneven surfaces, making use of toilet and bathing facilities, reaching and seeing items placed at conventional heights, and negotiating steps or changes in level at the entrance to a dwelling unit.

The design and construction requirements of the Fair Housing Act and the Guidelines focus primarily on the spatial needs of people who use wheelchairs because those needs are met more easily in the initial construction phase of a building project. This section provides basic information on the spatial requirements for an average seated adult

---

[5]Based on the census report *Americans With Disabilities* 1991/1992, published January 1994

INTRODUCTION

in a stationary position and the space necessary to execute the two most common turns typically described in accessibility standards. The specifications given here are based on the A117.1 - 1986 ANSI Standard (see ANSI 4.2, 4.3, and 4.4).

**Clear Floor Space:** The minimum clear floor space required to accommodate a single, stationary wheelchair is 30 inches by 48 inches. For an approach to an object, counter, or control, depending upon the object, the user may position his or her chair either parallel or perpendicular to the object. These two types of approaches are discussed in more detail in Chapters Five and Seven.

**Turning Spaces:** The space required for a person using a wheelchair to make a 180-degree turn is a circle with a diameter of 60 inches. Alternatively, a person can make a T-shaped turn, similar to a three-point turn in a car, at the intersection of a hall or in a room where some of the space necessary to perform the turn may be under a desk, table, or countertop.



**Space Allowances and Approximate Dimensions of Adult-Sized Wheelchairs**



**Pivoting Turn Space**



**T-Turn Space**



**T-Turn within a Knee Space**

## Ambulatory Mobility Disabilities

This category includes people who walk with difficulty or who have a disability which affects gait. It also includes persons who do not have full use of arms or hands, or who lack coordination. Persons who use crutches, canes, walkers, braces, artificial limbs, or orthopedic shoes are included in this category. Activities that may be difficult for people with mobility disabilities include walking, climbing steps or slopes, standing for extended periods of time, reaching, and fine finger manipulation.



**Space Necessary for Adults
Using Crutches or Walker**

31" to 32-1/2"        28"

## 2. Visual Disabilities

This category includes people with partial vision or total vision loss. Some people with a vision disability can distinguish light and dark, sharply contrasting colors, or large print, but cannot read small print, negotiate dimly lit spaces, or tolerate high glare. Many people who are blind depend upon their sense of touch and hearing to perceive their environment and communicate with others. Many use a cane or have a service animal to facilitate moving about.



32"

**Minimum Space Necessary for Person
with a Service Animal**

INTRODUCTION

### 3. Hearing Disabilities

People with partial hearing often use a combination of speech reading and hearing aids which amplify the available sounds. Echo, reverberation, and extraneous background noise can distort hearing aid transmission. People who are deaf and who rely on lip reading for information must be able to see clearly the face of the individual who is speaking. Those who use sign language to communicate also may be adversely affected by poor lighting. People who are hard of hearing or deaf may have difficulty understanding oral communication and receiving notification by equipment that is exclusively auditory such as telephones, fire alarms, public address systems, etc.

### 4. Cognitive Disabilities and Other Hidden Conditions

People with cognitive and learning disabilities may have difficulty using facilities, particularly where the signage system is unclear or complicated. In addition to people with permanent disabilities, there are others who may have a temporary condition which affects their usual abilities. Broken bones, illness, trauma, or surgery – all may affect a person's use of the built environment for a short time. Frequently, people have diseases of the heart or lungs, neurological diseases with resulting lack of coordination, arthritis, or rheumatism that may reduce physical stamina or cause pain. Reduction in overall ability is also experienced by many people as they age. People of extreme size or weight often need special accommodation as well.

## ENFORCEMENT

Under the Fair Housing Act, discrimination includes a failure to design and construct covered multifamily dwellings in a manner which includes the specific features of accessible design delineated in the Act. Thus, responsibility for complying with the law rests with any and all persons involved in the design and construction of covered multifamily dwellings. This means, for example, that if a complaint is filed, the complaint could be filed against all persons involved in the design and construction of the building, including architects, builders, building contractors, the owner, etc.

HUD has the responsibility for enforcement of the Fair Housing Act. The Fair Housing Act provides that an aggrieved person may, not later than one year after an alleged discriminatory housing practice has occurred or terminated, file a complaint with the Secretary of HUD. The Secretary, on the Secretary's own initiative, also may file such a complaint. With respect to the design and construction requirements, complaints could be filed at any time that the building continues to be in noncompliance, because the discriminatory housing practice – failure to design and construct the building in compliance – does not terminate.

Following the filing of the complaint, an investigation is conducted and completed within 100 days, unless impracticable to do so. During the period beginning with the filing of the complaint and ending with the filing of a charge or a dismissal by the Secretary, HUD will engage in conciliation.

If a charge of discrimination is issued after an investigation, an aggrieved person or a respondent may elect, in lieu of an administrative proceeding with HUD, to have the complaint decided in a civil action. An aggrieved person may bring a civil action in state or federal district court within two years after occurrence or termination of an alleged discriminatory housing practice.

If an administrative law judge finds that a respondent has engaged in or is about to engage in a discriminatory housing practice, the administrative law judge will order appropriate relief. Such relief may include actual and compensatory damages, injunctive or other equitable relief, attorney's fees and costs, and may also include civil penalties ranging from $10,000 for the first offense to $50,000 for repeated offenses. In addition, in the case of buildings which have been completed, structural changes could be ordered, and an escrow fund might be required to finance future changes.

With respect to the design and construction requirements, HUD may encourage, but cannot require, states and units of local government to include in their existing procedures for the review and approval of newly constructed covered multifamily dwellings, determinations as to whether the design and construction of such dwellings are consistent with the requirements of the Fair Housing Act, HUD's implementing regulations, and the Fair Housing Accessibility Guidelines.

HUD provides technical assistance to states and units of local government and other interested persons, in order to implement the design and construction requirements of the Fair Housing Act. Architects, designers and builders may contact HUD with questions, either by telephone or by letter. However, HUD is not required to, nor does the agency have a procedure

INTRODUCTION

for, review and approval of building plans to determine if they are in compliance. Technical assistance provided by HUD serves only as general interpretation of law and regulations and is not binding on the agency with respect to a specific case.

Some states have incorporated the requirements of the Fair Housing Act into their state laws. How this is done may differ from state to state. Some states, for example, have included the design and construction requirements as a part of the state law and simply incorporated HUD's Fair Housing Accessibility Guidelines by reference. Other states have drafted their own language to implement the design and construction requirements of the Fair Housing Act into the state building code. States which have incorporated the requirements of the Fair Housing Act into their state laws enforce those laws independently of the federal government. However, it should be noted that it is the state law that is being enforced. Such enforcement will not preclude any individual from exercising his or her right to file a complaint with HUD under the Fair Housing Act, or from filing a private lawsuit; nor does it preclude HUD from conducting a Secretary-initiated complaint.

The Fair Housing Act does not invalidate or limit any law of a state or local government that requires dwellings to be designed and constructed in a manner that affords persons with disabilities greater accessibility than the requirements of the Fair Housing Act. Likewise, the Fair Housing Act does not invalidate or replace other federal laws which require greater accessibility in certain housing, such as Section 504 of the Rehabilitation Act of 1973 or the Architectural Barriers Act of 1968.

The following is a list of HUD enforcement offices. Architects, builders and other users of this manual are encouraged to contact these and other HUD Fair Housing field offices for technical assistance as needed.

### New England

U.S. Department of Housing
and Urban Development
Thomas P. O'Neill, Jr. Federal Building
10 Causeway Street, Room 308
Boston, Massachusetts 02222-1092
(617) 994-8300
**Connecticut, Maine, Massachusetts, New Hampshire, Rhode Island, Vermont**

### New York/New Jersey

U.S. Department of Housing
and Urban Development
26 Federal Plaza
New York, New York 10278-0068
(212) 264-1290
**New Jersey, New York**

### Mid-Atlantic

U.S. Department of Housing
and Urban Development
The Wanamaker Building
100 Penn Square East
Philadelphia, Pennsylvania 19106-3392
(215) 656-0647
**Delaware, District of Columbia, Maryland, Pennsylvania, Virginia, West Virginia**

**Southeast/Caribbean**

U.S. Department of Housing
and Urban Development
Five Points Plaza
40 Marietta Street
Atlanta, Georgia  30303-3388
(404) 331-5140
**Alabama, Florida, Georgia, Kentucky,
Mississippi, North Carolina, South Carolina,
Tennessee, Puerto Rico, Virgin Islands**

**Midwest**

U.S. Department of Housing
and Urban Development
77 West Jackson Boulevard
Chicago, Illinois  60604-3507
(312) 353-7776
**Illinois, Indiana, Minnesota, Michigan,
Ohio, Wisconsin**

**Southwest**

U.S. Department of Housing
and Urban Development
801 North Cherry Street
Fort Worth, Texas  76113-2905
(817) 978-5900
**Arkansas, Louisiana, New Mexico,
Oklahoma, Texas**

**Great Plains**

U.S. Department of Housing
and Urban Development
Gateway Tower II, 400 State Avenue
Kansas City, Kansas  66101-2406
(913) 551-6958
**Iowa, Kansas, Missouri, Nebraska**

**Rocky Mountain**

U.S. Department of Housing
and Urban Development
First Interstate Tower North
633 17th Street
Denver, Colorado  80202-2349
(303) 672-5434
**Colorado, Montana, North Dakota, South
Dakota, Utah, Wyoming**

**Pacific/Hawaii**

U.S. Department of Housing
and Urban Development
Phillip Burton Federal Building
450 Golden Gate Avenue
P.O. Box 36003
San Francisco, California 94102-3448
(415) 436-6569
**Arizona, California, Hawaii, Nevada, Guam,
American Samoa**

**Northwest/Alaska**

U.S. Department of Housing
and Urban Development
Federal Office Building
909 First Avenue, Suite 200
Seattle, Washington  98104-1000
(206) 220-5170
**Alaska, Idaho, Oregon, Washington**

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **EQUAL RIGHTS CENTER** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 1:06CV01991** |
| | ) | **Judge Richard J. Leon** |
| **vs.** | ) | |
| | ) | |
| **POST PROPERTIES, INC.,** *et al.*, | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| | ) | |

<u>**PRELIMINARY INJUNCTION**</u>

The Court has considered the Motion of Plaintiff the Equal Rights Center ("ERC") for a Preliminary Injunction, Defendants' Opposition, Plaintiff's Reply and the entire record herein. The Court finds that:

    1.     The ERC has demonstrated that it is likely to prevail on the merits.

    2.     The ERC has demonstrated irreparable harm in that if Defendants Post Properties, Inc., Post GP Holdings, Inc., and Post Apartment Homes, L.P. (collectively "Post"), their affiliates or their officers, directors, employees or agents sell properties to good faith purchasers, this Court may no longer order those properties to be retrofitted to comply with the Fair Housing Act, Title VIII of the Civil Rights Act of 1968, as amended by the Fair Housing Act Amendments of 1988, 42 U.S.C. §§ 3601, *et seq.* (the "FAA"), and the Americans with Disabilities Act, 42 U.S.C. §§ 12181, *et seq.,* ("the ADA").

    3.     In balancing the harm between the parties, the Court finds that there can be no harm to Defendants in being ordered to comply with federal law.

4.    The Court finds that it is in the public interest that Defendants and their affiliates not sell any properties without either:  (a) making such modifications as are necessary to bring the property to be sold into compliance with the FHA and the ADA prior to the sale, such compliance to be confirmed by the ERC, or (b)including in the terms of any such sale a provision allowing Post to reenter the property and to take such actions, including retrofitting, as may be finally ordered by this Court.

Based on these findings, this Court hereby enjoins Defendants Post Properties, Inc., Post GP Holdings, Inc., and Post Apartment Homes, L.P., their affiliates, and the officers, directors, employees and agents of any of them, pursuant to F.R.Civ.P. 65(a) from selling any properties, or any individual housing units at those properties, unless without either:  (a) making such modifications as are necessary to bring the property to be sold into compliance with the FHA and the ADA prior to the sale, such compliance to be confirmed by the ERC, or (b) including in the terms of any such sale a provision allowing Post Properties, Inc., Post GP Holdings, Inc. and Post Apartment Homes, L.P., post-sale access to the property(ies) on thirty (30) days' written notice in order to comply with any final Order of this Court, including retrofitting.

Defendants Post Properties, Inc., Post GP Holdings, Inc., and Post Apartment Homes, L.P. shall cause a copy of this Preliminary Injunction to be transmitted to each of their affiliates' officers, directors, employees and agents who may be in a position to sell or attempt to sell any of the properties, or any individual housing units within those properties, covered by this Preliminary Injunction.

The properties covered by this Preliminary Injunction are all properties presently owned by Post or any of its affiliates, or acquired during the course of this litigation, which properties were designed and constructed for first occupancy after March 13, 1991, including:

- 2 -

**Arizona**
Roosevelt Square

**Colorado:**
Uptown Square

**District of Columbia:**
Massachusetts Avenue

**Florida:**
Hyde Park
Harbour Place
Harbour Place City Homes
Hyde Park Walk
The Grand View
Parkside
Rocky Point

**Georgia:**
The Vinings
Brookhaven
Peachtree
Renaissance
Crossing
Lenox Park
Crest
Dunwoody
Collier Hills
Oglethorpe
Lindberg
Gardens
Glen
Ridge
Riverside
Briarcliff
Stratford
Parkside
Spring
Biltmore
Alexander
Legacy Town Center
River

**New York:**
Luminaria
Toscona

**North Carolina:**
Ballentyne
Gateway Place
Park at Phillips Place
Uptown Place

**Texas:**
Worthington
Vintage
Uptown Village
Abbey
Vineyard
Square
Heights
Addison Circle
Rice Lofts
Gallery
Midtown Square
Wilson Building
Legacy
Mercer Square Condos
Rise
Cole's Corner
West Avenue Lofts

**Virginia:**
Carlyle
Corners
Forest
Pentagon Row
Tysons Corner

ORDERED this ___ day of _____, 2007 at Washington, D.C. at _____ _.m.


_____
RICHARD J. LEON
United States District Court Judge

Copies to:

Sheila J. Carpenter, Esq.
Jorden Burt, LLP
1025 Thomas Jefferson Street, N.W.
Suite 400 East
Washington, D.C. 20007

Donald L. Kahl, Esq.
Washington Lawyers' Committee
  for Civil Rights and Urban Affairs
11 Dupont Circle, N.W., Suite 400
Washington, D.C.  20036

Christopher B. Hanback, Esq.
Alan I. Baron, Esq.
Rafe Peterson, Esq.
Holland & Knight, LLP
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C.  20006