# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

### CASE NO. 06-01991

### EQUAL RIGHTS CENTER

### PLAINTIFF,

v.

### POST PROPERTIES, INC. et al.

### DEFENDANTS.

---

## OPPOSITION TO PLAINTIFF'S MOTION
## FOR PRELIMINARY INJUNCTION

---

## BRIEF OF DEFENDANTS POST PROPERTIES, INC.,
## POST GP HOLDINGS, INC. AND POST APARTMENT HOMES, L.P.

HOLLAND & KNIGHT LLP

Christopher B. Hanback (Bar # 232579)
Alan I. Baron (Bar. # 340273)
Rafe Petersen (Bar # 465542)
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006
(202) 955 3000 Phone
(202) 955 5564 Fax
E-mail: christopher.hanback@hklaw.com
E-mail: alan.baron@hklaw.com
E-mail: rafe.petersen@hklaw.com
*Counsel for Post Properties, Inc., et al.*

# TABLE OF CONTENTS

I.    INTRODUCTION AND STATEMENT OF FACTS .................................................... 1

II.   ARGUMENT ................................................................................................................ 5

    A.    Standard Of Review ................................................................................................ 5

    B.    The ERC cannot show a substantial likelihood of success on the merits .......... 7

        1.    The flexible language of the FHA and the clear language of HUD's Guidelines and Design Manual show that the features that the ERC claims are required are not mandated by law .............................................. 8

        2.    The ERC has failed to present sufficient and credible evidence of Post's alleged FHA violations. .................................................................. 12

    C.    Plaintiff cannot show irreparable injury if the injunction is not granted ...................................................................................................................... 15

        1.    Section 3613(d) of the FHA will not apply to limit any relief, if granted, in this case. ................................................................................... 17

        2.    Any potential changes or retrofits to buildings can always take place at a later date even if the building is sold. ........................................ 19

    D.    The injunction will substantially injure Post ..................................................... 23

        1.    Post will suffer substantial economic harm if the preliminary injunction is granted. ....................................................................................... 24

        2.    The ERC seeks a remedy greater in scope than that to which they are entitled. ................................................................................................... 28

    E.    The public interest will not be furthered by the injunction ............................. 29

III.  CONCLUSION ........................................................................................................... 30

## TABLE OF AUTHORITIES

**CASES:**

*Alabama v. U.S. Army Corps of Eng'rs*, 424 F.3d 1117 (11th Cir. 2005) ........................................6

*Balt. Neighborhoods, Inc. v. LOB, Inc.*, 92 F. Supp. 456 (D. Md. 2000) ................................20

*\*Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290 (D.C. Cir. 2006).........6,15,16,22

*Christopher Phelps & Assocs. LLC v. Galloway*, 477 F.3d 128 (4th Cir. 2007) ...........................29

*CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738 (D.C. Cir. 1995).........................6

*Clarke v. Office of Fed. Housing Enter. Oversight*, 355 F. Supp. 2d 56
(D.D.C. 2004) ...................................................................................................6,7,15,16

*Cumulus Media, Inc. v. Clear Channel Commc'ns, Inc.*, 304 F.3d 1167 (11th Cir. 2002).............28

*Guaranty Savings & Loan Ass'n v. Fed. Home Loan Bank Bd.*, 330 F. Supp. 470
(D.D.C. 1971) .............................................................................................................23

*HUD v. Perland*, 1998 WL 142159 (9HUDALF 05-96-1517-8, Mar. 30, 1998) ........................20

*Indep. Union of Flight Attendants v. Pan Am. World Airways, Inc.*, 502 F. Supp. 1013
(D.D.C. 1980) .............................................................................................................23

*Mazurek v. Armstrong*, 520 U.S. 968 (1997) ...............................................................5

*Moore v. Summers*, 133 F. Supp. 2d 5 (D.D.C. 2000)....................................................5

*Nat'l Treasury Employees Union v. Yeutter*, 918 F.2d 968 (D.C. Cir. 1990) ..................................7

*Natural Res. Def. Council v. Pena*, 147 F.3d 1012 (D.C. Cir. 1998) .......................................6, 13

*Nicolas M. Salgo Assocs. v. Cont'l Ill. Props.*, 532 F. Supp. 279 (D.D.C. 1981)..........................29

*Flight Attendants v. Pan American World Airways, Inc.*, 502 F. Supp. 1013
(D.D.C. 1980) .............................................................................................................23

*Price v. City of Stockton*, 390 F.3d 1105 (9th Cir. 2004) .............................................................28

*\*Qualls v. Rumsfeld*, 357 F. Supp. 2d 274 (D.D.C. 1995).......................................5, 6,7,13,14,223

*Serono Labs, Inc. v. Shalala*, 158 F.3d 1313 (D.C. Cir. 1998).........................................................6

*Societe Comptoir De L'industrie Cntonniere, Etablissements Boussac v. Alexander's Dep't Stores, Inc.*, 190 F. Supp. 594 (S.D.N.Y. 1961) ...................................................................6

*United States v. Edward Rose & Sons*, 246 F. Supp. 2d 744 (E.D. Mich. 2003) ...........21,22,24,27

*United States v. Edward Rose & Sons*, 384 F.3d 258 (6th Cir. 2004) .......................................21,22

*\*United States v. Microsoft Corp.*, 147 F.3d 935 (D.C. Cir. 1998) ...............................................16

*United States v. Pac. NW Elec. Inc.*, No. CV-01-019-S-BLW, 2003 WL 24573548 (N.D. Idaho Mar. 21, 2003) ............................................................................................................11

*Warth v. Seldin*, 422 U.S. 490 (1975) ...........................................................................................29

*\*Weinberger v. Romero-Barcelo*, 456 U.S. 305 (1982) .................................................7,14,16,23,26

*Western & Southern Life Ins. Co. v. Crown Am. Corp.*, 877 F. Supp. 1041 (E.D. Ky. 1993)..........................................................................................................................29

## STATUTES:

42 U.S.C. § 3604(f)(C)(i)-(iii) ........................................................................................................4,9

42 U.S.C. § 3604(f)(4) ......................................................................................................................9

42 U.S.C. § 3604(f)(5)(C)................................................................................................................10

42 U.S.C. § 3604(f)(7)(B)................................................................................................................24

42 U.S.C. § 3613(c)(1)...............................................................................................................17, 18

42 U.S.C. § 3613(d) ...............................................................................................................17, 18,19

## REGULATIONS:

24 C.F.R. Part 100...........................................................................................................................9

24 C.F.R. § 104.910........................................................................................................................18

53 Fed. Reg. 44992 (Nov. 7, 1988)................................................................................................10

54 Fed. Reg. 3232 (Jan. 23, 1989) .................................................................................................19

56 Fed. Reg. 44 (Mar. 6, 1991)......................................................................................................21

56 Fed. Reg. 9472 (Mar. 6, 1991)......................................................................................3, 10, 14

59 Fed. Reg. 33362 (June 28, 1994) ............................................................................................10

**LEGISLATIVE MATERIALS:**

H. Rep. No. 100-711 100th Cong., 2d Sess. 1998, *reprinted in* 1988 U.S.C.C.A.N. 2173,
2179................................................................................................................................................9

**DOCKETED CASES:**

*Friends of Earth v. U.S. Dep't of the Interior*, No. 05-2302, slip op. (D.D.C. Mar. 21,
2007) ............................................................................................................................................2

*Memphis Ctr. for Independent Living v. Grant*, Civ. No. 01-2069, slip op. (W.D. Tenn.
Oct. 2, 2003.) ...............................................................................................................7,11,16,30

**Authorities chiefly relied upon are marked with asterisks.**

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| EQUAL RIGHTS CENTER )<br><br>        Plaintiff,              )<br><br>    vs.                          )<br><br>POST PROPERTIES, INC.       )<br>POST GP HOLDINGS, INC.     )<br>POST APARTMENT HOMES, L.P. )<br><br>        Defendants.           ) | Case. No. 1:06CV01991<br>Judge Richard J. Leon |

## DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendants Post Properties, Inc., Post GP Holdings, Inc., and Post Apartment Homes, L.P. (collectively "Post") by undersigned counsel hereby file this Opposition to Plaintiff's Motion for Preliminary Injunction.

### I.    INTRODUCTION AND STATEMENT OF FACTS

Plaintiff, the Equal Rights Center ("ERC"), seeks the extraordinary relief of a preliminary injunction. The ERC carries a heavy burden of proof to demonstrate entitlement to any form of injunctive relief. The ERC is unable to meet its burden. The ERC's motion does not establish that there is a likelihood that Post has violated the Fair Housing Act ("FHA"), nor that maintenance of the status quo will lead to irreparable harm. In contrast, the relief the ERC seeks could have an immediate and devastating impact on Post, its shareholders and investors, innocent third parties, and the residents of its buildings. These considerable impacts far outweigh the speculative theories of liability and harm advanced by the ERC.

The ERC's motion is premature and no more than another attempt to distract the Court from Post's pending Motion to Dismiss. When it became clear that there are serious deficiencies in the ERC's ability to establish standing and to overcome the FHA's two-year statute of limitations, the ERC's response was to request discovery from Post. Having failed to bolster that it has suffered injury-in-fact, the ERC now attempts to skip over the merits stage of the case and to go directly to the remedy stage of the proceedings – actually requesting an order to require modifications to Post's properties before it is even established that there is a violation of the FHA, much less the extent of any alleged violation. Yet, the serious deficiencies in the ERC's complaint cannot simply be glossed over by an unsupported request for preliminary relief. Such threshold issues of jurisdiction must be resolved prior to the Court even considering if the ERC has met its heavy burden of demonstrating that an injunction is warranted. It is clear that once Post's Motion to Dismiss is considered, this case will be substantially narrowed if not thrown out completely. A "sincere interest" in an issue is not enough to prove standing – the ERC cannot simply assert that they have visited the "Subject Properties" (as set forth in the Complaint)[1] and expect that the Court will "extrapolate from that the facts necessary to support standing." *See Friends of Earth v. United States Dep't of the Interior*, Civil Action No. 05-2302 (RCL) (D.D.C. Mar. 21, 2007) (dismissing various counts and plaintiffs for lack of standing). Judicial resources should not be further spent until Post's Motion to Dismiss is given full consideration.

The ERC seeks a preliminary injunction enjoining Post from selling any of the Subject Properties or units within such properties unless Post either makes modifications allegedly necessary to bring the units into compliance with the ERC's interpretation of the FHA and Americans with Disabilities Act ("ADA") prior to sale, or includes terms in its contract of sale to allow Post to reenter the property and retrofit it if retrofits are ordered by this Court. This is an

---

[1] Incredibly, the ERC's proposed order includes properties not even named in the Complaint.

2

unprecedented request for relief, which vests the ERC with power to prevent sales of properties, especially considering the meager evidence and almost complete lack of proof of likely violations of the FHA and of irreparable harm.

In hopes of establishing a likelihood of success on the merits, the ERC attempts to mislead the Court by arguing that if a feature of a covered dwelling unit is inconsistent with a measurement set forth in the US Department of Housing and Urban Development's ("HUD") Fair Housing Act Accessibility Guidelines ("Guidelines"),[2] then the unit ought to be considered in violation of the FHA. This interpretation of the Guidelines is inconsistent with the very purpose and terms of that technical guidance document. The Guidelines, which provide technical guidance on designing dwelling units that are in compliance with the FHA, plainly state that they are not mandatory.[3] In fact, the Guidelines are but one of many so-called "safe harbors" designed to provide the regulated community with technical guidance on how to design dwelling units so as to avoid potential liability under the FHA. Such safe harbors are not the only way for determining if a particular dwelling unit meets the "modest accessibility requirements" of the FHA. The ERC, however, would have the Court convert the Guidelines into mandatory requirements. Regardless of whether the ERC can show that a particular feature of a dwelling unit is inconsistent with a suggested design approach from the Guidelines, this does not mean that they have established *prima facie* evidence of a violation. Consistency with the Guidelines is immaterial to the underlying question of Post's liability under the FHA.

In addition to the misuse of the Guidelines, the ERC presents a declaration that shows a complete lack of technical understanding of the requirements of the FHA. The FHA requires

---

[2] The Guidelines were published in the federal register on March 6, 1991. 56 Fed. Reg. 9472-9515.

[3] The fact that the Guidelines "are not mandatory" is confirmed on page 13 of the Fair Housing Act Design Manual, attached as Exhibit E to Plaintiff's Motion.

"features of adaptive design" such as an "accessible route into and through the dwelling," placement of certain controls (e.g. light switches) "in accessible locations" and "usable kitchens and bathrooms such that an individual in a wheelchair can maneuver about the space." 42 U.S.C. § 3604(f)(3)(C)(i)-(iii). Whether a particular unit has a kitchen that is "usable" is generally determined through surveys by architects or civil engineers with expertise in FHA compliance or through demonstrative evidence. Yet, rather than utilize someone with the proper credentials, the ERC attempts to rely on a conclusory declaration from one of its employees. This individual is not an architect, civil engineer, or otherwise qualified to render an opinion. With regard to the properties "tested", simply stating that a kitchen is "difficult or impossible for a person in a wheelchair" to use is not evidence of a violation of the FHA. Legal conclusions cannot substitute for actual evidence of a violation. The Court should not accept such substandard "evidence" particularly in making a decision that implicates the finances of a public company at this early stage in the litigation.

Incredibly, the ERC attempts to extrapolate beyond the "tested" properties to allege "common elements of design" and "similar violations" at properties the ERC has not even visited. The brochures and website floor plans utilized by Plaintiff are not to scale, and do not include detailed dimensions that must be used to ascertain the accessibility of a space. In fact, several brochures and websites plans state that they are approximate and for illustrative purposes only. This shortcut to actual evidence concerning the accessibility of the Subject Properties is not sufficient to show a likelihood that the ERC will be able to prove that the properties were designed and constructed in violation of the FHA.

The ERC's claims of irreparable harm are weak. The assertion that if the Court does not grant the ERC all the relief they seek the Court will lose all power to issue an enforceable order

4

and "housing units will be permanently 'unavailable' to persons with disability" is alarmist and legally erroneous. The Court has broad authority to fashion relief and nothing in the FHA precludes the Court from enforcing an order requiring retrofits even if Post no longer owns the property.

On the other side of the balancing that the Court must undertake in consideration of the ERC's request for an injunction is the significant harm that Post faces if the injunction is granted. Post is a public company. As explained in the attached affidavit from Christopher J. Papa, if Post were enjoined from selling condominium units or apartment buildings, this could result in direct economic harm to Post, its shareholders, its lenders and its residents. In turn, if Post's ability to enter into contracts was severely curtailed, the result could be a reduction in the value of Post's properties or an inability to sell. Further, the public would be harmed by the ERC's proposed restrictions on the alienability of land.

In sum, the ERC does not even come close to meeting its heavy burden of production and persuasion in showing a likelihood of success on the merits and irreparable harm. The relief the ERC seeks would have an extreme impact on Post, and the public in general. The ERC carries a high burden and this burden has not been met.

## II.    ARGUMENT

### A. Standard of Review

"A preliminary injunction is an extraordinary form of relief not granted lightly." *Moore v. Summers*, 133 F. Supp. 2d 5, 17 (D.D.C. 2000); *see also Qualls v. Rumsfeld*, 357 F. Supp. 2d 274, 279 (D.D.C. 2005); *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).[4] The plaintiff, as the

---

[4] As the Eleventh Circuit explains:

> [an] injunction is completely at odds with a sanction for past conduct that may be addressed by adequate remedies at law. The sole function of an action for injunction is to forestall future violations. It is so unrelated to

movant, carries both the burden of production and persuasion and must show the following factors: "1) a substantial likelihood of success on the merits, 2) that [he or she] would suffer irreparable injury if the injunction is not granted, 3) that an injunction would not substantially injure other interested parties, and 4) that the public interest would be furthered by the injunction." *Qualls*, 357 F. Supp. 2d at 279, 281 (quoting *Mova Pharm. Corp. v. Shalala*, 140 F.3d 1060, 1066 (D.C. Cir. 1998)). Although these four factors are balanced against each other, the D.C. Circuit holds that proof of irreparable injury is essential. *See CityFed Fin. Corp. v. Office of Thrift Supervision*, 58 F.3d 738, 747 (D.C. Cir. 1995); *see also Serono Labs., Inc. v. Shalala*, 158 F.3d 1313, 1318 (D.C. Cir. 1998). "A movant's failure to show any irreparable harm is therefore grounds for refusing to issue a preliminary injunction, even if the other three factors entering the calculus merit such relief." *Chaplaincy of Full Gospel Churches v. England*, 454 F.3d 290, 298 (D.C. Cir. 2006). Moreover, "if the plaintiff makes a particularly weak showing on one factor . . . the other factors may not be enough to compensate." *Clarke v. Office of Federal Housing Enter. Oversight*, 355 F. Supp. 2d 56, 63 (D.D.C. 2004) (citation omitted).

In meeting its burdens of production and persuasion, the plaintiff must offer "credible evidence." *Qualls*, 357 F. Supp. 2d at 281; *Natural Res. Def. Council v. Pena*, 147 F.3d 1012, 1022-23 (D.C. Cir. 1998); *see also Societe Comptoir De L'industrie Cntonniere, Etablissements Boussac v. Alexander's Dep't Stores, Inc.*, 190 F. Supp. 594, 601-02 (S.D.N.Y 1961) ("Indeed, proof to support a preliminary injunction must be strong and clear in view of the restraint put upon the defendant at a time before his liability has actually been adjudged."). Furthermore, the plaintiff's burden is even greater in a case, such as this one, where the injunction is mandatory

---

punishment or reparations for those past that its pendency or decision does not prevent concurrent or later remedy for past violations by indictment or action for damages by those injured.

Alabama v. U.S. Army Corps of Eng'rs, 424 F.3d 1117, 1133 (11th Cir. 2005) (citations omitted).

and seeks to alter, rather than preserve the status quo.[5] *Qualls*, 357 F. Supp. 2d at 279; *Clarke*,

355 F. Supp. 2d at 63.  For mandatory injunctions, the moving party "must meet a higher

standard" and show "clearly that he or she is entitled to relief or that extreme or very serious

damage will result from the denial of the injunction." *Clarke*, 355 F. Supp. at 63 (internal

quotations omitted).

In sum, injunctive relief "is not a remedy which issues as of course, or to 'restrain an act

the injurious consequences of which are merely trifling.'" *Weinberger v. Romero-Barcelo*, 456

U.S. 305, 311 (1982) (quoting *Harrisonville v. W.S. Dickey Clay Mfg. Co.*, 289 U.S. 334, 337-38

(1933)).  Any injunction that the court issues must be carefully circumscribed and tailored to

remedy the harm shown. *Nat'l Treasury Employees Union v. Yeutter*, 918 F.2d 968, 977

(D.C.Cir. 1990) (citation omitted).

### B. The ERC cannot show a substantial likelihood of success on the merits.

A party seeking a preliminary injunction must show a "substantial" likelihood of success

on the merits; "some" likelihood is not enough. *See Memphis Center for Independent Living v.

Grant*, No. 01-2069, slip op. at 7 (W.D. Tenn. Oct. 2, 2003) (order denying preliminary

injunction) (attached hereto as Ex. C).  The ERC seeks to enjoin Post from selling any

multifamily dwellings until Post "complete[s] retrofits necessary to bring the subject property

being sold into compliance with the FHA and ADA prior to closing the sale" or include terms in

the contract of sale that would allow Post to re-enter the properties at a later date to complete a

retrofit.  (Plf.'s Mot at 5.)  This extraordinary request for relief is based on the misperception that

the ERC can demonstrate a likelihood of success on the merits by simply showing that a few of

---

[5] Although the ERC asserts that this preliminary injunction would merely preserve the status quo, that is
not in fact the case.  The preliminary injunction, if granted, is intended to force Post to retrofit properties
subject to the ERC's inspections and unilateral approval, or alter their contracts of sale in such a way that
the value of the property subject to sale could be decreased.

the features in one unit of each of the Subject Properties visited were constructed in a manner that is inconsistent with the Guidelines (e.g. the placement of light switches, electrical outlets and thermostats is higher than the heights suggested in the Guidelines). This theory of liability must fail for several reasons.

Foremost, the Guidelines are not binding. A diversion from the "safe harbor" of the Guidelines is not evidence of a violation of the FHA. While the Guidelines serve as a shield to possible enforcement action, there are other ways to meet the FHA's imprecise requirement of accessibility and adaptability. Second and most telling, the ERC's method of testing compliance is shoddy at best and unworthy of serious consideration. The declaration relied upon by the ERC is rife with unsubstantiated legal conclusions by a non-expert. In terms of the ERC's burden of production and persuasion, the Crootof declaration is entitled to little weight.

> 1. The flexible language of the FHA and the clear language of HUD's Guidelines and Design Manual show that the features that the ERC claims are required are not mandated by law.

The FHA imposes certain accessibility-for-the-handicapped requirements on covered multifamily dwelling units designed and built for first occupancy after March 13, 1991 (i.e., all apartment/condominium units in buildings with elevators and all ground floor apartments/condominiums in buildings without elevators). Specifically, the FHA requires covered dwellings to be designed and constructed in such a manner that:

> (i)      the public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons;
>
> (ii)     all the doors designed to allow passage into and within all premises within such dwellings are sufficiently wide to allow passage by handicapped persons in wheelchairs; and
>
> (iii)    all premises within such dwellings contain the following features of adaptive design: (I) an accessible route into and through the dwelling; (II) light switches, electrical outlets, thermostats, and other environmental controls in accessible locations; (III) reinforcements in bathroom walls to allow later installation of grab

8

> bars; and (IV) usable kitchens and bathrooms such that an
> individual in a wheelchair can maneuver about the space.

42 U.S.C. § 3604(f)(3)(C)(i)-(iii). In the words of Congress, these are "modest requirements"

that are designed to "result[] in features which do not look unusual and will not add significant

additional costs." H. Rep. No. 100-711 100th Cong., 2d Sess. 1998, *reprinted in* 1988

U.S.C.C.A.N. 2173, 2179 ("House Report"). Thus, the FHA sets out an imprecise mandate of

accessibility and adaptability that is unlike, for example, a national building code of accessibility.

The lack of specificity under the FHA makes clear that Congress intended that builders

would retain flexibility in designing apartments, and could continue to achieve diversity in home

design and construction while meeting the basic accessibility and adaptability requirements of

the FHA.[6] In enacting the FHA, Congress did not direct or empower HUD to promulgate

binding regulations for accessible design features. The HUD regulations implementing the Act,

24 C.F.R. Part 100, simply track the statutory language, without imposing any specific design

requirements. Further, the regulations do not provide any interpretation of the statutory language

(other than two limited examples not relevant here). When HUD proposed these regulations, it

indicated that a set of accessibility guidelines would be forthcoming, but emphasized that these

guidelines would not be mandatory:

> The Department intended to publish proposed accessibility
> guidelines to help builders understand and comply with the
> specific accessibility requirements of the Fair Housing Act. The
> guidelines would, of course, not be mandatory. Rather, they would

---

[6] For instance, the FHA created an explicit "safe harbor" for meeting accessibility requirements, namely compliance with the American National Standards for buildings and facilities providing accessibility and usability for physically handicapped people ("ANSI A117.1"). 42 U.S.C. § 3604(f)(4). Yet, by identifying ANSI as a safe harbor, Congress did "not intend[] to require that designers follow [ANSI] exclusively, for there may be other local or state standards with which compliance is required or there may be other creative methods of meeting these standards." House Report at 2188 (emphasis added). In fact, as stated by HUD, "a dwelling unit that complies fully with ANSI A.117.1 goes beyond what is required by the [FHA]." *Id.* at 45005.

> provide technical assistance to persons who must comply with
> paragraph (c).

53 Fed. Reg. 44992, 45004 (Nov. 7, 1988). This is due to the fact that Congress empowered

HUD only to issue reports and technical guidance concerning the accessibility requirements. 42

U.S.C. § 3604(f)(5)(C).

Lacking authority to create mandatory design standards, HUD issued the Fair Housing

Accessibility Guidelines ("Guidelines") as an example of a "safe harbor" that could be utilized to

ensure compliance. In turn, HUD published the Fair Housing Act Design Manual ("Design

Manual") to further explain the application of the Guidelines. Both the Guidelines and the

Manual state unequivocally that they are neither binding nor mandatory. *See* 56 Fed. Reg. 9473

(Guidelines); Design Manual, Transmittal Letter from HUD Secretary Cuomo (April, 1998).

The Preamble to the Guidelines states:

> The Guidelines adopted by the Department provide one way in
> which a builder or developer may achieve compliance with the
> Act's accessibility requirements. **There are other ways to
> achieve compliance with the Act's accessibility requirements**,
> as for example, full compliance with ANSI A117.1. **Given this
> fact, it would be inappropriate on the part of the Department
> to constrain designers by presenting the Fair Housing
> Accessibility Guidelines as minimum requirements. Builders
> and developers should be free to use any reasonable design
> that obtains a result consistent with the Act's requirements.**
> Accordingly, the design specifications presented in the final
> Guidelines are appropriately referred to as "recommended
> guidelines."

*Id.* at 9478 (emphasis added).[7] Similarly, the Design Manual — which again states that the

"Guidelines are not mandatory, but are intended to provide a safe harbor for compliance with the

---

[7] This position is reiterated in a supplemental clarification published in 1994:

> The design specifications presented in the Guidelines are recommended guidelines only. Builders
> and developers may choose to depart from these guidelines and seek alternate ways to
> demonstrate that they have met the requirements of the Fair Housing Act.

10

accessibility requirements of the Fair Housing Act" — by its own terms "is provided as a suggestion for accessibility and not a requirement under the Act." Design Manual at 2 (Plf.' Ex E).

Despite the fact that the Guidelines and the Manual state in no uncertain terms that they are not binding and that design professionals may seek alternate ways to demonstrate that they have met the requirements of the FHA, the ERC argues that the Guidelines set "minimum standards of compliance with the specific accessibility requirements of the FHA." (Plf.'s Mot. at 7.) On this basis, the ERC poses its alleged violations of the FHA, and likelihood of success on the merits, in terms of inconsistencies with the Guideline's recommendations. (*See* Plf.'s Mot. at 13-15.) As explained above, however, the Guidelines and Manual do not provide mandatory—or even presumptive—design specifications. Contrary to the ERC's central allegation, whether a particular dwelling unit meets the modest requirements of the FHA is almost always "subject to reasonable dispute" and is not simply determined "with a tape measure" and the Guidelines in hand. (Plf.'s Mot. at 13.) At most, the Guidelines and Manual constitute HUD's pronouncement that a designer complies with the FHA if its design meets the standards contained therein; they do not pronounce that a designer violates the Act if its design does not meet these standards. In sum, inconsistency with the Guidelines "does not constitute unlawful discrimination." *Memphis Center*, slip op. at 7 (order denying preliminary injunction); *United States v. Pacific Northwest Electric Inc.*, No. CV-01-019-S-BLW, 2003 WL 24573548, *12 (N.D. Idaho Mar. 21, 2003) (non-compliance with the Guidelines does not establish a violation of the FHA). The ERC's allegations that there are violations of the Guidelines' "requirements," Plf.'s Mot. at 13-15, is

---

HUD, Supplement to Notice of Fair Housing Accessibility Guidelines: Questions and Answers About the Guidelines, 59 Fed. Reg. 33362 (June 28, 1994).

11

therefore misleading and inadequate to meet their heavy burden of demonstrating a violation of the FHA.

As explained in the attached declaration of Mark Wales, one of the Nation's preeminent experts in the FHA, the requirement for "features of adaptive design" has not been implemented based on a mandatory set of specific measurements, or physical layout. (Wales Dec. ¶¶ 7-10, attached hereto as Ex. A) With one exception (the requirement for reinforcements in bathroom walls to allow later installation of grab bars),[8] the FHA leaves it up to the design professional to determine how best to meet the Act's requirements for "an accessible route into and through the dwelling" and "usable" kitchens and bathrooms. While the Guidelines and other sources provide a means for builders to design a building that has features that HUD has adopted as optimal design, builders and architects are by no means bound by such technical guidance. In fact, the Guidelines go beyond what is required by the FHA. Whether or not a building is accessible is a case-by-case determination made on the basis of a detailed review of the actual features of the unit. The Guidelines are not national building codes, departures from which are violations of the FHA.

    2. <u>The ERC has failed to present sufficient and credible evidence of Post's alleged FHA violations.</u>

Even if showing inconsistencies between the design of certain features of an apartment unit and the "safe harbors" of the Guidelines and Manuals were sufficient to prove a violation of the FHA, and it is not, the ERC has not met its burden of coming forth with sufficient and credible evidence of a violation. The technical determination of whether or not a unit is

---

[8] This requirement for separate reinforcements is largely moot because of the new technical advances in wall materials and support mechanisms.

"accessible" or "adaptable"[9] is not made on the basis of a few cursory measurements and review of floor plans published for purposes of marketing the building.

The ERC's only evidence of alleged FHA violations is set out in the Declaration of Rebecca Crootof. Ms. Crootof is completely unqualified to offer the opinion that Post's buildings are not accessible under the FHA. Ms. Crootof is not an expert on FHA construction and compliance and her declaration reflects an thorough misunderstanding of the methodology commonly used to assess whether the features of a dwelling unit are accessible or adaptable. Simply put, it appears from the declaration that Ms. Crootof has no educational background in architecture or civil engineering, no formal training in accessibility design, and zero experience in producing FHA compliance surveys.[10] It is unlikely that any court of law recognize her as an expert in this field and ultimately whether the covered units of the Subject Properties meet the FHA's nebulous requirements of "features of adaptive design" is a situation requiring credible expertise which is not found in Ms. Crootof or her assistants.[11]

---

[9] As explained in the Design Manual, "adaptable" design elements are those with a design that allow them to be adjusted to accommodate the needs of different people. Design Manual at 7. This would include, for example, kitchen base cabinets that can be removed to allow for knee spaces under sinks and counters.

[10] Based on her Declaration, Ms. Crootof appears to have approximately two and one half years of experience with the ERC. (Crootof Dec. ¶ 1.) This experience is largely composed of training, editing, and participation or assistance in a Fair Housing Symposium. The Declaration makes no mention of a technical educational background, a history of working on issues related to accessibility, or that any of Ms. Crootof's experience gained in the two and a half years while at the ERC involved accessibility surveys to any depth. Much of Ms. Crootof's experience appears to be related to fair housing law and civil rights in general.

[11] Regarding the other personnel involved in gathering information for Ms. Crootof's analysis, the Declaration states, "This testing consisted of two ERC personnel trained the accessibility requirements of the FHA and some of the requirements of the ADA physically inspecting each of the Tested Properties, making visual observations, taking actual measurements and photographs of critical design features." (*See* Crootof Dec. ¶ 6.) However, all this statement appears to represent is that Ms. Crootof (as an educator, editor, graphic designer, and website developer) analyzed data collected by two individuals of unspecified credentials that have been trained to some unspecified degree in some of the requirements. Again, it does not appear that Ms. Crootof and her assistants have the expertise or depth of knowledge necessary to make technical conclusions regarding accessibility under the FHA.

Ms. Crootof's declaration is insufficient to show that the ERC is substantially likely to demonstrate that the Subject Properties are not accessible. It fails to offer "credible evidence" of a likelihood to prevail on the merits. *Qualls*, 357 F. Supp. 2d at 281; *Natural Res. Def. Council v. Pena*, 147 F.3d 1012, 1022-23 (D.C. Cir. 1998). In turn, many of the alleged "violations" (e.g. the heights of outlets or the size of thresholds) are too "trifling" to warrant an injunction of the scope requested by the ERC. *See Weinberger*, 456 U.S. at 311. Merely visiting a Subject Property and taking a few measurements is not sufficient to reach the conclusion that an entire Subject Property has "multiple violations" of the FHA. Moreover, extrapolating from that limited information that entire buildings in other locations are also not accessible based on review of marketing floor plans is completely untenable. The Crootof Declaration is entitled to no weight from this Court.

It is not Post's burden at this stage in the litigation to demonstrate that the buildings comply with the FHA. *See Qualls*, 357 F. Supp. 2d at 279 (burden of production and persuasion is on plaintiff). Yet, even if the Court were to allow the ERC to rely on the Crootof Declaration, Ms. Crootof's statements that the bathrooms and kitchens in certain buildings "do not have sufficient clear floor space to allow a person in a wheelchair to maneuver about the space" and use the facilities or appliances, Crootof Dec. ¶¶ 14, 17, are baseless. Mr. Wales notes that there are multiple statements in Ms. Crootof's declaration that are completely unsupportable. (*See, e.g.,* Wales Dec. ¶¶ 23, 24, 25, 28, 30, 31, 32, 34, 35.)

For example, the argument that every kitchen must have a 60" turning diameter, Crootof Dec. at ¶ 17, is incorrect. (Wales Dec. ¶ 32.) HUD has clearly explained, " a wheelchair turning radius is not required for either useable kitchens or useable bathrooms." 56 Fed. Reg. 9492-93. Also in kitchens, the ERC claims, "For a person in a wheelchair to use a sink when no forward

14

approach is possible . . . there needs to be 48" centered clear floor spaces at the sink." (Crootof

Dec. ¶ 15.) Again, the ERC is incorrect. As Mr. Wales explains, neither the FHA nor the safe

harbors (Guidelines, 1986 ANSI A117.1, or 1992 ANSI A117.1) require alignment of centerlines

of clear floor spaces and fixtures or appliances. (Wales Dec. ¶ 34.) Yet, another example of the

ERC's inaccuracy is the ERC's allegation that there are doors in units not sufficiently wide

enough for wheelchair passage. (Plf. Memo. at 13.) In response, Mr. Wales points out that not

all doors are required to be sufficiently wide enough for a person using a wheelchair and that the

ERC's allegations of required widths are not mandatory. (Wales Dec. ¶ 28.)

Further, Mr. Wales makes clear that the floor plans relied upon by Ms. Crootof are of

almost zero value in terms of determining whether the bathrooms and kitchen are "usable."

(Wales Dec. ¶ 25.) These plans are for marketing purposes and are imprecise. They are not to

scale nor are they exact representations.  As stated on the floor plans for the Condominiums at

Carlyle Square (Ex. C of Crootof Dec.), "all dimensions and square footage shown on this page

and floor plans are approximate only" and the illustrations are "concept only" and "model

representations" and "are intended for illustrative purposes only."[12] Reliance on such inaccurate

drawings for purposes of impacting Post's operations in such a drastic fashion would do a terrible

injustice. This is a sloppy shortcut that should not be condoned given the seriousness of

Plaintiff's allegations and the relief requested.

### C. Plaintiff cannot show irreparable injury if the injunction is not granted.

The D.C. Circuit "has set a high standard for irreparable injury." *Chaplaincy*, 454 F.3d at

297. "The moving party must show 'the injury complained of is of such imminence that there is

a clear and present need for equitable relief to prevent irreparable harm.'" *Id.* (quoting *Wisc. Gas*

---

[12] The large majority of these illustrative floor plans do not even show square footages.

*Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985).  Additionally, "the injury must be both certain

and great; it must be actual not theoretical."  *Id.*  A court will not grant an injunction "against

something merely feared as liable to occur at some indefinite time."  *Clarke*, 355 F. Supp. 2d at

65 (quoting *Connecticut v. Massachusetts*, 282 U.S. 660, 674 (1931)).  Furthermore, to be

irreparable, "the injury must be beyond remediation."  *Chaplaincy*, 454 F.3d at 297.  "The

possibility that adequate compensatory or other corrective relief will be available at a later date,

in the ordinary course of litigation weighs heavily against a claim of irreparable harm."  *Clarke*,

355 F. Supp. 2d at 65 (quoting *Wisc. Gas*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also Memphis*

*Center*, slip op. at 8 (holding that irreparable harm does not exist where retrofits, modifications,

and other relief will be available to correct any FHA violations at a later date).

At the outset, the ERC argues that a positive showing of irreparable harm is not required

where a statute allows for injunctive relief and the plaintiff has demonstrated a violation of the

statute.  (Plf.'s Mot. at 17.)  This presumption of irreparable harm is not the rule in the D.C.

Circuit.  In the D.C. Circuit, "a movant's failure to show any irreparable harm is . . . grounds for

refusing to issue a preliminary injunction, even if the other three factors entering the calculus

merit such relief."  *Chaplaincy of Full Gospel Churches v. England*, 454 F,3d 290, 298 (D.C.

Cir. 2006).  Thus, irreparable harm cannot presumed.  However, "if a statute confers a right to

an injunction *once a certain showing is made*, no plaintiff . . . need show more than the statute

specifies."  *United States v. Microsoft Corp.*, 147 F.3d 935, 943 (D.C. Cir. 1998) (emphasis

added).  This displacement of traditional equitable standards, however, "is not lightly assumed."

*Id.* (quoting *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982)).  "Plaintiffs must show

that Congress intended to 'intervene and guide or control the exercise of the courts' discretion.'" *Id.* (quoting *Weinberger*, 456 U.S. at 312).[13]

1. Section 3613(d) of the FHA will not apply to limit any relief, if granted, in this case.

42 U.S.C. § 3613(c)(1), which is cited by the ERC in support of its contention that irreparable injury can be presumed, does not show Congress's intent to guide or control a court's discretion. Instead, the statutory language does the opposite—it allows the court to fashion relief for a FHA violation as it "deems appropriate". Injunctive relief is just one of many options for the court, as 42 U.S.C. § 3613(c)(1) provides that the court may grant as relief "any other order." Accordingly, the ERC is required to show actual irreparable harm.

The ERC, however, has failed to show irreparable harm. The ERC's alleged irreparable harm is that it will be denied the opportunity to seek complete relief from this Court at a later time and that "housing units will be permanently 'unavailable' to persons with disability." (Plf.'s Mot. At 17.)  This assertion is based on the ERC's erroneous and unsupported contention that, if Post were to sell a property, this Court would lose power to issue an enforceable order as to the retrofitting or modification of that property.  This alleged irreparable harm is theoretical at best as changes and retrofits to buildings can always take place at any time even if a building is sold.

The ERC mistakenly relies on 42 U.S.C. § 3613(d) for support.  Section 3613(d) provides: "Relief granted under this section shall not affect any contract, sale, encumbrance, or lease consummated before the granting of such relief and involving a bona fide purchaser, encumbrancer, or tenant, without actual notice of the filing of a complaint with the Secretary or civil action under this subchapter."  The ERC reads this provision as a restriction on the Court's

---

[13] According to the Supreme Court, "the grant of jurisdiction to ensure compliance with a statute hardly suggests an absolute duty to do so under any and all circumstances, and a federal judge sitting as chancellor is not mechanically obligated to grant an injunction for every violation of law." *Romero-Barcelo*, 456 U.S. at 313.

ability to grant relief as to a property sold by Post to a new owner. (Plf.'s Mot. At 17.) The

ERC, however, gives no support for such a restrictive interpretation of the FHA. Indeed, the

plain meaning of the statute, its legislative history and HUD's interpretation suggest it should be

read differently.

Section 3613(d) is merely a protection for bona fide purchasers that enter into contracts to

purchase covered multifamily buildings without notice that their purchased property is subject to

a lawsuit. It provides such protection for the very purpose that at a later date a court may order a

retrofit of a property that was purchased during the pendency of the suit. This statutory

provision does not restrict the court from granting relief as to properties of which a new

purchaser has notice of the suit.[14]   HUD's promulgation of rules regarding § 3613(d) demonstrate

that the ERC has taken this language out of context:

> The proposed rule provides that no order for injunctive or
> other relief may affect any contract, sale, encumbrance, or lease
> consummated before the issuance of the initial decision that
> involves a *bona fide* purchaser, encumbrancer, or tenant without
> actual knowledge of the charge.
>
> Commenters noted that a considerable amount of the time
> may elapse between the filing of the complaint and the issuance of
> the charge, and from the issuance of the charge to the issuance of
> the initial decision. They argued that the regulations do not provide
> a mechanism for providing third parties with notice that a
> complaint or charge has been filed. They charged that the failure to
> include such requirements threatens the efficacy of the equitable
> relief provisions. **Commenters asserted that a respondent
> seeking to avoid the injunctive or other equitable relief will
> have sufficient time to contract for the sale, encumbrance or
> lease to another during this period. The commenters suggested
> the addition of provisions requiring the respondent to give
> actual notice to such persons. . . . .**
>
> HUD agrees that the proposed rule did not adequately
> address this issue. To remedy this problem, **the final rule requires
> the respondent to give actual notice to third parties with whom**

---

[14] Absent a specific statutory provision limiting jurisdiction, the court has broad authority to fashion
relief. *See* 42 U.S.C. § 3613(c)(1).

> **the respondent engages in a contract, sale, encumbrance, or lease involving the property that is the subject of the charge.** The copy of the charge would be provided before the respondent and the third party enter into the contract, sale, encumbrance or lease.

54 Fed. Reg. 3232 (Jan. 23, 1989) (discussing 24 C.F.R. § 104.910) (emphasis added). HUD notes that commenters also suggested that the rule provide for an injunction that preserves the status of all property identified in the charge (or complaint) until the final resolution of the case. *Id.* Tellingly, HUD did not accept or incorporate that suggestion into the rules. Thus, the ERC's citation to the FHA's provisions to protect purchasers of properties is misplaced. The FHA does not affect the court's jurisdiction in the manner suggested by the ERC.

It is also important to note that potential purchasers of Post's properties already have notice of the ERC's lawsuit. The same SEC filings that the ERC references to show Post's potential property sales also sets forth Post's disclosure of lawsuits pending against Post. Moreover, Post's final contract discussions with potential purchasers of operating communities include information as to lawsuits pending against Post and whether the property sold is subject to a lawsuit. (Papa Aff. ¶ 12.) Any potential purchaser of Post properties will undoubtedly have notice of this lawsuit and therefore, section 3613(d) will not apply to limit the relief, in any, granted here under the FHA.

> 2. <u>Any potential changes or retrofits to buildings can always take place at a later date even if the building is sold.</u>

The FHA does not limit the courts from ordering relief for violations at properties that have been sold by a developer who is later found to have constructed the property in violation of the accessibility construction and design requirements. Moreover, even if the Court's ability to craft relief was so limited, the ERC is still not irreparably harmed because there are other ways to obtain this same relief. For example, a fund can be set up to pay the owners for the necessary

retrofits. Moreover, the ERC can always file suit against the new owner.[15] In other words, there is no way in which the housing units subject to this suit will be "permanently unavailable to persons with disabilities." *See* Plf.'s Mot. at 18.[16]

Where FHA violations are found, courts have granted relief in the form of requiring access for retrofits against non-liable entities. *See, e.g., Balt. Neighborhoods, Inc. v. LOB, Inc.*, 92 F. Supp. 2d 456, 472 (D. Md. 2000); *HUD v. Perland*, 1998 WL 142159 (HUDALJ 05-96-1517-8, Mar. 30, 1998) In *Balt. Neighborhoods*, the Court ordered a condo association not found liable for any FHA violations to permit retrofitting and access by the developer found liable for the violations. *Balt. Neighborhoods, Inc*, 92 F. Supp. 2d at 472. Similarly, in *Perland*, the Administrative Law Judge noted the following with regard to remedies for violations of the FHA:

> Courts have required developers to establish retrofit funds to remedy violations of the Act based on the accessibility requirements. See, e.g., United States v. A.T. Maras Co., Inc., Civ. No. 97 C 8176 (N.D.Ill. Dec. 8, 1997) (Consent Decree) (Attachment A to Charging Party's Brief); HUD v. Hansen, No. 09-91-2048-3 (HUDALJ Apr. 28, 1992) (Consent Order) (Attachment B to Charging Party's Brief). Such a remedy, in light of the transfers of ownership that have occurred and the goals of the Act, is "what is necessary, what is fair, and what is workable." Park View Heights, 605 F.2d at 1036 (quoting Lemon v. Kurtzman, 411 U.S. 192, 200 (1973)). See also HUD v. DiCosmo, 2A Fair Housing--Fair Lending (Aspen) ¶ 25,094, 25,851 (HUDALJ Feb. 1, 1995) (equitable relief "is to be tailored to the facts of the particular situation")

*Perland*, 1998 WL 142159 at *8.

---

[15] Given its self-styled series of lawsuits, it is clear that the ERC is not shy about filing lawsuits against property owners and developers.

[16] Plaintiff's allegation of properties being "unavailable to persons with disabilities" is another reminder that the ERC has yet to allege that a single person with disabilities has actually sought to live in any of the Subject Properties and encountered barriers.

HUD's intent and interpretation of the FHA regarding the sale of property and liability of

the developer for FHA violations can be seen further in HUD's treatment of condominiums:

> The fact that a condominium unit is sold before the completion of
> construction does not exempt a developer from compliance with
> the Act's accessibility requirements. The Act imposes affirmative
> duties on builders and developers to design and construct covered
> multifamily dwellings for first occupancy after March 13, 1991 in
> accordance with the Act's accessibility requirements. These
> requirements are mandatory for covered multifamily dwellings for
> first occupancy after March 13, 1991, regardless of the ownership
> status of covered individual dwelling units. Thus, to the extent that
> the pre-sale or post-sale construction included features that are
> covered by the Act (such as framing for doors in pre-sale "shell"
> construction), they should be built accordingly.

54 Fed. Reg. 44 (Mar. 6, 1991). Thus, HUD, the federal agency charged with enforcement of the

FHA, has taken the position that sale of the unit does not shield it from FHA compliance.

Regardless of who owns the condominium unit, the developer will be found liable for any

violations that exist and presumably the unit owner would have to allow the developer access to

ensure compliance with the FHA.  When this concept is expanded to the sale of entire buildings,

it is clear that a court may require a new owner to grant Post access to make any retrofits.

The ERC principally relies on the *Edward Rose* case in support of its motion for

preliminary injunction and claim of irreparable harm. *See United States v. Edward Rose & Sons*,

246 F. Supp. 2d 744 (E.D. Mich. 2003); *United States v. Edward Rose & Sons*, 384 F.3d 258 (6th

Cir. 2004).  In *Edward Rose*, a FHA case based on accessibility, the district court granted a

preliminary injunction against a developer enjoining the developer from continuing construction

on two properties not yet completed and halting leasing of units of completed properties "until

such time as the Court can determine an appropriate remedy or the parties can conduct discovery

and come to an agreement regarding an alternative design and/or modifications which would

bring the units into compliance with the FHA." 246 F. Supp. 2d at 747. The *Edward Rose* case, however, is distinguishable from the case at hand.

First, in balancing the four prongs of the preliminary injunction test, the *Edward Rose* Court considered stronger evidence of an FHA violation and thus, likelihood of success on the merits by the plaintiffs. This strong evidence weighed heavily in both the district court decision and the Sixth Circuit's affirmance and overpowered all other prongs of the test, including irreparable harm. See 384 F.3d at 264. In *Edward Rose*, the developer's buildings had ground floor apartments with two exterior entrances—a front door and a rear patio door. 384 F.3d at 261. To enter from the front door, which was closest to the parking lot, one had to descend a half flight of stairs. The back patio door was accessible but located farther from the parking lot. *Id.* The district court, affirmed by the Sixth Circuit, found that the inaccessibility of the front door to persons with disabilities violated the FHA and that the plaintiffs were accordingly likely to succeed on the merits in the preliminary injunction proceeding. 246 F. Supp. 2d at 753. In contrast, here no such barrier exists and, as noted above, the ERC has shown little, if any, likelihood of success on the merits.

Second, the district court did not require the plaintiff to make a showing of irreparable harm, but rather simply presumed it in view of the likelihood of an FHA violation. In the D.C. Circuit, however, overlooking irreparable harm in unacceptable. *See Chaplaincy*, 454 F.3d at 298. Thus, the Sixth Circuit's reasoning on appeal that "the other equitable factors, particularly the strong likelihood of success on the merits, outweigh any lack of irreparable harm," 384 F.3d at 264, is not reasoning that can be adopted by this Court.

Accordingly, the ruling in *Edward Rose* is inapposite to this case where the ERC must show both likelihood of success on the merits and irreparable harm under D.C. Circuit law and has failed to do so.

### D. The injunction will substantially injure Post.

While the ERC has failed to meet its burden in showing likelihood of success on the merits and irreparable harm, Post can easily demonstrate the significant injury that the ERC's requested injunction may cause. In effect, the ERC seeks to fundamentally impact Post's operations and to have the court micro-manage the terms and conditions of Post's contracts for purchase with third parties.

In evaluating harm to others, the court must look at harm in the aggregate and the total effect that the preliminary injunction would have on all future cases. *See Qualls*, 357 F. Supp. 2d at 286. Consequential loss of business or increased costs of business due to injunction have been found to constitute substantial harm to the non-moving party. *See, e.g., Independent Union of Flight Attendants v. Pan American World Airways, Inc.*, 502 F. Supp. 1013 (D.D.C. 1980) (holding that financial harm can be substantial "even if the court does not know the precise amount"); *Guaranty Savings and Loan Ass'n v. Federal Home Loan Bank Bd.*, 330 F. Supp. 470 (D.D.C. 1971) (holding that loss of business as a consequence of the preliminary injunction constituted substantial harm). Furthermore, where there is substantial financial harm to the defendant or non-moving party, courts should hesitate to grant the preliminary injunction in cases where the plaintiff is unable to provide a security bond. *See* Weinberger, 456 U.S. at 312; *Pan American*, 330 F. Supp. at 1013, ¶ 25 ("The harm weighs even greater when the prospect of recovering the losses, once incurred, is problematic due to plaintiff's difficulty in or inability to provide a security.").

23

Here, Plaintiff requests three different injunction scenarios, all of which impact Post. First, the ERC suggests that the Court ought to enjoin Post from selling any of the Subject Properties. (Plf.'s Mot. at 5.)  As an alternative, the ERC requests that the Court require Post to "complete retrofits necessary to bring the subject property being sold into compliance with the FHA and ADA prior to closing the sale." *Id.* Finally, the ERC requests the Court order that certain terms be added into Post's contract for sale that would allow Post to "re-enter the property after sale in order to comply with any retrofitting order entered by the Court." *Id.* In the case of retrofits, the ERC seeks to place itself in the role of exercising approval authority over whether a unit meets the FHA's requirements. All three of these options are so financially burdensome to Post that upon a balancing of the harm to Post against the alleged theoretical harm to the ERC if the injunction is not granted, the balance weighs in favor of denying the preliminary injunction. In addition, the harm to Post in subjecting each and every multifamily dwelling unit, including those not subject to the FHA at all,[17] to this preliminary injunction will create a remedy greater than that to which the ERC is equitably entitled.

   1.   Post will suffer substantial economic harm if the preliminary injunction is granted.

The relief the ERC seeks would harm Post in multiple ways. As explained in the Declaration of Christopher J. Papa, Executive Vice President & Chief Financial Officer of Post Properties, Inc., Post operates as a Real Estate Investment Trust or REIT[18] whose primary business consists of developing and managing apartment communities for its own account. Papa

---

[17] The Subject Properties in the ERC's Complaint include many multifamily dwelling units which are not subject to the FHA. These dwelling units would be those located on upper-level floors in buildings without elevators. Under the FHA, only first-floor units in buildings without elevators are subject to accessibility requirements. 42 U.S.C. § 3604(f)(7)(B).

[18] As explained by Mr. Papa, "REIT is a tax designation for a corporation investing in real estate that reduces or eliminates corporate income taxes. In return REITs are required to distribute 90% of their income to the shareholders." Papa Dec. ¶ 4.

Dec. ¶ 3 (Ex. B). Mr. Papa explains that one of Post's " key business strategies is to sell its older and less competitively located properties in order to provide capital to reinvest in the development of new communities and to rebalance its overall portfolio to focus on a limited number of major cities." *Id.* at ¶ 8. Mr. Papa notes that in 2003, 2004, 2005, 2006 and the first quarter of 2007, Post had $253 million, $244 million, $232 million, $175 million and $24 million, respectively, of apartment community sales. *Id.* In addition, " Post has expanded its traditional apartment business over the last few years to include the sales of condominiums, generating $71 million from the sale of condominium units during 2005 and $63 million during 2006." *Id.* at ¶ 10. Moreover, Post's business strategy also includes selectively pursuing joint venture transactions. *Id.* at ¶ 9.

The ERC's request to freeze Post's ability to sell property would have obviously broad implications for Post, it shareholders, other stakeholders, its lenders and its residents. As explained by Mr. Papa, ERC's injunction could "vitiate Post's efforts to execute on this strategy, which has been a fundamental element of the company's business model since 2003, which together with other factors has contributed to Post's share price nearly doubling over the last three years." *Id.* at ¶ 9. The injunction the ERC seeks could also have a significant impact on Post's liquidity and results of operations. For example, "[f]rom a liquidity standpoint, the lack of sales proceeds could require Post to keep a higher balance on its revolving credit facility, significantly increasing its interest expense and overall cost of capital. " *Id.* ¶ 11. In turn, "any significant shortfall in projected sales proceeds could reduce funds which would otherwise be available to pay its regular quarterly dividend, which could have a negative impact on the trading price of Post's common stock." *Id.* Finally, Mr. Papa explains that if Post falls short of its

projections (or those of the financial analysts that cover the company's stock), this would "likely cause a decline in the trading price of Post's common stock." *Id.*

Second, the request to require Post to "complete retrofits necessary to bring the subject property being sold into compliance with the FHA and ADA prior to closing the sale," Plf.'s Mot at 5, is premature and unworkable. At this stage in the litigation it is unclear what, if any, retrofits are required. As discussed above, the question of compliance with the vague requirements of the Act are not nearly as straightforward as it would seem.[19] Also, the changes suggested by the ERC as necessary to meet the Guidelines (to change dimensions of kitchens and bathrooms and to move fixtures) would cost significant amounts of money and impose an incredible burden on the current residents of the units. As explained by Mr. Papa, despite the ERC's claims of "similarity of design" no two of Post's properties are exactly the same. Papa Dec. ¶ 13. Not only does Post utilize numerous design professionals, the properties are built with a wide array of issues in mind such as "the relevant market and location within the market, cost of land, type of building, and other factors." *Id.* Mr. Papa notes that "[w]hile Post designs properties to comply with the FHA and ADA, not all units are the same (e.g. they have different layouts, kitchens, bathrooms etc.)." *Id.* Hence, altering units in order to re-design them to comport with the demands of the ERC " would be expensive, time consuming and impose an incredible burden on the current residents of the units." *Id.* Overall, to require Post to start ripping apart apartment units in order to meet the ERC's misunderstanding of the role of the Guidelines (e.g. to change dimensions of kitchens and bathrooms and to move fixtures) would impose a significant burden and make little sense.

---

[19] For example, which of the "safe harbors" (which at times conflict) would be utilized.

Finally, Mr. Papa addresses the significant and irreparable harm to Post and others if Post is required to include a provision in its contracts for sale that would allow Post to reenter and retrofit the sold property. Mr. Papa opines that it "would be extraordinary for a seller such as Post to reserve the right of access to a property, including residents' units, to make modifications after the property had already changed hands." Papa. Dec. ¶ 13. He explains that " issues such as the impact of litigation on the sale of a community are addressed during the course of a sale transaction through the process of due diligence and negotiation of the definitive purchase and sale agreement and indemnities." *Id.* Hence, it is his expectation that "[b]uyers generally would not agree to allow a third party (i.e. the ERC) to exert control over property modifications after signing a contract – any such right would constructively give the ERC 'veto' authority over the modifications to the buyer's property after execution of the contract or even after the sale closes." *Id.* Mr. Papa also notes that as of April 23, 2007, Post has 147 pending sales contracts for the sale of condominium units at various locations nationwide. *Id.* at 10. "If Post were required to offer updated terms of sales under these contracts, potential purchasers may assert a right to unilaterally cancel their sale contracts." *Id.* Thus, "Post could face substantial delays in finding substitute purchasers following any cancellation of a sales contract (resulting in additional interest costs to service indebtedness) and may ultimately have to sell any such units at a substantial discount to the original contract price or even for a loss." *Id.* In conclusion, the potential impact of such a reentry clause could be a reduction in the value of Post's properties or an inability to sell – the ERC could effectively "freeze the sale of condominium units and the Subject Properties for the course of the litigation." *Id.*

27

The significant potential harm caused to Post, its shareholders and other stakeholders is unjustified – Post would suffer immediate and irreparable harm without ever having the opportunity to properly defend itself against the underlying allegations in the ERC's complaint.

The ERC again cites to *Edward Rose*, in which the court found that elimination of discrimination against persons with disabilities outweighs the financial harm to or burden on the developer in correcting the FHA violations. *Edward Rose*, 246 F. Supp. 2d at 755. Here, however, there is no credible proof that discrimination against persons with disabilities exists in Post's properties or that the properties subject to suit are even covered by the FHA. *See Memphis Center*, slip op. at 9 (holding that a preliminary injunction which halts construction and leasing of a building subject to an FHA suit "seems drastic when this Court may find that Defendants complied with the Fair Housing Act"). In contrast, the harm to Post if the injunction were granted is real and tangible. While Post recognizes the importance of eliminating discrimination, in this case there is no proof of discrimination and a balance of unsubstantiated claims of discrimination versus the likely substantial injuries to Post weighs in favor of denying the preliminary injunction.

      2.    <u>The ERC seeks a remedy greater in scope than that to which they are entitled.</u>

The ERC indiscriminately seeks to subject all the properties listed in the Complaint to this preliminary injunction, even though multiple individual units within the properties are not covered units under the FHA.[20] A preliminary injunction must be narrowly tailored to the violation it seeks to redress. *Cumulus Media, Inc. v. Clear Channel Communications, Inc.*, 304

---

[20] This is aside from the issue of the statute of limitations and the effective date of the Act. Post respectfully submits that Plaintiff's standing and the applicability of the statute of limitations and effective date of the Act ought to be resolved before further resources of the court are expended on Plaintiff's motion for preliminary injunction.

F.3d 1167, 1178 (11th Cir. 2002) (holding that "a preliminary injunction must be "narrowly

tailored to fit specific legal violations, because the district court should not impose unnecessary

burdens on lawful activity"); *see also Price v. City of Stockton*, 390 F.3d 1105, 1117 (9th Cir.

2004) (holding that "an injunction must be narrowly tailored to affect only those persons over

which it has power, and to remedy only the specific harms shown by the plaintiffs, rather than to

enjoin all possible breaches of the law"). In this case, the preliminary injunction Plaintiff seeks

is hardly narrowly tailored. Prohibiting Post from selling properties or units that are not even

subject to the FHA goes far beyond the violations alleged by the ERC.

### E. The public interest will not be furthered by the injunction.

Finally, the court must determine whether the public interest will be furthered by the

injunction. This preliminary injunction, if granted, will affect or influence several public

interests, including the public policy against restraints on the alienability of land and the

constitutional requirements that there be a case or controversy and that a plaintiff show standing

before it is granted relief. Moreover, in such a case as this one, "where an injunction is asked

which will adversely affect a public interest for whose impairment, even temporarily, an

injunction bond cannot compensate, the court may in the public interest withhold relief until a

final determination of the rights of the parties, though postponement may be burdensome to the

plaintiff." *Weinberger*, 456 U.S. at 312.

First, the preliminary injunction, if granted, would constitute a restraint on the alienability

of land and property. This type of restraint is strongly disfavored in public policy. *See, e.g.,*

*Nicolas M. Salgo Assocs. v. Continental Illinois Properties,* 532 F. Supp. 279, n.5 (D.D.C. 1981)

referring to "the strong public policy against restraining the alienability of land"); *Christopher*

*Phelps & Assocs., LLC v. Galloway,* 477 F.3d 128, 131 (4th Cir. 2007) (holding that an

injunction permanently enjoining the sale of lease of a home would "unduly restrain the

alienation of real property"); *Western & Southern Life Ins. Co. v. Crown America Corp.*, 877 F. Supp. 1041, 1046 (E.D. Ky. 1993) ("The policy of the law is that property should be freely alienable and that restraints on alienation are to be strictly construed and invalidated if unreasonable.").

Second, if the Court grants the preliminary injunction, then it will render the constitutional requirements of case and controversy and Article III standing meaningless. Standing is a threshold issue. *Warth v. Seldin*, 422 U.S. 490, 498 (1975). When a plaintiff's standing is challenged, the court must determine whether that plaintiff has met the elements of injury in fact, causation, and redressibility before granting that plaintiff any relief. *Id.* Here, Post has challenged the ERC's standing for various reasons—the ERC has not sufficiently alleged an injury in fact nor has the ERC shown that its alleged injuries are fairly traceable to Post's actions. If the Court grants this injunction, a precedent may be sent in which a fair housing group can affect the business practices and policies of a public company without showing that (1) the group has standing, (2) a person has ever been harmed, (3) the subject properties alleged in the Complaint are subject to the FHA, or (4) the alleged violations actually exist. Thus, despite the fact that the public interest favors eliminating discrimination, there is no public interest in an order which so thoroughly affects a company's business in a case where the plaintiff has failed to sufficiently allege an injury or prove the existence of the discrimination. *See Memphis Center*, slip op. at 9 (distinguishing *Edward Rose* case and holding that "the public interest also demands a protection from unnecessary intervention by courts.").

### III.    CONCLUSION

Based on the foregoing, Post respectfully requests that the Court DENY Plaintiff's Motion for Preliminary Injunction.

Respectfully submitted,

HOLLAND & KNIGHT LLP

    /s/ Christopher B. Hanback
Christopher B. Hanback (Bar # 232579)
Alan I. Baron (Bar. # 340273)
Rafe Petersen (Bar # 465542)
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006
(202) 955 3000 Phone
(202) 955 5564 Fax
E-mail: christopher.hanback@hklaw.com
E-mail: alan.baron@hklaw.com
E-mail:  rafe.petersen@hklaw.com
*Counsel for Post Properties, Inc., et al.*

31

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Opposition to Plaintiff's

Motion for Preliminary Injunction was served by electronic filing, this 25th day of April, 2007,

on the following:

Sheila Jane Carpenter, Esq.
Jorden Burt LLP
1025 Thomas Jefferson Street, NW
Suite 400 East
Washington, DC 20007

Donald Lee Kahl, Esq.
Washington Lawyers' Committee for Civil Rights & Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, DC 20036

/s/ Christopher B. Hanback
Christopher B. Hanback

32

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| EQUAL RIGHTS CENTER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case. No. 1:06CV01991 |
| | ) | Judge Richard J. Leon |
| POST PROPERTIES, INC. | ) | |
| POST GP HOLDINGS, INC. | ) | |
| POST APARTMENT HOMES, L.P. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF MARK WALES

I, Mark Wales, being over the age of 21 years, have personal knowledge and am competent to testify to the matters set forth herein. I hereby state as follows:

1.     A true and correct copy of my curriculum vitae is attached as exhibit "A" to this affidavit.

2.     I am owner of Wales Associates, LLC, a consulting firm with a primary focus in Building Codes, Standards, and accessibility. Wales Associates was established in April 1999. I earned my Bachelor of Architecture, Professional degree, in 1979 from the University of Southwest Louisianan.

3.     I have twenty-four years of experience related to interpretation, enforcement, and development of building codes, including accessibility standards. My experiences include the following:

            a.   Served as Code Analyst for 10 years with Southern Building Code Congress, International (one of the three legacy model code organizations of the International Code Council);

1

b. Served as Staff Representative on Committee that developed first draft of International Building Code accessibility and means of egress provisions;

c. Served on the NFPA Building Code subcommittee that developed the accessibility provisions for the first edition of NFPA 5000 Building Code;

d. Served for 14 years on the ANSI A117 Committee (Architectural Features and Site Design of Public Buildings and Residential Structures for Persons with Handicaps);

e. Served on the Residential Task Force to develop Type B dwelling unit provisions of ANSI A117.1 for accessibility that meets or exceeds Fair Housing Guidelines;

f. Served on HUD Working Group that developed model code provisions to have International Building Code deemed a Fair Housing Act "safe harbor";

g. Consulted with and represented the American Institute of Architects in matters relating to accessibility, including, ADA, FHA, ANSI A117, and International Building Code for over 5 years;

h. Served on the Public Rights-of-Way Access Advisory Committee, a federal advisory committee to develop recommendations for accessibility within the public rights-of-way;

i. Helped with early development of accessibility code for Vietnam;

j. Presented at AIA National Convention on ADA (two years);

k. Presented at National Multihousing Council's Property Management Committee, on team building for FHA compliance;

l. Served or currently consult in litigation related to FHA and ADA:

   (i) *United States v. Grant*, No. 01-2069 D/P (W.D. Tenn.); deposition testimony April 4, 2006.

   (ii) *United States v. Shanrie Company, Inc.*, Case No. 05-306 (DRH) (S.D. Ill.); deposition testimony March 10, 2006.

   (iii) *United States v. Edward Rose and Sons*, No. 02cv73618, (E.D. Mich.); deposition testimony Oct. 5 & 6, 2004.

m. Review plans and consult with designers and builders in matters related to accessibility.

4.      I have been asked to review multiple documents and to provide my opinion of the allegations made by the Equal Rights Center ("ERC") in their Motion for Preliminary Injunction. Included in my review were the following documents:

2

    a.  Motion of Plaintiff the Equal Rights Center for Preliminary Injunction;

    b.  Memorandum of Points and Authorities in Support of Plaintiff the Equal Rights Center's Motion for Preliminary Injunction and all attachments and exhibits (hereinafter cited as "Memo.");

    c.  Declaration of Rebecca Crootof, including plans and brochures attached thereto (hereinafter cited as "Crootof Dec.") ; and

    d.  Declaration of Sheila J. Carpenter in Support of the Equal Rights Center's Motion for Preliminary Injunction.

5.      I also reviewed the FHA, the implementing regulations, the US

Department of Housing and Urban Development's ("HUD") Fair Housing Act

Accessibility Guidelines ("Guidelines"), the Design Manual and numerous other

technical documents and safe harbor guidance that I typically consult in performing FHA

compliance assessments.

6.      My review of the ERC's Motion and Crootof Declaration and

accompanying documents leads me to the conclusion that the ERC is mistaken in their

underlying theory that the Subject Properties are not in compliance with the FHA.

**Determining FHA Compliance – The Guidelines Are Not Mandatory**

7.      The FHA accessibility requirements are not as straightforward as the ERC

would have the Court believe. Merely showing that features found in a particular

dwelling unit are inconsistent with the Guidelines does not in fact show non-compliance

with the modest requirements of the FHA. The Guidelines are, by their own terms, non-

mandatory recommendations. They serve as safe harbors.  Thus, the ERC is correct that

the Guidelines "provide one way in which a builder or developer may achieve

compliance with the Act's accessibility requirements." (Memo at 7, n. 6.)  They are

incorrect, however, in suggesting that consistency with the Guidelines is necessary for

---

[1] The Guidelines were published in the federal register on March 6, 1991. 56 Fed. Reg. 9472-9515.

FHA compliance. There are numerous other approved "safe harbors" or a designer may utilize an alternative approach.

8.      The ERC claims that "the Guidelines are the most lenient of the published accessibility standards." (Memo. at 7, n. 6.) While this statement is based on a quotation from the Federal Register (56 Fed. Reg. 9478), it must be looked at in context. In fact, in the preamble to the Guidelines, HUD responded to commenters that requested that the Guidelines be finalized as minimum requirements as follows:

> **The Department has not categorized the final Guidelines as either performance standards or minimum requirements. The minimum accessibility requirements are contained in the Act.** The Guidelines adopted by the Department provide one way in which a builder or developer may achieve compliance with the Act's accessibility requirements. **There are other ways to achieve compliance with the Act's accessibility requirements**, as for example, full compliance with ANSI A117.1. **Given this fact, it would be inappropriate on the part of the Department to constrain designers by presenting the Fair Housing Accessibility Guidelines as minimum requirements. Builders and developers should be free to use any reasonable design that obtains a result consistent with the Act's requirements.** Accordingly, the design specifications presented in the final Guidelines are appropriately referred to as "recommended guidelines". It is true, however, that compliance with the Fair Housing Accessibility Guidelines will provide builders with a safe harbor.

56 Fed. Reg. 9478 (emphasis added).

9.      Additionally, Andrew Cuomo, HUD Secretary at the time the 1998 Fair Housing Act Design Manual was published, included a memorandum in the FHA Design Manual, which stated the following:

> The Manual provides direct information about the accessibility requirements of the Act which must be incorporated into the design and construction of multifamily housing covered by the Act. It carries out two statutory responsibilities: (1) to provide a clear statement of HUD's interpretation of the accessibility requirements of the Act so that readers may know what actions on their part will provide them with a "safe harbor"; **and (2) to provide guidance in the form of recommendations**

> **which, although not binding, meet the Department's obligation to
> provide technical assistance on alternative accessibility approaches
> which will comply with the Act, but may exceed its minimal
> requirements.**

Design Manual, Transmittal Letter from HUD Secretary Cuomo (April, 1998) (emphasis

added). Similar language is incorporated into and referenced in the Design Manual.

10.    It is my expert opinion that parts of the Guidelines and the Design Manual

actually exceed the FHA's minimal requirements. In any event, it is clear that the

Guidelines and the Design Manual are not mandatory and non-compliance with them

does not necessarily indicate a violation of the FHA.

**Determining ADA Compliance**

11.    The ERC discusses (Memo. at 10) the regulatory requirements of the

Americans With Disabilities Act ("ADA"). They fail to note, however, that the ADA

does not apply to all portions of every apartment community. There are distinctions to

which part, if any, the ADA applies. For example, in the Supplement to Notice of Fair

Housing Accessibility Guidelines: Questions and Answers about the Guidelines, HUD

states:

> The Department has been asked, in particular, if public and common use
> areas of residential housing are covered by title III of the ADA. Strictly
> residential facilities are not considered places of public accommodation
> and therefore would not be subject to title III of the ADA, nor would
> amenities provided for the exclusive use of residents and their guests.

59 Fed. Reg. 33362-33368.

**Determining FHA and ADA Compliance – Expertise Is Necessary**

12.    The FHA accessibility and adaptive design requirements are imprecise.

While the technical guidance provided in safe harbors such as the Guidelines may

occasionally recommend specific measurements, such measurements are by no means required by the FHA.

13.     More than a tape measure and the Guidelines are needed to assess whether the features of a particular unit comply with the FHA.  A greater degree of knowledge and understanding of the various technical criteria and their bases is required to undertake a compliance assessment under the FHA or ADA.

14.     The terms of the FHA is so imprecise that it is subject to interpretation and reasonable dispute.  Thus, expertise and experience are often required to determine what meets the accessibility requirements under the Act.  Often, misinterpretation of the safe harbors and technical guidance result in erroneous allegations of violations, as well as error in design and construction.

15.     I do not agree with the ERC's methodology for "testing" compliance with the FHA.  A measurement that is inconsistent with the Guidelines would not lead me to the conclusion that a particular feature of a dwelling unit is inaccessible.  The FHA does not include specific measurements or other prescriptive technical criteria that can readily be determined with measurements alone.  While measurements may be part of an accessibility survey, it is more important to know what to measure.  In addition, the analysis of the data collected must be based on appropriate criteria to determine whether accessibility is provided or not.  The ERC claims, "Comparison of the actual measurements at the Tested Properties to what is required by the law is simply done and subject to verification." (Memo. at 13).  This is an incredible oversimplification.  The FHA does not include specific technical criteria, (i.e., dimensions) for simple verification.  Modest accessibility is required, but a specific standard or measurement is not.

6

**Ms. Crootof Lacks The Expertise Necessary to Determine FHA Compliance**

16.     I have reviewed Ms. Crootof's qualifications as outlined in her declaration.  While I am hesitant to comment on an individual's resume, it does not appear that Ms. Crootof or her assistants have the expertise, experience or depth of knowledge necessary to asses the apartment communities and conclude they are not accessible under the FHA.  There is nothing to indicate a significant involvement with the technical side of providing accessibility for people with disability in the built environment.  Unfortunately, her work reflects her lack of education and experience.

**The ERC's Data is Incomplete And Inexact**

17.     I have reviewed the Declaration of Ms. Crootof as well as the ERC's allegations of FHA and ADA violations in the Memorandum of Points and Authorities, and I believe that the grounds on which the ERC bases its allegations are for the most part incomplete and inexact.

18.     Overall, Ms. Crootof makes many statements, such as it would be "difficult or impossible for a person in a wheelchair" to use an area, but she does not back up such conclusions with sufficient detail to determine whether there is, in fact, a violation of any sort.  I would not consider this an acceptable means of documenting a compliance issue.  Stating something is not accessible does not necessarily make it so.  Yet, numerous times that is what was done.  Access for some people with disabilities may be difficult, but that is not necessarily inaccessible, or a violation of the law.  Additionally, "impossible" was not alleged or proven.  In the same paragraph there are single instances where something "appeared" to make access "difficult or impossible".

7

Appearance is not a basis for calling something a violation under the Act. The appearance of "difficult or impossible" does not make something legally inaccessible.

19.    When some detail was given, it was often not tied to any requirement under law. While the stated basis for Ms. Crootof's allegations was reported to be the FHA, the Act does not mandate the specific technical criteria, including required dimensions, for spaces or elements to be made accessible. Yet, Ms. Crootof repeatedly states that there are "required" measurements without identifying the source of such requirements. While the Memorandum itself contained references to the Fair Housing Accessibility Guidelines, those are merely recommendations, not legal requirements, regardless of how they are described in that document.

20.    The following lists specific issues I found with various allegations in the Memorandum and Crootof Declaration:

### *ADA Generally*

21.    The Crootof Declaration states that the ERC investigated properties that were remodeled after January 23, 1993 for determination of compliance with the ADA. (Crootof Dec. ¶ 9.) The Declaration does not identify which properties or how many were in the "remodeled" category.

22.    Full compliance with the ADA is not required for alterations. Alterations are based on a standard of "maximum extent feasible." It is unlikely that a simple visit to a property and the knowledge that an alteration occurred would yield a determination of whether the alteration was performed in a manner consistent with or in violation of the ADA. The alteration provisions of the ADA are functional. The requirements for alterations apply to certain types of alteration work that specifically affects the usability

8

of a building, facility or part thereof. They do not apply to normal maintenance, painting

or wallpapering, asbestos removal, or changes to mechanical and electrical systems

unless they affect usability of the building or facility. They may be specific to elements,

spaces, or areas. In sum, Ms. Crootof does not indicate the type of work undertaken or if

these variables were considered.

23.    The ERC's Memorandum states that there are "rental offices located up

stairs or served by inaccessible ramp routes" in violation of the ADA and that "Tested

Properties Carlyle Square, Glen, Gallery and Abbey each has steps without an

accompanying ramp, either at units or at the leasing office entrance, making access

impossible for a person in a wheelchair." (Memo. at 15). There are multiple problems

with this statement including:

      a.  Crootof alleges a violation because of steps at "units." The ADA does
           not typically apply to "units" covered by the FHA. The ADA has not
           been shown to apply to those units.

      b.  Neither the ERC's Memorandum or the Crootof Declaration identifies
           which apartment communities include the alleged violations at units,
           as opposed to those that include alleged violations at office entrances,
           which makes the ERC's allegations difficult to assess.

      c.  The ADA does not require that every entrance to a building or facility
           be accessible.

      d.  The route in which the alleged steps or inaccessible route ramps occur
           is not identified. In my experience, many routes with steps have been
           identified as alleged "violations" when actually they were not part of a
           required accessible route. The information contained in the
           Memorandum and Crootof Declaration (¶14) are insufficient to
           establish that the route on which they occur is a route that is required
           to be accessible.

      e.  There is no information given as to why the "inaccessible ramp routes"
           are identified as "inaccessible."

24.    The ERC's Memorandum states that there is a lack of reserved or

accessible parking in violation of the ADA and that "Tested Properties Gallery, Heights

9

II, and Worthington provide no accessible parking at various locations for persons with

disabilities." (Motion at 15). There are multiple problems with this statement including:

   a. The Memorandum states that three properties "provide no accessible
      parking at *various locations*." Not all "locations" are required to be
      provided with accessible parking. There is insufficient information to
      determine the validity of the alleged "violation" of law.

   b. Ms. Crootof claims that no accessible parking is provided at three
      locations. Crootof Decl. ¶ 14. Again, there is insufficient information.
      There is nothing to indicate what makes the parking inaccessible. It is
      not even clear whether there is parking provided at those locations.

### *Accessibility in Bathrooms –*
### *Comparison of Marketing Floor Plans Does Not Indicate Inaccessibility*

25.    In making allegations about the alleged inaccessibility of bathrooms in

various properties including those not tested, the ERC relied on "floor plans, brochures

and Post's website to determine if untested Post properties shared common elements of

design with the tested properties and would thus, exhibit similar violations." Crootof

Decl. ¶ 18. This method of determining if untested properties with similar designs would

exhibit similar violations is faulty and unreliable for the following reasons:

   a. Ms. Crootof states that the ERC looked at floor plans, brochures and
      Post's website and compared them to determine if tested and untested
      properties were similar in design. (Crootof Dec. ¶ 18.) The accuracy
      of floor plans to as-built construction cannot be determined by the
      documents utilized by the ERC. Brochures and website floor plans are
      typically not to scale, nor do they include detailed dimensions that
      could be used to ascertain the accessibility of a space.

   b. It is claimed that the ERC found "similarities in design" between the
      tested properties and the floor plans of untested properties. (Crootof
      Dec. ¶ 18.) Even if the designs were "similar" (and this is not clear)
      similar designs can produce fully accessible dwelling units and
      inaccessible dwelling units. Similarities in design does not constitute
      violations of the FHA.

   c. There is no reliable means of concluding that even if the accessibility
      determination made at a tested property was correct that the untested
      properties also exhibit the alleged violations. It appears that instead of
      making such a determination, an assumption was made that if the
      designs are similar they have been built in exactly the same way.

10

d.  The Crootof Declaration, ¶ 18, states that bathrooms that are the width of a bathtub with fixtures arranged along a common plumbing wall are inherently inaccessible. A room the width of a bathtub may provide adequate space to meet the accessibility provisions of the FHA. The arrangement of fixtures along a common plumbing wall does not make a bathroom inaccessible under the FHA.

e.  The ERC's claim that "[t]his common design in every tested instance results in inadequate clearance in the bathroom making it difficult or impossible for persons in wheelchairs to use the facilities," (Crootof Dec. ¶ 18) does not identify the "inadequate clearance." I am unable to distinguish what is meant by the term "inadequate clearance" because it does not refer to anything specific. I am not sure that it even refers to something that is addressed in the FHA.

f.  The declaration utilizes examples of bathroom floor plans that do not include scale or dimensions. Therefore, it is not possible to determine that these units are inaccessible based on this Exhibit. I also note that three of the plans are for multi-story units, which may not be required to meet any requirements of the FHA simply because they are multistory units.

26.  The ERC alleges that it has identified "bathrooms that do not have sufficient clear floor space so as to allow a person in a wheelchair to maneuver about the space, in violation of [the FHA]." (Motion at 14). This alleged violation is not supported by any data in the Crootof Declaration at either paragraphs cited by the ERC. Such statements alone are insufficiently detailed to establish a FHA violation.

27.  The ERC also alleges generally that Requirement 7 of the Guidelines requires that the center line of a toilet must be at least 1'6" from the nearest obstacle. (Motion at 14). There is no FHA requirement that the center line of a toilet be at least 1'6" from the nearest obstacle. Again, the Guidelines are not mandatory. Furthermore, Requirement 7 actually allows toilet center lines to be 1'3" from lavatories and other features. Neither the Motion or the declaration gives the actual measurement taken by Ms. Crootof.

***Accessibility at Doors and Thresholds***

11

28.     The ERC alleges that there are "doors in units that are not sufficiently wide so as to allow passage into kitchens, bathrooms, bedrooms, and other areas in the units by persons using wheelchairs," and that the required nominal clear door opening is 32". However, in the Crootof Declaration, the only door specifically identified is a walk-in closet door. Not all doors are required to be sufficiently wide for a person using a wheelchair and in any event, doors do not have to be 32" wide to be accessible.

29.     For patio thresholds, the ERC claims that Requirement 4 of the Guidelines requires changes in level within the dwelling units to be ramped if greater than 0.5". (Motion at 14). The Guidelines, however, do not require ramping of all thresholds over 0.5" high. Additionally, even changes in level over 4" are allowed to be beveled.

30.     The Crootof Declaration states, "Tested Property Lenox Park has a main entrance to a unit threshold that appears to make access to the ground floor unit difficult or impossible for a person in a wheelchair; Tested Properties Carlyle Square and Gardens had a main entrance to the leasing office that appears to make access to the leasing office difficult or impossible for a person in a wheelchair." (Crootof Dec. ¶ 14.) "A" main entrance to "a" unit indicates a single unit was observed. A threshold that "appears" to make a unit "difficult or impossible" to use is not evidence sufficient to be cited as a violation. The Act intends to provide "modest accessibility". Even features that fully comply with the most stringent standards may be "difficult" for some users. A certain "appearance" is not required to make an element accessible.

### *Accessibility in Kitchens*

31.     The ERC alleges that various Subject Properties include "kitchens that do not have sufficient clear floor space so as to allow a person in a wheelchair to maneuver

about the space" in violation of the FHA and that Requirement 7 requires a 40" clearance

between opposing elements. (Motion at 14). I find multiple problems with these

allegations including:

> a. "Clear floor space" is a term used in many standards to identify the space required for a stationary wheelchair, with extra space around it.
>
> b. Ms. Crootof did not identify 40" clearance violations in her report at ¶¶14, 15 or 16, or anywhere else that I noticed. In fact, most of the allegations are vague contentions that adequate space is not provided. In any event, 40" clearance is not required to provide accessibility within a kitchen. The 1986 ANSI Standard which is cited in FHA, 42 U.S.C. 3604(f)(4), allows kitchens without forward approach to the sink to be 36 inches wide.
>
> c. The Act does not provide prescriptive requirements for space necessary to maneuver about a kitchen

32.    Ms. Crootof addresses U-shaped kitchens and centering of clear floor

spaces on sinks, and contends, "This unit had a U-shaped kitchen; the standard for such

kitchens is to have a 60" diameter clear floor space at the base of the 'U' so that a person

using a wheelchair can turn around and exit the kitchen safely in case of an emergency."

(Crootof Dec. at ¶ 15). The Guidelines (though not referenced as relied upon by Crootof)

do not require all U-shaped kitchens to have a 60" diameter turning radius. Congress and

HUD has commented on the need for a turning radius as follows:

> a. "The Committee intends that such space be usable by handicapped persons, but this does not necessarily require that a turning radius be provided in every situation." House Report 100-711 at 27.
>
> b. "The guidelines for kitchen space would result in a kitchen usable by handicapped persons, but would not require a wheelchair turning radius." 55 Fed. Reg. 24381 (Preamble to Proposed Guidelines); see also 56 Fed. Reg. 9492, 9493 ("*a wheelchair turning radius is not required for either usable kitchens or usable bathrooms*").

33.    If, however, turning around and leaving a kitchen in case of emergency is

considered to be important, research findings should be considered. Empirical research

indicates that a space 54" wide by 72" deep accommodates most people with disabilities using wheelchairs to make a 180 degree turn (u-turn). Another method for making a 180 degree turn is the three-point turn, (K-turn, similar to the K or Y-turn used to turn an automobile around on a narrow street). K-turns can be accommodated in less space than U-turns. The average size of the area necessary in one study of wheelchair users with a wide range of abilities was 54" wide by 66" deep.

34.    The Crootof Declaration further states, "For a person in a wheelchair to use a sink when no forward approach is possible (as is the case in this kitchen), there needs to be 48" centered clear floor space at the sink; in other words, 24" from the center of the sink to the nearest obstruction. The sink in this kitchen had only 20.5" from the center to the nearest obstruction, making it difficult or impossible for a person in a wheelchair to use. The bathroom in this unit also did not meet the standards for sufficient clear floor space at the toilet or at the sink necessary for a person in a wheelchair to be able to use the facilities." (Crootof Dec. at ¶ 15). Again, there are multiple problems with this statement, some of which include:

  a. The center line of a clear floor space is not required to be aligned with the center line of a fixture or appliance for that fixture or appliance to be accessible by a person using a wheelchair. This is true for kitchen appliances and fixtures, as well as bathroom fixtures.

  b. The FHA and Regulations do not require alignment of center lines of clear floor spaces and any fixture or appliance.

  c. The Guidelines (a safe harbor) do not require alignment of center lines of clear floor spaces and any fixture or appliance.

  d. The 1986 ANSI A117.1 standard (FHA § 3604) does not require alignment of center lines of clear floor spaces and fixture or appliance.

  e. The 1992 ANSI A117.1 standard (a safe harbor) does not require alignment of center lines of clear floor spaces and fixture or appliance.

  f. Research used in the development of the wheelchair maneuvering spaces on which the figures in the Guidelines, 1986 ANSI A117.1 and

14

1992 ANSI A117.1 are based indicate that fixtures and appliances are not required to be centered on the clear floor space to provide accessibility.

### *Accessibility to Environmental Controls and Light Switches*

35.    In regard to the location of light switches, electrical outlets, thermostats and other environmental controls, the ERC claims that these features must be at a 48" maximum height and 15" minimum height (Memo. at 14, 16), and that various properties violate this requirement, (Crootof Dec. ¶¶ 14-16). The FHA, however, does not specify heights of controls. The ADA does not require all controls to be 48" maximum from floor.

36.    Environmental controls are not required to be within 48" of the floor to be accessible. The 1986 ANSI Standard, which includes technical criteria for reach ranges for controls that are not, in all cases, within 48" of the floor, is directly referenced as satisfying the requirements for dwelling units in the FHA and in the Regulations at 100.205 (e), which state: "Compliance with the appropriate requirements of ANSI A117.1-1986 suffices to satisfy the requirements of (c)(3)."

37.    Empirical studies performed for the purpose of establishing reach ranges of persons with disabilities to reach elevator controls indicate that at least 86% of those tested could reach heights at least 54 inches. Empirical studies preformed to establish the low reach of persons with disabilities indicates that most people can reach as low as 9 inches above the floor.

38.    Additionally, the ERC's allegations regarding environmental controls are vague. The specific types of controls are not identified. In fact, based on this ERC's information, it cannot be established that the subject controls are the types of controls that are even covered by the FHA.

15

39.    Variables in the built environment can affect whether controls are accessible. The location of the controls, in relation to other features of the built environment, is not provided. It is not stated that such variables were considered.

**Conclusion**

40.    In sum, the allegation that "violations" are pervasive is not convincing when Crootof's Declaration is identifying single elements, in a single unit, in a single apartment community, as in ¶¶ 15, 16, and 17, and using the vague allegations discussed above. Even those allegations that were more direct did not typically provide enough information back up their validity, as shown in my responses.

41.    The ERC's Memorandum and the Crootof Declaration does not sufficiently establish that Post properties are in violation of the FHA or ADA.

I declare under penalty of perjury that the foregoing is true and correct.

Executed April 25, 2007.


Mark Wales

16

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER )
)
    Plaintiff, )
)
    vs. )        Case. No. 1:06CV01991
)        Judge Richard J. Leon
POST PROPERTIES, INC. )
POST GP HOLDINGS, INC. )
POST APARTMENT HOMES, L.P. )
)
    Defendants. )
)

## AFFIDAVIT OF CHRISTOPHER J. PAPA

I, Christopher J. Papa, being over the age of 21 years, have personal knowledge and am competent to testify to the matters set forth herein. I hereby state as follows:

1.     I am Executive Vice President & Chief Financial Officer of Post Properties, Inc. and Post GP Holdings, Inc. (which is the sole general partner of Post Apartment Homes, L.P.) (collectively "Post").

2.     I have been with Post in this capacity for 3 years.

3.     Post is a leading developer and operator of upscale multi-family communities, with a total market capitalization of over 2 billion dollars. Post operates as a Real Estate Investment Trust or REIT whose primary business consists of developing and managing Post® brand name apartment communities for its own account. Post is also engaged in the condominium conversion and development business.

4.     A REIT is a tax designation for a corporation investing in real estate that reduces or eliminates corporate income taxes. In return REITs are required to distribute 90% of their income to the shareholders.

1

5.      I am providing this statement in response to the Equal Rights Center's ("ERC")
Motion for a preliminary injunction in the above captioned case.

6.      It is my understanding that the ERC seeks a preliminary injunction enjoining Post
from selling any of the Subject Properties or units within such properties unless Post either (i)
makes modifications allegedly necessary to bring the units into compliance with the Fair
Housing Act ("FHA") and Americans with Disabilities Act ("ADA") prior to sale (such
compliance to be determined in ERC's sole discretion), or (ii) includes terms in its contract of
sale with buyers to allow Post to reenter a property after the sale date and retrofit the property if
retrofits are ordered by this Court.

7.      If Post's operations were restricted in the manner requested by the ERC,
significant harm could result to Post, its shareholders and other stakeholders, its lenders and its
residents.

8.      One of Post's key business strategies is to sell its older and less competitively
located properties in order to provide capital to reinvest in the development of new communities
and to rebalance its overall portfolio to focus on a limited number of major cities.  In 2003, 2004,
2005, 2006 and the first quarter of 2007, Post had $253 million, $244 million, $232 million,
$175 million and $24 million, respectively, of apartment community sales.  During this time,
capital market conditions relating to sales of multifamily apartment assets have benefited from
improving apartment market fundamentals and reductions in cap rates (i.e., reduced cap rates
raise the value of the assets).  Accordingly, substantial delays in Post's ability to access the
capital markets and sell apartment communities to provide liquidity it deems necessary to fund
its operations could result in substantial harm to Post if capital market conditions were to shift
adversely.

2

9.     The relief sought by the ERC would vitiate Post's efforts to execute on this strategy, which has been a fundamental element of the company's business model since 2003, which together with other factors has contributed to Post's share price nearly doubling over the last three years.   Post has also supplemented this strategy by selectively pursuing joint venture transactions and the relief sought by the ERC would also handcuff Post from entering into new joint venture arrangements with respect to existing Post apartment communities.

10.     Furthermore, Post has expanded its traditional apartment business over the last few years to include the sales of condominiums, generating $71 million from the sale of condominium units during 2005 and $63 million during 2006.  As of April 23, 2007, Post had 147 pending sales contracts for the sale of condominium units at The Peachtree Residences, in Georgia, Harbour Place City Homes in Florida, RISE and Mercer Square in Texas, and The Condominiums at Carlyle Square in Virginia.   If Post were required to offer updated terms of sales under these contracts, potential purchasers may assert a right to unilaterally cancel their sale contracts.  In addition, condominium markets in some of these jurisdictions have softened since the original sales contracts with buyers were entered into.  Accordingly, Post could face substantial delays in finding substitute purchasers following any cancellation of a sales contract (resulting in additional interest costs to service indebtedness) and may ultimately have to sell any such units at a substantial discount to the original contract price or even for a loss.

11.     The consequences of these restrictions could have a significant impact on Post's liquidity and results of operations.  From a liquidity standpoint, the lack of sales proceeds could require Post to keep a higher balance on its revolving credit facility, significantly increasing its interest expense and overall cost of capital.  Additionally, any significant shortfall in projected sales proceeds could reduce funds which would otherwise be available to pay its regular

quarterly dividend, which could have a negative impact on the trading price of Post's common stock. Lastly, any injunction could require Post to record significant accounting charges or could cause expected apartment community and condominium sales not to close, each of which could result in Post falling short of its own projected performance or projections of financial analysts that cover the Company's stock, which would, in turn, likely cause a decline in the trading price of Post's common stock.

  12. If Post's ability to enter into contracts were severely curtailed, it could also result in significant and irreparable harm. If Post is required to include a provision in its contracts for sale which would allow Post to reenter and retrofit the property sold, it could cause unnecessary difficulties in the normal process for a purchase and sale transaction. Generally speaking, issues such as the impact of litigation on the sale of a community are addressed during the course of a sale transaction through the process of due diligence and negotiation of the definitive purchase and sale agreement and indemnities. It would be extraordinary for a seller such as Post to reserve the right of access to a property, including residents' units, to make modifications after the property had already changed hands. Buyers generally would not agree to allow a third party (i.e. the ERC) to exert control over property modifications after signing a contract – any such right would constructively give the ERC "veto" authority over the modifications to the buyer's property after execution of the contract or even after the sale closes. This could result in a reduction in the value of Post's properties or an inability to sell. Consequently, the price of the property could drop dramatically. In effect, the ERC would freeze the sale of condominium units and the Subject Properties for the course of the litigation.

  13. Finally with regard to retrofits, no two of our properties are exactly the same. Post utilizes numerous design professionals and builds properties with a wide array of factors in

mind — the relevant market and location within the market, cost of land, type of building, and other factors. While Post designs properties to comply with the FHA and ADA, not all units are the same (e.g. they have different layouts, kitchens, bathrooms etc.). Hence, tearing apart properties in order to re-design them to comport with the demands of the ERC (e.g. to change dimensions of kitchens and bathrooms and to move fixtures) would be expensive, time consuming and impose an incredible burden on the current residents of the units.

I solemnly affirm under the penalties of perjury that the contents of the foregoing Affidavit are true to the best of my knowledge, information and belief.

4/25/07
_____
Date

_____
Christopher J. Papa

# 4504833_v2

03 OCT -2  AM 7: 09

ROBERT R. DI TROLIO
CLERK, U.S. DIST. CT.
W.D. OF TN, MEMPHIS

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

---

MEMPHIS CENTER FOR
INDEPENDENT LIVING,

     Plaintiff,

v.

J. RICHARD GRANT,
MILTON GRANT,
THE RICHARD AND MILTON
GRANT COMPANY, ET AL.,

     Defendants, and

UNITED STATES OF AMERICA,          No. 01-2069

     Plaintiff-Intervenor

v.

J. RICHARD GRANT,
MILTON GRANT,
THE RICHARD AND MILTON
GRANT COMPANY, ET AL.,

     Defendants.

---

## ORDER DENYING UNITED STATES' MOTION FOR PRELIMINARY INJUNCTION
## AND ADMITTING VIDEOTAPE EVIDENCE OF LEO HILL

---

Before this court is Plaintiff-Intervenor United States of America's Motion for Entry of a

Preliminary Injunction against Defendants J. Richard Grant, Milton Grant, and the Richard and

1

This document entered on the docket sheet in compliance
with Rule 58 and/or 79(a) FRCP on 10-2-03

434

Milton Grant Company ("Grant Defendants")[1]. The United States seeks to preliminarily enjoin the

design, construction, and leasing of existing phases in the absence of retrofit efforts of the Camden

Grove apartment complex which is allegedly in violation of the Fair Housing Act ("FHA"). 42

U.S.C § 3601 *et seq.* For the following reasons, United States' request for a preliminary injunction

is **DENIED**.

## I. Factual and Procedural Background

Camden Grove is a multifamily apartment complex currently in the final phase of

construction in Cordova, Tennessee. The complex is comprised of non-elevator buildings, each

building consisting of eight or more apartments. The ground floor units in question consist of either

one or two bedrooms. Camden Grove is advertised as being a uniquely designed community,

primarily because the one bedroom units have an adjacent one-car garage, while the two bedroom

units have an adjacent two-car garage. The public areas of Camden Grove include mail kiosks,

refuse facilities, and various recreational facilities. No sidewalks connect the units with the public

areas, but there is "vehicular access" via the streets of the complex.

The United States filed an amended complaint in the present action on October 12, 2002,

alleging Grant Defendants, and others, had violated the FHA by designing and constructing the

Camden Grove apartment complex with its public and common areas not readily accessible to people

with disabilities. The United States filed the present Motion for Entry of a Preliminary Injunction

against the Grant Defendants, and others, on May 27, 2003, in order to stop ongoing construction

and leasing of Camden Grove. An evidentiary hearing was held before this Court on June 16, 17,

---

[1] This Court has already declined to preliminarily enjoin another defendant. See Order Denying
United States' Motion For Entry Of A Preliminary Injunction As To Defendant Parker, Estes &
Associates, Inc.

and 18, 2003.

During the hearing, the United States also made an oral motion to exclude the video evidence of Leo Hill, a disabled man using a wheelchair to maneuver the Camden Grove Complex.

## II. Legal Standard

"A district court must assess four factors in deciding whether to issue a preliminary injunction: '(1) whether the plaintiff has established a substantial likelihood or probability of success on the merits; (2) whether there is a threat of irreparable harm to the plaintiff; (3) whether issuance of the injunction would cause substantial harm to others; and (4) whether the public interest would be served by granting injunctive relief.'" *Hamad v. Woodcrest Condominium Ass'n*, 328 F.3d 224, 229 (6th Cir. 2003). "None of these factors, standing alone, is a prerequisite to relief; rather, the court should balance them." *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 653 (6th Cir. 1996), *cert. denied*, 519 U.S. 807, 117 S.Ct. 49, 136 L.Ed.2d 13 (1996). Furthermore, "[a] preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urban County Gov't*, 305 F.3d 566, 573 (6th Cir. 2002), *citing Leary v. Daeschner*, 278 F.3d 729, 739 (6th Cir. 2000).

## III. Analysis

### A. Substantial Likelihood of Success on the Merits

The Court first looks to whether Plaintiff has a substantial likelihood of success on the merits. The FHA provides that it shall be unlawful "[t]o discriminate in the sale or rental, or to otherwise make unavailable or deny, a dwelling to any buyer or renter because of a handicap" of a buyer, renter, resident, or any person associated with such a buyer or renter. 42 U.S.C § 3604(f)(1).

3

The FHA also makes it unlawful "[t]o discriminate against any person in the terms, conditions, privileges of sale or rental of a dwelling, or in the provision of services or facilities in connection with such dwelling, because of a handicap" of that person or any associated with him or her. 42 U.S.C. § 3604(f)(2). A statutory definition of discrimination with regard to dwellings such as these is "failure to design and construct those dwellings" so that "the public use and common use portions of such dwellings are readily accessible to and usable by handicapped persons." 42 U.S.C § 3604(f)(3)(c).

The Secretary of Housing and Urban Development, under authority granted by Congress, has promulgated the implementing regulations and technical guidelines for the FHA, which have been codified at 24 C.F.R § 100.1 *et seq.*[2] The definitions of accessible and accessible route, relevant to this case, read:

> "Accessible", when used with respect to the public and common use areas of a building containing covered multifamily dwellings, means that the public or common use areas of the building can be approached, entered, and used by individuals with physical handicaps. The phrase "readily accessible to and usable by" is synonymous with accessible. A public or common use area that complies with the appropriate requirements of ANSI A117.1-1986[3] or a comparable standard is "accessible" within the meaning of this paragraph.
>
> "Accessible route" means a continuous unobstructed path connecting accessible elements and spaces in a building or within a site that can be negotiated by a person with a severe disability using a wheelchair and that is also safe for and usable by people with other disabilities . . . Exterior accessible routes may include parking access aisles, curb ramps, walks, ramps and lifts. A route that complies with the appropriate requirements of ANSI A117.1-1986 or a comparable standard is an "accessible route."

24 C.F.R. § 100.201 (footnote added).

---

[2] Both parties in the present action have agreed that the regulations issued by HUD are to be given deference.

[3] The ANSI standard is called such because it was developed by ANSI, the American National Standards Institute.

4

As noted in the United States' Motion, the implementing regulations are stated in similarly broad

language. *See* 24 C.F.R. § 100.205(c)(1).

In addition to the regulations, HUD published the final "Fair Housing Accessibility

Guidelines, " offering technical guidelines for implementing the Fair Housing Act. *See* 56 Fed. Reg.

9472 (March 6, 1991).[4] These guidelines, along with several other standards, including the ANSI

A117.1 standard, are intended to be "safe harbors" or advisory guidelines.

> The Guidelines adopted by the Department provide one way in which a builder or developer
> may achieve compliance with the Act's accessibility requirements. There are other ways to
> achieve compliance with the Act's accessibility requirements, as for example, full compliance
> with ANSI A117.1. Given this fact, it would be inappropriate on the part of the Department
> to constrain designers by presenting the Fair Housing Accessibility Guidelines as minimum
> requirements. Builders and developers should be free to use any reasonable design that
> obtains a result consistent with the Act's requirements. Accordingly, the design specifications
> presented in the final Guidelines are appropriately referred to as "recommended guidelines."

56 Fed. Reg. 9478. Compliance with "safe harbors," such as the guidelines or the ANSI A117.1

standard, are sufficient to satisfy the FHA's requirements, but they are not the exclusive means for

doing so.

Two of the seven guidelines published by HUD pertain to the instant case are: (1) an

accessible entrance on an accessible route ("Requirement 1") and (2) accessible and usable public

common use areas ("Requirement 2"). Under 24 C.F.R. § 100.205(a), Requirement 1 provides that

---

[4]These guidelines were subsequently codified at 24 C.F.R. Ch. 1, Subch. A, App. II, but were
removed from the C.F.R. in 1996 because "[t]he Fair Housing Accessibility Guidelines are not
mandatory, nor do they prescribe specific requirements which must be met and which if not met,
would constitute unlawful discrimination under the Fair Housing Act. The purpose of the
guidelines is to provide technical guidance on designing dwelling units as required by the Fair
Housing Amendments Act. Removal of the Guidelines will make it easier for HUD to update the
Guidelines, if necessary and appropriate, to address issues that may arise with respect to new
types of designs for dwelling units (the CFR is updated only once a year)." *See* 61 Fed. Reg.
7942. They are presently available from HUD in print version and also electronically at
www.hud.gov/library/bookshelf09/fhefhag.cfm.

"covered multifamily dwellings shall be designed and constructed to have at least one building

entrance on an accessible route, unless it is impractical to do so because of terrain or unusual

characteristics of the site." 56 Fed. Reg. 9503-9504. The guideline provides for each ground floor

unit having a separate entrance; "such unit shall be served by an accessible route" with the exception

of sites with a prohibitive terrain or other unusual characteristics. *Id.* The section also includes the

relevant definition of "accessible route":

> (5) Accessible route. An accessible route that complies with ANSI 4.3 would meet section
> 100.205(a). If the slope of the finished grade between covered multifamily dwellings and a
> public or common use facility (including parking) exceeds 8.33%, or where other physical
> barriers (natural or manmade) or legal restrictions, all of which are outside the control of the
> owner, prevent the installation of an accessible pedestrian route, an acceptable alternative is
> to provide access via a vehicular route, so long as necessary site provisions such as parking
> spaces and curb ramps are provided at the public or common use facility. *Id.*

Furthermore, Requirement 1 offers guidelines for determining site impracticality. *Id.*

Requirement 2 provides that, under 24 C.F.R. § 100.205(c)(1), public and common areas

must be accessible to and usable by disabled persons. The guideline for this requirement consists

of a chart with public and common areas that should be made accessible and the appropriate

corresponding ANSI standard. *Id.* at 9504-9505.

In the instant case, Plaintiff's main claims are that the Defendants are in violation of the Fair

Housing Act by: 1) not providing an accessible route to the entrances of the ground floor units, 2)

not proving an accessible route to the public and common areas, 3) failing to provide an adequate

amount of accessible resident parking, 4) failing to provide an adequate amount of designated

accessible visitor parking, and 5) failing to provide covered parking for persons with disabilities on

the same terms and conditions provided to other residents. (Pl.'s Mem. at 1-2.) Defendants claim

that they were compliant with the FHA based on their attempt to comply with the International Code

6

Council's "Code Requirements for Housing Accessibility," another safe harbor for Fair Housing compliance. (Def.'s Opp'n at 20; M. Grant Aff. ¶ 8.) Furthermore, the Camden Grove Defendants claim that because of site impracticality, not all of the ground floor units needed to be compliant. Thus, the main question at issue is whose interpretation of "accessible" should prevail, a question which seems to hinge on the definitions of "accessible" and "accessible route."

As for Requirement 1 that all ground floor units have an accessible entrance, there is some disagreement as to where the arrival point is located. In any case, Plaintiff has demonstrated to the Court that some units may have barriers such as large slopes, cross-slopes, concrete lips, and stairs, which could constitute noncompliance with the statute. Factual issues remain to be decided, but Plaintiff could be successful on the merits as to this claim.

As for Requirement 2, the parties again disagree as to what constitutes "accessible." Plaintiff argues that pedestrian access is necessary for compliance, while Defendants argue that a vehicular route is sufficient. Again, factual issues remain to be decided, but Plaintiff could be successful on the merits of this claim as well.

The FHA does not answer with specificity what is enough to constitute accessibility, so it is appropriate to look at the various regulations and guidelines promulgated by HUD, and accompanying commentary. By doing so, this Court is deferring to HUD's interpretation of the act, it being the agency with the authority and expertise to do so. *See U.S. v. Edward Rose*, 246 F.Supp.2d 744 (E.D.Mich. 2003). After reviewing the various regulations, guidelines, and standards with regard to the minor amount of precedent, this Court notes that the issue is not as tilted in Plaintiff's favor as argued. Though there is some likelihood that Plaintiff will be successful, it is not substantial enough to require the granting of the immediate and preliminary relief requested.

7

**B. Irreparable Injury**

The United States argues that "[w]hen a plaintiff seeks an injunction to prevent the violation of a federal statute that specifically provides for injunctive relief, a showing of irreparable harm is not required." *Edward Rose,* 740 F.2d at 753, *citing, e.g., Illinois Bell Telephone Co. v. Illinois Commerce Commission,* 740 F.2d 566, 571 (7th Cir. 1984). Since the Fair Housing Act provides for injunctive relief at 42 U.S.C. § 3614(a), Plaintiff is arguably entitled to this presumption. However, at least one court has held that this presumption is rebuttable. *See Greshem v. Windrush Partners, Ltd.,* 730 F.2d 1417, 1423 (11th Cir. 1984).

In the instant case, there remains evidence against a finding of irreparable harm. The majority of the alleged violations of the Fair Housing Act have already occurred. More specifically, should the Defendants be found in violation of the Act, retrofits, modifications, and other relief will be available to correct any present or future violations found at Camden Grove, the only complex at issue in the present motion. Furthermore, the Court feels that the Plaintiff's argument that, without the injunction, there will be fewer housing choices for disabled people, is not strong enough to warrant immediate relief. The granting of this injunction would not make a significant difference in the months before the final disposition of the case to warrant immediate relief.

**C. Degree of Harm to Others**

The United States also argues that the potential financial burden of correcting unlawful discrimination outweighs the harm caused by allowing a party to actively engage in discriminatory acts. "By enacting the statute and the provisions at issue here, Congress has indicated that obliterating discrimination against disabled persons at all levels in housing is a priority." *Edward Rose,* 740 F.2d at 753. However, as noted above, the existence of discrimination is not so persuasive

8

here as to require the extraordinary remedy that a preliminary injunction provides. Halting the construction and limiting the leasing of Camden Grove seems drastic when this Court may find that Defendants complied with the Fair Housing Act. An injunction would harm the construction employees and many others involved in the project, in addition to the Grant Defendants. Furthermore, the majority of harm to Plaintiff has already occurred, so even if a preliminary injunction could have prevented irreparable injury, it is of little use at the present date. Weighing the balance of harms, this Court finds that substantial harm to others that may result from preliminarily enjoining the Grant Defendants.

### D. The Public Interest

As was also noted in *Edward Rose*, "where there has been a showing of housing discrimination, preliminary injunctive relief serves the public interest by carrying out the stated policy of the United States" as found in the Fair Housing Act. 246 F.Supp.2d 744, *citing Chapp v. Bowman*, 750 F.Supp. 274, 277 (W.D. Mich. 1990). Again, this Court strongly agrees that obliterating housing discrimination serves the public interest. However, it also notes that the public interest also demands a protection from unnecessary intervention by the courts. The alleged discrimination at issue in this case is not so egregious as to demand immediate relief. Such relief can and should be granted only after this case's final disposition on the merits. Accordingly, the Court finds that there is not a sufficient basis for entry of a preliminary injunction. The United States' motion for entry of a preliminary injunction is **DENIED**.

A final related matter concerns the video evidence of Leo Hill. At the evidentiary hearing in this matter, the United States made an oral motion to exclude the video evidence of Leo Hill, a

9

disabled man using a wheelchair to maneuver the Camden Grove Complex. This court took the

matter under advisement, and hereby **ADMITS** the videotape evidence. While Mr. Hill is one

disabled individual and is not representative of the entire spectrum of disabled persons, the evidence

is pertinent and relevant to the issues at bar.

### III. Conclusion

After carefully weighing the relevant factors, this Court finds that the circumstances of the

present case do not clearly demand immediate relief as requested by the Plaintiff-Intervenor United

States. Having carefully considered the record and relevant case law, this Court hereby **DENIES**

the Motion for Entry of a Preliminary Injunction against the Grant Defendants and **ADMITS** the

contested videotape evidence of Leo Hill.


**IT IS SO ORDERED** this _18_ day of _October_ , 2003.

BERNICE BOUIE DONALD
UNITED STATES DISTRICT JUDGE


10

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| EQUAL RIGHTS CENTER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case. No. 1:06CV01991 |
| | ) | Judge Richard J. Leon |
| POST PROPERTIES, INC. | ) | |
| POST GP HOLDINGS, INC. | ) | |
| POST APARTMENT HOMES, L.P. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## ORDER

UPON CONSIDERATION OF Motion of Plaintiff the Equal Rights Center for

Preliminary Injunction, and any opposition thereto, it is by the United States District Court for

the District of Columbia, this ____ day of _____ 2007, hereby

ORDERED that Plaintiff's Motion for Preliminary Injunction is DENIED.

                                                                                  **JUDGE RICHARD J. LEON**

Copies provided to:

Sheila Jane Carpenter, Esq.
Jorden Burt LLP
1025 Thomas Jefferson Street, NW
Suite 400 East
Washington, DC 20007

1

Donald Lee Kahl, Esq.
Washington Lawyers' Committee for Civil Rights & Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, DC 20036

Christopher B. Hanback, Esq.
Holland & Knight LLP
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006