## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| EQUAL RIGHTS CENTER )<br><br>Plaintiff, )<br><br>vs. )<br><br>POST PROPERTIES, INC. )<br>POST GP HOLDINGS, INC. )<br>POST APARTMENT HOMES, L.P. )<br><br>Defendants. ) | Case. No. 1:06CV01991<br>Judge Richard J. Leon |

### ERRATA TO DEFENDANTS' EXHIBIT A TO
### OPPOSITION TO PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION

Defendants Post Properties, Inc., Post GP Holdings, Inc., and Post Apartment Homes, L.P. (collectively "Post"), by undersigned counsel, respectfully request to submit a correction to Post's Exhibit A (Declaration of Mark Wales) of Post's Opposition to Plaintiff's Motion for Preliminary Injunction. The attachment to Exhibit A was inadvertently not attached.

For the Court's convenience, a corrected Exhibit A is attached. Post apologizes for any inconvenience this correction may cause and submits this filing to correct its error.

Respectfully submitted,

HOLLAND & KNIGHT, LLP

 /s/ Christopher B. Hanback
Christopher B. Hanback (Bar # 232579)
Alan I. Baron (Bar. # 340273)
Rafe Petersen (Bar # 465542)
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006
(202) 955 3000 Phone
(202) 955 5564 Fax

E-mail: christopher.hanback@hklaw.com
E-mail: alan.baron@hklaw.com
E-mail: rafe.petersen@hklaw.com
*Counsel for Post Properties, Inc., et al.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing Errata was served by electronic filing and via first-class mail, postage prepaid, this 26th day of April, 2007, on the following:

Sheila Jane Carpenter, Esq.
Jorden Burt LLP
1025 Thomas Jefferson Street, NW
Suite 400 East
Washington, DC 20007

Donald Lee Kahl, Esq.
Washington Lawyers' Committee for Civil Rights & Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, DC 20036

/s/ Christopher B. Hanback
Christopher B. Hanback

# 4510522_v1

3

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EQUAL RIGHTS CENTER )<br><br>Plaintiff, )<br><br>vs. )<br><br>POST PROPERTIES, INC. )<br>POST GP HOLDINGS, INC. )<br>POST APARTMENT HOMES, L.P. )<br><br>Defendants. ) | Case. No. 1:06CV01991<br>Judge Richard J. Leon |

## DECLARATION OF MARK WALES

I, Mark Wales, being over the age of 21 years, have personal knowledge and am competent to testify to the matters set forth herein. I hereby state as follows:

1.    A true and correct copy of my curriculum vitae is attached as exhibit "A" to this affidavit.

2.    I am owner of Wales Associates, LLC, a consulting firm with a primary focus in Building Codes, Standards, and accessibility. Wales Associates was established in April 1999. I earned my Bachelor of Architecture, Professional degree, in 1979 from the University of Southwest Louisianan.

3.    I have twenty-four years of experience related to interpretation, enforcement, and development of building codes, including accessibility standards. My experiences include the following:

        a.    Served as Code Analyst for 10 years with Southern Building Code Congress, International (one of the three legacy model code organizations of the International Code Council);

1

    b.  Served as Staff Representative on Committee that developed first draft of International Building Code accessibility and means of egress provisions;

    c.  Served on the NFPA Building Code subcommittee that developed the accessibility provisions for the first edition of NFPA 5000 Building Code;

    d.  Served for 14 years on the ANSI A117 Committee (Architectural Features and Site Design of Public Buildings and Residential Structures for Persons with Handicaps);

    e.  Served on the Residential Task Force to develop Type B dwelling unit provisions of ANSI A117.1 for accessibility that meets or exceeds Fair Housing Guidelines;

    f.  Served on HUD Working Group that developed model code provisions to have International Building Code deemed a Fair Housing Act "safe harbor";

    g.  Consulted with and represented the American Institute of Architects in matters relating to accessibility, including, ADA, FHA, ANSI A117, and International Building Code for over 5 years;

    h.  Served on the Public Rights-of-Way Access Advisory Committee, a federal advisory committee to develop recommendations for accessibility within the public rights-of-way;

    i.  Helped with early development of accessibility code for Vietnam;

    j.  Presented at AIA National Convention on ADA (two years);

    k.  Presented at National Multihousing Council's Property Management Committee, on team building for FHA compliance;

    l.  Served or currently consult in litigation related to FHA and ADA:

        (i)  *United States v. Grant*, No. 01-2069 D/P (W.D. Tenn.); deposition testimony April 4, 2006.

        (ii)  *United States v. Shanrie Company, Inc.*, Case No. 05-306 (DRH) (S.D. Ill.); deposition testimony March 10, 2006.

        (iii)  *United States v. Edward Rose and Sons*, No. 02cv73618, (E.D. Mich.); deposition testimony Oct. 5 & 6, 2004.

    m.  Review plans and consult with designers and builders in matters related to accessibility.

4.    I have been asked to review multiple documents and to provide my opinion of the allegations made by the Equal Rights Center ("ERC") in their Motion for Preliminary Injunction. Included in my review were the following documents:

a. Motion of Plaintiff the Equal Rights Center for Preliminary Injunction;

b. Memorandum of Points and Authorities in Support of Plaintiff the Equal Rights Center's Motion for Preliminary Injunction and all attachments and exhibits (hereinafter cited as "Memo.");

c. Declaration of Rebecca Crootof, including plans and brochures attached thereto (hereinafter cited as "Crootof Dec.") ; and

d. Declaration of Sheila J. Carpenter in Support of the Equal Rights Center's Motion for Preliminary Injunction.

5.      I also reviewed the FHA, the implementing regulations, the US Department of Housing and Urban Development's ("HUD") Fair Housing Act Accessibility Guidelines ("Guidelines"), the Design Manual and numerous other technical documents and safe harbor guidance that I typically consult in performing FHA compliance assessments.

6.      My review of the ERC's Motion and Crootof Declaration and accompanying documents leads me to the conclusion that the ERC is mistaken in their underlying theory that the Subject Properties are not in compliance with the FHA.

**Determining FHA Compliance – The Guidelines Are Not Mandatory**

7.      The FHA accessibility requirements are not as straightforward as the ERC would have the Court believe.  Merely showing that features found in a particular dwelling unit are inconsistent with the Guidelines does not in fact show non-compliance with the modest requirements of the FHA.  The Guidelines are, by their own terms, non-mandatory recommendations.  They serve as safe harbors.  Thus, the ERC is correct that the Guidelines "provide one way in which a builder or developer may achieve compliance with the Act's accessibility requirements." (Memo at 7, n. 6.)  They are incorrect, however, in suggesting that consistency with the Guidelines is necessary for

---

[1] The Guidelines were published in the federal register on March 6, 1991.  56 Fed. Reg. 9472-9515.

FHA compliance. There are numerous other approved "safe harbors" or a designer may

utilize an alternative approach.

8.      The ERC claims that "the Guidelines are the most lenient of the published

accessibility standards." (Memo. at 7, n. 6.) While this statement is based on a

quotation from the Federal Register (56 Fed. Reg. 9478), it must be looked at in context.

In fact, in the preamble to the Guidelines, HUD responded to commenters that requested

that the Guidelines be finalized as minimum requirements as follows:

> **The Department has not categorized the final Guidelines as either**
> **performance standards or minimum requirements. The minimum**
> **accessibility requirements are contained in the Act.** The Guidelines
> adopted by the Department provide one way in which a builder or
> developer may achieve compliance with the Act's accessibility
> requirements. **There are other ways to achieve compliance with the**
> **Act's accessibility requirements,** as for example, full compliance with
> ANSI A117.1. **Given this fact, it would be inappropriate on the part of**
> **the Department to constrain designers by presenting the Fair Housing**
> **Accessibility Guidelines as minimum requirements. Builders and**
> **developers should be free to use any reasonable design that obtains a**
> **result consistent with the Act's requirements.** Accordingly, the design
> specifications presented in the final Guidelines are appropriately referred
> to as "recommended guidelines". It is true, however, that compliance with
> the Fair Housing Accessibility Guidelines will provide builders with a safe
> harbor.

56 Fed. Reg. 9478 (emphasis added).

9.      Additionally, Andrew Cuomo, HUD Secretary at the time the 1998 Fair

Housing Act Design Manual was published, included a memorandum in the FHA Design

Manual, which stated the following:

> The Manual provides direct information about the accessibility
> requirements of the Act which must be incorporated into the design and
> construction of multifamily housing covered by the Act. It carries out two
> statutory responsibilities: (1) to provide a clear statement of HUD's
> interpretation of the accessibility requirements of the Act so that readers
> may know what actions on their part will provide them with a "safe
> harbor"; **and (2) to provide guidance in the form of recommendations**

> which, although not binding, meet the Department's obligation to
> provide technical assistance on alternative accessibility approaches
> which will comply with the Act, but may exceed its minimal
> requirements.

Design Manual, Transmittal Letter from HUD Secretary Cuomo (April, 1998) (emphasis

added). Similar language is incorporated into and referenced in the Design Manual.

10.     It is my expert opinion that parts of the Guidelines and the Design Manual

actually exceed the FHA's minimal requirements. In any event, it is clear that the

Guidelines and the Design Manual are not mandatory and non-compliance with them

does not necessarily indicate a violation of the FHA.

**Determining ADA Compliance**

11.     The ERC discusses (Memo. at 10) the regulatory requirements of the

Americans With Disabilities Act ("ADA"). They fail to note, however, that the ADA

does not apply to all portions of every apartment community. There are distinctions to

which part, if any, the ADA applies. For example, in the Supplement to Notice of Fair

Housing Accessibility Guidelines: Questions and Answers about the Guidelines, HUD

states:

> The Department has been asked, in particular, if public and common use
> areas of residential housing are covered by title III of the ADA. Strictly
> residential facilities are not considered places of public accommodation
> and therefore would not be subject to title III of the ADA, nor would
> amenities provided for the exclusive use of residents and their guests.

59 Fed. Reg. 33362-33368.

**Determining FHA and ADA Compliance – Expertise Is Necessary**

12.     The FHA accessibility and adaptive design requirements are imprecise.

While the technical guidance provided in safe harbors such as the Guidelines may

5

occasionally recommend specific measurements, such measurements are by no means required by the FHA.

13.    More than a tape measure and the Guidelines are needed to assess whether the features of a particular unit comply with the FHA.    A greater degree of knowledge and understanding of the various technical criteria and their bases is required to undertake a compliance assessment under the FHA or ADA.

14.    The terms of the FHA is so imprecise that it is subject to interpretation and reasonable dispute.    Thus, expertise and experience are often required to determine what meets the accessibility requirements under the Act.    Often, misinterpretation of the safe harbors and technical guidance result in erroneous allegations of violations, as well as error in design and construction.

15.    I do not agree with the ERC's methodology for "testing" compliance with the FHA.    A measurement that is inconsistent with the Guidelines would not lead me to the conclusion that a particular feature of a dwelling unit is inaccessible.    The FHA does not include specific measurements or other prescriptive technical criteria that can readily be determined with measurements alone.    While measurements may be part of an accessibility survey, it is more important to know what to measure.    In addition, the analysis of the data collected must be based on appropriate criteria to determine whether accessibility is provided or not.    The ERC claims, "Comparison of the actual measurements at the Tested Properties to what is required by the law is simply done and subject to verification." (Memo. at 13).    This is an incredible oversimplification.    The FHA does not include specific technical criteria, (i.e., dimensions) for simple verification. Modest accessibility is required, but a specific standard or measurement is not.

**<u>Ms. Crootof Lacks The Expertise Necessary to Determine FHA Compliance</u>**

16.    I have reviewed Ms. Crootof's qualifications as outlined in her declaration. While I am hesitant to comment on an individual's resume, it does not appear that Ms. Crootof or her assistants have the expertise, experience or depth of knowledge necessary to asses the apartment communities and conclude they are not accessible under the FHA. There is nothing to indicate a significant involvement with the technical side of providing accessibility for people with disability in the built environment. Unfortunately, her work reflects her lack of education and experience.

**<u>The ERC's Data is Incomplete And Inexact</u>**

17.    I have reviewed the Declaration of Ms. Crootof as well as the ERC's allegations of FHA and ADA violations in the Memorandum of Points and Authorities, and I believe that the grounds on which the ERC bases its allegations are for the most part incomplete and inexact.

18.    Overall, Ms. Crootof makes many statements, such as it would be "difficult or impossible for a person in a wheelchair" to use an area, but she does not back up such conclusions with sufficient detail to determine whether there is, in fact, a violation of any sort. I would not consider this an acceptable means of documenting a compliance issue. Stating something is not accessible does not necessarily make it so. Yet, numerous times that is what was done. Access for some people with disabilities may be difficult, but that is not necessarily inaccessible, or a violation of the law. Additionally, "impossible" was not alleged or proven. In the same paragraph there are single instances where something "appeared" to make access "difficult or impossible".

7

Appearance is not a basis for calling something a violation under the Act. The appearance of "difficult or impossible" does not make something legally inaccessible.

19.     When some detail was given, it was often not tied to any requirement under law. While the stated basis for Ms. Crootof's allegations was reported to be the FHA, the Act does not mandate the specific technical criteria, including required dimensions, for spaces or elements to be made accessible. Yet, Ms. Crootof  repeatedly states that there are "required" measurements without identifying the source of such requirements. While the Memorandum itself contained references to the Fair Housing Accessibility Guidelines, those are merely recommendations, not legal requirements, regardless of how they are described in that document.

20.     The following lists specific issues I found with various allegations in the Memorandum and Crootof Declaration:

### *ADA Generally*

21.     The Crootof Declaration states that the ERC investigated properties that were remodeled after January 23, 1993 for determination of compliance with the ADA. (Crootof Dec. ¶ 9.) The Declaration does not identify which properties or how many were in the "remodeled" category.

22.     Full compliance with the ADA is not required for alterations. Alterations are based on a standard of "maximum extent feasible." It is unlikely that a simple visit to a property and the knowledge that an alteration occurred would yield a determination of whether the alteration was performed in a manner consistent with or in violation of the ADA. The alteration provisions of the ADA are functional. The requirements for alterations apply to certain types of alteration work that specifically affects the usability

of a building, facility or part thereof. They do not apply to normal maintenance, painting

or wallpapering, asbestos removal, or changes to mechanical and electrical systems

unless they affect usability of the building or facility. They may be specific to elements,

spaces, or areas. In sum, Ms. Crootof does not indicate the type of work undertaken or if

these variables were considered.

      23.    The ERC's Memorandum states that there are "rental offices located up

stairs or served by inaccessible ramp routes" in violation of the ADA and that "Tested

Properties Carlyle Square, Glen, Gallery and Abbey each has steps without an

accompanying ramp, either at units or at the leasing office entrance, making access

impossible for a person in a wheelchair." (Memo. at 15). There are multiple problems

with this statement including:

    a.  Crootof alleges a violation because of steps at "units." The ADA does not typically apply to "units" covered by the FHA. The ADA has not been shown to apply to those units.

    b.  Neither the ERC's Memorandum or the Crootof Declaration identifies which apartment communities include the alleged violations at units, as opposed to those that include alleged violations at office entrances, which makes the ERC's allegations difficult to assess.

    c.  The ADA does not require that every entrance to a building or facility be accessible.

    d.  The route in which the alleged steps or inaccessible route ramps occur is not identified. In my experience, many routes with steps have been identified as alleged "violations" when actually they were not part of a required accessible route. The information contained in the Memorandum and Crootof Declaration (¶14) are insufficient to establish that the route on which they occur is a route that is required to be accessible.

    e.  There is no information given as to why the "inaccessible ramp routes" are identified as "inaccessible."

      24.    The ERC's Memorandum states that there is a lack of reserved or

accessible parking in violation of the ADA and that "Tested Properties Gallery, Heights

II, and Worthington provide no accessible parking at various locations for persons with disabilities." (Motion at 15). There are multiple problems with this statement including:

   a. The Memorandum states that three properties "provide no accessible parking at *various locations*." Not all "locations" are required to be provided with accessible parking. There is insufficient information to determine the validity of the alleged "violation" of law.

   b. Ms. Crootof claims that no accessible parking is provided at three locations. Crootof Decl. ¶ 14. Again, there is insufficient information. There is nothing to indicate what makes the parking inaccessible. It is not even clear whether there is parking provided at those locations.

*Accessibility in Bathrooms –*
**Comparison of Marketing Floor Plans Does Not Indicate Inaccessibility**

25.     In making allegations about the alleged inaccessibility of bathrooms in various properties including those not tested, the ERC relied on "floor plans, brochures and Post's website to determine if untested Post properties shared common elements of design with the tested properties and would thus, exhibit similar violations." Crootof Decl. ¶ 18. This method of determining if untested properties with similar designs would exhibit similar violations is faulty and unreliable for the following reasons:

   a. Ms. Crootof states that the ERC looked at floor plans, brochures and Post's website and compared them to determine if tested and untested properties were similar in design. (Crootof Dec. ¶ 18.) The accuracy of floor plans to as-built construction cannot be determined by the documents utilized by the ERC. Brochures and website floor plans are typically not to scale, nor do they include detailed dimensions that could be used to ascertain the accessibility of a space.

   b. It is claimed that the ERC found "similarities in design" between the tested properties and the floor plans of untested properties. (Crootof Dec. ¶ 18.) Even if the designs were "similar" (and this is not clear) similar designs can produce fully accessible dwelling units and inaccessible dwelling units. Similarities in design does not constitute violations of the FHA.

   c. There is no reliable means of concluding that even if the accessibility determination made at a tested property was correct that the untested properties also exhibit the alleged violations. It appears that instead of making such a determination, an assumption was made that if the designs are similar they have been built in exactly the same way.

10

    d.   The Crootof Declaration, ¶ 18, states that bathrooms that are the width of a bathtub with fixtures arranged along a common plumbing wall are inherently inaccessible. A room the width of a bathtub may provide adequate space to meet the accessibility provisions of the FHA. The arrangement of fixtures along a common plumbing wall does not make a bathroom inaccessible under the FHA.

    e.   The ERC's claim that "[t]his common design in every tested instance results in inadequate clearance in the bathroom making it difficult or impossible for persons in wheelchairs to use the facilities," (Crootof Dec. ¶ 18) does not identify the "inadequate clearance." I am unable to distinguish what is meant by the term "inadequate clearance" because it does not refer to anything specific. I am not sure that it even refers to something that is addressed in the FHA.

    f.   The declaration utilizes examples of bathroom floor plans that do not include scale or dimensions. Therefore, it is not possible to determine that these units are inaccessible based on this Exhibit. I also note that three of the plans are for multi-story units, which may not be required to meet any requirements of the FHA simply because they are multistory units.

26.    The ERC alleges that it has identified "bathrooms that do not have sufficient clear floor space so as to allow a person in a wheelchair to maneuver about the space, in violation of [the FHA]." (Motion at 14). This alleged violation is not supported by any data in the Crootof Declaration at either paragraphs cited by the ERC. Such statements alone are insufficiently detailed to establish a FHA violation.

27.    The ERC also alleges generally that Requirement 7 of the Guidelines requires that the center line of a toilet must be at least 1'6" from the nearest obstacle. (Motion at 14). There is no FHA requirement that the center line of a toilet be at least 1'6" from the nearest obstacle. Again, the Guidelines are not mandatory. Furthermore, Requirement 7 actually allows toilet center lines to be 1'3" from lavatories and other features. Neither the Motion or the declaration gives the actual measurement taken by Ms. Crootof.

*Accessibility at Doors and Thresholds*

11

28.    The ERC alleges that there are "doors in units that are not sufficiently wide so as to allow passage into kitchens, bathrooms, bedrooms, and other areas in the units by persons using wheelchairs," and that the required nominal clear door opening is 32".   However, in the Crootof Declaration, the only door specifically identified is a walk-in closet door.  Not all doors are required to be sufficiently wide for a person using a wheelchair and in any event, doors do not have to be 32" wide to be accessible.

29.    For patio thresholds, the ERC claims that Requirement 4 of the Guidelines requires changes in level within the dwelling units to be ramped if greater than 0.5". (Motion at 14).  The Guidelines, however, do not require ramping of all thresholds over 0.5" high.  Additionally, even changes in level over 4" are allowed to be beveled.

30.    The Crootof Declaration states, "Tested Property Lenox Park has a main entrance to a unit threshold that appears to make access to the ground floor unit difficult or impossible for a person in a wheelchair; Tested Properties Carlyle Square and Gardens had a main entrance to the leasing office that appears to make access to the leasing office difficult or impossible for a person in a wheelchair." (Crootof Dec. ¶ 14.)  "A" main entrance to "a" unit indicates a single unit was observed.  A threshold that "appears" to make a unit "difficult or impossible" to use is not evidence sufficient to be cited as a violation. The Act intends to provide "modest accessibility".  Even features that fully comply with the most stringent standards may be "difficult" for some users.  A certain "appearance" is not required to make an element accessible.

### *Accessibility in Kitchens*

31.    The ERC alleges that various Subject Properties include "kitchens that do not have sufficient clear floor space so as to allow a person in a wheelchair to maneuver

about the space" in violation of the FHA and that Requirement 7 requires a 40" clearance

between opposing elements. (Motion at 14). I find multiple problems with these

allegations including:

    a.  "Clear floor space" is a term used in many standards to identify the space required for a stationary wheelchair, with extra space around it.

    b.  Ms. Crootof did not identify 40" clearance violations in her report at ¶¶14, 15 or 16, or anywhere else that I noticed. In fact, most of the allegations are vague contentions that adequate space is not provided. In any event, 40" clearance is not required to provide accessibility within a kitchen. The 1986 ANSI Standard which is cited in FHA, 42 U.S.C. 3604(f)(4), allows kitchens without forward approach to the sink to be 36 inches wide.

    c.  The Act does not provide prescriptive requirements for space necessary to maneuver about a kitchen

    32.    Ms. Crootof addresses U-shaped kitchens and centering of clear floor

spaces on sinks, and contends, "This unit had a U-shaped kitchen; the standard for such

kitchens is to have a 60" diameter clear floor space at the base of the 'U' so that a person

using a wheelchair can turn around and exit the kitchen safely in case of an emergency."

(Crootof Dec. at ¶ 15). The Guidelines (though not referenced as relied upon by Crootof)

do not require all U-shaped kitchens to have a 60" diameter turning radius. Congress and

HUD has commented on the need for a turning radius as follows:

    a.  "The Committee intends that such space be usable by handicapped persons, but this does not necessarily require that a turning radius be provided in every situation." House Report 100-711 at 27.

    b.  "The guidelines for kitchen space would result in a kitchen usable by handicapped persons, but would not require a wheelchair turning radius." 55 Fed. Reg. 24381 (Preamble to Proposed Guidelines); see also 56 Fed. Reg. 9492, 9493 ("*a wheelchair turning radius is not required for either usable kitchens or usable bathrooms*").

    33.    If, however, turning around and leaving a kitchen in case of emergency is

considered to be important, research findings should be considered. Empirical research

indicates that a space 54" wide by 72" deep accommodates most people with disabilities using wheelchairs to make a 180 degree turn (u-turn). Another method for making a 180 degree turn is the three-point turn, (K-turn, similar to the K or Y-turn used to turn an automobile around on a narrow street). K-turns can be accommodated in less space than U-turns. The average size of the area necessary in one study of wheelchair users with a wide range of abilities was 54" wide by 66" deep.

34.    The Crootof Declaration further states, "For a person in a wheelchair to use a sink when no forward approach is possible (as is the case in this kitchen), there needs to be 48" centered clear floor space at the sink; in other words, 24" from the center of the sink to the nearest obstruction. The sink in this kitchen had only 20.5" from the center to the nearest obstruction, making it difficult or impossible for a person in a wheelchair to use. The bathroom in this unit also did not meet the standards for sufficient clear floor space at the toilet or at the sink necessary for a person in a wheelchair to be able to use the facilities." (Crootof Dec. at ¶ 15). Again, there are multiple problems with this statement, some of which include:

        a.   The center line of a clear floor space is not required to be aligned with the center line of a fixture or appliance for that fixture or appliance to be accessible by a person using a wheelchair. This is true for kitchen appliances and fixtures, as well as bathroom fixtures.

        b.   The FHA and Regulations do not require alignment of center lines of clear floor spaces and any fixture or appliance.

        c.   The Guidelines (a safe harbor) do not require alignment of center lines of clear floor spaces and any fixture or appliance.

        d.   The 1986 ANSI A117.1 standard (FHA § 3604) does not require alignment of center lines of clear floor spaces and fixture or appliance.

        e.   The 1992 ANSI A117.1 standard (a safe harbor) does not require alignment of center lines of clear floor spaces and fixture or appliance.

        f.   Research used in the development of the wheelchair maneuvering spaces on which the figures in the Guidelines, 1986 ANSI A117.1 and

14

1992 ANSI A117.1 are based indicate that fixtures and appliances are not required to be centered on the clear floor space to provide accessibility.

### Accessibility to Environmental Controls and Light Switches

35.    In regard to the location of light switches, electrical outlets, thermostats and other environmental controls, the ERC claims that these features must be at a 48" maximum height and 15" minimum height (Memo. at 14, 16), and that various properties violate this requirement, (Crootof Dec. ¶¶ 14-16).  The FHA, however, does not specify heights of controls.  The ADA does not require all controls to be 48" maximum from floor.

36.    Environmental controls are not required to be within 48" of the floor to be accessible. The 1986 ANSI Standard, which includes technical criteria for reach ranges for controls that are not, in all cases, within 48" of the floor, is directly referenced as satisfying the requirements for dwelling units in the FHA and in the Regulations at 100.205 (e), which state: "Compliance with the appropriate requirements of ANSI A117.1-1986 suffices to satisfy the requirements of (c)(3)."

37.    Empirical studies performed for the purpose of establishing reach ranges of persons with disabilities to reach elevator controls indicate that at least 86% of those tested could reach heights at least 54 inches. Empirical studies preformed to establish the low reach of persons with disabilities indicates that most people can reach as low as 9 inches above the floor.

38.    Additionally, the ERC's allegations regarding environmental controls are vague.  The specific types of controls are not identified.  In fact, based on this ERC's information, it cannot be established that the subject controls are the types of controls that are even covered by the FHA.

15

39.     Variables in the built environment can affect whether controls are accessible.  The location of the controls, in relation to other features of the built environment, is not provided.  It is not stated that such variables were considered.

**Conclusion**

40.     In sum, the allegation that "violations" are pervasive is not convincing when Crootof's Declaration is identifying single elements, in a single unit, in a single apartment community, as in ¶¶ 15, 16, and 17, and using the vague allegations discussed above.  Even those allegations that were more direct did not typically provide enough information back up their validity, as shown in my responses.

41.     The ERC's Memorandum and the Crootof Declaration does not sufficiently establish that Post properties are in violation of the FHA or ADA.

I declare under penalty of perjury that the foregoing is true and correct.

Executed April 25, 2007.

Mark Wales

16

Exhibit A
to
Declaration of Mark Wales

# Mark W. Wales, Associate AIA, CBO
**Code Consultant**

*1020 Bourque Road  •  Duson, Louisiana 70529-4402  •  Voice 337.406.9600  •  Fax 202.478.1673*

## CODES AND STANDARDS EXPERIENCE

Mr. Wales has broad experience in the codes and standards field.  Mr. Wales has used codes in the design and construction of buildings, enforced codes in two states, served as staff to one of the three model code organizations in the U.S. and been a consultant to organizations in government building regulations and codes and standards development.

Mr. Wales worked for over 10 years with Southern Building Code Congress, International, one of the three model code organizations in the U.S.  During that time Mr. Wales was involved in the development of many codes and standards covering a wide range of subjects. His work involved facilitating code development committees, acting as staff serving committees and serving as member of ode development committees. In addition, Mr. Wales edited codes and standards for the SBCCI.  That effort involved reducing the committee's work to writing and producing reports and code books ready for printing.

As a code analyst for SBCCI, Mr. Wales worked daily with building designers, constructors and owners to determine the code requirements for a wide range of building types and to assess alternative methods of code compliance.

Since 1992, Mr. Wales has worked in the U.S. arena for developing accessibility regulations. That work includes serving as a member of the ANSI A117 Committee for 14 years, which develops the Standard *A117.1- Accessible and Usable Buildings and Facilities.*

Mr. Wales served on the ANSI A117 Residential Task Force, which refined the dwelling unit accessibility criteria in the A117.1 Standard, and developed new requirements intended to provide housing as accessible as (meeting or exceeding) the requirements of Fair Housing Act Accessibility Guidelines

## CONSULTING EXPERIENCE

Mr. Wales is owner of Wales Associates, LLC, code consulting firm in business since 1999. Mr. Wales is knowledgeable in a wide range of technical codes and standards and the code development process of the model code organizations. Mr. Wales has represented national organizations in the development of codes, standards and government regulations.

Mr. Wales serves architects and building owners by offering code-consulting services for existing buildings and buildings under design.  These services include consultation through all stages of design, as well as plan review and evaluation of existing buildings, and development of alternative methods to meet codes and standards. Types of buildings for which consulting services have been provided include business, schools, churches, multi-family housing, nursing homes, hotel and conference centers, stadium, warehousing hazardous material, and explosives manufacturing.

Mr. Wales has represented a national organization of architects in the development of codes, standards and government regulations of accessibility related to the Americans with Disabilities Act (ADA), the Fair Housing Act Accessibility Guidelines (FHAG), ANSI A117.1 Standard, International Building Code, and the NFPA 5000 Building Code. He represented that organization in a task force that led to HUD's eventual acceptance of the ICC Code Requirements for Housing Accessibility as "safe harbor" for compliance with Fair Housing Act Accessibility Guidelines.

Mr. Wales assisted Vietnam in its early development stages of a national accessibility code.

Mr. Wales serves the legal process by providing research and interpretations of codes and standards to attorneys, as well as testifying as an expert witness.  Additionally, Mr. Wales has been involved in large cases related to the Fair Housing Act and the Americans with Disabilities Act as a consultant in litigation and settlement efforts.

**Mark W. Wales**, Associate AIA, CBO
Code Consultant                                   337.406.9600

---

**CURRENT PROFESSIONAL AFFILIATIONS AND COMMITTEES**
Member of the following organizations:
- International Code Council (ICC), member
- National Fire Protection Association (NFPA), member
- American Institute of Architects (AIA) Associate member
- Louisiana AIA - South Louisiana Chapter, member
- Building Officials Association of Louisiana (BOAL), member

Member of the following committees:
- ANSI A117 Committee – Accessible and Usable Buildings and Facilities ('92 – '04)
  - ANSI A117 Harmonization Task Force (99-05)
  - ANSI A117 Editorial Task Force (02-05)
  - ANSI A117 Residential Task Force (93-97)
  - ANSI A117 Plumbing Task Force (94-97)
  - ANSI A117 Membership Subcommittee (97-98)
  - ANSI A117 Research Task Force (97)
- U. S. Architectural and Transportation Barriers Compliance Board – Public Right-of-Way Access Advisory Committee (1999-2000)
- NFPA 5000 – NFPA Building Code - Building Systems Technical Committee (2001-2004)
  - Accessibility Task Group
- The American Institute of Architects (AIA)
  - Accessibility Task Force (1999-2004)
  - Codes and Standards Committee (1999-2001)

**PAST CODE DEVELOPMENT EXPERIENCE**
SBCCI Liaison to:
- ICC International Building Code - Means of Egress Subcommittee (including Accessibility)
- ICC/CABO One and Two Family Dwelling Code Committee
- ICC/CABO Model Energy Code Committee
- CABO Manufactured Home Construction and Safety Standards

Staff facilitator on SBCCI committees including:
- Fire and Life Safety Committee
- Code Action Committee
- Means of Egress Ad Hoc Committee
- Roofing Ad Hoc Committee

Secretariat for SBCCI committees including:
- Building Life Safety Committee
- General Design Committee
- Fire Code Development Committee

**DEGREES AND CERTIFICATIONS**
Bachelor of Architecture – The University of Southwestern Louisiana, 1979
Certified Building Official - Council of American Building Officials (CABO) not current
Certified Plans Examiner – Southern Building Code Congress International (SBCCI) not current
Certified Building Inspector – Southern Building Code Congress International (SBCCI) not current

**PRESENTATIONS**
AIA National Convention – 2001 Presenter – ADAAG Seminar
AIA National Convention – 2002 Presenter – ADAAG Seminar
National Multi-Housing Council – 2006 Panelist Property Management Committee – Fair Housing
AIA South Louisiana Chapter – International Building Code Seminar
CSI Louisiana  - International Building Code Seminar

## EMPLOYMENT

CODE CONSULTANT                                                     (1999-PRESENT)
*Wales Associates, LLC*                                         *Lafayette, Louisiana*

CODE ANALYST                                                         (1988-1999)
*Southern Building Code Congress International, Inc.*        *Birmingham, Alabama*

CHIEF OF DEVELOPMENT MANAGEMENT                                      (1986-1988)
*Manatee County Government*                                      *Bradenton, Florida*

PLANS EXAMINER                                                       (1984-1986)
*Acadian Metropolitan Code Authority*                          *Lafayette, Louisiana*

HOUSING INSPECTOR                                                       (1984)
*City of Lafayette*                                            *Lafayette, Louisiana*

OWNER                                                                   (1983)
*Wales Construction Company*                                   *Lafayette, Louisiana*

CORPORATE MANAGER                                                    (1981-1982)
*Cecil Perry Improvements, Ltd*                                *Lafayette, Louisiana*

ARCHITECT                                                              (1981)
*Production Management Corporation*                            *Lafayette, Louisiana*

ARCHITECT                                                              (1980)
*Leo A. Daly, Architect*                                          *Omaha, Nebraska*