## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **EQUAL RIGHTS CENTER,** | ) | |
| | ) | |
| Plaintiff, | ) | |
| vs. | ) | |
| | ) | |
| **POST PROPERTIES, INC.,** *et al.*, | ) | **Case No. 1:06CV01991** |
| | ) | **Judge Richard Leon** |
| Defendants. | ) | |
| | ) | |

### PLAINTIFF THE EQUAL RIGHTS CENTER'S
### REPLY TO DEFENDANTS' OPPOSITION TO PLAINTIFF'S
### MOTION FOR PRELIMINARY INJUNCTION

Plaintiff the Equal Rights Center ("ERC"), by its attorneys, respectfully submits this Reply to the Opposition ("Opp.") of Defendants Post Properties, Inc., Post GP Holdings, Inc., and Post Apartment Homes, L.P. (the "Post Defendants") to the ERC's Motion for Preliminary Injunction filed April 18, 2007. Substituting rhetoric and obfuscation for a clear delineation of the issues, the Post Defendants in their Opposition try to walk a fine line. They criticize the ERC's showing of its need for a preliminary injunction and the standards it used for determining the Post Defendants' violations of the fair housing laws, while at the same time not actually stating what standards they believe should be used to judge their violations of these statutes. However, under any recognized accessibility standards, the ERC has demonstrated that it is likely to be successful in showing that the Post Defendants' properties are in violation of the law. The public interest in rectifying discrimination is overwhelming and the ERC's harm if the Post Defendants are allowed to sell properties without appropriate safeguards is irreparable. Any harm to the Post Defendants is speculative and in any event, it is of their own making.

1.      The Post Defendants spend much of their effort attacking the efforts of the ERC and its employee, Rebecca Crootof, to investigate the Post Defendants' violations of the fair housing laws.  Their main objections seem to be that Ms. Crootof is not an "expert" in the fair housing laws and that the HUD Guidelines are not binding on them.  Neither objection is well taken.

a.    First, Ms. Crootof is a *fact* witness.  She managed the investigation and testing of the Post Defendants' properties, a factual inquiry.  Her job was to measure doors, thresholds, clearances in kitchens and bathrooms and take other objective measurements.  When permitted, she and her team also took pictures to document their work.  She then compared her team's measurements to the HUD Guidelines, another objective task.  In contrast, the Post Defendants' purported expert has not done *any* field work (that he reveals to the Court) to determine the Post Defendants' compliance with the fair housing laws.  Instead, his opinion that "the ERC is mistaken in their underlying theory that the Subject Properties are not in compliance with the FHA" is based on his review of the ERC's Motion for Preliminary Injunction papers and some largely unspecified FHA-related documents.  (Wales Aff. ¶¶ 4-6)

b.    As the ERC indicated in its opening Memorandum in Support of its Motion for Preliminary Injunction (p. 7, fn. 6), the Post Defendants are correct that the HUD Guidelines are not the only standards against which to measure compliance with the fair housing laws.  Those who design and construct covered housing may use the more rigorous ANSI standards or other alternative standards.[1]  However, *some* objective standard in harmony with the FHA must be followed and the HUD Guidelines are the

---

[1] A search of the federal caselaw did not reveal any other standards accepted by the courts other than ANSI or Guidelines published by HUD.

*minimum standards* for compliance.  56 Fed. Reg. 9476 (emphasis added); *U.S. v. Tanski*, 2007 WL 1017020 (N.D.N.Y.)  If a covered multi-family dwelling does not meet the HUD standards, it is not likely that it will meet other standards.  Thus, the fact that there are other standards, which the ERC has always acknowledged, does not help the Post Defendants.[2]  Try as they might, the Post Defendants cannot show, under any recognized accessibility standard, that a 22" door (or a 28" door) is wide enough for a person who uses a wheelchair or that a 1-1/2" threshold with no bevel is not an obstacle.  The Post Defendants' assertion that the latter violation is "trifling" (Opp. at 19) shows how little awareness the Post Defendants have for the significant barriers these violations create for persons with disabilities.

    c.  *U.S. v. Shanrie Co., Inc.,* 2007 WL 980418 (S.D. Ill. 2007) is one of the three cases that Mr. Wales lists on his resume'.  His tortured "anything goes" construction of the FHA did not prevail in that case.  *See* fn. 2 below.  The second case Mr. Wales lists is

---

[2] In adopting the Guidelines, HUD said in its preamble:

    …Congress, in the Fair Housing Act, specifically referenced the ANSI Standard, thereby encouraging utilization of the ANSI Standard as guidance for compliance with the Act's accessibility requirements.  Accordingly, in using the ANSI Standard as a reference point for the Fair Housing Act Accessibility Guidelines, the Department is issuing Guidelines based on existing and familiar design standards, and is promoting uniformity between Federal accessibility standards, and those commonly used in the private sector.  However, the ANSI Standard and the final Guidelines have differing purposes and goals, and they are by no means identical.  The purpose of the Guidelines is to describe minimum standards of compliance with the specific accessibility requirements of the Act.

56 Fed. Reg. 9476  Later on in the preamble, HUD opines that their Guidelines are not minimum standards but are a "safe harbor."  What is clear from the Guidelines and their preamble is that designers and builders must follow the Guidelines, the more restrictive ANSI or some other standard.  Courts have interpreted the Guidelines as setting minimum standards.  *See United States v. Shanrie Co., Inc.,* 2007 WL 980418 at *2 and *3, fn. 3 (S.D. Ill. 2007) (granting summary judgment to the U.S. on liability) and *U.S. v. Tanski*, supra at *11.

*United States v. Grant*, Case No. 01-2069 D/Pha (W.D. Tenn.), a case in which the preliminary injunction decision is cited repeatedly by the Post Defendants *sub nom. Memphis Center for Independent Living v. Grant. See* Opp. at 7, 11, 16, 30.[3]  Recently *Memphis Center* settled after the court granted the government partial summary judgment.  The Consent Decree, filed February 15, 2007, provides, at fn. 2 on p. 9, that in making public or common use areas accessible, Defendants will use ANSI as their standard or use a standard that is the equivalent or better.  Apparently, Mr. Wales's view did not prevail in that case either.  In the third case Mr. Wales cites, *United States v. Edward Rose & Sons*, No. 02cv73618 (E.D. Mich.), preliminary injunction decision reported at 246 F. Supp. 2d 744 (E.D. Mich. 2003), aff'd 384 F.3d 258 (6th Cir. 2004), the courts also viewed HUD's pronouncements as authoritative.  So does Mr. Wales when he is not wearing his litigation hat.  Attached to this Reply is a copy of a PowerPoint show he prepared for the National Multi Housing Council, the apartment industry's trade group.  Note that slides 9-14 and 37-38 use the same HUD Guidelines as the ERC did.

d.  Mr. Wales is purportedly an "expert" on the FHA.  His affidavit is almost entirely legal argument; it should have been labeled a brief.  He is a non-lawyer from Louisiana who attempts to usurp the role of the Court in determining whether ERC has demonstrated that it is likely to prevail on the merits.  As noted above, his views have yet to be accepted by any court.  This Court should similarly ignore him.

---

[3] *Memphis Center* is not relevant to this case since there the plaintiff sought to halt construction of an apartment complex.  There is no suggestion in the opinion that the builder was about to sell the complex to a third party.  Rather the court decided that retrofitting would be an adequate remedy if liability were found.

e.   At the time of its motion for summary judgment, the ERC will submit the report of an architectural firm which will do a complete physical survey of all of the Post Defendants' properties designed and built for first occupancy after March 1991.[4]  For this Motion for Preliminary Injunction, a 100% survey was not possible.  However, the ERC did survey about half of the Post Defendants' properties and found violations at every complex.  The number and variety of violations make it plain that the ERC is likely to demonstrate on summary judgment or at trial that the Post Defendants are guilty of a pattern and practice of discrimination against the disabled.

f.   The Post Defendants nibble around the edges of the ERC's investigation and testing of the Post Defendants' properties, attempting to obfuscate the evidence of their violations of the law.  For example, they quarrel with the ERC's conclusion that untested properties are in violation because when an apartment bathroom has the tub on one wall and the adjoining walls are the length of the tub, there is not enough room in the bathroom for a person in a wheelchair to maneuver.  There might be enough room if the bathtub were 8 feet long.  However, in the tested properties, bathrooms with that configuration did not have enough room for a person in a wheelchair to maneuver.  A 6' by 6' room that has a tub, toilet and sink in it is obviously not big enough for a person in a wheelchair.  That none of the tested properties had 8' tubs strongly suggests that the untested ones do not either.

---

[4] The ERC served its First Request to Inspect on the Post Defendants on April 5, 2007.  When the undersigned called counsel for Defendants to discuss arrangements for the inspection, they advised that such discovery was premature and indicated that they would be filing a motion to stay discovery.  That motion was subsequently filed and yesterday was denied by the Court so those inspections will go forward.  It is ironic that the Post Defendants complain about the lack of an architectural survey while taking steps to thwart such a survey.

2.     The Motion for Preliminary Injunction is not "premature" (Opp. at 2).  The Post

Defendants' conduct in selling properties out from under this Court's jurisdiction has

necessitated this Motion.  Moreover, the Post Defendants talk out of both sides of their mouth on

the issue of whether their buyers are made aware of the implications of this lawsuit.  On the one

hand, they suggest that any "potential purchaser of Post properties will undoubtedly have notice

of this lawsuit and therefore, section 3613(d) [the bona fide purchaser exception to the FHA] will

not apply to limit the relief, i[f] any, granted here under the FHA."  Opp. at 19.  On the other

hand, Post CFO Christopher Papa, in his Affidavit at ¶12, says:

> It would be extraordinary for a seller such as Post to reserve the right
> of access to a property, including residents' units, to make modifications
> after the property had already changed hands.  Buyers generally would not
> agree to allow a third party (i.e. the ERC) to exert control over property
> modifications after signing a contract... .  This could result in a reduction
> in the value of Post's properties or an inability to sell.  Consequently, the
> price of property could drop dramatically.  In effect, the ERC would freeze
> the sale of condominium units and the Subject Properties for the course of
> the litigation.

If the Post Defendants in fact are making full disclosure to their buyers of the risk of retrofitting,

the buyers would know that, since they are not bona fide purchasers under the FHA, there is a

substantial risk that any covered multi-family dwellings they purchase will need to be retrofitted.

The buyers would know that Post will need to come back into the property to make

modifications under the supervision of whomever the Court appoints to monitor the retrofitting.

That Mr. Papa is willing to swear that a speculative parade of horribles will occur if this Court

orders the Post Defendants to include in their contracts what the buyers ought to be told anyway

suggests that the Post Defendants are not making full disclosure to their buyers; any failure to

disclose puts ERC at risk that the buyers will claim to be bona fide purchasers and thus exempt

from any retrofitting order.  The ERC should not have to risk the uncertain legal status of a

subsequent purchaser merely so that the Post Defendants can profit from the sale of inaccessible properties.

3.      The Post Defendants' suggestion (Opp. at 19-22) that there are other ways to obtain retrofitting relief besides an injunction against them is nonsense.

a.   The Post Defendants suggest that "the ERC can always file suit against the new owner."  Opp. at 20.  Sue them for what?  It is the entities that *design and build* the covered multi-family dwellings that are liable for retrofitting.  Subsequent bona fide purchasers are under no obligation to permit retrofitting, let alone pay for it, at least not without the necessity of expensive, protracted and uncertain litigation.  The Post Defendants cite a HUD rule that condominium builders who sell units prior to construction are still required to *build* the units in accord with the FHA and then assert, without citing any authority, that unit owners must provide access to ensure compliance.  Then, without any authority, the Post Defendants say:  "[w]hen this concept is expanded to the sale of entire buildings, it is clear that a court may require a new owner to grant Post access to make any retrofits."  (Opp. at 21)  This assertion is apparently based on a HUD rule that says that condominium builders cannot escape their FHA obligations by claiming that the units they are building are already sold.  However, the FHA is clear that bona fide purchasers without notice of the lawsuit are not subject to the Act.  Neither are the purchasers parties to the litigation.  Many may not ever be subject to the jurisdiction of the Court.  Despite Post's desire to pass its compliance problems on to third parties, that is certainly not a practical or legal option.

b.   The Post Defendants' argument (Opp. at 20) from *Baltimore Neighborhoods, Inc. v. LOB, Inc.*, 92 F. Supp. 2d 456 (D. Md. 2000) that innocent parties can be included in a

court's injunction is misleading. It is true that, after finding that the modest inconvenience to residents was outweighed by the benefit to plaintiffs, Judge Black ordered the condominium association to cooperate with retrofitting to make the common areas of the condominium accessible. *Id.* at 469. However, the court noted that retrofitting of individual units was voluntary. Unit owners within the condominium complex had to agree to retrofit their units. To encourage them to do so, the court ordered the developer to deposit funds into the registry of the court not only for the cost of retrofitting individual condominiums, but to deposit an incentive payment of $3000 per homeowner to encourage the unit owners to agree to make their homes accessible. *Id.* at 470-71. Thus, *Baltimore Neighborhoods* does not suggest that bona fide purchasers can be ordered to retrofit.

4.      The Post Defendants' assertions that they will be harmed by the injunction ignore the fact that they have brought any harm on themselves. For more than 15 years, the Post Defendants have ignored their obligations under the FHA and ADA. The ERC seeks only that the Post Defendants not interfere with the remedies Congress provided for violations of these fair housing laws. The only harm the Post Defendants will suffer will be that resulting from bringing their properties into compliance with the law, a harm they could have avoided had they designed and built their properties in compliance with the law from the outset.

5.      The Post Defendants argue that some of their properties are not subject to the FHA. Opp. at 28-29. As the ERC mentioned in its opening Memorandum (at p. 6, fn. 3), in garden apartments without elevators, only "first floor" units are covered by the FHA. However, the Post Defendants are surely not going to sell the upper floors of a garden apartment complex without selling the first floor apartments with them. As pointed out in the ERC's Memorandum and Affidavits accompanying its Motion, the Post Defendants' have a relatively new portfolio of

- 8 -

apartment complexes, and they are still building apartments that do not comply with the fair housing laws. The proposed injunction submitted with the ERC's Motion specifically excludes properties built before the effective date of the FHA and is thus narrowly tailored to avoid any unnecessary harm to the Post Defendants.

6.    The public interest will be served by issuance of an injunction. Recognizing that the threat of damages alone would not bring about compliance with the fair housing laws, Congress granted the courts broad powers to issue injunctions in cases such as this. While the Post Defendants are correct (Opp. at 29) that restraints on alienation are disfavored, discrimination against the disabled is also disfavored. The Post Defendants would not be precluded, under the requested injunction, from selling their properties. They would simply be precluded from using those sales to escape their obligations under the fair housing laws.

Dated:  May 2, 2007

Respectfully submitted,

*Sheila J. Carpenter*
Sheila J. Carpenter
DC Bar #935742

Jorden Burt LLP
1025 Thomas Jefferson St. N.W.
Suite 400 East
Washington, D.C.  20007
Tel:  (202) 965-8165
Fax: (202) 965-8104

*Donald L. Kahl*
Donald L. Kahl
DC Bar # 489472

Washington Lawyers' Committee for
 Civil Rights and Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, D.C.  20036
Tel:  (202) 319-1000
Fax:  (202) 319-1010

Attorneys for Plaintiff
Equal Rights Center

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 2nd day of May, 2007, a copy of the foregoing **Reply of Plaintiff the Equal Rights Center to Defendants' Opposition to Plaintiff's Motion for Preliminary Injunction** and attachment were filed via the electronic case filing system of the United States District Court for the District of Columbia and accordingly, that the Court will send notice of this filing electronically to:  Christopher Hanback at, Alan I. Baron at, and Rafe Petersen at, counsel for defendants.

*Sheila J. Carpenter*
Sheila J. Carpenter

# Fair Housing and ADA Design and Construction

## Risk Mitigation – A TEAM Approach!

### NMHC Property Management Committee

January 11, 2006

Mark Wales, Associate AIA, CBO

Wales Associates, LLC

# WELCOME!

## ACT NOW!!!!

# An important and timely message

January 11, 2006

2

# Are YOU the owner?

- Low income
- Garden Style walk-up apartments
- Shelters
- Dormitories
- Nursing Homes
- Hi-Rise luxury apartments
- Condominiums
- Townhouses (single story or elevatored)



# Generally, FHA applies to housing:

**ARE YOUR PROPERTIES COMPLIANT?**

- built since 1991

- Any multifamily housing that includes 4 dwelling units in the same structure

January 11, 2006

4

# Compliance Awareness Level – How do you score?

- Aware there is a law
- Do not know if you comply
- Somewhat compliant
- Aware and compliant
- Dazed and confused

# Then ask yourself!

- Do you provide accessible pedestrian routes leading from each covered dwelling unit to the office/community buildings?



# Do you have accessible pedestrian routes to mail boxes, trash dumpsters, or laundry rooms?



# Accessible Parking????

Are you providing
   accessible parking?


Are you providing
   accessible parking of
   all types – lot, garage,
   carport, detached,
   attached, etc??





Dimensions of Parking Spaces in Parking Lot (Van Accessible)



Accessible Space Street Parking

January 11, 2006

8

# Protruding Objects

Do you have stairs without protection from head injuries?



# Doors



**Doorway Depth**

- Are doors wide enough? All doors?
- Are the opening forces too great?
- Are sliding door thresholds over ¾ inches high?

# Light switches, and environmental controls

- Are switches and thermostats over 48 inches from the floor?

- Are receptacles less than 15 inches from the floor?

- Are switches and receptacles over 46 inches above the floor at counters?

- Are switches and receptacles in corner of kitchen counters?



January 11, 2006                                                           11

# Kitchens

■ Clear floor spaces centered on appliances and fixtures?
- Sinks?
- Ranges?
- Refrigerators?



# Kitchens ….

- Is there at least 40 inches clearance in the kitchen?
- Is there at least 60 inches clearance in U-shaped kitchens?
- Do any appliances interfere with clearances?



# Bathrooms -



■ Are the bathrooms arranged to have a 30 X 48 inch clear floor space beyond the swing of the door?

■ A 30 X 48 inch clear floor space centered on the lavatory?



January 11, 2006

14

# The unfortunate TRUTH !

- If you are not sure that you comply – there is a high degree of probability that you do not!

- Even if you are taking some steps to address Fair Housing in new construction – there is still a good chance your products are noncompliant.

January 11, 2006

15

# So what?

■ It is a crucial that you

## **get a handle on it**.

■ And, there are pitfalls to be avoided !

# The Delusion!!!

- We comply!
  - We have procedures in place!
  - Be careful!  What is the basis of your confidence?
  - Let's look at some common pitfalls!

# Our **staff** is covering it!

- Is your staff well educated in FHA design & construction requirements?

- Where is accessibility in their list of priorities?

- Is your staff depending on:
  - the architect, accessibility consultant, and/or building department!

# My **architect** is covering it!

- How knowledgeable is the architect of FHA & ADA.
- The tools or the architect can be a source of mistakes
- Plan revisions can cause noncompliance.
- "Equivalent" materials and products aren't!
- Architect certified it was compliant!
- Architect may be counting on:
  - your personnel, accessibility consultant, building department, etc.

# **Building department** approved it!

■ Local building department:

– Personnel are often not educated in FHA and ADA.

– May not review for compliance with federal laws.

– May review to state and local accessibility requirements only.

– Have limited resources and too many codes to check focus is on life safety – (fire, wind, snow, seismic)

– Depending on architect and constructor to watch it

# I hired an accessibility consultant to watch it!

- Consultant may not be involved at all the right stages of the project.
  - Plans are changed after the review.
  - Changes are made on site without consultant.
  - "Equivalent" materials and products are substituted.
  - Appliances and fixtures are sized differently than in plans.

# Summary of pitfalls

- Everyone thinks someone else is watching the fort!
- Lack of education on all fronts.
- Lack of coordination between parties
- Lack of attention to detail.
- Disconnects in the process

# ACT NOW or Wait???

- Whether you act now or later, there are certain common elements to the process.

- If a suit is filed, additional elements are added to the process.

# The process

■ The process to bring your properties into compliance, and keep them there includes:

   ■ Observation

   ■ Analysis

   ■ Evaluation

   ■ Developing a plan to address the issues

   ■ Implementing corrective actions

   ■ Understanding the issues

# Common elements of the process

- Owner establishes a priorities with help of advisors

- Observation, Analysis & Report
  - Consultant collects data from site
  - Consultant analyzes data
  - Consultant writes report of findings

- Owner assesses the findings

# . . . .

- Legal counsel and accessibility consultant assist owner in:
  - Determining positions on issues
  - Determining course of action
  - Developing a plan of action
  - Developing a plan for corrections

- Owner implements the plan

# After a suit is filed…..

- All the above actions, plus:
    - The plaintiff is involved in the decisions
    - Court proceedings determine schedule
    - Corrective action may be based on someone else's priorities
    - Defense posture is less than desirable
    - The learning curve is steep
    - The process is more costly in many ways

# REASONS TO ACT NOW

- Time
- Greater control of the process
- Business Considerations
- Money

# REASONS TO ACT NOW.........

- Time

You'll have more time to:

- Learn what to do
- assess and analyze details
- develop a plan of action
- develop and implement a transition plan for corrections

# REASONS TO ACT NOW………

- Greater control of the process
  - Process based on your priorities
  - Process based on your schedule
  - Better posture

# REASONS TO ACT NOW……...

■ Business Considerations

    – Action Now will provide:

        ■ Better opportunity to protect your reputation

        ■ Less stress on business relations

        ■ Prepared response in case a suit is filed

    – Waiting can result in:

        ■ Disruption of business plan

        ■ Delays in projects

        ■ Reduced revenue generation

        ■ Interruption of operations at each property

        ■ Public knowledge of the suit

# REASONS TO ACT NOW………

■ Money………….Acting NOW
– Remember, previous work is still applicable
– May be able to avoid a lawsuit
– Well thought out positions and details are prepared through the process

# REASONS TO ACT NOW………

- Money………After you are sued
  - Legal fees will likely be higher
    - Larger contingent of legal advisors
    - Court proceedings
  - Accessibility consultant:
    - Availability of your choice of consultant is uncertain
    - More consultants may be required

# REASONS TO ACT NOW………

■ Money………After you are sued..

■ Business Costs:

– Development may be slowed or halted

– Property management personnel are taken away from normal duties to scramble to meet court proceeding deadlines

– Costs associated with disclosure in sale of property

– Corrective measures may include more items and at a significantly higher cost

– Corrective measures must be accomplished according to someone else's timetable

– Business relations are stressed

# Corrections: Cost Examples

■ Consider these cost estimates:
- Provide clear floor space in kitchen with removable base cabinet at cook top - $158,000 per property
- Outlets  over kitchen counters to be relocated (max ht. 46") $310 per unit X 243 kitchens = $75,000

# Corrections: Cost Examples

■ Consider these cost estimates:

– Replacing lavatory cabinet with removable base cabinet and pipe insulation - $78,000 per property

– Adjustments to provide clear floor space in bathrooms - $13,000 per property

# Corrections: Cost Examples

■ Consider the cost:

– Increasing clearance in kitchen to 40 inches - $48,000 per property

– U-Shaped kitchens do not have a 60-inch turning radius (demo, replace countertop, relocate base and wall cabinet, patch flooring) - $1,410 per unit X 113 kitchens = $159,000

■ Alternate: replace refrigerator with shallower model - $1100 X 113 kitchens = $124,000

January 11, 2006                                                                37

# Corrections: Cost Examples

- Increase maneuvering space in kitchen which required moving the islands/ peninsulas with granite tops in 26 units, the estimated cost was about $200,000, (one project)

- To provide sufficient clear floor space in 32 kitchens in which the range was in the corner of a u-shaped kitchen and the refrigerator had a wall protruding out next to it, the cost was $320,000.

- To remove and replace the lavatory bowl (centered on the vanity but too close to the wall) to allow centered clear floor space, in 72 units - $86,000.

# MONEY

There is a public rumor that most of these lawsuits are costing the owners

## $15,000,000  to  $20,000,000

# How do you approach this?

- What should you do to reduce risk and mitigate risk?
  - Don't hesitate! Hesitation will cost you!

- The enormity of the task seems overwhelming. How to we tackle this problem?
  - Build a Team!

# The Team Approach

- As we've seen, many of the breakdowns in compliance are due to disconnects between the folks that are involved in the process of design and construction.

- A strong TEAM approach will alleviate many of the problems.

# The Goal

- **The goal is:**
  - to establish protocol that protects the interest of all the team members as it relates to meeting the requirements of accessibility.
  - to work with thoroughness and attention to detail.
  - for every team member to protect the other – to everyone's mutual benefit.
  - And, KEEP IT SIMPLE!

# Step 1 – Establish the Team

■ Establish the CORE TEAM.
  – Who will be part of the core team?
    ▪ Owner representatives
    ▪ Legal counsel
    ▪ Accessibility consultant

# Extended Teams

Specific teams might include:

- Acquisition Team
- Current Holdings Team
- New Design and Construction Team

# Team members

- Teams might include the Core Team as well as the following components:
  - Architect
  - Constructor
  - Property Management
  - Financial advisors
  - Others as identified
- Each of the identified members will participate as needed.

# Step 2 Synchronization

■ Team education

– It is important that all members are sufficiently educated in the technical requirements of the laws, guidelines and technical assistance material to identify problems and question team decisions.

– Legal counsel and consultant will provide education to the team members

# Step 3 – Protocol

- ■ The team will
  - – develop goals and objectives
  - – start to establish protocol for the team's work as well as the overall effort
  - – Develop protocol for projects based on status ….acquisitions to construction

# Protocol

- Protocol may be different for each owner, based on their corporate structure and relationships

- Protocol will be established to protect the interests of the stakeholders

# Acquisitions Team

■ Due diligence to understand maximum exposure prior to acquisition

■ The experience of this team will also be helpful in future property sales

■ Team may include owner, counsel, property management, financial advisor, others.

# Current Holdings Team

- Assess current holdings
- Identify corrective actions
- Develop transition plan
- Establish positions on issues
- Establish management protocol
- Team may include:
  - owner, counsel, consultant, property management, architect, construction personnel

# New Design and Construction Team

- ■ Develop customized design standards
- ■ Develop design and construction checklists
- ■ Develop design and construction monitoring procedures
- ■ Develop management protocol
- ■ Develop certification procedures
- ■ Team may include:
  - – owner, counsel, consultant, architect, engineer, construction personnel, property management

January 11, 2006                                                                 51

# Prioritize

■ Prioritize based on goals and objectives.

■ For example: If the objective is to assure compliance of any new design or construction, then the priorities may look something like this:

- Current construction

- Design in progress

- Considered acquisitions

- Future design

- Properties built or acquired in last two years

- Older properties

# TEAM APPROACH Advantages

- Reduces or eliminates noncompliance in new projects

- Mitigates risk overall

- Reduces stress in relationships

- Projects are developed with wide knowledge base of all members.

- Defendable decisions are documented

- Team will be able to defend their decisions

# SUMMARY

- Your portfolio probably includes properties covered by FHA
- Your awareness perception may not be accurate
- Your properties are probably not compliant
- Misconceptions do not make a good defense
- The Team approach is most advantageous
- This is an urgent issue that requires immediate action!



January 11, 2006

55

# Disclaimers

1.    My comments in this presentation are intended to provide guidance to owners regarding steps I believe would be helpful in mitigating risks associated with noncompliance with ADA and Fair Housing.  They are also intended to promote accessibility in housing by proactive methods.

2.    The comments are intended to be general in nature and to be examples. My comments here are not provided as guidance in any specific circumstances, nor do they reflect my opinions of specific cases or requirements.

3.    This program is not intended to be instructive in the technical provisions of FHA or ADA

4.    For the purposes of this seminar, my comments do not necessarily reflect my views and interpretations of the requirements of the law or technical criteria of any of the safe harbors as they would apply to any specific case.

5.    Additionally, examples used in this discussion may be real life examples, but are not to be regarded as specific to my clients or any group of clients identified here.

6.    Examples and lists are not exhaustive and not intended to reflect detailed requirements of any law, code, or standard.

January 11, 2006

56

# Wales Associates, LLC
## Codes ~ Standards ~ Accessibility

**Mark Wales** Associate AIA, CBO

1020 Bourque Road

Duson, LA 70529

Office phone:   337.406.9600

Office fax:      202.478.1673

Email: Mark@WalesAssociates.com

January 11, 2006                                                    57