## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

EQUAL RIGHTS CENTER    )
             )
  Plaintiff,       )
             )
  vs.          )   Case. No. 1:06CV01991
             )   Judge Richard J. Leon
POST PROPERTIES, INC.   )
POST GP HOLDINGS, INC.   )
POST APARTMENT HOMES, L.P. )
             )
  Defendants.     )

### AFFIDAVIT OF PAUL STANLEY SHERIFF

I, Paul Sheriff, being over the age of 21 years, have personal knowledge and am competent to testify to the matters set forth herein. I hereby state as follows:

### BACKGROUND

1. I reside in Honolulu, Hawaii and I am the founder and President of Paul Sheriff Incorporated. Paul Sheriff Incorporated was founded in 1991 and provides its services to large corporations, small companies, architects, attorneys, individual business owners and insurance companies, to assess and accomplish accessibility compliance of building for persons with disabilities under applicable federal and state law.

2. In addition, I am a paraplegic and have used a wheelchair for the past 25 years. I became a paraplegic due to an auto accident in 1982 and thus have a special insight into life's challenges for persons with disabilities.

3. I have received numerous recognitions and achievement awards including being named one of the United States Jacyee's Ten Outstanding Young Americans, the American

1

Veterans Silver Helmet Rehabilitation Award, and the American Society of Interior Designers Human Advancement Award for providing seamless integration between the able-bodied human environment and the disabled human environment. Moreover, I was honored by the Senate of the State of Hawaii for my "outstanding achievements and service to the people of Hawaii."

    4.    I have started a number of small businesses, including my consulting corporation, Paul Sheriff Incorporated. Through Paul Sheriff Incorporated, I provide a wide range of services such as compliance strategies for buildings, facilities, corporations and organizations to comply with the requirements of the Americans with Disabilities Act ("ADA"), the Fair Housing Amendments Act ("FHAA") and Air Carriers Act. I also provide services concerning spinal cord injury life care. Specifically as to the ADA and FHAA, I offer the following services (some of which are outlined in greater detail below):

        a.  Special Master to the Court
        b.  Court Monitor to the United State District Court for District of Hawaii Magistrate Judge
        c.  Arbitrator/Mediator to the United State District Court for District of Hawaii Magistrate Judge
        d.  Public Rights-of-Way Access Advisory Committee Attendee USATBCB
        e.  Technical advisor to clients on Department of Justice, Department of Housing & Urban Development, and Hawaii Civil Rights Center investigations.
        f.  Client Consulting vs. Hawaii Civil Rights Center
        g.  Blue Print Reviews
        h.  Site Roll-Thrus
        i.  Site Surveys
        j.  Barrier Identification Surveys
        k.  Defense Work
        l.  Auto CAD Barrier Removal Drawings
        m.  Barrier Removal Implementation Plans
        n.  Barrier Removal Budgeting and Time-Lines
        o.  Skilled Equivalent Facilitation and "Alternative Barrier Removal Specialties"
        p.  Negotiator, Medication, and Arbitration for on-site roll thru settlements
        q.  Consulting and Dispute Resolution
        r.  ADA Project Coordinator
        s.  Sensitivity Awareness and Education
        t.  Specifications for ADA Signage, Hardware and Accessories
        u.  Policies and Practices Modification

v.   Client Education
w.  Courtroom "On the Stand" Expert Testimony
x.   Status and Settlement Conference Participation
y.   Design Review
z.   Scoping, Schematic, Adaptability Review and Documentation
aa. Project "Legal File History"
bb. Consultation on Design and Adaptability Option
cc. Periodic Construction Compliance Roll-Thrus

## EXPERIENCE

5.      Federal Court Monitoring Services:  As a federal court monitor I have been
appointed by United States District Court for the District of Hawaii Judges and Magistrate
Judges to provide services to the federal court in the areas of compliance monitoring, mediation,
arbitration and supervision of implementation of settlements to lawsuits and to settlement
agreements.  In this capacity, I also provide services enabling parties to reach mutual agreements
and courses of action through legal stipulations.

6.      Blueprint reviews:  I provide blue print reviews for architects, contractors, and
other entities in order to ensure that the minimum requirements of the accessibility guidelines are
met in the design and blueprint stage.  Blue print review can be provided from conceptual and
scoping phases of the project clear through final cut sheet and shop drawing stages. The scope of
blue print review can be from small, single element projects, such as ramps or parking to multi-
story, multi-million dollar facilities.

7.      Barrier Identification Surveys.  Barrier Identification Surveys are provided to
identify all of the accessibility barriers that exist in an existing facility that do not comply with
the minimum design standards of the Americans with Disabilities Act Accessibility Guidelines
(ADAAG).  Such surveys primarily consist of a series of photographs identifying the barrier with
the corresponding ADAAG section.  The site survey can then be used as a base and starting point

3

for a barrier removal plan in order to responsibly remove barriers for a facility to become compliant with the barrier removal obligations of the Americans with Disabilities Act.

8.    Roll-thru Surveys. Whereas the Barrier Identification Survey is provided on paper with text and photographs, a roll-thru is used to identify barriers and to begin the road map to barrier removal and compliance strategies. Another common service provided for entities and facilities is the site "usability" roll-thru. It is an on-site roll-thru in which the site is analyzed on foot and on wheels and discussions and recommendations are provided on the spot at the time of the roll-thru. This practice is usually done with facilities and personnel, as well as with contractors and maintenance individuals.

9.    I would estimate that I have performed over 2,500 facility roll-thrus with various applications. These have been utilized as evidence in court, where I have been qualified as an expert witness.

10.    The nature of the assessment and the overall purpose of a usability roll-thru is different from a technical blueprint review or a site survey. I perform the roll thru as a qualified person with a disability and also as wheelchair user who has substantial knowledge of the ADA's and FHAA's basic requirements and safe harbors. In effect, I field test a covered dwelling unit and make an assessment of whether the elements of design provided under the FHAA are being met.

11.    Overall, the goal of the assessment is to determine if the unit has the requirements of accessibility and usability. Therefore, following the requirements of the FHAA, I look for the following items based on the Congressional intent of the Act: (1) the public use and common use areas of multifamily facilities are readily accessible and usable by handicapped persons; (2) all the doors within the dwelling allow passage and are sufficiently wide enough to allow passage

4

by handicapped persons and persons who use wheelchairs; (3) there is an accessible route into and through the dwelling; (4) light switches, electrical outlets, thermostats, and other environmental controls are provided in accessible locations; (5) there are reinforcements in bathroom walls and other appropriate areas to allow later installation of grab bars; and (6) the kitchens and bathrooms are designed to allow an individual in a wheelchair to maneuver about the space.

12. This is not done with simple measurements, but rather with an actual use of the facilities. By actually maneuvering through the space, approaching the facilities, and using them I can determine whether or not the units as built are actually usable to a person in a wheelchair. This gives me a perspective on the usability of an element of design (e.g. the kitchen or bathroom) that simplistic floor plan review cannot provide. Thus, a roll-thru is a practical approach to determine if the elements of the unit that are reviewed are actually usable by a person with a mobility disability.

## REVIEW OF CROOTOF DECLARATION

13. I have been asked to review multiple documents and to provide my opinion of the allegations made by the Equal Rights Center ("ERC") in their Motion for Preliminary Injunction as to the accessibility and usability of certain design elements at various Post Properties dwelling units and public and common areas. Included in my review were the following documents:

    a. Motion of Plaintiff the Equal Rights Center for Preliminary Injunction;

    b. Memorandum of Points and Authorities in Support of Plaintiff the Equal Rights Center's Motion for Preliminary Injunction and all attached and exhibits;

    c. Declaration of Rebecca Crootof, including plans and brochures attached thereto; and

    d. Declaration of Sheila J. Carpenter in Support of the Equal Rights Center's Motion for Preliminary Injunction.

    e. Reply Memorandum of the Equal Rights Center

5

14.    Based on my extensive experience in advising clients on the FHAA and on my roll-thru of three of Post's properties, I was shocked, stunned, and disappointed by both the methodology and conclusions of the ERC and their declaration.

15.    First, I disagree with the suggestion by the Plaintiff in this case that the Guidelines are mandatory. As noted in the Federal Register:

> In developing the final guidelines, the Department was cognizant of the need to provide technical guidance that appropriately implements the specific accessibility requirements of the FHAA of 1988, while avoiding design specifications that would impose an unreasonable burden on builders, and significantly increase the cost of new multifamily construction. The Department believes that the final Guidelines adopted by this notice (1) are consistent with the level of accessibility envisioned by Congress; (2) simplify compliance with the FHAA by providing guidance concerning what constitutes acceptable compliance with the Act; and (3) maintain the affordability of new multifamily construction by specifying reasonable design and construction methods.

56 Fed. Reg. 9472

> The design specification presented in the Fair Housing Accessibility Guidelines provides technical guidance to builders and developers in complying with the specific accessibility requirements of the FHAA of 1988. The Guidelines are intended to provide a safe harbor for compliance with the accessibility requirements of the FHAA, as implemented by 24 CFR 100.205 of the Department's Fair Housing regulations. The Guidelines are not mandatory. Additionally, the Guidelines do not prescribe specific requirements which must be met, and which, if not met, would constitute unlawful discrimination under the FHAA. Builders and developers may choose to depart from the Guidelines, and seek alternate ways to demonstrate that they have met the requirements of the FHAA.

*Id.* at 9473.

16.    While the Guidelines provide minimal design recommendations for qualifying under the safe harbor, deviations from the non-mandatory Guideline recommendations is not viewed as a violation of the FHAA. Moreover, it has been my experience, that as a practical matter, deviations from the Guidelines do not make a dwelling unit unusable, inaccessible, or noncompliant to a person with disabilities. Merely taking a few cursory measurements at a

6

property and reviewing a floor plan prepared for marketing purposes does not constitute enough evidence to demonstrate that the important but vague requirements of the FHAA are being met. As borne out by the roll thru, there are many ways to make a covered dwelling unit usable and accessible and no one design is required.

### PROPERTIES VISITED

17.    I was asked to visit and perform roll-thrus in three Post properties in the greater Washington, DC area. In particular, I visited Pentagon Row (1201 South Joyce Street, Suite C-1 Arlington, VA  22202), Carlyle (501 Holland Lane Alexandria, VA  22314), and Massachusetts Avenue (1499 Massachusetts Avenue, NW Washington, DC  20005). I saw individual units that reflected a cross-section of the different unit designs at each property. Each roll thru at the individual units and common areas of each property was filmed.  I have attached a true and correct copy of the film from the roll-thrus at each property and have also provided still photos from that tape for the court's convenience.

18.    The roll-thrus I performed for this case differ from those mentioned above only in the fact that there was no spoken narrative. The purpose of the roll thru was to show only that the elements required to be usable and accessible under the FHAA were in fact usable and accessible.

**Pentagon Row**

19.    I performed a roll-thru examining usability and accessibility elements at the following locations of the Pentagon Row apartment community:  the entrance into the building and the leasing office; apartment home 2342 (an unfurnished one bedroom, one bath unit); apartment home 2340 (a one-bedroom, one bath model unit); apartment home 2424 (an

7

unfurnished studio unit with one bathroom); the community center; the fitness center; the fitness center bathroom; and the pool.

**Carlyle**

20.    I performed a roll-thru examining usability and accessibility elements at the following locations of the Carlyle apartment community:  the entrance into the building and the leasing and condominium sales offices; apartment home 104 (an unfurnished one bedroom, one bath unit on the ground floor); apartment home 307 (a two bedroom two bath model unit); the trash room; the community center; the business center; the fitness center; and the fitness center bathroom.  It is my understanding that apartment home 104 was recently rented by a person with a disability who also uses a wheelchair.

21.    In addition, I performed a roll-thru at several condominium units at Carlyle. Specifically, I performed a full roll-thru at 218 (an unfurnished studio, one bathroom home); 215 (a one bedroom one bathroom model home).  Following the roll-thru at the two condominium units, I requested to see other units in order to see further variation of units (and in particular "inline units" in the middle of the hallway).  I was then granted entry into a number of other units (unit numbers 201 and 204).  While we did not video the observations, I maneuvered around the space in the same manner as the units at which I performed a full scale roll-thru.

**Massachusetts Avenue**

22.    I performed a roll-thru examining usability and accessibility elements at the following locations of the Massachusetts Avenue apartment community:  the entrance into the building and the leasing office; apartment home G07 (a one bedroom one bath model unit); apartment home 1101 (an unfurnished two bedroom, two bath unit); the community center; the

8

business center, the fitness center; the fitness center bathroom; the roof-top deck; and roof-top shower bathrooms.

## OBSERVATIONS ON ROLL THRU

23.     I have attached copies of the full unedited video and film, which was taken at each roll thru. It is important to note that these roll thrus were not staged but performed live. I did not prescript or perform a "trial run" through any of the units with the camera off. Moreover, I did not delete any of the tape or otherwise edit it. The attached video (**Exhibit A**) and still photographs (**Exhibits B through O**) taken from the video present the roll thru exactly as it happened, in real time.

24.     For each roll-thru, I followed the same general process in each apartment building and each individual dwelling unit. First, I concluded that the public and commons areas were readily usable and accessible. Then, in each individual unit, I concluded that the elements inside the units, which are required to be approachable and usable, were in fact designed and constructed to be useable in the manner in which constructed. Upon entering a dwelling unit, I determined whether or not the required doors were of adequate width, whether sufficient floor space existed for me to maneuver about in the various rooms and whether an accessible route throughout the unit existed. I also tested the thermostat control and light switches. I maneuvered about the kitchen, approaching the kitchen sink and stovetop, using the refrigerator, the dishwasher and oven. I determined if I could reach light switches in the kitchen as well as the garbage disposal switch. Subsequently, I tested the bathroom. I investigated whether the bathroom doors allowed passage and whether the swing of the door would interfere with use of the bathroom. I utilized the clear floor space and maneuvering space in the bathroom to enter and close the door. I also utilized maneuvering space at bathroom fixtures, e.g., vanities,

9

lavatories, and toilets, and I determined whether clear floor space at the bathtubs existed. Overall, I maneuvered around the entire dwelling unit and then exited back into the public and common space.

25.     The following summarizes my observations and includes some specific examples from the video:

**Entrance to Building**

26.     I found the building entrance at each of the three properties to be accessible. Each building had designated parking spaces that were clearly marked and access is provided. At each entrance, I was able to access and use the push plates which automatically open the door or was able to open the door manually.

**Common Area Amenities**

27.     At Pentagon Row, I concluded that the common area amenities are accessible and usable. Specifically, I found accessible parking spaces outside the leasing office door. The leasing office itself was accessible. Additionally, I was able to use the amenities of the community room, fitness center, pool, common kitchen area, and public restrooms. In both the kitchen area and public restroom I concluded that the elements, including the lavatory, urinal, and toilet, to be usable and accessible. Exhibit B shows photos in which I am using the common kitchen sink and public restroom lavatory.

28.     At Carlyle, I concluded that the common area amenities are accessible and usable. I entered the community room and was able to maneuver about the space. I found the fitness center and common kitchen area to be accessible and I was able to use the common kitchen sink. *See* Exhibit C. I also entered the business center, approached and used the computers. *Se id.*

10

Additionally, I found that the parking garage included accessible parking spaces adjacent to the elevator access.

29.     At the Massachusetts Avenue property, I concluded that the common area amenities are accessible and usable. Specifically, I found accessible parking spaces in the underground parking garage and I was able to approach and access the door to the elevators. I accessed and used the trash room. I accessed the roof top deck (and was able to approach and use the rooftop pool shower room, including the toilet, shower seat, and sink. See Exhibit D. Additionally, I found the community room, ground floor public restroom, and gym facility accessible.

**Entrance to Unit**

30.     At each unit in which I performed a roll thru at Pentagon Row, I was able to enter the unit, accessing and using the front door, and roll my wheelchair into the kitchen.

31.     At each unit in which I performed a roll thru at Carlyle, I was able to enter the unit, accessing and using the front door, and roll my wheelchair into the kitchen.

32.     At each unit in which I performed a roll thru at Massachusetts Avenue, I was able to enter the unit, accessing and using the front door, and roll my wheelchair into the kitchen.

**Kitchen**

33.     At each unit in which I performed a roll thru at Pentagon Row, I found the kitchens accessible and the kitchen elements approachable and usable. The roll-thrus show that in each unit, I was able to approach, access, and use the kitchen sink, light and garbage disposal switches located above the sink and countertops, and stovetop controls. See Exhibit E showing the usability of kitchen elements in apartment home 2342. Additionally, I was able to approach and open the refrigerator door as well as maneuver about the kitchen area.

11

34.    At each unit in which I performed a roll-thru at Carlyle, I found the kitchens accessible and the kitchen elements approachable and usable. In each unit I was able to maneuver about the kitchen, approach, access, and use the kitchen sink, light and garbage disposal switches, stove top controls. Additionally, I was able to open and use the refrigerator and oven. Attached as Exhibit F to this Affidavit, are photos in which I am using the sink and stovetop controls in unit 104 and attached as Exhibit G, are photos in which I am accessing the light switch, using the sink, and opening the refrigerator in unit 307.

35.    At each unit in which I performed a roll thru at Massachusetts Avenue, I found the kitchens accessible and the kitchen elements usable. For example, in both apartment homes 1101 and G07, the roll thru shows that I turned on the water at the kitchen sink, I accessed the kitchen light and garbage disposal switches, the refrigerator, and stovetop controls. *See* Exhibit H. I also opened the oven and the dishwasher. *See id.* Additionally, I was able to maneuver about the kitchen area.

36.    All of the apartment units and condominiums that I tested had sufficient clear floor space to allow me to maneuver about in the space and to use the kitchen as a person with a disability who uses a wheelchair would typically do on a daily basis. Yet, as shown in the videos, not all of these kitchens had the exact same design. Variation in design is one of the reasons that I requested to enter a number of different condominium units at the Carlyle. Some are "u-shaped" kitchens and others are an "l-shaped" configuration. They varied in size and dimension. It is clear from the roll-thru that all of these kitchens usable as discussed in the Guidelines.

**Bathrooms**

12

37.     At each unit in which I performed a roll thru at Pentagon Row, I found the bathrooms to be accessible and usable. In each bathroom, I was able to enter and exit from all doors as well as close the doors, and the swing of the door did not interfere with the clear floor space. Additionally, in each unit, I approached the bathtub and used the faucet, approached the bathroom vanity and lavatory and used the faucet, and approached the toilet and accessed the toilet flush. For example, Exhibit I, shows photos in which I am using the bathtub faucet, flushing the toilet, and using the lavatory in apartment home 2424.

38.     At each unit in which I performed a roll thru at Carlyle, I found the bathrooms to be accessible and usable. I was able to enter and close the door, maneuver about in the bathroom, approach, access, and use the vanity and lavatory faucet, bathtub faucet, and toilet flush. Exhibit J, attached to this affidavit, shows photos in which I am accessing the toilet flush, using the sink, and using the bathtub faucet in unit 307. Exhibit K shows photos in which I am using the sink, and using the bathtub faucet in unit 204.

39.     At each unit in which I performed a roll thru at Massachusetts Avenue, I found the bathrooms to be accessible and usable. I was able to enter each bathroom and close the door. In apartment home 1101, I was able to enter and exit the bathroom from either door and use both at the same time. Additionally, in both unit bathrooms, I approached the bathtub and used the faucet. *See* Exhibit L. I accessed the toilet flush and toilet lid. *See id.* Additionally, I approached the vanity and lavatory and used the faucet.

40.     The ERC's Reply brief states that if the "apartment bathroom has the tub on one wall and the adjoining walls are the length of the tub, there is not enough room in the bathroom for a person in a wheelchair to maneuver" unless there is an 8 foot tub. The ERC's allegations concerning the relationship of placement of a bathtub and whether there is enough space to

13

maneuver about the bathroom is completely off-base and unfounded. As shown in exhibits I and K, I maneuvered around a bathroom and approached the bathtub within Pentagon Row unit 2424 and Carlyle unit 204, that has the exact configuration complained of by the ERC (and shown in the marketing floor plan of Carlyle unit 112 as attached as an exhibit to Ms. Crotoff's declaration). As with all the units I tested, where the bathtubs is on the wall it is constructed so that there is a plumbing pipe chase at the control end (i.e. a small structures column which provides for more usability that the non-mandatory Guidelines recommend) by the controls that allows for a parallel approach (for example Carlyle unit 104, Carlyle unit 218 and unit 215, Pentagon Row units 2342, 2340 and 2424 and Massachusetts unit G07). Thus, contrary to the ERC's position and overly simplistic analysis, the size of the tub has no bearing on whether or not the bathroom is usable.

### Environmental Controls, Lights, and Electric Outlets

41. At each unit in which I performed a roll thru at Pentagon Row, I found environmental controls, lights, and electric outlets to be usable and accessed. See Exhibit M in which I access the outlets in apartment home 2342, and access the thermostat and outlets in apartment home 2424.

42. At each unit in which I performed a roll thru at Carlyle, I found environmental controls, lights, and electric outlets to be usable and accessed. Exhibit N shows photos in which I am accessing the thermostat in apartment homes 104 and 218 and using the light switch in apartment home 307.

43. At each unit in which I performed a roll thru at Massachusetts Avenue, I found environmental controls, lights, and electric outlets to be usable and accessed. Exhibit O is a photo in which I am accessing the thermostat in apartment home 1101.

14

44.     Not all of the environmental controls, light switches and electric outlets were at the same height and not all of them were constructed in accordance with the recommendations of the Guidelines. It has been my experience that environmental controls are often installed at a height higher than the Guidelines because that is what the manufacturer recommends in order for them to be effective. Nonetheless, as shown by the photos, even an environmental control placed as high as 60" can be usable.

**Accessible Route Through Unit**

45.     In each unit in which I performed a roll through in Pentagon Row, I found an accessible route through the unit. In apartment home 2342, the roll thru shows that I entered the unit and had an accessible route to the kitchen, from the kitchen to the living room, from the living room to the hall, from the hall to the bathroom, and from the bathroom to exiting the dwelling unit. In apartment home 2340, the roll thru shows that I entered the unit and had an accessible route to the kitchen, from the kitchen to the living room, from the living room to the bedroom, from the bedroom to the bathroom from which I could enter and exit both doors, from the bathroom to the kitchen, and from the kitchen to exiting the dwelling unit. Finally, in apartment home 2424, I entered and found an accessible route to the kitchen, from the kitchen to the hallway, from the hallway to the living room, from the living room to the bathroom, and from the bathroom to exiting the dwelling unit.

46.     In each unit in which I performed a roll through in Carlyle, I found an accessible route through the unit. In unit 104, I entered and found an accessible route to the kitchen, from the kitchen to the living room, from the living room to the hall, from the hall to the bathroom, and from the bathroom to exiting the dwelling unit. In unit 307, I entered and found an accessible route to the kitchen, from the kitchen to the bedroom, from the bedroom to the

15

bathroom, from the bathroom back through the bedroom and to the hall and living room, from the living room to the second bedroom; from the second bedroom to the living room; from the living room to the kitchen, from the kitchen to the second bedroom; and from the second bedroom to exiting the dwelling unit. In unit 218, I entered and found an accessible route to the kitchen, from the kitchen to the bathroom, from the bathroom to the living room, from the living room back to the bathroom, and from the bathroom to exiting the dwelling unit. Finally, in unit 204, I entered and found an accessible route to the kitchen, from the kitchen to the living room, from the living room to the bathroom, from the bathroom to the kitchen, from the kitchen to the bathroom, from the bathroom to the living room, from the living room to the kitchen, from the kitchen to the living room and too exiting the dwelling unit.

47.    In both units in which I performed a roll through in Massachusetts Avenue, I found an accessible route through the unit. In apartment home 1101, the roll thru shows that I entered the unit and rolled to the kitchen, from the kitchen to the bedroom and into the adjoining bathroom, from the bathroom back to the kitchen, from the kitchen to the living room, and from the living to exiting the dwelling unit. Similarly, in G07, I entered the unit and rolled to the kitchen, from the kitchen to the hall and back to the kitchen, from the kitchen to bathroom, from the bathroom to the hall, and from the hall to exiting the dwelling unit.

48.    I did not encounter a single door that was not wide enough to go through nor did I encounter any barriers to an accessible route at any of the three Post communities I tested.

## CONCLUSION

49.    Having field-tested a number of Post's properties that are the subject of this lawsuit, I believe that the ERC's supposed survey is both overly simplistic and factually inaccurate. The roll-thru shows that these properties were designed and constructed in a manner

16

that meets the Congressional intent of the FHAA. Having lived in a wheelchair for the past 25 years, I can state with conviction that these dwelling units and the common areas of these properties are unquestionably usable by a person with a disability and a person who uses a wheelchair.

50.     Given Ms. Crootof's reliance on a tape measure, I also took a few measurements of my own. As shown in the video, they demonstrate the fallacy of Plaintiff's assertion that unless certain measurements are met, the unit is not usable under the FHAA or that it will be "difficult or impossible" for a person in a wheelchair to use the design element. For example, in apartment home 2424 in Pentagon Row, a unit in which I performed a roll thru and found the required elements to be usable, I measured the clear floor area in the kitchen from the sink to the fridge, the distance between the bathroom sink and the wall as well as the between the bathroom tub and the doorway, of which incidentally meet or exceed document safe harbors. I also measured the height of the light switches, electrical outlets, and thermostat controls. Ms. Crootoff might be correct in saying that some of these measurements are inconsistent with the suggestions of the safe harbor application of the non-mandatory Guidelines. Yet, proof of usability is in the photos and the video. Not only do I not agree with Ms. Crootof's inaccurate position that the measurements set forth in the Guidelines and Design Manual are mandatory, as a practical matter, the measurements discussed by Plaintiff are not necessary to allow for a dwelling unit to be usable.

51.     As an expert in the field of FHAA usability and accessibility, and equally important, as a disabled individual, from what I have experienced of Post's properties, I am appalled that the Plaintiffs would file such a suit against Post and attempt to obtain an injunction

with the "facts" they have provided.   While the Guidelines are a good reference for a party who

wishes to be sure that it meets the safe harbor, they do not portray the whole story.

52.    The accessibility design and construction of Post's facilities is an example of

Congress' intent for eliminating barriers which discriminate against persons with disabilities in

their attempts to obtain equal housing opportunities.


I declare under penalty of perjury that the foregoing is true and correct.

Executed May 4, 2007.


Paul Stanley Sheriff

Sworn and subscribed to before me on this 4TH day of May, 2007.

Notary Public

My commission expires on:  JUNE 30, 2010

HELEN J. LUKIEVICS
Notary Public, State of New York
No. 24-4777853
Qualified in Kings County
Commission Expires June 30, 2010

# 4521235_v1

18

# EXHIBIT B

PENTAGON ROW PROPERTY

## PICTURE 1

SHOWING P. S. SHERIFF USING SINK IN COMMON KITCHEN AREA

## PICTURE 2

SHOWING P.S. SHERIFF USING PUBLIC RESTROOM LAVATORY





## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EQUAL RIGHTS CENTER )<br><br>Plaintiff, )<br><br>vs. )<br><br>POST PROPERTIES, INC. )<br>POST GP HOLDINGS, INC. )<br>POST APARTMENT HOMES, L.P. )<br><br>Defendants. )<br>) | Case. No. 1:06CV01991<br>Judge Richard J. Leon |

## <u>NOTICE REGARDING VIDEO EXHIBIT ATTACHMENT</u>

Exhibit A, which is an attachment to the Affidavit of Paul Stanley Sheriff, are three compact discs containing videos taken at  Post Pentagon Row, Post Mass. Ave., and Post Carlysle Square.  Copies of the videos are being maintained in the case file in the Clerk's Office. The videos will be available for public viewing between the hours of 9:00 a.m. to 4:00 p.m., Monday through Friday.

In addition to the videos, color still shots extracted from the videos will be placed in the case file for viewing with courtesy copies provided to Judge Leon.


Respectfully submitted,

HOLLAND & KNIGHT LLP

   /s/ Christopher B. Hanback
Christopher B. Hanback (Bar # 232579)
Alan I. Baron (Bar. # 340273)
Rafe Petersen (Bar # 465542)

2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006
(202) 955 3000 Phone
(202) 955 5564 Fax
E-mail: christopher.hanback@hklaw.com
E-mail: alan.baron@hklaw.com
E-mail:  rafe.petersen@hklaw.com
*Counsel for Post Properties, Inc., et al.*

Date:  May 4, 2007

**CERTIFICATE OF SERVICE**

I hereby certify that a true and accurate copy of the foregoing Notice Regarding Video

Exhibit Attachment was served by electronic filing, this 4th day of May, 2007, on the following:

Sheila Jane Carpenter, Esq.
Jorden Burt LLP
1025 Thomas Jefferson Street, NW
Suite 400 East
Washington, DC 20007

Donald Lee Kahl, Esq.
Washington Lawyers' Committee for Civil Rights & Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, DC 20036

/s/ Christopher B. Hanback
Christopher B. Hanback