# UNITED STATES DISTRICT COURT
## FOR DISTRICT OF COLUMBIA

**EQUAL RIGHTS CENTER**,                    )
                                            )
       Plaintiff,                        )
                                            )
    vs.                                   )    **Case No. 1:06CV01991**
                                            )    **Judge Richard A. Leon**
**POST PROPERTIES, INC.,** *et al.,*        )
                                            )
       Defendants.                       )
                                            )

## PLAINTIFF'S SUPPLEMENTAL MEMORANDUM IN SUPPORT OF MOTION FOR PRELIMINARY INJUNCTION

The Equal Rights Center ("ERC"), by its attorneys, respectfully submits this Supplemental Memorandum, at the Court's invitation, to address various inquiries of the Court at oral argument regarding the ERC's Motion for Preliminary Injunction (the "PI Motion") against Defendants ("Post").

## INTRODUCTION

In passing the Fair Housing Act Amendments of 1988 ("FHAA" or the "Act"), Congress recognized that "[a] person using a wheelchair is just as effectively excluded from the opportunity to live in a particular dwelling by the lack of access into a unit and by too narrow doorways as by a posted sign saying "No Handicapped People Allowed" and that simply prohibiting traditional types of discrimination would not sufficiently provide equal access to housing for persons with disabilities. H.R. Rep. No 711 at 24-28 (1988).[1] The accessibility

---

[1] The FHAA passed with overwhelming bipartisan support and was signed by President Reagan on September 9, 1988. The statute originated in the House as H.R. 1158 and only the House produced a committee report. The bill passed the House, was slightly modified in the Senate and the House accepted the Senate's amendments. The legislative history makes clear that the prime concern of Congress was to strengthen the enforcement mechanisms of the Fair Housing Act. In

requirements of the FHAA "are essential for equal access and to avoid future *de facto* exclusion of persons with handicaps." *Id.* at 27

As a result of the FHAA, the Fair Housing Act has required since 1991 that new multi-family housing include certain basic features of accessibility. Including these features at the time of initial construction, as the law requires, adds little to the cost of construction. *Id.* at 18. The vision of the FHAA was that multi-family housing units added to the nation's housing stock after March 12, 1991, would be accessible to persons with disabilities. *Id.* By focusing on new construction, Congress clearly placed the onus for compliance on those who "design and construct" new multifamily housing. [2]

The law was intended to benefit not only those individuals disabled at the time they rent or purchase an apartment, but also those who become disabled in the future, and visitors with disabilities. The FHAA was intended to change the paradigm in multi-family housing to one of access, rather than exclusion. Thus, a person living in housing built in compliance with the

---

addition, the statute was intended to make sure that the nation's disabled and its families with children had a wide variety of housing choices. The primary House debates may be found at 134 Cong. Rec. H4603-02, 1988 WL 183051 (Cong. Rec.), 134 Cong. Rec. H4673-04, 1988 WL 172759 (Cong. Rec.), 134 Cong. Rec. H4898-04, 1988 WL 173277 (Cong. Rec.), 134 Cong. Rec. H4912-03, 1988 WL 173280 (Cong. Rec.), 134 Cong. Rec. H6491-02, 1988 WL 185128 (Cong. Rec.), and the Senate debates at 134 Cong. Rec. S10532-04, 1988 WL 174367 (Cong. Rec.), 134 Cong. Rec. S10544-02, 1988 WL 174368 (Cong. Rec.)

[2] In the FHA, Congress has chosen not to statutorily define the universe of parties liable for the type of discrimination at issue here. Instead, Congress defined only the prohibited actions—the designing and constructing of covered multifamily housing without the identified minimum features of accessibility and adaptable design. 42 U.S.C. § 3604. Courts have interpreted Congress's intent to be that all participants in the design and construction are liable. *See U.S. v. Tanski*, 2007 WL 1017020, No. 1:04-CV-714 at *7 (N.D.N.Y. March 30, 2007)*; Baltimore Neighborhoods, Inc. v. Rommel Builders, Inc.,* 3 F. Supp. 2d 661, 664-65 (D. Md. 1998) ("*Rommel I*"); *U.S. v. Quality Built Constr., Inc.,* 309 F. Supp. 2d 756, 761 (E.D.N.C. 2003).

FHAA, who becomes disabled, would no longer be required to move or undertake costly renovations, because their unit would already have basic accessibility features in place.[3]

The ERC's PI Motion undeniably enjoys a substantial likelihood of success on its claims that Post has designed and constructed apartments in violation of the law.  Despite the nearly two-decade old federal mandate of the FHAA, Post has designed and constructed numerous rental and condominium  complexes that are inaccessible to persons with disabilities.  *See* Stratton and Crootof Declarations.

As noted at oral argument, the fact that one healthy, athletic paraplegic can access some of the features in a few of Post's newer apartments is not proof of anything.  Other courts have rightfully disregarded such evidence:

> [T]hese wholly subjective declarations are not probative on the question of whether the apartments are designed and constructed such that they comply with the section 3604(f)(3)(C).  No reasonable reading of the section supports the view that the Fair Housing Act's requirements may be met by satisfying the accessibility needs of a particular handicapped individual.  Rather, a plain reading of section 3604(f)(3)(C) demonstrates that it requires compliance with an objective accessibility standard broadly applicable to handicapped people.

*Tanski,* 2007 WL 1017020, at *14.  *Accord, U.S. v. Quality Built Constr., Inc.,* 309 F. Supp. 2d 756, 776 (E.D.N.C. 2003).

---

[3] During consideration of the FHAA, amendments were offered to reduce substantially the number of apartments required to be accessible.  These amendments were defeated.  *E.g.*, in the Senate such an amendment was offered to which one of the managers for the bill, responded: "What if you have disabled friends? … What happens if you get older and fall down and break a hip and you are in one of those [inaccessible] apartments?  You are out of luck." 1988 WL 174367 at pp. 46-47.  In the House, Rep. Gonzalez noted:  "Another dimension of this problem comes … in being forced to leave.  This problem especially plagues our disabled elderly when their disability worsens, and they can no longer negotiate steps, or fit the new wheelchair in the bathroom. … Gone is the relationship with the corner grocer, the local church, neighbors and friends."  1988 WL 172759 at p. 51.  The problem of having to move out affects not only the elderly but, among others, returning war veterans with serious injuries, young people paralyzed in traffic accidents, family members with serious illnesses and workers injured on the job.

Post's actions in selling complexes and individual condominium units during the pendency of this litigation threaten to circumvent this Court's ability to remedy this discrimination for two independent reasons:  (1) a subsequent buyer may argue it is a "*bona fide*" purchaser without "actual notice" of this lawsuit and thus, under 42 U.S.C. §3613(d), should not be forced to allow access for completion of retrofitting; and (2) if the sale is made to an entity without a presence in this district, this Court may have no personal jurisdiction over the buyer to enforce a retrofit order, rendering thousands of housing units forever inaccessible to persons with disabilities.

## ARGUMENT

At oral argument on the PI Motion, the Court made several inquiries to which the ERC provides the following information and authorities:

A.     **The Relief Requested**—The ERC seeks to maintain the status quo here and preserve the sole remedy available to this Court to rectify Post's years of discriminatory conduct -- the ability to enforce an order requiring retrofitting of inaccessible housing units.  That remedy is preserved, in the least intrusive way, by requiring Post to include in its future contracts of sale for any covered housing (whether an entire apartment complex, one or more apartment buildings, or individual condominium units), a provision allowing Post post-sale access to the property in order to perform such actions, including retrofitting, as are ultimately ordered by this Court.

B.     **The Necessity for the Requested Relief**

1.          **The necessity for the interim relief sought by the ERC is caused by Post's  refusals to address this issue by agreement.**

Other developers, involved in similar litigation with the ERC, have voluntarily agreed to a process to protect the courts' ability to effect retrofitting.  For example, in *Equal Rights Center v. Archstone Smith Trust,* the developer agreed to include the very type of "access provision"

sought here, in any contract for sale of a property subject to that litigation. It did so, and in fact sold properties under that agreement while litigation was pending. When the case settled, a requirement for such an "access provision" in future sales contracts was incorporated in the Consent Decree in order to ensure retrofits could be performed at properties sold by the developer during the term of the Consent Decree. *See Archstone,* (Consent Decree, Civil Action No. 04-3975 (AMD) (D. Md. June 8, 2005) Paragraph 10 "Corrective Action for "To Be Sold" Properties" at 6-7. A similar provision was included as part of a court order in an FHAA case filed by the United States Department of Justice, *United States v. Taigen*, (D. Id. 2003) (Consent Order, U.S. v. Taigen & Sons, Inc., No. CV01-337-N-EJL, 2006 U.S. Dist. Lexis 49772 (D. Id. July 18, 2006)) (requiring that defendant provide each buyer notice that the property was subject to defendants' duty to complete retrofits and allow inspections).

## 2. The FHAA creates uncertainty regarding a subsequent buyer's obligations if this Court were to issue a retrofit order.

Section 3613 (c) of the Act sets out the remedies available for violations, and includes actual and punitive damages as well as injunctive relief "ordering affirmative action as may be appropriate." The *only* remedy that will eliminate Post's ongoing violations is an order mandating that violations in its buildings and units be fixed; courts have routinely ordered that defendants retrofit non-compliant properties to bring them into compliance with the law. [4] The available remedies, however, must be read in conjunction with Section 3613(d), which provides:

> Relief granted under this section shall not affect any contract, sale . . . or lease consummated before the granting of such relief and involving a bona fide purchaser . . .or tenant, without actual notice of the filing of a complaint with the Secretary or civil action under this subchapter.

---

[4] *See* the ERC's Opening Brief on the PI Motion at p. 18 and Reply Brief at pp. 7-8.

42 U.S.C. §3613(d)   This provision does not affect liability of the *defendant*, who designed and constructed the property out of compliance with the FHAA.  Thus Post's assertion at oral argument that it would not use a transfer as a defense[5] is no concession at all[6].  This section may, however, give a subsequent good faith purchaser without "actual notice" of the filing of a complaint the ability to refuse to allow Post to make the necessary retrofits.

The Court asked at oral argument about the legislative history of 42 U.S.C. §3613(d). This subsection was not new with the FHAA but was originally part of the Fair Housing Act as enacted in 1968.  Until 1988, it was part of 42 U.S.C. §3612(a) which provided for civil actions to enforce the FHA.  The prior text, and the debate about it, could not be located on Westlaw but it is quoted in *Johnson v. Decker,* 333 F. Supp. 88, 89 (N.D. Cal. 1971).  After providing for enforcement of the FHA in federal courts, the statute said:

> *And provided, however,* That any sale, encumbrance, or rental consummated prior to the issuance of any court order issued under the authority of this Act, and involving a bona fide purchaser, encumbrancer, or tenant without actual notice of the existence of the filing of a complaint or civil action under [the Act] shall not be affected.

*Id.*  The predecessor to 42 U.S.C. §3613(d) was discussed in *Otero v. New York City Hous. Auth.*, 354 F. Supp. 941 (S.D.N.Y. 1973),  a case involving racial preferences in public housing. Judge Lasker reviewed the legislative history and noted that the sponsor of the language quoted above described it as meaning that a bona fide purchaser, without knowledge of a complaint, who was actually in possession of the premises "will not be thereafter injured by reason of any court order… ."  *Id.* at 955.  The court interpreted comments by Sen. Mondale to mean that

---

[5] Tr. at 23

[6] As explained by one treatise writer, in the case of an asset sale of a covered property:  "When such a "piecemeal" sale of assets is involved, the purchaser ordinarily does not succeed to the builder's liability, absent an agreement for the assumption of such liability or a fraudulent conveyance designed to shield the builder from liability."  Robert G. Schwemm:  Accessible Housing, 40 U. Richmond L. Rev. 753, 784 (2006) (emphasis added) ("Schwemm").

"court action, prior to the issuance of an order, would not be deemed constructive notice to a bona fide purchaser who records his interest…, giving actual notice to subsequent purchasers." *Id.* The Second Circuit reversed Judge Lasker in some respects but upheld his ruling that Section §3612(a) did not bar disruption of the leases at issue because the tenants had not taken possession. *Otero v. New York City Hous. Auth.*, 484 F.2d 1122, 1140 (2nd Cir. 1973)

It could be argued that the retrofits necessary to bring a sold unit into compliance do not affect a "contract" or "sale" because it does not negate the sale and does not oust a purchaser from their home. See, *e.g.*, *Baltimore Neighborhoods, Inc. v. Rommel Builders, Inc.*, 40 F. Supp. 2d 700, 712 (D. Md. 1999) (*"Rommel II"*).

The application of Section 3613(d) to a future retrofit remedy may vary, depending on whether the sale is of apartment building, a condominium complex, or individual condominium units. With respect to condominium complexes, at least one court has ordered a condominium association to allow retrofits to public and common use areas. See, e.g., *Baltimore Neighborhoods, Inc., v. LOB, Inc.*, 92 F. Supp. 2d 456, 467-70 (D. Md. 2000), *Rommel II,* 40 F. Supp. 2d at 712 (retrofits to common areas ordered in sold properties). We are unaware of any court however, that has ordered *individual unit owners* who purchased condominiums without actual notice to allow retrofits to the unit, and *every* court or administrative agency that has addressed the issue has either ruled, or assumed, that a subsequent purchaser of an individual unit *without notice* cannot be ordered to allow retrofits.[7] *See, e.g., Silver State Fair Hous. Council, Inc. v. ERGS, Inc.,* 362 F. Supp. 2d 1218, 1222 (D. Nev. 2005) (noting the

---

[7] With respect to the sale of individual condominium units, Professor Schwemm explains: "Thus far, courts have been reluctant to impose liability on new owners of condominiums for § 3604 (f)(3)(c) violations." Robert G. Schwemm, Barriers to Accessible Housing: Enforcement Issues in "Design and Construction" Cases under the Fair Housing Act. 40 U. Rich. L. Rev. 753, 793 (Mar. 2006) (*citing HUD v. Perland*).

appropriateness of punitive damages because otherwise "a defendant could evade FHA liability simply by offloading the property after completion."); *Baltimore Neighborhoods, Inc. v. LOB, Inc.,* 92 F. Supp. 2d at 470-71 (setting up fund to induce condominium owners to agree to retrofit voluntarily while awarding relief against the builder and condominium association); *HUD v. Perland,* HUDALJ 05-96-1517-8, 1998 WL 142159 at 13-14 (HUD ALJ Mar. 30, 1998) (builder ordered to take specific steps, including monetary payments, to obtain permission from unit owners to retrofit.)

Further, Section 3613 (d) uses "actual notice" as the standard for a purchaser's knowledge. At oral argument, the Court suggested that potential buyers might be on notice of this action's impact on the Subject Properties. However, there no facts in the record that would allow the Court to conclude that any commercial purchaser of Post's apartment complexes, much less the hundreds of individual purchasers of covered condominium units, have actual notice of this lawsuit and that future retrofits may be ordered. Post dances around this issue, dropping hints that buyers know, speaking in hypotheticals. However, Post has been careful not to say that its commercial buyers will get *actual* notice (unless they ask the correct question) and has conceded, with its arguments about how pending condominium sales might be harmed if reopened, that it has not given actual notice to its condominium buyers. It is therefore crucial that the necessary steps be taken to provide purchasers with actual notice 1) of the lawsuit and 2) that their sale is subject to a possible future retrofit remedy. If the buyer does by some other means have actual notice of this lawsuit, then requiring that the notice be documented should pose no significant burden to any party. Post's adamant resistance to providing actual notice to its buyers strongly suggests that buyers, in fact, do not have such actual notice.

**C.  Irreparable Harm – the Court's Loss of Control means ERC's Loss of Remedy**

Even if this Court determined that a subsequent buyer, regardless of notice, were required to allow retrofits under the FHA, issues of personal jurisdiction stand as a bar to the Court's ability to grant full relief.  At this point, this Court has personal jurisdiction over Post, and Post has control over fifty-eight of the fifty-nine Subject Properties—properties which are located in eight states across the country and the District of Columbia.  Absent the requested preliminary injunction, nothing prevents Post from selling Subject Properties outside the District of Columbia to buyers who have no minimum contacts with the District of Columbia.  Without such minimum contacts, this Court cannot exercise personal jurisdiction over such buyers, even if there were a legal or equitable theory upon which this Court could enter an order requiring that Post have access to the sold property.  *See, e.g., World-wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 294-98 (1980); *Lacey v. Wing,* 360 F. Supp. 2d 31, 35-37 (D.D.C. 2003), *aff'd* 2004 WL 2616289 (D.C. Cir. Nov 17, 2004)  Thus, absent a contractual "access clause" in any sales contract for a Subject Property located outside of this jurisdiction, this Court will be deprived of the ability to render full relief—leaving thousands of housing units built by Post inaccessible to persons with disabilities**.**

Absent the requested injunction, the ERC will be left to the vagaries of *where* a purchaser of a covered Post property lives, and, at best, to piecemeal litigation to determine the level of duty subsequent purchasers may have to permit access for completing retrofits and if such duty is established, to further litigate issues of personal jurisdiction.  Imposing on the ERC, a non-profit, civil rights organization with limited resources, the burden caused by converting a single litigation matter into multiple lawsuits across the country in an attempt to enforce a retrofit order by this Court, is antithetical to both the broad remedial purposes of the FHAA, and Rule 1 of the

Rules of Federal Civil Procedure ("[The Federal Rules] shall be construed and administered to secure the just, speedy, and inexpensive determination of every action.").  Moreover, the avoidance of this protracted and uncertain litigation or the threat that any future order of this Court will be unenforceable, is easily avoided either by Post's agreement to put the requested provision in its sales contracts, or, since Post will not agree, by entry of the requested preliminary injunction.

In resisting the simple measures the ERC requests in its PI Motion, Post seeks to shift the burden of dealing with its buyers to the ERC.  It was Post's obligation to design and build accessible housing.  To the extent that it did not, the burden by statute is on Post to remedy those violations, not on the ERC.  Congress specifically gave this Court injunctive power under the FHA to enforce its provisions.  42 U.S.C. § 3613(c)(1). Where Congress has identified a legislative priority, a court may not refuse to order injunctive relief when doing so will permit a violation to go uncorrected.  See *Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 173, 194 (1978) (holding that court was required to enjoin construction of dam to prevent violation of Endangered Species Act).  Failing to use that power here may result in the opportunity to provide full relief slipping away, complex by complex, as Post sells off its properties.

Other courts examining FHA issues have found that preliminary injunctive relief is proper.  In *U. S. v. Edward Rose & Sons*, 246 F. Supp. 2d 744 (E.D. Mich. 2003), *aff'd,* 384 F.3d 258 (6th Cir. 2004), an FHAA accessibility case, the district court granted a preliminary injunction not only precluding defendants from leasing or occupying completed non-compliant apartment units, but also *halting on-going construction* of new units.  *Id., 246* F. Supp. 2d at 757-58.  That preliminary injunction was affirmed on appeal, with the Sixth Circuit noting that even defendants' claim of losses of $150,000 a month from halting construction was not sufficient to

defeat a request for injunction to halt construction of units that did not comply with the FHA.

*Id.,* 384 F.3d at 265.  The judicially-approved interruption of a defendant's business operations in

*Edward Rose* is far more intrusive than the modest steps requested here by the ERC.

Nor are the ERC's concerns over the immediacy of irreparable harm speculative.  Post

has *already* sold one of the Subject Properties here, the 182-unit Post Oak in Atlanta, Georgia.

More important, Post has publicly declared their intent to sell additional properties.  *See* Post

SEC Form 10K Annual Rept. for Year Ending Dec. 31, 2006 at pp. 24 and 43.  Finally, Post is

actively seeking to sell individual condominium units at Subject Properties in Virginia, Texas,

Florida and Georgia. *See* Post SEC Form 10-Q Quarterly Rept. for Quarter Ending March 31,

2007 at p. 37-38 and 47.  Thus, absent interim relief, this Court's retrofit remedy *will* be

substantially undermined.

**D.    The Defendants' Claim of Financial Harm**—Post argues that the granting of

the requested preliminary injunction may cause it financial harm because it may have to

renegotiate existing contracts, thereby giving buyers the opportunity to walk away from their

obligations, or by the loss of potential buyers.  First, Post was on notice of allegations that these

units are in violation of the law and proceeded at its own risk when it failed to give the same

notice to its subsequent purchasers.  Moreover, Post has made no evidentiary showing to support

this "fear" of financial harm and it should therefore be disregarded by the Court.

As to future sales, Post cannot seek the Court's equitable protection for its own illegal

acts.  To the extent that any property to be sold by Post violates the FHA, there is no harm to

Post in requiring it to come into compliance before the sale, or to provide for reaching

compliance by retrofitting after the sale.  As this Court has recognized:  "[m]aking the

Defendants comply with their legal responsibilities [under the ADA] is not substantial harm to

the Defendants." *Ramirez v. District of Columbia*, No. 99-803, 1999 WL 986914 (D.D.C. Oct.

14, 1999).  Similarly, on this issue, the district court in *Edward Rose* opined:

> By enacting the statute and the provisions at issue here, Congress has indicated that obliterating discrimination against disabled individuals at all levels in housing is a priority.  *Had Congress wanted to limit the Court's authority when the potential financial burden would be great, it could have expressly done so.  It did not.*

*Id.*, 246 F. Supp. 2d at 755 (emphasis added).  There is no shield for Post here.

In summary, the factual record before the Court demonstrates that Post has many

apartment complexes with violations of the Act, meaning that the ERC is likely to prevail on the

merits.  Note that Post has put forth no proof that it has not violated the Act.  Instead, it has an

expert who criticizes the ERC's proof based on reading some court papers.  Did they send this

expert out to look at the buildings tested by the ERC?  No.  Instead they send a wheelchair

athlete to some of the newest properties for photo opportunities.  Of course, the ERC was not

invited to the filming so there is no way to know what was not filmed.  The ERC has

demonstrated irreparable harm.  As demonstrated above, Post's sales of its properties put the

Court in a position where it cannot accord the ERC with full relief.  Most of Post's properties are

not in the District of Columbia.  Balancing this harm against the inconvenience to Post of putting

another paragraph in its sales agreements, the balance of harms tips toward the ERC.[8]  Finally, it

is in the public interest that the Court have the opportunity to order retrofitting when this

litigation concludes.  Congress intended that a new era of accessible housing start for the

disabled in 1991.  The only way to follow the law and public policy is to preserve the right to

retrofit.

---

[8] The Proposed PI Order submitted to the Court requires *either* retrofitting prior to a sale or the inclusion of a contractual "access provision."  The latter relief would appear, to the ERC, to be the least intrusive means of protecting the retrofit remedy.  Should the Court or Post choose retrofitting instead, the ERC has no objection to the designation of a mutually agreeable third party to supervise retrofits (at Post's expense).

## CONCLUSION

Based on the foregoing, and the authorities and evidence previously submitted to the Court, the preliminary injunction requested by the Equal Rights Center should be granted.

Dated this 22nd day of May, 2007                 Respectfully submitted,

*Sheila J. Carpenter*
_____
Sheila J. Carpenter (DC Bar #935742)
sjc@jordenusa.com
Jorden Burt LLP
1025 Thomas Jefferson Street, NW
Suite 400 East
Washington, DC 20007
Tel:  (202) 965-8165
Fax: (202) 965-8104


Isabelle M. Thabault (DC Bar # 318931)
isabelle_thabault@washlaw.org
Donald L. Kahl (DC Bar #489472)
don_kahl@washlaw.org
Washington Lawyers' Committee
For Civil Rights and Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, DC 20036
Tel:  (202) 319-1000
Fax: (202) 319-1010

Attorneys for Plaintiff
Equal Rights Center


## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 22nd day of May, 2007, a copy of the foregoing **Supplemental Memorandum** was filed via the electronic case filing system of the United States District Court for the District of Columbia and accordingly, that the Court will send notice of this filing electronically to:  Christopher Hanback at christopher.hanback@hklaw.com, Alan I. Baron at alan.baron@hklaw.com, and Rafe Petersen at rafe.peterson@hklaw.com, counsel for defendants.

*Sheila J. Carpenter*
Sheila J. Carpenter