## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| EQUAL RIGHTS CENTER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case. No. 1:06CV01991 |
| | ) | Judge Richard J. Leon |
| POST PROPERTIES, INC. | ) | |
| POST GP HOLDINGS, INC. | ) | |
| POST APARTMENT HOMES, L.P. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DEFENDANTS' MOTION FOR LEAVE TO EXCEED DURATION FOR DEPOSITION OF REBECCA CROOTOF

Defendants Post Properties, Inc., Post GP Holdings, Inc., and Post Apartment Homes,

L.P. (collectively "Post") hereby request permission to depose Plaintiff's principle fact witness

for longer than the seven hours permitted by Rule 30(d)(2). The grounds for this Motion are

more fully set forth in the accompanying Memorandum of Points and Authorities.[1]

Respectfully submitted,

HOLLAND & KNIGHT LLP

 /s/ Elizabeth Phelps
Christopher B. Hanback (Bar # 232579)
Lynn E. Calkins (Bar # 445854)
Rafe Petersen (Bar # 465542)
Elizabeth Phelps (Bar # 502026)
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006
(202) 955 3000 Phone
(202) 955 5564 Fax

---

[1] Pursuant to Local Rule LCvR 7(m), counsel for Defendant has discussed this Motion with counsel for Plaintiff in a good faith effort to determine whether there is any opposition to the relief sought and, if there is opposition, to narrow the areas of disagreement. At this time, counsel for Plaintiff opposes this Motion.

E-mail: christopher.hanback@hklaw.com
E-mail: lynn.calkins@hklaw.com
E-mail:  rafe.petersen@hklaw.com
E-mail: libby.phelps@hklaw.com
*Counsel for Post Properties, Inc., et al.*

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| EQUAL RIGHTS CENTER ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| vs. ) | Case. No. 1:06CV01991 |
| ) | Judge Richard J. Leon |
| POST PROPERTIES, INC. ) | |
| POST GP HOLDINGS, INC. ) | |
| POST APARTMENT HOMES, L.P. ) | |
| ) | |
| Defendants. ) | |
| ) | |

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF**
**DEFENDANTS' MOTION FOR LEAVE TO EXCEED**
**DURATION FOR DEPOSITION OF REBECCA CROOTOF**

Defendants Post Properties, Inc., Post GP Holdings, Inc., and Post Apartment Homes,

L.P. (collectively "Post") submit this Memorandum in Support of their Motion for Leave to

depose Plaintiff's principal fact witness, Rebecca Crootof, for longer than the seven hour

duration set forth in Rule 30(d)(2) of the Federal Rules of Civil Procedure.

**I.    BACKGROUND**

The ERC bases its lawsuit against Post on certain testing that it conducted on Post

properties in 2004 and 2006.   These tests include the testing of two properties in 2004 and the

testing of twenty-seven properties in 2006, which includes a re-testing of two properties tested in

2004.  As a justification for including thirty-one untested properties in this lawsuit, the ERC

performed a "floor plan analysis" during which it extrapolated its findings from the 2006 testing

of twenty-seven properties to thirty-one other properties for which ERC conducted no testing.

Rebecca Crootof is the ERC's principal witness on the 2006 testing of the twenty-seven

properties.  Ms. Crootof was the project coordinator for all of those tests and served and the

measurement tester for the vast majority of those tests. Numerous witnesses have pointed to Ms.

Crootof as being critically involved in the 2006 testing process. For example:

>Ezinwanne Hawkins, the Fair Housing Program Manager of ERC, testified that Ms. Crootof was the project coordinator for the Post tests and gave Ms. Hawkins her testing assignments and provided her with a tester profile with regard to Post properties. (Exhibit 1, Hawkins Dep. Tr. 119, 127-28.) Ms. Hawkins further testified that as the test coordinator for Post, it was Ms. Crootof's job to put together the files for the Post tests. (*Id.* at 154.)

>Shauna Eisenberg, one of ERC's testers for Post properties testified that she reported to Ms. Crootof and that Ms. Crootof gave her the assignment to test Post properties. (Exhibit 2, Eisenberg Dep. Tr. 20, 32-33.)

>Dan Sullivan, the former Director of Enforcement at ERC, testified that the tests of Post properties were coordinated by Ms. Crootof and that Ms. Crootof was the "point person" for the investigation. (Exhibit 3, Sullivan Dep. Tr. 129, 186-87.) Mr. Sullivan further testified that Ms. Crootof developed and revised the ERC's accessibility report form with respect to Post. (*Id.* at 213.)

>Ms. Crootof herself acknowledged in a declaration filed with this Court that she

>(a) "designed, supervised, and participated in" the 2006 testing (Exhibit 4, Declaration of R. Crootof);

>(b) oversaw the testing of certain properties in the greater D.C. area including her debriefing of testers, collection of materials, creating files, reviewing and inputting results (*Id.*, ¶ 6);

>(c) is aware of the ERC's research and decision to test additional properties (*Id.*, ¶ 6);

>(d) selected the additional properties to test and created a timeline and budget for the investigation" (*Id.*, ¶ 11);

>(e) planned the logistics for the testing  (*Id.*);

>(e) took the measurements "for all of the 'expanded-scope' tests"  (*Id.*);

>(f) met with the ERC's director of testing and reviewed the testing and its results (*Id.*, ¶ 14).

In addition, Ms. Crootof played a critical role in ERC's "floor plan analysis" upon which ERC

justifies the inclusion of the thirty-one untested properties in the Complaint. Again, as indicated

in her declaration, Ms. Crootof testified that she worked on the "floor plan analysis." (Exhibit 4, ¶¶ 13, 18.)

Furthermore, for six weeks over the past two and half months, Ms. Crootof has been participating in on-site inspections of Post properties in order to assist the ERC's testifying expert collect data for his opinions. Ms. Crootof has collected data from at least 23 properties as an assistant to ERC's testifying expert throughout the course of fact discovery.

Because of ERC's decision to have Ms. Crootof assist its testifying expert so heavily, the ERC has been unable to produce Ms. Crootof for a deposition during fact discovery. As a convenience to the ERC, Post agreed to take Ms. Crootof's deposition in May following her completion of assisting the ERC's expert but requested at least two days for her deposition given her extensive involvement in the factual basis for the filing of the Complaint.[2] Post anticipates needing an additional day to learn about how Ms. Crootof has been assisting its testifying experts during their inspections.

## II.    ARGUMENT

Federal Rule of Civil Procedure 30(d)(2) requires the Court to allow additional time beyond seven hours for a deposition when "consistent with Rule 26(b)(2)," the additional time is "needed for a fair examination of the deponent." Rule 26(b)(2)(A) authorizes the Court to alter the limits in the Federal Rules of Civil Procedure, including the length of depositions. In addition, Rule 26(b)(2)(C) sets forth reasons why discovery should be limited, none of which exist in this case where the amount of time for the deposition should actually be extended.

---

[2] The ERC has also been unable to produce one of its Rule 30(b)(6) witness – Donald Kahl – during fact discovery and has requested that his Rule 30(b)(6) deposition be taken in May as well. Post agreed to this request. For both of these depositions, the parties have agreed that any motions to compel or discovery disputes that arise from these depositions may be brought before the Court outside of the discovery period.

3

To fairly and adequately examine Ms. Crootof, ERC's principal witness with regard to its investigation of Post, Post is entitled to depose Ms. Crootof regarding ERC's testing and its "floor plan analysis". Post has reason to believe that both the testing and floor plan analysis are flawed and do not sufficiently support the factual allegations made against Post in this lawsuit. Thus, Post is entitled to depose Ms. Crootof regarding the 22 testing files for which she has not yet testified.[3] Although Post has attempted to get information regarding these testing files from ERC's testers, Ms. Crootof as the project coordinator in charge of these tests is the only deponent who has full knowledge regarding these particular tests, including how ERC created each test and what was done with the testing files following these 22 tests. ERC's testers have all testified that they reported to Ms. Crootof and that Ms. Crootof provided the testers with instructions and training regarding these tests. Ms. Crootof is thus the logical and only person to testify fully regarding the tests.

In addition, Post is entitled to depose Ms. Crootof regarding the floor plan analysis, which serves as ERC's basis for including 31 untested properties within the Complaint. Post has not yet deposed any ERC employee in their individual capacity who has been able to sufficiently testify as to how the floor plan analysis was created or conducted. The floor plan analysis seems to be a primitive attempt at comparing marketing floor plans with no technical support. In order for Post to thoroughly examine the vehicle upon which ERC believes it can more than double the scope of this suit, Post must be entitled to depose Ms. Crootof on the floor plan analysis.

Ms. Crootof's involvement in ERC's expert discovery also entitles Post to a fair and full examination of Ms. Crootof regarding this issue. Ms. Crootof has been gathering information for

---

[3] Ms. Crootof was also designated as ERC's 30(b)(6) witness on October 18, 2007, on issues relating to testing and the basis for ERC's claims against Post. ERC has represented that Ms. Crootof's 30(b)(6) testimony was based on Ms. Crootof's personal knowledge. Thus, in requesting the deposition of Ms. Crootof, Post will not revisit the issues already covered by Ms. Crootof in her Rule 30(b)(6) deposition, including her testimony related to five testing files.

ERC's experts since February with the bulk of her inspections occurring in March and April. She has inspected 23 different properties and has used multiple persons as assistants to help her gather and record her data. Post is entitled to know how Ms. Crootof has gathered and recorded her data at the 23 different properties, who has assisted her at each property, what types of photographs she has taken of Post's properties, whether she has spoken to any employees or residents at Post's properties, what are her qualifications for doing the inspections, and what is her role in ERC's expert discovery.

The deposition of Ms. Crootof will not be duplicative or cumulative, and the information sought is obtainable from no other source. The discovery benefits of the deposition sought far outweigh any expense to the parties. The issues at stake go to the heart of this litigation, both in terms of ERC's claims and Post's defenses. In sum, the discovery sought in the deposition of Ms. Crootof is integral to the case as Ms. Crootof's testimony goes to the basis of ERC's claims both before it files the Complaint and as it has attempted to support those claims through discovery and inspections at Post's properties.

Post intends to be judicious in its questioning of Ms. Crootof and hopes to reach a resolution with ERC regarding the appropriate length for Ms. Crootof's deposition. At this time, with fact discovery at a close and not yet having an opportunity to depose Ms. Crootof in her personal capacity, Post believes two days are necessary to depose Ms. Crootof with regard to pre-filing matters and an additional day is necessary to fully explore Ms. Crootof's involvement in expert discovery in this matter. Ms. Crootof is familiar with 22 different testing files, on which she has not already testified. The review of 22 files, with a conservative estimate of 20 minutes per file, is just over seven hours and that does not include the additional time that certain more lengthy files may take or additional questioning that may come from Ms. Crootof's

responses regarding the files. This time also would not include Post's questioning related to and Ms. Crootof's description of the "floor plan analysis" and any other pre-filing information Ms. Crootof may have. Furthermore, Post seeks a day to cover Ms. Crootof's post-filing inspection of 23 Post properties. Again, the questioning related to these 23 different properties is likely to require a full day with conservative estimates of how much time will be spent on each property.

## III.    CONCLUSION

Based on the foregoing, Defendants respectfully request that this Court grant their Motion for Leave to Exceed Duration for Deposition of Rebecca Crootof.

Respectfully submitted,

HOLLAND & KNIGHT LLP

   /s/ Elizabeth Phelps
Christopher B. Hanback (Bar # 232579)
Lynn E. Calkins (Bar # 445854)
Rafe Petersen (Bar # 465542)
Elizabeth Phelps (Bar # 502026)
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006
(202) 955 3000 Phone
(202) 955 5564 Fax
E-mail: christopher.hanback@hklaw.com
E-mail: lynn.calkins@hklaw.com
E-mail: rafe.petersen@hklaw.com
E-mail: libby.phelps@hklaw.com

*Counsel for Post Properties, Inc., et al.*

6

**RULE 37 CERTIFICATE**

I hereby certify that counsel for Post has in good faith conferred or attempted to confer with counsel for the ERC in an effort to secure a resolution without court order.

Dated: April 30, 2008

_/s/ Elizabeth Phelps_____
Elizabeth Phelps

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was served via the Court's electronic filing system, this 30th day of April, 2008, on the following:

Alyssa C. Lareau, Esq.
Fried, Frank, Harris, Shriver & Jacobson, LLP
1001 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20004


        /s/ Elizabeth Phelps
        Elizabeth Phelps

8

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| EQUAL RIGHTS CENTER | ) | |
| Plaintiff, | ) | |
| vs. | ) | Case. No. 1:06CV01991 |
|  | ) | Judge Richard J. Leon |
| POST PROPERTIES, INC. | ) | |
| POST GP HOLDINGS, INC. | ) | |
| POST APARTMENT HOMES, L.P. | ) | |
| Defendants. | ) | |

## ORDER

UPON CONSIDERATION OF Defendants' Motion for Leave to Exceed Duration for Deposition of Rebecca Crootof, and any opposition thereto, it is by the United States District Court for the District of Columbia, this ____ day of _____ 2008, hereby

ORDERED that Defendants' Motion for Leave to Exceed Duration for Deposition of Rebecca Crootof GRANTED.  Defendants will have two days to depose Ms. Crootof regarding pre-filing issues and one day to depose Ms. Crootof regarding her involvement in Plaintiff's expert discovery.

.

_____
**JUDGE RICHARD J. LEON**

Copies provided to:

Alyssa Lareau, Esq.
Christopher B. Hanback, Esq.

Exhibit 1

```
 1          IN THE UNITED STATES DISTRICT COURT

 2            FOR THE DISTRICT OF COLUMBIA

 3

 4 EQUAL RIGHTS CENTER,              )

 5            Plaintiff,             )

 6 vs                               ) Case No.

 7 POST PROPERTIES, INC.,           ) 1:06CV01991

 8 POST GP HOLDINGS, INC.,          )

 9 POST APARTMENT HOMES, L.P.,      ) Judge Leon

10            Defendants.           ) CONFIDENTIAL

11          -      -     -     -     -

12          The deposition of EZINWANNE NDUBUISI

13 HAWKINS was taken on Friday, February 15, 2008,

14 commencing at 10:00 a.m., at the offices of

15 Holland & Knight, 2099 Pennsylvania Avenue,

16 N.W., Washington, D.C., before Sally Jo Bowling,

17 Notary Public.

18          -      -     -     -     -

19

20

21

22
```

2

```
 1              A P P E A R A N C E S

 2

 3 ON BEHALF OF THE PLAINTIFFS:

 4       ALYSSA C. LAREAU, ESQ.
         KATIE RAIMONDO, ESQ.
 5       YAEL LIVNY, ESQ.
         Fried, Frank, Harris, Shriver & Jacobson
 6       1001 Pennsylvania Avenue, N.W.
         Suite 800
 7       Washington, D.C.  20004
         (202) 639-7306
 8       alyssa.lareau@friedfrank.com

 9             and

10       DONALD L. KAHL, ESQ.
         Washington Lawyers' Committee for Civil
11             Rights & Urban Affairs
         11 Dupont Circle, N.W., Suite 400
12       Washington, D.C.  20036
         (202) 319-1000
13       don_kahlwashlaw.org.

14
   ON BEHALF OF THE DEFENDANTS:
15       LYNN E. CALKINS, ESQ.
         RAFE PETERSEN, ESQ.
16       Holland & Knight
         2099 Pennsylvania Avenue, N.W.
17       Suite 100
         Washington, D.C.  20006-6801
18       (202) 457-7041
         lynn.calkins@hklaw.com
19

20

21

22 (Index appears following the transcript.)
```

119

1  community told you about any discriminatory

2  practices that they thought were ongoing at Post

3  Properties?

4      A.    Not that I recall, no.

5      Q.    How was a decision made to begin

6  accessibility testing on Post Properties, as far

7  as you're aware?

8      A.    I don't know, I wasn't involved in that

9  decision.

10     Q.    Part of your research did not involve

11 researching Post Properties at all?

12     A.    No, it didn't.

13     Q.    Do you recall who provided you with the

14 assignment that there would be accessibility

15 testing of Post Properties?

16     A.    Rebecca Crootof was the project

17 coordinator for those tests.

18     Q.    And what did Ms. Crootof tell you about

19 your assignment for accessibility testing at

20 Post Properties?

21     A.    That I was to be the photograph tester.

22     Q.    When did this discussion with

127

1    Q.    Was it a meeting with Ms. Crootof?

2    A.    I don't think it was a meeting.

3    Q.    How did you receive your assignment

4 from Ms. Crootof to become a tester for

5 accessibility testing on Post Properties?

6    A.    I don't know how she gave me the

7 information.

8    Q.    Do you know whether Mr. Singleton was

9 with you when you learned that you would be an

10 accessibility tester?

11   A.    I don't remember.

12   Q.    Did you have any discussions with

13 Mr. Singleton about the testing that was going

14 to be done on Post Properties?

15   A.    Can you rephrase your question?

16   Q.    Did you have any discussions with

17 Mr. Singleton about the testing that was to be

18 undertaken at Post Properties before that

19 testing began?

20   A.    I don't remember.

21   Q.    Did Ms. Crootof, when she gave you your

22 assignment for Post Properties, provide you with

1 a specific tester profile to be used at Post

2 Properties?

3    A.    She did, yes.

4    Q.    And what was that testing profile that

5 Ms. Crootof gave you for Post Properties?

6         MS. LAREAU:  We're going to designate

7 as confidential, but you can answer.

8         THE WITNESS:  It involves her testing

9 methodology.

10        MS. LAREAU:  No, you can answer as to

11 what the profile was.

12        MS. CALKINS:  You need to say anything

13 you're saying to the witness, it needs to be

14 loud enough so that the court reporter can write

15 it down on the record, please, unless it's a

16 privileged conversation.

17        MR. KAHL:  All of our conversations

18 with our client are privileged conversations.

19 If you have another question, ask another

20 question.

21        MS. CALKINS:  She hasn't responded, and

22 the question was what was the testing profile

154

1    Q.    You're pointing to specific pages of
2 Exhibit 3.    What is the Bates number in the
3 bottom right corner that you're referring to as
4 the testing report?

5    A.    It begins at 984.

6    Q.    And what is the last page of the
7 testing report?

8    A.    The last page of the test report form
9 would include the photo log which is 994.  And
10 subsequent pages are the photographs.  And I
11 believe some notes as well.

12   Q.    Did you put together the testing file
13 itself for Pentagon Row?

14   A.    No, I didn't.

15   Q.    Do you know who did?

16   A.    No, it's my understanding that Rebecca
17 Crootof was the test coordinator for this.  It's
18 the test coordinator's job to put together the
19 files for a particular test.

20   Q.    Did you ever receive a copy of the
21 testing file?

22   A.    No.

Exhibit 2

1        IN THE UNITED STATES DISTRICT COURT

2            FOR THE DISTRICT OF COLUMBIA

3

4 EQUAL RIGHTS CENTER,          )

5          Plaintiff,           )

6               v.              )  Case No.

7 POST PROPERTIES, INC.,        )  1:06cv01991

8 POST GP HOLDINGS, INC.,       )

9 POST APARTMENT HOMES, L.P.,)  Judge Richard J. Leon

10          Defendants.         )

11

12            - - - - - - - - - - -

13

14                CONFIDENTIAL

15

16        DEPOSITION OF SHAUNA T. EISENBERG

17

18            Wednesday, March 19, 2008

19

20

21 Reported by:  Lori Goodin Mackenzie, RPR-CLR

22 Job No.:  186241

1

2

3

4                    The deposition of SHAUNA T.

5 EISENBERG was convened on Wednesday, March 19,

6 2008, commencing at 9:02 a.m., at the offices of

7 Holland & Knight, 2099 Pennsylvania Avenue, Suite

8 100, Washington, D.C., before Lori Goodin

9 Mackenzie, Registered Professional Reporter,

10 Certified LiveNote Reporter, and Notary Public

11 for the District of Columbia.

12

13

14

15

16

17

18

19

20

21

22

```
 1                    APPEARANCES

 2 For Plaintiff:

 3    MIRIAM LEDERER, Skadden Fellow

 4    DONALD L. KAHL, Esquire

 5    Washington Lawyers' Committee for Civil

 6        Rights & Urban Affairs

 7    11 Dupont Circle, N.W., Suite 400

 8    Washington, D.C.  20036

 9    202-319-1000

10    202-319-1010 (fax)

11    miriam_lederer@washlaw.org

12    dkahl@equalrightscenter.org

13 For Plaintiff and Shauna T. Eisenberg:

14    ALYSSA LAREAU, Esquire

15    KATHERINE A. RAIMONDO, Esquire

16    YAEL LIVNY, Esquire

17    Fried, Frank, Harris, Shriver & Jacobson, LLP

18    1001 Pennsylvania Avenue, N.W., Suite 400 East

19    Washington, D.C.  20004-2505

20    202-639-7306

21    202-639-7003 (fax)

22    alyssa.lareau@friedfrank.com
```

4

```
 1              APPEARANCES (Continued)

 2

 3 For Defendants:

 4    ELIZABETH L. PHELPS, Esquire

 5    LYNN E. CALKINS, Esquire

 6    ALAN I. BARON, Esquire

 7    Holland & Knight

 8    2099 Pennsylvania Avenue, N.W., Suite 100

 9    Washington, D.C.   20006

10    202-457-5915

11    202-955-5564 (fax)

12    lynn.calkins@hklaw.com

13

14

15

16

17

18

19

20

21

22
```

20

 1      A.    I reported to the project manager

 2 depending on the test, the type of test it was.

 3      Q.    For your accessibility testing, who

 4 did you report to?

 5      A.    I reported to Rebecca Crootof and

 6 possibly Ezinwanne Hawkins, although I'm not sure

 7 whether I reported to Ezinwanne for accessibility

 8 testing or if it was a different kind of test.

 9            But I know that she was involved in

10 it.

11      Q.    Okay.  Have you ever heard of the

12 Floor Plan Analysis that employees at the ERC

13 have prepared?

14      A.    No.  I haven't.

15      Q.    And were you involved in any testing

16 in 2004?

17      A.    No.  I wasn't.

18      Q.    At some point, as part of your

19 duties at ERC as a tester, you were assigned to

20 test certain Post properties; is that correct?

21      A.    That's right.

22      Q.    Did you do any practice tests before

32

1 BY MS. PHELPS:

2        Q.    I'm showing you what has been marked

3 as Exhibit 2.

4              And this is the Accessibility Test

5 Assignment Form that was previously identified as

6 a true and accurate part of the Pentagon Row

7 testing file by Rebecca Crootof at her

8 deposition.

9              Have you ever seen a document

10 similar to this one?

11       A.    Yes.  I have.

12       Q.    Did you review this type of document

13 before doing a test?

14       A.    Yes.  I did.

15       Q.    And is the information in this

16 document, specifically on Page 980, the second

17 page, is that similar to the information you used

18 in your testing profile at Post properties?

19       A.    I can't be sure of that.  I don't

20 remember.

21       Q.    Do you know who gave you this

22 specific assignment to test Post properties?

33

```
 1       A.     Rebecca Crootof.

 2       Q.     And what did she tell you about the

 3 assignment?

 4       A.     Well, I believe I didn't mini test

 5 for Post, so I don't remember what she said

 6 exactly.

 7       Q.     Do you remember what your first test

 8 was for Post?

 9       A.     I do not.

10       Q.     Do you remember when it would have

11 been, even just a general time frame?

12       A.     2006, spring.

13       Q.     And who else went with you on your

14 tests for Post Properties?

15       A.     The ones that I remember were

16 specifically Post was Rebecca Crootof.

17       Q.     On each of them?

18       A.     I couldn't remember whether I had

19 visited any Post Properties in the D.C. area, but

20 I know that I went to Atlanta and at Atlanta

21 Rebecca Crootof and I were there together.

22       Q.     And you said before that you were
```

Exhibit 3

```
 1        IN THE UNITED STATES DISTRICT COURT

 2          FOR THE DISTRICT OF COLUMBIA

 3 - - - - - - - - - - - - - - - - X

 4 EQUAL RIGHTS CENTER,              :

 5          Plaintiff,              :

 6 vs.                              :  Case No.

 7 POST PROPERTIES, INC.,           :  1:06CV01991

 8 POST GP HOLDINGS, INC.,          :

 9 POST APARTMENT HOMES, L.P.,      :  Judge Leon

10          Defendants.             :

11 - - - - - - - - - - - - - - - - X

12             -      -      -      -      -

13

14        The deposition of DANIEL FRANCIS SULLIVAN

15 was taken on Thursday, February 28, 2008,

16 commencing at 9:36 a.m., at the offices of Holland

17 & Knight, 2099 Pennsylvania Avenue, N.W.,

18 Washington, D.C., before Dana C. Ryan, RPR, CRR

19 and Notary Public for the District of Columbia.

20

21             -      -      -      -      -

22
```

2

```
 1                A P P E A R A N C E S

 2

 3 ON BEHALF OF THE PLAINTIFF:

 4         KATHERINE A. RAIMONDO, Esquire

 5         ALYSSA C. LAREAU, Esquire

 6         Fried, Frank, Harris,

 7             Shriver & Jacobson, L.L.P.

 8         1001 Pennsylvania Avenue, N.W.

 9         Suite 800

10         Washington, D.C. 20004

11         Telephone:  (202) 639-7000

12         katherine.raimondo@friedfrank.com

13                        and

14         MIRIAM R. LEDERER, Esquire

15         Washington Lawyers' Committee For Civil

16                 Rights & Urban Affairs

17         11 Dupont Circle, N.W.

18         Suite 400

19         Washington, D.C. 20036

20         Telephone:  (202) 319-1000

21         miriam_lederer@washlaw.org

22
```

3

```
 1    A P P E A R A N C E S   C O N T I N U E D

 2

 3 ON BEHALF OF THE DEFENDANTS:

 4         LYNN E. CALKINS, Esquire

 5         RAFE PETERSEN, Esquire

 6         KEVIN SHIELDS, Esquire

 7         ELIZABETH PHELPS, Esquire

 8         Holland & Knight

 9         2099 Pennsylvania Avenue, N.W.

10         Suite 100

11         Washington, D.C. 20006-6801

12         Telephone:   (202) 955-3000

13         lynn.calkins@hklaw.com

14

15

16

17

18

19

20

21

22
```

129

1 employed with the ERC at some point, did you begin

2 an investigation of Post Properties?

3    A    I did not personally conduct that

4 investigation.

5    Q    Who did?

6    A    To the best of my recollection and

7 knowledge, that investigation was coordinated by

8 Rebecca Crootof and perhaps others at the Equal

9 Rights Center.

10    Q    Do you know any of the others, other

11 than Ms. Crootof, who participated in the

12 investigation of Post Properties?

13    A    I believe that Ezinwanne Hawkins may

14 have also been involved in that investigation.

15    Q    Can you think of any others?

16    A    Those are the only two that I'm

17 comfortable that I remember being involved while I

18 was there.

19    Q    Was it Ms. Crootof's decision to

20 investigate Post Properties in the first place?

21         MS. RAIMONDO:  Objection; speculation.

22         THE WITNESS:  No, it was not.

186

1            Do you see that?

2      A      I do.

3      Q      Did Bruce Kahn use the word "diversion

4  of staff time" to you?

5      A      I don't remember what he said.

6      Q      What do you understand "a diversion of

7  staff time" to mean?

8      A      A diversion of time from one thing to

9  another thing.

10     Q      How was staff time being diverted for

11  purposes of this investigation?

12     A      I don't remember what activities

13  everybody was involved in at the time that I wrote

14  this memo.

15     Q      What diversion of financial resources

16  was being made with respect to this investigation?

17     A      Again, I -- I don't remember what --

18  what financial resources were brought to bear

19  here.

20     Q      It says in the next sentence of the

21  second paragraph of your memo in Exhibit 2 that,

22  You have been approved as the ERC point person.

187

```
 1           Do you see that?

 2      A    I do.

 3      Q    And by "you," you're referring to

 4 Rebecca Crootof?

 5      A    Yes.

 6      Q    How was it determined that Rebecca

 7 Crootof was going to be the ERC point person

 8 responsible for this investigation?

 9           MS. RAIMONDO:  Objection; speculation.

10           THE WITNESS:  That would have been

11 determined in consultation with and with the

12 approval of the executive director.

13      BY MS. CALKINS:

14      Q    Were you involved in that decision?

15      A    I believe so, yes.

16      Q    What qualifications did Rebecca Crootof

17 have in order to be assigned to be the point

18 person for this investigation?

19      A    I can't remember at this time what

20 exactly her qualifications were or what her

21 training was at this -- at this point in time.

22      Q    Why weren't you selected as far as you
```

1 affordable housing?

2          MS. RAIMONDO:  Objection; speculation.

3          THE WITNESS:  I don't have any personal

4 recollection of any discussion of affordable

5 housing issues and Post Properties.  I just have

6 no personal recollection of such a discussion.

7      BY MS. CALKINS:

8      Q    Okay.  If you would turn to the page

9 marked as ERC00984.  Is this the beginning of the

10 ERC's accessibility report form?

11     A    Yes, it appears to be that.

12     Q    What, if any, role did you have with

13 respect to creating this accessibility report

14 form?

15     A    I'm looking at the date revised of this

16 report form, which is 1/06, and based on my best

17 recollection of the development of -- in the

18 development of this form, I would have reviewed it

19 along with a number of other people.  And I

20 believe that it was developed by and revised by

21 Rebecca Crootof.

22     Q    Is it your testimony, then, that you

Exhibit 4

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **EQUAL RIGHTS CENTER,** | ) | |
| | ) | |
| | ) | **Case No. 1:06CV01991** |
| | ) | |
| Plaintiff, | ) | **Judge Richard Leon** |
| | ) | |
| vs. | ) | |
| | ) | |
| **POST PROPERTIES, INC.** *et al.,* | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## DECLARATION OF REBECCA CROOTOF

1.      I am a Senior Project Coordinator at the Equal Rights Center ("ERC"). I have

worked at the ERC for approximately two and a half years. I am over the age of 18 years, have

personal knowledge of the facts stated herein and am competent to testify to them. I was

primarily responsible for the investigation and testing conducted by the ERC with respect to Post

Properties, Inc.'s ("Post") apartment and condominium complexes.

2.      The ERC is a non-profit civil rights organization dedicated to identifying,

challenging, and eliminating discrimination in housing, employment, public accommodations,

and government services through education, research, testing, counseling, enforcement, and

advocacy. The ERC also represents the interests of its approximately 150 individual public

members, many of whom are persons with disabilities.

3.      Many of my duties at the ERC revolve around educating the public on their rights

under the Fair Housing Act and other civil rights laws. I have been responsible for drafting,

editing, and publishing the ERC's quarterly newsletter; I handled the ERC's section of the 2004

annual Fair Housing Symposium (which the ERC now puts on by itself to provide a forum for

experts and the public to discuss current fair housing issues) and assisted with subsequent ones; I

have developed the current version of the ERC's website and been involved in updating it

regularly; I have created, edited, updated, managed translation, and published a number of the

brochures which the ERC uses for education and outreach, including "What We Do" (which has

been translated into Spanish, Chinese, Vietnamese, and Amharic) and "Fair Housing Compliance

Program" (copies attached as Exhibits A and B), and provided graphic design advice for many

other brochures, mailings, posters, and documents; I have conducted numerous public

presentations on fair housing law and individual rights under the FHA; I have managed a

contract the ERC has with a major builder in the eastern U.S. and for over two years I conducted

bi-monthly fair housing training for their sales representatives; I worked as the Intern

Coordinator to educate interns on ERC activities and fair housing law; and I recently spent a

month teaching U.S. fair housing law to employees of the Estate Agents Affairs Board in South

Africa.

  4.  Post is a national developer and manager of apartments and condominiums, with

over 50 multi-family properties built for first occupancy after March 13, 1991 (and, thus,

"covered" by the Fair Housing Act as Amended in 1988 (FHAA).

  5.  In 2006, after the ERC learned that, among other housing providers, Post had a

number of apartment complexes not in compliance with the FHAA), I was asked by the ERC to

divert my time from my other duties to an investigation of Post to discover if, and if so, to what

extent Post participated in housing discrimination against persons with disabilities. I designed,

supervised, and participated in this systemic investigation of multifamily developments built by

Post for first occupancy after March 13, 1991, in order to determine their level of compliance with the technical standards of the FHAA.

6.      I first began a local systemic investigation of Post properties in the greater D.C. metropolitan area. This testing consisted of two ERC personnel trained in the accessibility requirements of the FHA and some of the requirements of the ADA physically inspecting each of the Tested Properties, making visual observations, and taking actual measurements and photographs of critical design features. At the conclusion of each testing trip, I debriefed testers and collected all forms, handouts, and signed-out equipment; created files for each test; reviewed the photo log created by one of the two testers; analyzed the test results, and inputted the results into testing reports.

7.      As a result of this local systemic testing, it became apparent that Post had covered housing complexes which were designed and constructed in violation of the FHAA. The ERC then determined that it was necessary to expand the local investigation of Post to a broader-scoped one in order to determine the extent of Post's non-compliance nationally.

8.      As part of the ERC's investigation, research was conducted to determine how many multi-family properties built for first occupancy after March 13, 1991 Post owned and had developed, the date each property was completed for first occupancy, the number and type of units, and in some cases, information about the office hours and if there were any apartments available to view.

9.      Based on the information available at the time, the ERC decided to test twenty-seven (27), or roughly one-half, of Post's total properties covered by the FHAA. In addition, twenty-six (26) of the twenty-seven (27) properties to be tested were constructed for first

occupancy or remodeled after January 26, 1993, the effective date for the accessibility requirements of the Americans with Disabilities Act.

10.     When choosing properties to test, the ERC selected sites designed to examine both how widespread geographically Post's discriminatory conduct was, and how pervasive the discriminatory conduct was in areas where Post had developed multiple covered properties.

11.     After selecting the Post properties to be tested, I created a timeline and a budget for the investigation. This budget was approved, and so I began planning the necessary logistics, including travel for testing in Colorado, Florida, Georgia, North Carolina, and Texas. For all of the "expanded-scope" tests, I was the tester who actually took measurements.

12.     As a result of this systemic testing, it became apparent that Post had numerous apartment complexes which were designed and constructed in violation of the FHAA.

13.     After all tests were completed, I worked with others at the ERC to do a floor plan analysis that looked for similarities in design between tested Post properties where FHAA violations were found, and untested properties. As noted in ¶ 18 below, we found many similarities.

14.     After I had completed the analysis for all Post testing, I met with the ERC's Director of Testing to do a complete review of the Post testing and its results. The testing results demonstrated numerous violations. For example, doors at several of the Subject Properties (including Brookhaven, Gallery, Abbey, Vintage, Corners, Gardens, Oglethorpe, Park Place at Phillips Place, Peachtree and Ballentyne have been measured at 22" to 28.5" instead of meeting the required minimum nominal 32", making them too narrow for a person in a wheelchair; Tested Properties Lindbergh, Collier Hills, and Lenox have 1.5" patio thresholds and no ramps,

making access to and from the patios difficult or impossible for a person in a wheelchair; Tested

Property Lenox Park has a main entrance to a unit threshold that appears to make access to the

ground floor unit difficult or impossible for a person in a wheelchair; Tested Properties Carlyle

Square and Gardens had a main entrance to the leasing office that appears to make access to the

leasing office difficult or impossible for a person in a wheelchair; Tested Properties Uptown

Square, Collier Hills, Lindbergh, Stratford, Lenox Park, Gardens, Glen, Ballentyne, Park at

Phillips Place, Uptown, Square, Pentagon Row, Corners, Rocky Point, Hyde Park, Oglethorpe,

Gallery and Abbey have bathrooms that do not have sufficient clear floor space to allow a person

in a wheelchair to maneuver about the space and/or use the facilities; Tested Properties Uptown

Square, Hyde Park, Harbor Park, Peachtree Hills, Stratford, Gardens, Oglethorpe, Gateway

Place, Gallery, Abbey, Square, Vintage, Corners, Carlyle Square, Mass Ave., Rocky Point,

Stratford and Ballentyne have kitchens that do not have sufficient clear floor space so as to allow

a person in a wheelchair to maneuver about the space and/or use the appliances in a safe manner;

Tested Properties Hyde Park, Collier Hills, Peachtree Hills, Stratford, Gardens, Glen,

Brookhaven, Oglethorpe, Ballentyne, Park at Phillips Place, Gateway Place, Uptown, and Mass

Ave. have environmental controls that range from 55" to 61" above the finished floor instead of

meeting the required maximum 48", making them too high for a person in a wheelchair to use;

Tested Properties Carlyle Square, Glen, Gallery and Abbey have steps without an accompanying

ramp, either at units or at the leasing office entrance, making access impossible for a person in a

wheelchair; and Tested Properties Gallery, Heights II and Worthington provide no accessible

parking at the leasing center for persons with disabilities.

15.     One of the properties tested was Post's Rocky Point apartments located in Tampa,

FL. I was part of the testing team for this garden-style complex which was built in 1995-1996.

While at this property, we were shown Unit #3525 on the ground floor. A number of features in

that unit did not meet the requirements of the FHAA. The environmental controls for the unit

were 62" above the floor instead of meeting the required maximum of 48", making them too

high for a person in a wheelchair. The outlets were at 13.5" above the floor instead of meeting

the required minimum height of 15", making them too low for a person in a wheelchair to reach.

This unit had a U-shaped kitchen; the standard for such kitchens is to have a 60" diameter clear

floor space at the base of the "U," so that a person using a wheelchair can turn around and exit

the kitchen safely in case of an emergency. The clear diameter in the kitchen was only 56.5".

For a person in a wheelchair to use a sink when no forward approach is possible (as is the case in

this kitchen), there needs to be 48" centered clear floor space at the sink; in other words, 24"

from the center of the sink to the nearest obstruction. The sink in this kitchen had only 20.5"

from the center to the nearest obstruction, making it difficult or impossible for a person in a

wheelchair to use. The bathroom in this unit also did not meet the standards for sufficient clear

floor space at the toilet or at the sink necessary for a person in a wheelchair to be able to use the

facilities. The complex also had open outdoor stairwells with no protective obstacles within cane

range underneath the stairwells; such obstacles are required by the standard to prevent a blind or

low-vision person from hurting themselves by running into the underside of the steps.

16.     Another of the properties tested was Post's Condominiums at Carlyle Square

located in Alexandria, VA. I was part of the testing team for this high-rise facility which was

still being built in 2006. We were not shown an apartment unit, as they were not yet available for

public viewing. We were shown a model kitchen and a model bathroom in the sales office,

which the sales agent said would be the same as those in the actual units. The sales office was up

steps and no ramp was apparent, making it difficult or impossible for a person with a mobility

disability to enter the office. The show kitchen did not have sufficient clear floor space to allow

a person in a wheelchair to maneuver about the space or use the appliances in a safe manner.

There were other common area problems: the common area bathroom had a light switch 51"

high (instead of the required maximum of 48") and not enough clear floor space for a person in a

wheelchair to close the door or use the toilet.

17.     A third property tested was Post's Ballentyne apartments located in Charlotte, NC.

I was part of the testing team for this garden-style complex which was completed in 2004. The

rental agent at this property showed us Unit #101 on the ground floor. The walk-in closet in one

of the bedrooms had a door only 28.5" wide instead of the required 32" minimum needed to

ensure accessibility. In the unit's U-shaped kitchen, there was only a 56" turning diameter rather

than the required 60" minimum, and the bathroom sink did not have enough clear floor space to

allow the facility to be used by a person in a wheelchair. We were not allowed by the rental

agent to photograph the property.

18. The above are just examples of the accessibility problems found in Post's various

properties. We found similar or additional violations at all the other Post properties built for first

occupancy after March 13, 1991 which were tested by the ERC. In addition to testing a large

sample of Post properties, the ERC also looked at floor plans, brochures and Post's website to

determine if untested Post properties shared common elements of design with the tested

properties and would, thus, exhibit similar violations. We found that they did. By way of

example: Five (5) Tested Properties—Uptown Square, Uptown Place, Stratford, Collier Hills, and Lenox Park—share common design elements in the bathrooms of their units, and with the bathroom units of 12 of the untested Subject Properties. Each of these properties uses a common bathroom design in units that makes the width of the room equal to the length of the bathtub, and arranges the bathtub, the toilet, and the lavatory in sequence along a single wall. This common design in every tested instance results in inadequate clearance in the bathroom making it difficult or impossible for persons in wheelchairs to use the facilities. Examples of these floor plans using this common bathroom design are attached as Exhibit C.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on April 18, 2007

Rebecca Crootof





Studio   1 by 1 bth         Straford

#3



1 Bd, 1 Bth
#2

Straford



Parkside

# Loft 2 bed, 2 bath #2



Bldg.

# Traditional 1 bed, 1 bath #1



Luminaria

# Traditional 1 bed, 1 bath #5



Post Toscana

# Traditional 1 bed, 1 bath #1



## POST UPTOWN VILLAGE
## TRADITIONAL- 2BR/ 2BATH



Ridge

# Traditional 2 bed, 2 bath #1



# Unit B9a

## 2 bedroom / 2 bath

230, 330

PRINT



THE CONDOMINIUMS AT

# CARLYLE SQUARE



Due to continuing changes in products, building codes and availability of material, builder reserves the right to incorporate new design features of equivalent materials at any time without notice. All dimensions and square footage shown on this page and floorplans are approximate only. Floor plans, specifications and standard features are subject to modifications at any time without notice. Room dimensions may vary between the rendered floor plans and the individually built units. All illustrations and photography are artist's concepts and model representations and may vary in detail from plans and specifications. Renderings and furniture are an artist's interpretation for illustrative purposes only. These renderings are intended for illustrative purposes only and shall not be made part of any Purchase Agreement.

  www.pnhoffman.com 

# Unit D4

2 bedroom / 2 1/2 bath / den

102

PRINT



THE CONDOMINIUMS AT

# CARLYLE
# SQUARE

1st Level



Mezzanine



Due to continuing changes in products, building codes andavailability of material, builder reserves the right to incorporate new design features of equivalent ma-
terials at any time without notice. All dimensions and square footage shown on this page and floorplans are approximate only. Floor plans, specifications and stan-
dard features are subject to modifications at any time without notice. Room dimensions may vary between the rendered floor plans and the individually built units. All
illustrations and photography are artist's concepts and model representations and may vary in detail from plans and specifications. Renderings and furniture are an art-
ist's interpretation for illustrative purposes only. These renderings are intended for illustrative purposes only and shall not be made part of any Purchase Agreement.

  www.pnhoffman.com 

# Unit D2a1

1 bedroom / 2 bath / den

112

PRINT



THE CONDOMINIUMS AT

# CARLYLE SQUARE





1st Level                    Mezzanine

Due to continuing changes in products, building codes and availability of material, builder reserves the right to incorporate new design features of equivalent materials at any time without notice. All dimensions and square footage shown on this page and floorplans are approximate only. Floor plans, specifications and standard features are subject to modifications at any time without notice. Room dimensions may vary between the rendered floor plans and the individually built units. All illustrations and photography are artist's concepts and model representations and may vary in detail from plans and specifications. Renderings and furniture are an artist's interpretation for illustrative purposes only. These renderings are intended for illustrative purposes only and shall not be made part of any Purchase Agreement.

 POST PREFERRED HOMES | PN HOFFMAN | www.pnhoffman.com  EQUAL HOUSING OPPORTUNITY

# POST BRIARCLIFF
## TRADITIONAL- 1BR/ 1BATH



# Traditional 1 bed, 1 bath #1

Dunwoody

Bath #1

