UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **EQUAL RIGHTS CENTER,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:06CV01991** |
| | ) | **Judge Richard J. Leon** |
| **POST PROPERTIES, INC.,** *et al.,* | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |

**PLAINTIFF'S MEMORANDUM OF POINTS AND AUTHORITIES IN
OPPOSITION TO DEFENDANTS' MOTION IN LIMINE**

Plaintiff the Equal Rights Center ("ERC"), by its counsel, hereby submits this

Opposition to Defendants' Motion in Limine to Exclude Evidence Regarding Plaintiff's

Untimely Damages Assessment Produced After the Close of Fact Discovery.  Notwithstanding

the conclusory label Defendants ascribe to their motion, there is nothing "untimely" about the

ERC's claimed damages in this case nor is there any merit to Defendants' motion.  The ERC

requests that the Motion be denied.[1]

**INTRODUCTION**

As set forth below, and as alleged in its Complaint, the ERC seeks two categories of

compensatory damages in this case:  (1) diversion of resources damages, and (2) frustration of

mission damages.   These are two distinct types of damages that are recoverable in Fair Housing

---

[1]    The ERC advises the parties and the Court that nothing in this Opposition recites or discloses any
information designated "confidential" by either party and therefore the ERC is not filing this Opposition
under seal.  Even so, portions of the materials cited by Post in its motion are properly designated
confidential and therefore should remain under seal at this time.

Act cases against developers such as Defendants (referred to collectively here as "Post").  In short, "diversion of resources" seeks recovery for the resources and employee time diverted by the agency to investigating the discriminatory activity at issue – in this case, Post's rampant pattern of designing and constructing apartments and apartment complexes that fail to comply with the accessibility provisions of the Fair Housing Act.  Separately, "frustration of mission" damages are designed to compensate the plaintiff for remedial actions it is forced to undertake as a result of a defendant's discrimination, including education and outreach programs, counseling and advocacy, testing and monitoring, advertising, and audits and reports.  In this case, there has never been a secret that the ERC is seeking both types of damages.  It is alleged expressly in the Complaint.  (*See* Docket. No. 1, Compl. ¶ 43 (frustration of mission) and ¶ 44 (diversion of resources).)

For reasons Post has never explained, but which prove fatal to its motion, Post concentrated virtually all of its fact discovery on "diversion of resources" damages.  Post asked interrogatories about that type of damage, asked deposition questions about that type of damage, and even sought to compel additional discovery on that element of damages.  In all instances, ERC responded to that discovery.

Post must have realized this omission in its discovery efforts because, for the first time, on April 14, 2008, Post demanded that the ERC designate a witness to testify specifically about "frustration of mission" damages.  Clearly, someone on Post's team knew and understood that the ERC had alleged this type of damage and that previous discovery efforts had omitted asking the ERC to specify a calculation of those damages.  Post's Rule 30(b)(6) notice was served prior to the close of discovery and the ERC agreed to produce a Rule 30(b)(6) fact witness to answer whatever questions Post had on that topic.

On May 30, 2008, the ERC produced its Chief Operating Officer, Donald Kahl, as its Rule 30(b)(6) corporate designee, to respond to any Post questions about the various topics in Post's Rule 30(b)(6) Notice, *including* the topic seeking information about "frustration of mission" damages.[2] Mr. Kahl was fully prepared to answer questions on this topic, including by providing Post with the quantum of damages the ERC was seeking for frustration of its mission and the methodology used to arrive at that damages figure. Yet, *in the four hours during which Post questioned Mr. Kahl, Post never once asked him either about that Rule 30(b)(6) topic in specific or about frustration of mission damages in general*. Whether this was an oversight or a calculated strategy is for Post to explain. The fact is that Post did not ask questions about the very topic it now claims in its Motion that it did not know the ERC was seeking. Post does not and cannot dispute this fact because the deposition transcript would belie any contrary contention. In short, Post had ample opportunity to take discovery of the ERC's frustration of mission damages and either affirmatively elected not to do so (which litigants sometimes do for strategic reasons) or simply forgot to ask questions on the deposition topic Post itself noticed. In either event, Post's actions cannot in any way be blamed on the ERC.

Faced with Post's failure to elicit testimony on the ERC's "frustration of mission" damages, and not wanting to leave this issue to the eve of trial, the ERC *voluntarily* provided Post's counsel with a summary of its frustration of mission damages on August 1, 2008. Gauging Post's reaction, the ERC suspects that Post's failure to ask the ERC's Rule 30(b)(6)

---

[2]    Donald Kahl initially served as co-counsel in this matter, as he previously worked at the Washington Lawyers' Committee for Civil Rights and Urban Affairs. However, in February 2008, Mr. Kahl left the Washington Lawyers' Committee and accepted a position as Chief Operating Officer (COO) at the Equal Rights Center. Immediately thereafter, Defendants noticed Mr. Kahl for a deposition in his personal capacity. In April 2008, ERC designated Mr. Kahl to speak on behalf of the organization in a 30(b)(6) deposition relating to the calculation of the ERC's damages. Thus, Mr. Kahl has been deposed twice: once in his personal capacity and once as a 30(b)(6) witness.

designee about this noticed topic during fact discovery appears to have been an act of omission rather than a deliberate strategy.    For that reason, and again in a good faith attempt to avoid having this issue fester until trial, the ERC offered to make a witness available to answer questions on the "frustration of mission" damages topic, just as an ERC designee had been prepared to do during fact discovery.  Post, however, refused the offer and sought instead to seek the extraordinary relief of barring any claim for frustration of mission damages by the ERC through this Motion.

Given the history of this issue, and under the relevant law, Post's motion is wholly unfounded.  Post is in this predicament because it did not diligently pursue this issue in discovery.  Moreover, Post can claim no cognizable prejudice, since it now has the information far in advance of dispositive motions and trial.  Indeed, the ERC could have designated an expert witness to present its frustration of mission damages analysis and Post would have first learned of the methodology – and the materials supporting it – when it received the expert report.

The notion that Post should now be rewarded with the extraordinary remedy of barring all frustration of mission evidence by the ERC is nonsensical.  The ERC had no obligation to specify the quantum of these claimed damages absent Post's specific inquiry and the record shows that Post failed to make such inquiry.  Moreover, Post cannot show prejudice since it now has the information well in advance of trial.  Finally, the ERC would be severely prejudiced by a ruling that would preclude evidence of this important element of recoverable damages.  The Motion in Limine should be denied.

## ARGUMENT

**I.    The Complaint Alleges that the ERC Suffered Two Distinct Types of Damages.**

The issue in this Motion in Limine is whether the Court should bar the ERC from putting

on trial evidence that Post's discriminatory housing practices have resulted in a frustration of the

ERC's mission.  Putting aside for the moment whether Post's motion should even be entertained

at this juncture, given that trial is months away and expert discovery has only recently

commenced, the motion is defective at its core.  The fact that the ERC has been seeking

frustration of mission damages has been open and notorious since Day One.  Post cannot claim

that it did not know of these damage claims because they are (a) in the Complaint, and (b) Post

expressly noticed a corporate deposition of the ERC on that very topic.  It is only after Post did

not follow up and after the ERC voluntarily provided the information to Post that Post cried foul.

There is no sandbagging here and no prejudice to Post.  The evidence is timely and proper.

Post's Motion is neither.

As stated above, "diversion of resources" seeks recovery for the resources and employee

time diverted by the agency to investigating the discriminatory activity at issue, while

"frustration of mission" damages are designed to compensate the plaintiff for remedial actions it

will be forced to undertake as a result of a defendant's discrimination, including education and

outreach programs, counseling and advocacy, testing and monitoring, advertising, and audits and

reports.  Courts have recognized these damages as separate and distinct, even if they arise from the same core discriminatory behavior.[3]

## II.     Post Did Not Seek Discovery Regarding the Amount of the ERC's Frustration of Mission Damages.

In order to prevail on its claim that the ERC violated Fed. R. Civ. P. 26(e) by failing to submit information on a "new damages claim" (Defs' Mem. at 12), Post must show that the ERC either failed to make a proper disclosure or failed to respond to one of Post's discovery requests. Fed. R. Civ. P. 26(e).  Post cannot make either showing.

First, Post incorrectly characterizes the ERC's frustration of mission damages as a "new" damages claim.  To the contrary, the ERC claimed frustration of mission damages from the outset of this litigation.  The ERC's Complaint clearly delineates that Post (1) frustrated the ERC in its mission to eradicate discrimination in housing (Compl. ¶ 43) and (2) forced the ERC to divert significant and scarce resources to identify, investigate, and counteract Post's discriminatory practices (Compl. ¶ 44), and that Post's actions will continue to injure the ERC until remedied (Compl. ¶ 46).  There is nothing "new" about the ERC's claim.

Second, the ERC did not violate 26(e) by failing to make a required disclosure, as the parties agreed to dispense with 26(a)(1) initial disclosures in their original Meet and Confer Statement.  (Docket No. 17 at 5.)  If Post wished to ask the ERC an interrogatory that mirrored the language of Rule 26(a)(1)(A)(iii) calling for a computation of each category of damages, it

---

[3]     *See, e.g., Fair Housing of Marin v. Combs*, No. C 97-1247, 2000 WL 365029, at *3-4 (N.D. Cal. Mar. 29, 2000) (awarding damages for (1) "harm caused by the diversion of resources away from . . . core [Fair Housing of Marin] programs to investigate the allegations against [Defendant] and for (2) "the costs envisioned for the design, printing and dissemination of literature aimed at redressing the impact [Defendant's] discrimination had on the Marin housing market [and to] redress [Fair Housing of Marin] for harm to its mission"), *aff'd*, 285 F.3d 899 (9th Cir. 2002).  To the extent that Post may now want to challenge this authority, a motion in limine is not the proper vehicle for doing so.

could have done so.[4]  Instead of asking the ERC for such a computation, however, Post focused

its discovery solely on the "diversion of resources" portion of the ERC's damages claims,

notwithstanding the Complaint language and the well-recognized fact that frustration of mission

is distinct from diversion of resources.

Third, Post's contention that it *did* ask about frustration of mission damages is belied by

the record.  Post's attempt  to cobble together answers from different deposition questions to

make its point are misleading and should be rejected.  Similarly, its attempt to characterize the

ERC's August 1, 2008 letter as a "supplementation" of the ERC's previous discovery responses

is erroneous.

None of Post's discovery requests focused on "frustration of mission" damages.  For

instance, Interrogatory No. 6 asks the ERC to "[s]tate all facts and identify all documents you

claim support the allegations set forth in the complaint."  (*See* Defs' Ex. A.)  The ERC

responded fully and completely to this overbroad interrogatory, providing all documents and

stating all facts that supported its allegations of discrimination in the Complaint.  This

interrogatory did *not* ask the ERC to provide a calculation of damages or supporting evidence for

such a calculation.

In contrast, Post's Document Request No. 19 asks for "all documents supporting your

claim for damages in this action."  (*See* Defs' Ex. B.)   By definition, the ERC had no obligation

to provide these documents until it quantified its frustration of mission damages.  Since Post

never asked for such specification, the ERC had no obligation to produce documents relied on to

---

[4]     Fed. R. Civ. P. 26(a)(1)(A)(iii) requires "a computation of each category of damages claimed by the
disclosing party — who must also make available for inspection and copying as under Rule 34 the
documents or other evidentiary material, unless privileged or protected from disclosure, on which each
computation is based, including materials bearing on the nature and extent of injuries suffered."

specify those damages.  If Mr. Kahl had been asked to specify such damages during his Rule 30(b)(6) deposition, he would have identified the supporting documents and the ERC would have produced them.  The eight pages produced as ERC9975-82 were produced after Mr. Kahl ultimately relied on them to support the ERC's finalized August 1, 2008 calculation of its frustration of mission damages and did not even exist prior to mid-April when Mr. Kahl was preparing for his 30(b)(6) deposition that was scheduled to occur in May.[5]  The August 1, 2008 calculation worksheet produced at ERC10026-27 was produced immediately after it was created.[6]  Thus, it is clear that the documents could not have been produced through the ERC's initial discovery responses, as they did not yet exist.  *Alexander v. F.B.I.*, 194 F.R.D. 305, 310 (D.D.C. 2000) ("Rule 34 only requires a party to produce documents that are already in existence.").  Further, the ERC had no duty to create these documents for Post, as "[a] party is not required to prepare, or cause to be prepared, new documents solely for their production."  *Id.* (internal citation omitted).  In fact, the ERC did not decide to rely on these documents as support for its claim for frustration of mission damages until it became apparent that similar information would not be elicited through Post's 30(b)(6) deposition of Mr. Kahl.[7]

---

[5]     Post improperly contends that, because ERC9975-82 contain an email from Donald Kahl, who previously served as counsel of record in this case (*see supra* note 2) the ERC has selectively waived its privilege.  Not so.  Personal information gained by Mr. Kahl during his role as an attorney on this case is clearly privileged.  Further, as Mr. Kahl testified in his deposition, and as Post surely knows in any event, Mr. Kahl's current position with the ERC, Chief Operating Officer, requires him to handle day-to-day operations as well as to provide legal advice.  (*See* Ex. A, Dep. Tr. of Donald Kahl, dated Apr. 23, 2008, at 23:2-9.)  The email contained in ERC9975-82 does not pertain to his counsel role, but rather his business function, and was prepared for purposes of the ERC's Rule 30(b)(6) deposition for which Mr. Kahl was designated to testify.  No privilege attached and none certainly was waived via reliance on this email.

[6]     This document was designated confidential pursuant to this Court's Protective Order entered on September 24, 2007 and was filed under seal with Post's Motion.  By referencing this document, the ERC does not waive the confidential nature of this document.

[7]     Even if these documents had been withheld in error, Post has suffered no prejudice at this juncture of the case.  And even if Post had suffered prejudice, only the documents themselves would be barred from

**Footnote continued**

Post next asserts that it asked about the ERC's calculation of its frustration of mission damages in earlier depositions, but the record shows otherwise. ERC designated Executive Director Rabbi Bruce Kahn to respond to an earlier Post Rule 30(b)(6) notice regarding the "dollar value of all resources utilized, used or diverted" by the ERC. (*See* Ex. B, Notice of Rule 30(b)(6) Deposition of Equal Rights Center, Topics 8-9, emphasis added.) Rabbi Kahn was not designated to testify about frustration of mission damages, and Post's Rule 30(b)(6) notice did not ask for a designee on that topic. Nonetheless, Rabbi Kahn squarely put Post on notice that prospective frustration of mission damages are part of the ERC's claim, while responding to a question related to diversion of resources, when he stated that:

> our efforts are those that…were completed before this was filed, since it's been filed, and we'll have to, of necessity to our frustration of our mission and our perception of the harm done to people with disabilities all across the country in which Post has -- has participated, are going to go on for years and are enormous.

(Ex. C, Dep. Tr. of Rabbi Bruce Kahn, dated Oct. 3, 2007, at 193:15-22.) Post's reliance on Rabbi Kahn's deposition as support for its current motion is clearly misguided.

The best evidence that Post did not previously ask for the ERC's position on frustration of mission damages is the fact that, on April 14, 2008, near the end of discovery, Post served a Rule 30(b)(6) notice seeking an ERC designee to testify on this precise topic. The April 14 Notice sought a corporate designee to testify about the "ERC's damages calculation, including but not limited to . . . a detailed description of how ERC's mission was frustrated." (*See* Ex. D, Amended Notice of Rule 30(b)(6) Deposition of Equal Rights Center, Topic 5.) On May 30, 2008, the ERC designee, Mr. Kahl appeared pursuant to this Notice to testify on this and other

---

**Footnote continued from previous page**

  evidence, not Mr. Kahl's timely produced calculation of frustration of mission damages or his testimony at trial about the same.

Rule 30(b)(6) topics.[8]  Post claims that during this deposition Mr. Kahl was "asked about how ERC's mission was allegedly frustrated because of Post" and that Mr. Kahl answered by stating "any monetary component of ERC's frustration of mission claim was equated with its alleged diversion of resources."  (Defs' Mem. at 8.)  That is not the case.  In fact, the questions Post cites to in support of this assertion do <u>not</u> contain the term "frustration of mission" at all, do not ask how to "value" or to provide a "monetary component" of <u>any</u> damages, but instead solely ask for the activities that resources have been diverted from.  *Id.*

In fact, Post <u>admits</u> that it did not inquire as to the "valuation of [the ERC's] frustration of mission allegation" during this 30(b)(6) deposition, purportedly because the ERC had not previously voluntarily disclosed such a valuation.  (Defs' Mem. at 7.)  But Post's <u>own</u> 30(b)(6) notice specifically identifies both diversion of resources and frustration of mission as components of damages. (*See* Ex. D, Topic 5.)  Post's focus on the pages produced at ERC9975-82 and ERC10026-27 to justify its failure to ask any frustration of mission valuation questions is disingenuous.  These pages show how Mr. Kahl actually calculated the frustration of mission damages figure, and were clearly not necessary for Post to ask more basic questions such as "what is your damages calculation" or "how do you calculate frustration of mission damages."  These basic questions could have been formulated at the very beginning of this case, based solely upon reading the Complaint.  While both frustration of mission and diversion of resources were

---

[8]    Post notes that the ERC never supplemented Interrogatory No. 5 ("identify each person whom you contend or reasonably believe has information or knowledge of facts or information concerning the allegations in the Complaint and provide for each person identified a summary of the facts or information in his or her possession relating to the allegations.")  However, the ERC is not offering Mr. Kahl as a witness who has information or facts concerning the allegations in the Complaint, as he would have gained that information while he was counsel for the Washington Lawyers' Committee.  Additionally, the ERC is offering Mr. Kahl as ERC's current Chief Operating Officer to explain the calculation of prospective frustration of mission damages.  Moreover, Post cannot articulate any prejudice as it was aware that Mr. Kahl was designated as a Rule 30(b)(6) witness to discuss calculation of damages, and had the opportunity to depose him in that and in his personal capacity.

separately and expressly identified by Post as subjects for inquiry in its Rule 30(b)(6) Notice, the deposition record clearly and decisively demonstrates that Post never asked the ERC's designee about that noticed topic. Post's own <u>admitted</u> oversight does not merit court intervention.

Perhaps in recognition of its failure to inquire of Mr. Kahl in his Rule 30(b)(6) capacity, Post seeks to justify its motion by pointing to Mr. Kahl's earlier deposition, on April 23, 2008, at which he testified in his personal capacity. (*See* Defs' Mem. at 5-7.) When counsel for the ERC refused to let Mr. Kahl answer questions other than those posed related to the non-legal aspects of his work as Chief Operating Officer of the ERC, Post attempted to inquire about the topics they had noticed for the Rule 30(b)(6) deposition, and asked Mr. Kahl questions that related <u>only</u> to diversion of resources.[9] In response, Mr. Kahl made clear that he was gathering information on behalf of the ERC to respond to those topics at the upcoming Rule 30(b)(6) deposition that Post had noticed. More significantly, Mr. Kahl specifically testified that the information being gathered related to "diversion of resources <u>and</u> frustration of mission damages." (*See* Ex. A, Dep. Tr. of Donald Kahl at 220:7-11, emphasis added.) Here again, prior to the May 30 deposition for which an ERC witness was fully prepared to testify about the noticed topic regarding the ERC's frustration of mission damages, Post was clearly on notice that there were two distinct sets of damages and calculations. While Post complains that Mr. Kahl did not have damages figures at the time of his personal deposition, it is axiomatic that, when deposed in a personal capacity, one speaks to his or her personal knowledge and is under no obligation to research or educate oneself about any other matters beyond that.

---

[9] In its memorandum, Post disingenuously states that it asked Mr. Kahl "what factual information [he] had about ERC's claim for damages." (Defs' Mem. at 6.) The question that actually precipitated the answer by Mr. Kahl cited in Post's memorandum was, "And how has the Equal Rights Center diverted resources as a result of the alleged discriminatory actions taken by Post Properties?" (*See* Ex. A, Dep. Tr. of Donald Kahl, at 219:20-22.) Again, Post chose to focus only on diversion of resources.

Finally, Post attempts to identify deposition questioning of two former ERC employees, Arlene Corbin-Lewis and Veralee Liban, who did not remember or possess knowledge as to how the ERC's mission was frustrated.  (*See* Defs' Mem. at 3-5.)  It is unclear how this is relevant to the present motion, as these employees were never designated as Rule 30(b)(6) witnesses on this topic.  They testified truthfully and fully.  Their inability to respond to frustration of mission damages claimed by the ERC in this case means nothing for purposes of Post's motion.

Because the ERC properly alleged frustration of mission and diversion of resources damages in the Complaint, because the parties agreed to forego initial disclosures, and because Post simply chose not to seek information relating to the calculation of frustration of mission damages, a Rule 26(e) analysis is inapplicable, and the ERC is not required to present a "substantial justification" as there was no untimely disclosure.

**III.    The Severe Sanction of Preclusion is Unwarranted, as Post Can Demonstrate No Prejudice Here.**

The D.C. Circuit has held, "[t]he central requirement of *Rule 37* is that 'any sanction must be just,'" and moreover, "[t]he choice of sanction should be guided by the 'concept of proportionality' between offense and sanction."  *Bonds v. District of Columbia*, 93 F.3d 801, 808 (D.C. Cir. 1996) (internal citations omitted).  Thus, in determining whether a severe sanction is justified, the D.C. Circuit has stated "the district court may consider the resulting prejudice to the other party, any prejudice to the judicial system, and the need to deter similar misconduct in the future."  *Id.*  Post has failed to show that there would be prejudice to any party or to the judicial system, and has failed to argue that there is a need to deter the alleged misconduct in the future.

If the Rules afford the defendant an adequate opportunity to take discovery before dispositive motions are due, then a failure to provide information as required by Rule 26(a) or (e) is harmless.  *See Flynn v. Dick Corp.*, No. 03-1718, 2008 U.S. Dist. LEXIS 46415, at *8 (D.D.C.

12

June 16, 2008).  In *Flynn v. Dick Corporation*, the defendant argued that documents produced

for the first time in plaintiff's motion for summary judgment, ought to be excluded under Rule

37(c)(1).  *See id.* at *7.  This Court, after reviewing the standard articulated in *Norden v.*

*Sampler*, 544 F. Supp. 2d 43, 50 (D.D.C. 2008), held that it need not determine if the plaintiffs

improperly failed to produce the documents because the withholding was harmless due to fact

that "the Rules afforded [defendants] an opportunity to take discovery on the subjects contained

[in the documents] before tiling their opposition to the [plaintiff]'s motion for summary

judgment."  *Id.* at *8.  Therefore, this Court held that "[plaintiff]'s failure to provide these

documents was harmless and the sanction of exclusion is not warranted."  *Id.*[10]

The ERC did not improperly withhold or fail to timely supplement propounded discovery

and did not have an affirmative obligation to produce the information contained in its August 1,

2008 letter during fact discovery, since Post never asked for it.  If Post is prejudiced by its failure

to make inquiry during discovery, Post has no one to blame but itself.

However, there is no evidence that Post will suffer any prejudice.  The ERC voluntarily

disclosed the evidence at issue precisely to avoid claims of prejudice and the distraction that this

issue might cause on the eve of trial.  Even though the ERC would have been well within its

---

[10]    The cases principally relied on by Post – *Elion v. Jackson*, 544 F. Supp. 2d 1 (D.D.C. 2008) and
*Norden v. Samper*, 544 F. Supp. 2d 43 (D.D.C. 2008) – are easily distinguishable because the timing of the
supplemental disclosures in those cases occurred at far later stages of litigation.  For example, in *Elion*, the
witness whose testimony was sought had remained unidentified until the eve of trial.  544 F. Supp. at 8
(noting that witness was not identified until filing of Joint Pretrial Statement).  Similarly, in *Norden*, the
evidence and testimony was submitted for the first time in opposition to a motion for summary judgment.
544 F. Supp. 2d at 49.  The court determined that "allowing the letter to be part of the record *this late in the
case* would prejudice [Defendant]."  *Id.* at 50 (emphasis added).  The other cases cited by Post are equally
unavailing.  *See, e.g.*, *Wong v. Regents of Univ. of Cal.*, 410 F.3d 1052, 1060 (9th Cir. 2005) (excluding
expert testimony filed in response to motion for summary judgment); *Trost v. Trek Bicycle Corp.*, 162 F.3d
1004, 1008-09 (8th Cir. 1998) (same); *Gen. Elec. Cap. Bus. Asset Funding Corp. v. S.A.S.E. Military Ltd.*,
No. SA-03-CA-189-RF, 2005 Lexis 6215 at * 11 (finding prejudice based on disclosure filed just two
months before trial).  Here, in stark contrast, Post cannot and does not claim that it was unaware of the
ERC's claim of frustration of mission damages; ample time exists for Post to further depose ERC's
designated Rule 30(b)(6) witness on frustration of mission damages before summary judgment motions are
due; and no trial date has been set.

rights to present this evidence of damages for the first time during witness testimony at trial, the ERC elected not to take advantage of this opportunity and, instead, to disclose the information now, while overall discovery remains open and dispositive motions and trial are months away.

The ERC's reward for sharing this evidence now is Post's demand that all such evidence be barred. Yet, Post's prejudice claims ring hollow. In the (belated) meet and confer prior to filing this motion, ERC's counsel offered the possibility that Post examine Mr. Kahl on this evidence as a courtesy and also to allow Post's expert additional time to prepare a rebuttal report on this topic if Post needed such time.

This opportunity completely excuses Post's failings in its discovery and would cure any purported prejudice that it might articulate. *See Flynn*, No. 03-1718, 2008 U.S. Dist. LEXIS 46415, at *8. Nor can Post make a valid claim of prejudice to the judicial system in this case. In *Walls v. Paulson*, No. 03-0186, 2008 U.S. Dist. LEXIS 41119, at *20-22 (D.D.C. May 27, 2008), this Court held that the sanction of exclusion was unwarranted, in part because there was sufficient time before dispositive motions were due for defendants to conduct discovery, despite the fact that plaintiffs had violated Rule 26(e). *See id.* In the case before the Court, briefing on summary judgment does not conclude until February 2009, and a trial date has not yet been scheduled, thus allowing Post sufficient time to prepare to respond to the information provided.

In rejecting the ERC's offer, Post insisted on re-deposing <u>all</u> of the ERC's present and former employees and contractors that Post deposed during fact discovery, and all at the ERC's expense. There is no justification for such a request and it is completely unwarranted, not only because the underlying cause is of Post's own making, but it is especially inappropriate with regard to witnesses who have already affirmatively testified that they lack knowledge on anything relating to the ERC's damage claims. Indeed, if Post had asked Mr. Kahl about

14

frustration of mission damages during the May 30 Rule 30(b)(6) deposition, there would be no question that Post would not be entitled to re-depose any ERC witnesses.   Nor would Post have been afforded this type of relief if the ERC's damages calculations were first presented, as the ERC could have done, through expert reports.  Indeed, expert discovery is ongoing.

Post's motion in limine, six months before dispositive motions are submitted, is simply unwarranted.  It has no factual foundation and Post can show no prejudice.  The motion should be denied.

## CONCLUSION

For the reasons stated above, the ERC respectfully requests that this Court deny Post's Motion in Limine.


Dated:  August 25, 2008                    Respectfully submitted,


                                            /s/ Alyssa C. Lareau
                                           Alyssa C. Lareau (DC Bar No. 494881)
                                           Douglas W. Baruch (DC Bar No. 414354)
                                           Fried, Frank, Harris, Shriver & Jacobson LLP
                                           1001 Pennsylvania Avenue, N.W.
                                           Suite 800
                                           Washington, D.C.  20004-2505
                                           Telephone No.:  202-639-7052
                                           E-mail address:  Alyssa.Lareau@friedfrank.com
                                           E-mail address:  Douglas.Baruch@friedfrank.com

                                           Isabelle M. Thabault
                                           Washington Lawyers' Committee
                                           for Civil Rights and Urban Affairs
                                           11 Dupont Circle
                                           Suite 400
                                           Washington, DC 20036
                                           Telephone No.:  202-319-1000
                                           E-mail address:  Isabelle_Thabault@washlaw.org

                                           *Attorneys for Plaintiff*

*Equal Rights Center*

## CERTIFICATE OF SERVICE

I hereby certify that, on this 25th day of August 2008, a copy of the foregoing Plaintiff's

Memorandum of Points and Authorities in Opposition to Defendants' Motion in Limine was

served via the Court's electronic filing system to:

> Lynn E. Calkins
> HOLLAND & KNIGHT LLP
> 2099 Pennsylvania Ave., N.W.
> Suite 100
> Washington, D.C. 20006
> *Attorney for Defendants*

>     /s/ Alyssa C. Lareau
>     Alyssa C. Lareau

# EXHIBIT A

# In The Matter Of:

*EQUAL RIGHTS CENTER   v.*
*POST PROPERTIES, INC., ET AL.*

---

*DONALD L. KAHL*
*April 23, 2008*

---

*For The Record, Inc.*
*Court Reporting and Litigation Support*
*10760 Demarr Road*
*White Plains, MD   USA   20695*
*(301) 870-8025     FAX: (301) 870-8333*

Original File 80423KAH.ASC, 240 Pages
Min-U-Script® File ID: 2360375081

## Word Index included with this Min-U-Script®

DONALD L. KAHL
April 23, 2008

EQUAL RIGHTS CENTER  v.
POST PROPERTIES, INC., ET AL.

Page 21

[1]    Q: What information did you provide the
[2] board of directors as the chief operating officer
[3] for the ERC about the ongoing lawsuit against Post
[4] Properties?
[5]    MR. BARUCH: Objection; privileged.
[6]            BY MS. CALKINS:
[7]    Q: Are you going to in — take that
[8] instruction from your lawyer?
[9]    A: I am.
[10]    Q: Did the board of directors consider
[11] anybody else for the position of chief operating
[12] officer for the ERC?
[13]    A: I don't —
[14]    MR. BARUCH: Object to form.
[15]    THE WITNESS: Excuse me.
[16] I don't know.
[17]            BY MS. CALKINS:
[18]    Q: Did you interview for the position of
[19] chief operating officer?
[20]    A: No.
[21]    Q: Were you selected exclusively by Rabbi
[22] Kahn for the position of chief operating officer

Page 22

[1] for the Equal Rights Center?
[2]    A: No.
[3]    Q: Did you receive a letter of offer of
[4] employment from somebody at the Equal Rights
[5] Center offering you the position of chief
[6] operating officer?
[7]    A: No.
[8]    Q: How were you then selected for the
[9] position of chief operating officer for the Equal
[10] Rights Center?
[11]    A: A request came through Rabbi Kahn for
[12] me to consider that position, and ultimately I was
[13] advised that the board of directors had given
[14] authority for that situation to take place.
[15]    Q: Did you meet with any members of the
[16] board of directors to discuss the position of
[17] chief operating officer?
[18]    A: No.
[19]    Q: What are — please describe your duties
[20] as the chief operating officer for the Equal
[21] Rights Center.
[22]    A: Other than I've described them

Page 23

[1] previously?
[2]    Q: Do — yes. Please describe for me the
[3] extent of your duties as the chief operating
[4] officer for the Equal Rights Center.
[5]    A: Well, as I previously testified,
[6] they're multifaceted. I am responsible for the
[7] day-to-day operations of the organization as well
[8] as providing legal counsel and advice to the
[9] organization.
[10]    Q: What percentage of your job duties is
[11] involved with dealing with the oversight of the
[12] day-to-day operations of the Equal Rights Center?
[13]    A: That varies extremely from day-to-day,
[14] and I — I would only be speculating about a
[15] percentage. I really can't answer that question.
[16]    Q: What percentage of your job duties as
[17] the chief operating officer involves providing
[18] legal counsel and expertise?
[19]    A: It would be the same answer. It varies
[20] from day-to-day, and I really can't give you a
[21] percentage.
[22]    Q: Are you in charge with the overall

Page 24

[1] administration of the Equal Rights Center?
[2]    A: I don't know what you mean by that.
[3]    Q: Is there anyone other than yourself
[4] serving as the chief operating officer who is in
[5] charge with the overall administration of the
[6] entity?
[7]    A: Well, there's certainly no one else who
[8] is titled chief operating officer. Rabbi Bruce E.
[9] Kahn remains the executive director and is
[10] directly involved in the operations of the ERC as
[11] well.
[12]    Q: What are the job duties of the
[13] executive director of the Equal Rights Center now
[14] that you serve in the capacity as chief operating
[15] officer?
[16]    A: I've never seen a job description for
[17] the executive director. I don't know the answer
[18] to that question.
[19]    Q: What does Rabbi Kahn do on a day-to-day
[20] basis for the Equal Rights Center?
[21]    MR. BARUCH: You can describe it if you
[22] know what he does.

Page 217

the e-mail?
A: I can't tell from this page other than it is — it is communication between counsel for the Equal Rights Center and someone involved in this litigation with respect to the testing of Post Properties at a time frame that is relevant to this litigation. That's what I can tell from this privilege log.
Q: As far as you're aware, was factual information contained in this e-mail regarding the testing of Post Properties?
A: I don't know without reviewing the document itself.
Q: The third document identified is an August 14, 2006 e-mail. Do you see that?
A: Yes.
Q: And the fourth line down in the Recipient column is K. Walsh; do you see that?
A: I do.
Q: Who is that — is — who is that individual?
A: Her name is Kathleen Walsh.

Page 218

Q: And what position did she hold with the Equal Rights Center, if any?
A: I'm sorry. I don't know what her specific title was.
Q: Was she an employee of the Equal Rights Center?
A: She was on the staff of the Equal Rights Center, yes.
Q: Is she still?
A: No.
Q: Was this memorandum regarding diversion of resources prepared at your request?
A: Yes.
Q: And was it serving as the basis of the filing of a lawsuit as far as you're aware?
MR. BARUCH: Objection.
THE WITNESS: I'm sorry —
MR. BARUCH: That's —
THE WITNESS: — I —
MR. BARUCH: — not —
THE WITNESS: — think that calls for —

Page 219

MR. BARUCH: — the standard for asserting privilege and —
(The Reporter asks for clarification.)
MR. BARUCH: Objection. That's not the standard for asserting privilege, and the answer to the question itself would call for privileged information anyway.
BY MS. CALKINS:
Q: Is part of the information that you have as a individual related to the — the information contained in the diversion of resources memo?
A: I'm sorry. I just don't understand your question, Ms. Calkins.
Q: Is part of the allegations in this complaint that the Equal Rights Center has diverted resources because of allegations of discrimination by Post Properties?
A: Yes.
Q: And how has the Equal Rights Center diverted resources as a result of the alleged discriminatory actions taken by Post Properties?

Page 220

A: Well, let me answer you two ways. First, I suspect that what you're really asking is for my own attorney work product while I was acting as counsel for the Equal Rights Center, and I'm going to decline to answer that on the basis of privilege.
That aside, the information relating to diversion of resources and frustration of mission damages, as I understand it, is the subject of discovery, and we are gathering information to timely respond to that request.
Q: As you sit here today, can you identify any way in which the Equal Rights Center has had to divert resources because of the discriminatory action allegedly taken by Post Properties?
A: I believe so.
Q: Okay. What is that?
A: I believe that the Equal Rights Center staff diverted time and financial resources, expenses, to researching, investigating, testing and now litigating with Post Properties with respect to its discriminatory actions.

# EXHIBIT B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EQUAL RIGHTS CENTER )<br><br>Plaintiff, )<br><br>vs. )<br><br>POST PROPERTIES, INC. )<br>POST GP HOLDINGS, INC. )<br>POST APARTMENT HOMES, L.P. )<br><br>Defendants. ) | Case. No. 1:06CV01991<br>Judge Richard J. Leon |

### NOTICE OF RULE 30(b)(6) DEPOSITION OF EQUAL RIGHTS CENTER

Pursuant to Federal Rule of Civil Procedure 30(b)(6), Defendants Post Properties, Inc.,

Post GP Holdings, Inc., and Post Apartment Homes, LP (collectively "Post") will take the

deposition of the Equal Rights Center ("ERC"). This deposition will commence at 10:00 A.M.

on September 26, 2007, and will continue from day to day thereafter until the deposition is

completed. The deposition will be taken at the offices of Holland & Knight LLP, located at 2099

Pennsylvania Avenue, NW, Suite 100, Washington, DC 20006. The deposition will be taken by

stenographic means. The deposition is being taken for all purposes authorized by the Federal

Rules of Civil Procedure.

Pursuant to Rule 30(b)(6), the Equal Rights Center is required to designate one or more

officers, directors, managing agents, or other persons who consent to testify on its behalf about

the following subjects:

## DEFINITIONS

1.    The term "COMMUNICATION" means and includes any oral or written

expression, statement or utterance of any nature made by or to anyone, including without

limitation, correspondence, email, conversations and agreements.

2.    The term "DISABILITY" is synonymous with "HANDICAP" and the terms have

the meaning given for "handicap" in section 802(h) of the Fair Housing Act, 42 U.S.C. §

3602(h).

3.    The term "DOCUMENT" is synonymous in meaning and equal in scope to the

usage of this term in Federal Rule of Civil Procedure 34(a) and shall include any tangible thing

upon which information is or has been stored, recorded or communicated, including, but not

limited to: records, letters, notes, correspondence, graphic or photographic matter, agreements,

memoranda, diaries, calendars, telephone logs, messages, records, tapes, email and other

electronically stored materials.

4.    The term "IDENTIFY" or the "IDENTITY" means:

    a.    When used in reference to a natural person, the person's full name, date of

        birth, social security number, dates of agency, employment or service as a

        volunteer (if the natural person is, or was at the time, an agency, employee or

        volunteer), and the last known business and residence address (including the

        specific apartment), and telephone number;

    b.    When used in reference to a document, the type of document (i.e., letter,

        memorandum, email, chart, etc.), a brief description of the nature of the

        information in the document, its author and originator, its date or dates, all

        addresses and recipients, and its present location or custodian.  If any such

document was, but is no longer, in your possession or subject to your control,

state additionally the approximate dates it was lost, discarded, or destroyed,

and the identity of each person having knowledge of the contents thereof;

c. When used in reference to a business entity, the structure of the business (i.e.,

corporation, partnership, sole proprietorship, etc.), a brief description of the

nature of the business, and the business address and telephone number; and

d. When used in reference to a Subject Property, the name of the Subject

Property and the full address.

5.      The phrase "RELATE TO" shall be deemed to include: contain, allude to, respond

to, comment on, discuss, show, disclose, explain, mention, refer to, analyze, constitute, comprise,

evidence, set forth, summarize, characterize, either directly or indirectly, in whole or in part.

6.      The phrase "FAIR HOUSING ACT" means the Fair Housing Act Amendment of

1988, 42 U.S.C. §§ 3601-3619.

7.      The phrase "AMERICANS WITH DISABILITIES ACT" means the Americans

with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.*

8.      The term "PERSON" means any natural person, group of natural persons,

corporation, partnership, government agency or board, association, proprietorship, organization,

or any other legal entity.

9.      The term "SUBJECT PROPERTIES" means the list of Subject Properties

attached to PLAINTIFF's Complaint.

## TOPICS

1.      The ERC's organizational and management structure, including office locations,

each for-profit or not-for-profit entity, and all government agencies, divisions, departments, and

employees that are affiliated, formally or informally, with the ERC; the relationship between the ERC and these affiliated entities; and all persons who have served as officers, directors, or trustees of any such entity.

2. The identity of each current or former officer, director, trustee, employee, and volunteer, past and present, of the ERC since November 21, 2002, and a description of each person's duties and job responsibilities, dates of employment, or if uncompensated, dates of participation.

3. The identity of current and past ERC members, including identifying those whom the ERC claims, knows, or believes are persons with disabilities, and those who live within 15 miles of each of the Subject Properties and those whom the ERC claims were affected by Post's activities.

4. The ERC's financial information, including the ERC's net worth (or balance of accounts and reserves) as of the last day of the ERC's fiscal year, income statements, annual operating budgets, assets, liabilities, income and expenses, state or local tax returns filed, and compensation paid to any officer, director or trustee exceeding $5,000, since November 21, 2002.

5. The ERC's sources of funding and revenue including any grants or donations in excess of $100.00 in cash or "in kind" donations or services by federal, state, local governments, private entities, foundations, or persons, and any application for funding of ERC activities or reports or documents filed with, or funding determination received from, the United States Department of Housing and Urban Development or any other federal, state, or local government agency or official relating to fair housing or disabilities issues, since November 21, 2002.

4

6.    Dollar value of all resources utilized, used, or diverted (specifically and separately itemized) to litigate or to prepare to bring this suit against Post, including resources expended to identify alleged discriminatory practice by Post and to investigate or "test" Post's activities (including the amount of time, resources, and money devoted to identification of victims of alleged discriminatory conduct by Post).

7.    Dollar value of all resources utilized, used, or diverted (specifically and separately itemized) to counteract alleged discriminatory practice by Post, including reaching out to other potential plaintiffs, and responding to community requests for assistance in investigating alleged discriminatory conduct by Post.

8.    Dollar value of all resources utilized, used, or diverted (specifically and separately itemized) to inspect Post's properties through the ERC's discovery process (including itemization of resources expended on experts, engineers, and consultants, and prosecution of this action at each property).

9.    Dollar value of all resources utilized, used, or diverted (specifically and separately itemized) to and any information related to attorney fees and attorney time related to the ERC's claims against Post.

10.    The date of communication, nature of communication, and identity of all persons (specifically identifying those whom the ERC claims, knows, or believes to have a disability) who have been in communication with the ERC or complained to the ERC with regard to the alleged fair housing discrimination by Post, or have resided in, inquired as to, or visited any Post property and have alleged or will allege to have been impacted by the alleged fair housing discrimination by Post.

11.    The date of communication, nature of communication, and identity (including location) of all federal, state, or local agencies, or associations or advocacy groups that, since November 21, 2002, have been in communication with the ERC with regard to alleged discrimination by Post or have requested assistance from the ERC in investigating alleged discriminatory conduct by Post, including the services provided and whether any funding, compensation or expense reimbursements were exchanged.

12.    All complaints, lawsuits, actions or administrative proceedings filed or instituted by the ERC or in which the ERC participated since January 1, 2002, related to Fair Housing Act accessibility design and construction violations.

13.    All services provided and resources expended, including seminars, presentations and community outreach, by the ERC in each locality where a Subject Property is located and the identity of the members and/or attendees who reside in each town or city where a Subject Property is located.

14.    The ERC's testing at Post properties, including the identity, qualifications, training, and knowledge regarding the Fair Housing Act ("FHA") and Americans with Disabilities Act ("ADA") accessibility requirements of any persons who served as testers or otherwise performed any investigative or other services at the direction of the ERC related to investigating alleged discrimination by Post, as well as a description of any investigation, testing or other analysis that the ERC has taken related to or in support of its allegations of discrimination against Post.

15.    The identity of all persons whom the ERC contends or reasonably believes have information or knowledge concerning the allegations in the Complaint and a description of that information or knowledge.

16.    The circumstances of how and when the ERC first became aware of each of the allegations of discrimination against Post at each Subject Property as well as the nature of each and every action that Post took that the ERC alleges violated the FHA and ADA.

17.    Information and expert reports obtained in the inspection of any Post properties inspected in relation to this lawsuit, including all documents and information reviewed, received, considered, or relied upon by the ERC's experts.

18.    Information and documents that the ERC has distributed or sent to any persons or entity, in relation to investigation, education, or counteraction of Post's actions or the allegations of discrimination against Post, including to whom and where they were sent.

Respectfully submitted,

HOLLAND & KNIGHT LLP

 /s/ Christopher B. Hanback
Christopher B. Hanback (Bar # 232579)
Alan I. Baron (Bar. # 340273)
Rafe Petersen (Bar # 465542)
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006
(202) 955 3000 Phone
(202) 955 5564 Fax
E-mail: christopher.hanback@hklaw.com
E-mail: alan.baron@hklaw.com
E-mail:  rafe.petersen@hklaw.com

*Counsel for Post Properties, Inc., et al.*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and accurate copy of the foregoing was served via first-class certified mail, postage prepaid, this 27th day of August, 2007, on the following:

Sheila Jane Carpenter, Esq.
Jorden Burt LLP
1025 Thomas Jefferson Street, NW
Suite 400 East
Washington, DC 20007

Donald Lee Kahl, Esq.
Washington Lawyers' Committee for Civil Rights & Urban Affairs
11 Dupont Circle, NW
Suite 400
Washington, DC 20036


                                        /s/ Christopher B. Hanback
                                        Christopher B. Hanback


# 4740837_v1

# EXHIBIT C

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

----------------------------X

EQUAL RIGHTS CENTER          )

                             )

          Plaintiff,         )  Case No.

                             )  1:06CV01991

   vs.                       )

                             )  Judge Richard J. Leon

POST PROPERTIES, INC.        )

POST GP HOLDINGS, INC.       )

POST APARTMENT HOMES, L.P.   )

                             )

          Defendants.        )

----------------------------X


DEPOSITION OF RABBI BRUCE EDWARD KAHN

Washington, D.C.

Wednesday, October 3, 2007


Reported by:  Cindy L. Sebo, RMR, CRR, RPR, CSR

Job No.  183319

**Esquire Deposition Services**
D.C. - 1-800-441-3376

**MD - 1-800-539-6398**
**VA - 1-800-752-8979**

# Rabbi Brude Edward Kahn

Page 189

1 referred to in that paragraph?

2     A.    Right. We have provided, I think,

3 a -- documents about that, about the expenses in

4 regard to Post --

5         MS. CARPENTER: We just looked at

6 them.

7         THE WITNESS: -- and I think they're

8 conservative. I think that it's -- that

9 there's -- there was more time and effort put into

10 it than what's reflected here. I mean, I know

11 that's the case.

12         BY MR. BARON:

13     Q.    Can you tell me which specific

14 documents you're referring to so we know what

15 we're talking about?

16     A.    Time slips and this --

17         MS. CARPENTER: Costs.

18         THE WITNESS: Costs.

19         MS. CARPENTER: And the witness is

20 referring to Exhibit 19 and Exhibit 17.

21         BY MR. BARON:

22     Q.    Any other documentation of the

Page 190

1 expenditures with relation to the Post matter

2 other than those two?

3         It's not a trick question. Is there

4 anything else you want to point to?

5     A.    I'm just sorting -- thinking through

6 the possibilities.

7         Specifically in regard to Post, I

8 don't have anything else to suggest.

9     Q.    Would you take a look at Paragraph 44

10 of the Complaint? I think that was Exhibit 2.

11         MS. CARPENTER: It's on Page 17.

12         THE WITNESS: I'm sorry. Which

13 paragraph?

14         BY MR. BARON:

15     Q.    Forty-four, right at the top.

16 Page 17.

17         (The witness reviews the document.)

18         THE WITNESS: Yes.

19         BY MR. BARON:

20     Q.    Now, in there, you refer -- the

21 Complaint refers to counteracting Post's

22 discriminatory practices.

Page 191

1         Do you see that?

2     A.    I do.

3     Q.    Within that term, are you including

4 the resources used to engage in testing to

5 counteract?

6     A.    That's part of --

7     Q.    I just want to know if it's included.

8     A.    Part of it, yes.

9     Q.    Okay. And would you include, as part

10 of the efforts to counteract Post, the

11 investigation that was undertaken to determine

12 whether, in fact, discriminatory activity was

13 going on?

14     A.    Well, in this paragraph, "investigate"

15 is separate from "counteract." So I'm -- I don't

16 know if investigate and counteract are meant to

17 be -- investigate is included in counteract or

18 separate from counteract, so --

19     Q.    What would you include in the efforts

20 to counteract? Let me rephrase it.

21         Would you include bringing the

22 litigation itself?

Page 192

1     A.    Yes, that would be part of it. In my

2 mind, there would be more to it than that.

3     Q.    Okay. But that's part of it.

4         And would you -- that's part of it?

5     A.    That's part of it.

6     Q.    Would you include the preliminaries

7 that had to be undergone -- investigation,

8 testing, et cetera, training, whatever -- prior to

9 initiating the investigation -- the -- initiating

10 the litigation as part of the effort to counteract

11 Post?

12     A.    In my mind, counteracting the -- the

13 discrimination may include the work that was done

14 to ascertain that accessible design and

15 construction, illegal discrimination is the

16 problem that it is, studying it, discovering it,

17 measuring it and all the aspects -- everything

18 that's necessary in terms of -- of identifying it,

19 investigating it, the work that we do to -- in

20 education and outreach, in advocacy and all the

21 other activities that we do to try to respond to

22 this crisis of -- that is afflicting a community

27 (Pages 189 to 192)

# Rabbi Brude Edward Kahn

## Page 193

1 of people with disabilities such that, according
2 to the national organizations with whom we've
3 spoken, such as AAPD, Paralyzed Vets, independents
4 and a bunch of others, represents the Number 1
5 crisis facing people with disabilities in this
6 country.
7          And a part of that is what we
8 understand, what we believe Post has contributed
9 to and has engaged in.
10          So our efforts as a result of Post's
11 activity are numerous and go in a lot of
12 directions as we try -- as we try and respond to
13 the frustration of the ERC's mission that this
14 discrimination represents.
15          And our -- our efforts are those that
16 have been complete -- that were completed before
17 this was filed, since it's been filed, and we'll
18 have to, of necessity to the frustration of our
19 mission and our perception of the harm done to
20 people with disabilities all across the country in
21 which Post has -- has participated, are going to
22 have to go on for years and are enormous.

## Page 194

1          So that's the most sincere and best
2 answer I can give to your question.
3     Q.   Can you point to any specific activity
4 undertaken by the ERC relating specifically to
5 what you claim are Post's discriminatory policies
6 that were undertaken by the ERC, specifically
7 relating to Post, not in a broad, general effort
8 to combat discrimination generically?
9     A.   When I go and discuss with people,
10 as -- as I frequently do, what is happening, the
11 crisis facing people with disability in regard to
12 housing in this country, Post is a part of the
13 discussion.
14          So it's not only about other than
15 Post, nor is it only about Post alone.  That --
16 those kinds of activities are constant and
17 ongoing, and I'm sure I'm not the only member of
18 the staff that's engaged in them.
19          So that's an example.
20          And if I understood your question
21 correctly, everything that we're doing in relation
22 to this Complaint (indicating) is -- I mean,

## Page 195

1 including today, is -- is a part of the answer to
2 your question.
3     Q.   I understand that part.
4          When you talk about speaking to people
5 about the problem of discrimination, is this in
6 reference -- are you referring to -- you know, you
7 talked about meeting of the -- I don't remember
8 the name -- a council of rabbis and then you had a
9 fair housing council, you sort of -- convocation,
10 so to speak, of people in your field in which you
11 discuss issues relating to, let's say, housing
12 discrimination; is that the occasions you were
13 referring to?
14     A.   Some of them.  There are -- I mean,
15 speaking at the gathering of the
16 Central Conference of American Rabbis or the NFHA
17 convention are just -- you know, those are -- and
18 the Central Conference of American Rabbis is not a
19 fair housing organization.  That's -- that's --
20 those are a couple of very different examples.
21          But I had a meeting with a group of
22 clergy in Southeast a couple of weeks ago.  I have

## Page 196

1 individual conversations with people who I think
2 could have an impact on what we're -- what we're
3 doing.
4          We are working very hard to firmly
5 establish a greater D.C. civil rights alliance.
6 And I have talked about this with over a hundred
7 heads of agencies and organizations that have been
8 invited to be a part of this alliance.  I mean, it
9 goes on and on and on --
10     Q.   But I'd like to come back to --
11     A.   -- and Post is a part of it.
12     Q.   But let me get back to my question.
13          Can you cite any specific instance in
14 which the ERC's resources are used specifically
15 with regard to Post as distinguished from Post as
16 part of the overall, general problem of
17 discrimination in housing?
18     A.   Post and Post alone?
19     Q.   Yes.  That's the only client I'm
20 representing here.
21     A.   But Post, specifically, is a part
22 of -- mentioned as a part of all these activities

28 (Pages 193 to 196)

# EXHIBIT D

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| EQUAL RIGHTS CENTER )<br><br>Plaintiff, )<br><br>vs. )<br><br>POST PROPERTIES, INC. )<br>POST GP HOLDINGS, INC. )<br>POST APARTMENT HOMES, L.P. )<br><br>Defendants. ) | Case. No. 1:06CV01991<br>Judge Richard J. Leon |

**AMENDED NOTICE OF RULE 30(b)(6) DEPOSITION OF EQUAL RIGHTS CENTER**

Pursuant to Federal Rule of Civil Procedure 30(b)(6), Defendants Post Properties, Inc.,

Post GP Holdings, Inc., and Post Apartment Homes, LP (collectively "Post") will take the

deposition of the Equal Rights Center ("ERC"). This deposition will commence at 9:30 A.M. on

April 29, 2007, and will continue from day to day thereafter until the deposition is completed.

The deposition will be taken at the offices of Holland & Knight LLP, located at 2099

Pennsylvania Avenue, NW, Suite 100, Washington, DC 20006. The deposition will be taken by

stenographic means. The deposition is being taken for all purposes authorized by the Federal

Rules of Civil Procedure.

Pursuant to Rule 30(b)(6), the Equal Rights Center is required to designate one or more

officers, directors, managing agents, or other persons who consent to testify on its behalf about

the following subjects:

## DEFINITIONS

1.    The term "COMMUNICATION" means and includes any oral or written expression, statement or utterance of any nature made by or to anyone, including without limitation, correspondence, email, conversations and agreements.

2.    The term "DISABILITY" is synonymous with "HANDICAP" and the terms have the meaning given for "handicap" in section 802(h) of the Fair Housing Act, 42 U.S.C. § 3602(h).

3.    The term "DOCUMENT" is synonymous in meaning and equal in scope to the usage of this term in Federal Rule of Civil Procedure 34(a) and shall include any tangible thing upon which information is or has been stored, recorded or communicated, including, but not limited to: records, letters, notes, correspondence, graphic or photographic matter, agreements, memoranda, diaries, calendars, telephone logs, messages, records, tapes, email and other electronically stored materials.

4.    The term "IDENTIFY" or the "IDENTITY" means:

    a.    When used in reference to a natural person, the person's full name, date of birth, social security number, dates of agency, employment or service as a volunteer (if the natural person is, or was at the time, an agency, employee or volunteer), and the last known business and residence address (including the specific apartment), and telephone number;

    b.    When used in reference to a document, the type of document (i.e., letter, memorandum, email, chart, etc.), a brief description of the nature of the information in the document, its author and originator, its date or dates, all addresses and recipients, and its present location or custodian. If any such

2

document was, but is no longer, in your possession or subject to your control,

state additionally the approximate dates it was lost, discarded, or destroyed,

and the identity of each person having knowledge of the contents thereof;

    c.   When used in reference to a business entity, the structure of the business (i.e.,

corporation, partnership, sole proprietorship, etc.), a brief description of the

nature of the business, and the business address and telephone number; and

    d.   When used in reference to a Subject Property, the name of the Subject

Property and the full address.

5.    The phrase "RELATE TO" shall be deemed to include: contain, allude to, respond to, comment on, discuss, show, disclose, explain, mention, refer to, analyze, constitute, comprise, evidence, set forth, summarize, characterize, either directly or indirectly, in whole or in part.

6.    The phrase "FAIR HOUSING ACT" means the Fair Housing Act Amendment of 1988, 42 U.S.C. §§ 3601-3619.

7.    The phrase "AMERICANS WITH DISABILITIES ACT" means the Americans with Disabilities Act of 1990, 42 U.S.C. §§ 12101 *et seq.*

8.    The term "PERSON" means any natural person, group of natural persons, corporation, partnership, government agency or board, association, proprietorship, organization, or any other legal entity.

9.    The term "SUBJECT PROPERTIES" means the list of Subject Properties attached to PLAINTIFF's Complaint.

## TOPICS

1.      ERC's storage and retention of electronic information, including but not limited to
e-mails, pdf files, text files, images, calendar files, databases, spreadsheets, audio files,
animation, websites, and computer programs.

2.      ERC's search for responsive documents, including but not limited to, a detailed
description of how ERC's electronic data was sought, located, secured, and searched in response
to Post's document requests.

3.      ERC's communications and correspondence with the United States Department of
Housing and Urban Development ("HUD"), including but not limited to, ERC's applications for
HUD grant funding and all attachments, ERC's reports based on approved grants and all
attachments, ERC's communications with HUD related to denied grant applications, and any
other communications with HUD related to accessible design and construction.   ERC's
designated witness should be prepared to discuss the drafting, content, and outcome of each of
ERC's communications and correspondences with HUD.

4.      The terms of ERC's contracts with third parties for ERC's performance of
services.

5.      ERC's damages calculation, including but not limited to, a detailed description of
activities and services ERC was unable to perform because of Post's alleged discrimination, a
detailed description of ERC's financial documents showing a diversion of resources from areas
related to ERC's counseling, referral, education, and outreach activities to areas related to
identifying and counteracting Post's alleged discrimination, and a detailed description of how
ERC's mission was frustrated and ERC's activities and services in Georgia, North Carolina,
Texas, Florida, Arizona, Colorado, and New York.

4

6.    The identification and authentication of each document produced by ERC in response to Post's First and Second Requests for Production of Documents, including but not limited to ERC's testing materials, training materials, and financial records, as well as all documents produced at depositions of ERC witnesses and any additional documents yet to be produced.

Respectfully submitted,

HOLLAND & KNIGHT LLP

Christopher B. Hanback (Bar # 232579)
Lynn E. Calkins (Bar # 445854)
Rafe Petersen (Bar # 465542)
Elizabeth Phelps (Bar # 502026)
2099 Pennsylvania Avenue, N.W.
Suite 100
Washington, D.C. 20006
(202) 955 3000 Phone
(202) 955 5564 Fax
E-mail: christopher.hanback@hklaw.com
E-mail: lynn.calkins@hklaw.com
E-mail: rafe.petersen@hklaw.com
E-mail: libby.phelps@hklaw.com

*Counsel for Post Properties, Inc., et al.*

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing was served via e-mail and first-class certified mail, postage prepaid, this 14th day of April, 2008, on the following:

Alyssa C. Lareau, Esq.
Fried, Frank, Harris, Shriver & Jacobson, LLP
1001 Pennsylvania Avenue, NW
Suite 800
Washington, DC 20004


Elizabeth Phelps

# 5259095_v1

6